KENNADAY LEAVITT PC
CURTIS S. LEAVITT (SBN 162032)
cleavitt@kennadayleavitt.com
621 Capitol Mall, Suite 2500
Sacramento, California 95814
Telephone:     (916) 732-3060

Attorneys for Plaintiffs,
MONTEREY PENINSULA
HORTICULTURE, INC. dba ROCKET
FARMS and MONTEREY PENINSULA
HORTICULTURE, INC. / STEVEN
ROBERTS ORIGINAL DESSERTS, LLC,
EMPLOYEE BENEFIT PLAN

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

| | |
|---|---|
| MONTEREY PENINSULA HORTICULTURE, INC. dba ROCKET FARMS and MONTEREY PENINSULA HORTICULTURE, INC. / STEVEN ROBERTS ORIGINAL DESSERTS, LLC, EMPLOYEE BENEFIT PLAN,<br><br>Plaintiffs,<br><br>v.<br><br>EMPLOYEE BENEFIT MANAGEMENT SERVICES, INC.,<br><br>Defendant. | Case No.<br><br>**COMPLAINT** |

Plaintiffs, MONTEREY PENINSULA HORTICULTURE, INC. dba ROCKET FARMS ("MPH"), for itself and as fiduciary of the MONTEREY PENINSULA HORTICULTURE, INC. / STEVEN ROBERTS ORIGINAL DESSERTS, LLC, EMPLOYEE BENEFIT PLAN (the "Plan"), files this Complaint against Defendant, EMPLOYEE BENEFIT MANAGEMENT SERVICES, INC. ("EBMS"), for breach of contract, breach of fiduciary duty, misrepresentation and indemnification.

## JURISDICTION AND VENUE

1. Jurisdiction is proper in this Court under 28 U.S.C. sections 1331, 1332 and 1367. Federal questions exist under 28 U.S.C. section 1331 because MPH alleges a claim under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(e)(1) for breach of

1. fiduciary duty. Diversity jurisdiction exists under 28 U.S.C. section 1332 because this case is between citizens of different states and the amount in controversy exceeds $75,000. EBMS is domiciled in Billings, Montana. MPH is domiciled in Salinas, California. Supplemental jurisdiction exists under 28 U.S.C. section 1367 because MPH's claims are based on, arise from, and are factually interrelated with the ERISA violation.

2. This Court has personal jurisdiction over the parties because Defendant systematically and continuously conducts business in this State, and otherwise has minimum contacts with this State sufficient to establish personal jurisdiction over each of them.

3. Venue is proper in the San Jose Division of the United States District Court for the Northern District of California under 28 U.S.C. sections 1391(b) and (c), and 29 U.S.C. section 1132(e)(2). This judicial district is the appropriate venue under 28 U.S.C. sections 1391(b) and (c) because this district is where the acts, omissions and events giving rise to MPH's claims occurred, and where EBMS conducts business. This judicial district is the appropriate venue under 29 U.S.C. section 1132(e)(2) because this district is where the Plan was administered and where the breaches occurred that caused loss and damage to MPH.

**THE PARTIES**

4. Plaintiff MPH is a California farming corporation with business operations in Half Moon Bay, Salinas, and Thermal, California. MPH is the farmer, grower and wholesaler of potted and cut flowers, edible herbs, and succulents. A labor-intensive business, in 2014 MPH employed 350 full-time workers when it implemented a self-funded health benefit program for its employees and their dependents. MPH was the sponsor and plan fiduciary of the Plan under ERISA sections 3(21)(A)(i) and (iii). The self-funded plan operated as a Referenced Based Reimbursement ("RBR") program.

5. Defendant EBMS is a Montana corporation with a national presence. EBMS' principle place of business at 1075 Overland Ave., Billings, MT. EBMS conducts business in California and is a third-party administrator providing administrative services, including plan design, medical bill review, and claims administrative services, to self-funded plans. In 2014, MPH hired EBMS to be the third-party administrator of its RBR Plan. Pursuant to the terms of the parties' contracts, EBMS would

provide claims and eligibility administration, first level provider appeal review, compliance audit and support, and preparation of the MPH Plan Document. Specifically, EBMS determined what healthcare providers would be paid by the Plan, and in what amount. EBMS received compensation from MPH and/or the Plan for services provided to MPH and the Plan. EBMS was a fiduciary of the Plan under ERISA section 3(21)(A)(i) and (iii) with regard to the design and terms of the Plan document, including the cost saving mechanism for claims processing and first level provider appeals review. Because EBMS failed in its fiduciary and/or contractual obligations, MPH has been sued on multiple occasions by multiple hospitals, including Salinas Valley Memorial Hospital ("SVMH"). MPH has settled all lawsuits and now seeks indemnification from EBMS for the loses caused by EBMS' breach of contract, breach of fiduciary duty, and misrepresentations made to healthcare providers regarding the eligibility and benefits available under the RBR Plan.

**FACTUAL ALLEGATIONS**

**A.     EBMS Responds to MPH's Request for Proposal.**

6.     In or about April 2014, MPH's insurance broker, Alliant Employee Benefits, released a Request for Proposal ("RFP"). The RFP stated that MPH wished "to establish an ACA compliant benefits program by July 1, 2014, while still being affordable to" MPH and its employees. EBMS' Regional Sales Manager, Jeff Brown, responded to the RFP with a Health Plan Management Proposal. The proposal represented that EBMS was "one of the nation's premier industry leaders in health risk management and third-party administration of self-funded health benefit plans." The proposal promised that MPH would "be up-to-date on the Affordable Care Act" because EBMS has "on staff compliance expertise," and that EBMS' compliance experts would keep MPH "compliant and assist them in making the best choices for their employees." The proposal offered EBMS' services for a monthly payment of $24.75 per employee per month. With 350 employees, EBMS would realize in excess of $100,000 per year from MPH for providing administrative services to the plan.

7.     The $24.75 per employee "Health Plan Management Fee" would cover, among other services: "claims administration," "audit compliance [and] compliance support," "plan document review and amendments," "eligibility administration" and "dedicated EBMS team members." EBMS

KENNADAY LEAVITT PC
ATTORNEYS AT LAW
621 CAPITOL MALL | SUITE 2500
SACRAMENTO, CA 95814

told MPH that it had onsite staff experts who could prepare ERISA and ACA compliant plan documents. EBMS told MPH that it had a dedicated plan document drafting department and would prepare MPH's draft plan documents. EBMS stressed its national presence as an industry leader in administering self-funded health benefit plans. Finally, because EBMS knew MPH lacked knowledge and experience in creating and operating an ACA compliant RBR plan, EBMS assured MPH that EBMS' experience, knowhow, and ACA "compliance expertise" would ensure that MPH's self-funded plan could save money while being fully compliant with ERISA and the ACA.

8. As part of MPH's decision to switch to a self-funded health benefit plan, EBMS presented the self-funded plan as a cost-savings mechanism that provided full healthcare coverage to MPH's employees and their dependents. EBMS and its agents also presented a Claim Review and Validation Program and the RBR program to MPH and the Plan. EBMS represented to MPH and the Plan that their self-funded plan was the type of RBR program that was accepted, and would enable MPH to reduce its costs for providing health coverage to MPH employees and their dependents.

9. When the self-funded plan, the Claim Review and Validation Program, and RBR Program were presented to MPH, EBMS represented that it was knowledgeable in self-funded plans, claim review and validation, and RBR and pricing programs. MPH relied on those representations when it executed the administrative services agreement and changed from a fully insured health benefit plan to a self-funded plan. EBMS was in a position of trust and confidence with regard to MPH. EBMS rendered compliance advice to MPH concerning the Plan, and represented to MPH that changing to a self-funded plan would help manage health benefit costs. MPH relied upon the advice of EBMS and adopted the self-funded plan, and implemented the Claim Review and Validation Program, and the RBR program under the self-funded plan. MPH paid EBMS hundreds-of-thousands-of-dollars for EBMS' advice and services.

10. The Parties executed two contracts in order to effectuate the services provided by EBMS to MPH, MPH's employees, and the Plan. Both contracts were signed by EBMS' president, Kevin Larson. The two contracts, as well as, MPH's RBR plan became effective on July 1, 2014. MPH was the plan sponsor. MPH's employees and employees' dependents participated in the Plan. The Plan was self-funded by MPH through employer and participant contributions. It was an

employee benefit plan within the meaning of ERISA section 3(1), and was subject to Title I of ERISA and its fiduciary standards. The Plan insured MPH's employees and employees' dependents against losses arising from their medical care. From July 1, 2014 through June 30, 2017, MPH was financially responsible for covered healthcare services obtained by MPH employees and their eligible dependents. EBMS was the plan administrator for the full three-year period.

**B.     The Parties' Execute the Administrative Services Agreement.**

11.    The first contract was EBMS' template Administrative Services Agreement (the "ASA"). The ASA, among other services, required EBMS to "assist in the preparation and printing of a Plan Document, summaries of benefits, identification cards, and other material necessary to the operation of the Plan." (ASA section 2.01(a)). EBMS was also obligated to "process and adjudicate all claims presented for payment in accordance with the Plan Document." (ASA section 2.01(b)). And the ASA required EBMS to "cooperate with the Plan Sponsor [MPH] in the defense of any action arising out of matters related to this Agreement." (ASA section 2.03). EBMS breached the ASA when it did not fulfill its contractual obligations pursuant to sections 2.01(a) and (b), as well as section 2.03.

12.    The Plan Document is the single most important document in a self-funded ERISA plan. It describes the benefits and exclusions available under the Plan, as well as the process for how healthcare provider claims are adjudicated and paid. Accordingly, the Department of Labor has enacted several Federal Regulations to ensure that Plan Documents properly advise Plan beneficiaries of their rights and obligations. The plan document prepared by EBMS for MPH (pursuant to ASA section 2.01(a)) did not comply with the Federal Regulation requirements adopted by the Department of Labor for self-funded plans.

13.    The ASA required EBMS to process and pay provider claims in accordance with the terms of the Plan Document. Here, the Plan Document required payment to providers to be a maximum of 140% or 150% of the Medicare allowable, depending on whether the employee had the silver or gold plan. Instead, EBMS routinely misrepresented to providers who sought eligibility and benefit information that payment under the MPH plan would pay 70% of the provider's full billed charges.

14.    The ASA required EBMS to cooperate with MPH in the defense of any action arising

out of matters related to this Agreement. Here, EBMS refused to provide necessary and relevant information, documents, and/or other evidence that MPH needed and required to successfully defend against the lawsuits filed by healthcare providers. For example, EBMS stated on several occasions that it had recordings of the phone conversations between providers and EBMS when the provider called to seek eligibility and benefits under the MPH plan. But EBMS has never produced any such recordings. Instead, EBMS witnesses testified that EBMS told healthcare providers that payment would be 80% of the providers' billed charges, instead of the 140% or 150% of the Medicare allowable amount provided in the Plan Documents. These misrepresentations and unwillingness to cooperate with MPH in defense of the lawsuits filed against MPH forced MPH to settle the lawsuits in order to avoid financial ruin.

15. In exchange for EBMS' promise to perform the services required under the ASA, MPH paid EBMS a "Benefit Management Global Fee" of $24.75 per employee per month. EBMS' president, Mr. Larson confirmed that the $24.75 "Benefit Management Global Fee" included: claims and eligibility administration; audit compliance and compliance support; vendor management; and Plan Document review. And Mr. Larson confirmed that these services were provided by the "dedicated EBMS team members." The evidence uncovered through various lawsuits brought by providers against MPH revealed that Mr. Larson was mistaken.

16. Section 9.02 of the ASA required EBMS to indemnify MPH against loses resulting from EBMS' negligence in the administration of the ASA, and the indemnification provision includes all forms of alternative dispute resolution and litigation. Section 9.02 provides in relevant part:

> The Contract Administrator [EBMS] shall indemnify and hold harmless the Plan Sponsor [MPH] against any expense, loss, lawsuit, settlement, costs, penalty, damage, liability, claim or judgment, including reasonable attorneys' fees, resulting from the negligent acts or omissions or willful misconduct of the Contract Administrator. … The provisions of this section shall apply to arbitration and all forms of alternative dispute resolution as well as litigation. These indemnifications shall survive the termination of this Agreement.

17. Through this lawsuit, MPH seeks indemnification from EBMS for the losses incurred as a result of EBMS' failure to provide services under the ASA.

///

**C.     The Parties Execute the Claims Delegate Service Agreement.**

18.     MPH and EBMS entered into a second contract—The Claims Delegate Service Agreement—that carved out certain administrative services and delegated those services to a third company, Claims Delegate Services ("CDS"). The CDS Agreement also modified the obligations required by EBMS pursuant to the ASA Agreement. Here, the CDS Agreement states in its introduction that MPH and EBMS "want to modify [EBMS'] services to support" the implementation of an RBR plan, and that EBMS is "willing to undertake such engagement and provide such services on the terms and conditions set forth in this Agreement." Though the CDS Agreement is clear, Mr. Larson testified that this agreement did not alter or change EBMS' contractual obligations under the ASA. On this point, Mr. Larson is wrong. Mr. Larson signed the CDS Agreement, and the CDS Agreement states its intent "to modify" EBMS' "services to support" implementing and administering MPH's RBR program. While Mr. Larson refuses to accept that the CDS Agreement modified EBMS' contractual obligations, the language of the CDS Agreement indicates otherwise. MPH relied on the terms, conditions, and express terms contained in the CDS Agreement when dealing with EBMS and its administration of the MPH plan. MPH had no idea that EBMS believed that the CDS Agreement did not modify EBMS' obligations in any way. EBMS never communicated this fact to MPH.

19.     The CDS Agreement modified EBMS' contractual obligations in several ways. First, EBMS agreed to provide CDS "a current copy and all prior amendments to the Plan Document." (CDS Agreement, p. 3, Document Review and Recommendations.) EBMS agreed to use its "best efforts to cause the New Plan Document to be finalized, formally adopted and fully executed within 20 days." (CDS Agreement, p. 6, New Plan Document.) Second, EBMS agreed to be responsible to "process all Hospital and Facility Claims in accordance with the New Plan Document and Applicable Law." (CDS Agreement, p. 6, Processing and Payment.) EBMS promised to "process all Hospital and Facility Claim Appeals, and be responsible for making benefit determinations on first Appeals and sending out required notices regarding such determinations." (CDS Agreement, p. 6, Processing and Payment.) Finally, EBMS agreed that "in processing claims and appeals" it would "comply with all requirements of the New Plan Document and Applicable Law." (CDS Agreement, p. 6, Processing and Payment.) Consistent with the terms of the CDS Agreement and EBMS' promises under that

agreement, the New Plan Document provides in relevant part:

> The first level of review will be performed by the Claims Administrator [EBMS] on the Plan's behalf. The Claims Administrator [EBMS] will review the information initially received and any additional information provided by the Claimant, and determine if the Initial Benefit Determination was appropriate based upon the terms and conditions of the Plan and other relevant information.

20. At no time did MPH know that EBMS was not performing its obligations as agreed to in the CDS Agreement. EBMS never indicated or stated to MPH that it was not performing the first level review of provider appeals. As such, EBMS breached the CDS Agreement when it did not review any first level appeals on MPH's behalf. For example, EBMS never reviewed the information initially received or any additional information provided by Salinas Valley Memorial Hospital when it appealed to EBMS for additional payment on underpaid claims. That EBMS *never* reviewed any provider appeals was confirmed by EBMS' President, Mr. Larson, and EBMS' Claims Supervisor, Ms. Tara Keehnm who testified that EBMS never reviewed any of Salinas Valley Hospital's appeals.

21. The CDS Agreement contains an indemnification provision that provides in relevant part:

> Each Party (the "Responsible Party") agrees to reimburse, indemnify, defend and hold harmless each of the other Parties … from and against any liability, damages, losses, costs and expenses (including reasonable attorneys' fees) incurred by any of them, or any claim, demand, charge, action, cause of action or other proceeding asserted by a third party against any of them, as a result of, arising out of, or based upon an uncured material breach of any covenant, agreement, representation or warranty made in this Agreement by the Responsible Party.

Through this lawsuit, MPH seeks indemnification from EBMS for the losses incurred as a result of EBMS' failure to provide services pursuant to the terms of the CDS Agreement.

**D.   EBMS Breaches the ASA and CDS Agreement by: (1) Failing to Provide ERISA Compliant Documents; (2) Failing to Administer the MPH Plan in Accordance with the Terms of the Plan Document; (3) Misrepresenting to Providers the Benefits Available Under the Plan; and (4) Not Providing the First Level Review of Provider Appeals.**

22. The operative Plan document, the Summary Plan Description ("SPD"), stated that EBMS was the Claims Administrator for the MPH Plan. The ASA listed EBMS' duties and

responsibilities as the Claim Administrator. These duties and responsibilities included, but were not limited to, preparing an ERISA complaint plan and SPD, processing and adjudicating all claims, reviewing and responding to appeals regarding benefit determinations, facilitating reviews by independent review organizations, and answering medical benefit and claim questions. Additionally, pursuant to the terms of the CDS Agreement, EBMS' was charged with processing "all hospital and facility claim appeals," and was "responsible for making benefit determinations on first Appeals and sending out required notices regarding such determinations." EBMS did not perform its contractual duties as required by the ASA and CDS Agreements.

23. First, the SPD prepared by and then modified by EBMS, violates federal law. Testimony from EBMS confirmed that the SPD provided to MPH was based on an EBMS template document. The SPD's Claim Review and Validation Program and RBR Program shifted healthcare costs to participants and violated the Affordable Care Act ("ACA") mandates, including the "minimum value" provision to participants from the Plan and rendering the Plan unaffordable. Additionally, the Claims Review and Validation Program and Plan Limitations violate ERISA, including the disclosure rules.

24. Second, EBMS did not administer the Plan in accordance with the SPD. EBMS discounted virtually all substantive medical claims submitted to the Plan by healthcare providers in a similar fashion for claims incurred or presented in the 2014 and 2017 time period. For example, the SPD, which is the governing Plan document, required payment of benefits at what was known as the "Allowable Charge." Determination of the Allowable Charge required consideration of numerous factors, which are reproduced here for convenience:

> **Allowable Charge** means the charge for a treatment, service, or supply that is the lesser of: (i) the charge made by the provider that furnished the care, service, or supply; (ii) the negotiated amount established by a provider network arrangement or other discounting or negotiation arrangement; (iii) the reasonable and customary charge for the same treatment, service, or supply furnished in the same geographic area by a provider of like service as further described below; or (iv) an amount equivalent to the following:
>
> - For specialty drugs, the lesser of average wholesale price (AWP) minus 10% or the amount set by the Plan's prescription drug service vendor;

- For inpatient or outpatient facility claims, an amount equivalent to 200% of the Medicare equivalent allowable.

> The reasonable and customary charge shall mean an amount equivalent to the **85th percentile** of a commercially available database, or such other cost or quality-based reimbursement methodologies as may be available and adopted by the Plan. If there are insufficient charges submitted for a given procedure, the Plan will determine an Allowable Charge based upon charges made for similar services. Determination of the reasonable and customary charge will consider the nature and severity of the condition being treated, medical complications or unusual circumstances that require more time, skill or experience, and the cost and quality data for that provider.
>
> For Covered Charges rendered by a Physician, Hospital or Ancillary Provider in a geographic area where applicable law dictates the maximum amount that can be billed by the rendering provider, the Allowable Charge shall mean the amount established by applicable law for that Covered Charges.
>
> The Plan Administrator or its designee has the ***ultimate discretionary authority*** to determine an Allowable Charge, including establishing the negotiated terms of a provider arrangement (including a PPO agreement if applicable) as the Allowable Charge even if such negotiated terms do not satisfy the lesser of test described above.

25. In processing claims, EBMS *ignored* the definition of Allowable Charge. Indeed, EBMS testified that it did not calculate payment levels at all, lacked the ability to calculate such payment levels, and instead delegated the task entirely—without informing Rocket Farms—to another entity. Instead of processing claims based on the definition of the Allowable Charge, claims were processed relying on a separate set of plan provisions buried in the back of the SPD which set a different (and much lower) level of payment for hospitals known as the "Permitted Payment Level." The Permitted Payment Level is based, in part, on 140% or 150% of Medicare rates, which is a form of "referenced based pricing." The inclusion of the Permitted Payment Level language in the SPD was incomplete, and done in a manner that obscured the true nature of the restrictive provision.

26. The Ninth Circuit routinely holds that such restrictive plan provisions when not adequately disclosed in the SPD and other plan summaries, violates ERISA and cannot be enforced. (*See, e.g., Spinedex Physical Therapy USA Inc., v. United Healthcare of Ariz., Inc.* 770 F.3d 1282, 1296 (9th Cir. 2014) (invalidating one-year limitation on filing suit because it was a restrictive

-10-

COMPLAINT

00194929.2

provision that was not disclosed in compliance with ERISA requirements set forth at 29 U.S.C. § 1022(b) and 29 C.F.R. § 2520.102-2(b)); *King v. Blue Cross & Blue Shield of Ill.*, 871 F.3d 730, 744 (9th Cir. 2017) (holding lifetime maximum on benefits unenforceable, based on the same principles, where disclosure was not "calculated to be understood by the average plan participant" (citing 29 U.S.C. § 1022(a)).

27. Here, the Permitted Payment Level provisions were not adequately disclosed to plan participants or beneficiaries. The Schedule of Benefits at the front of the SPD refers only to the Allowable Charge (and a related limitation on payment, known as Covered Charges). The SPD neglects to explain, however, that benefits can and will be capped at a *much lower* Permitted Payment Level of 140% or 150% of Medicare. Likewise, the Plan's Summary of Benefits and Coverage ("SBC") – which the Affordable Care Act required the Plan to issue each year – fails to disclose that hospital benefits will be limited to 140% or 150% of Medicare rates. (Attached as **Exhibit 1** is a representative SBC, from plan year 2015.) This failure to disclose would have been "critical" to beneficiaries and participants "who could have obtained health insurance to cover the cost of [their] medical care" elsewhere, without being subject to the substantial out-of-pocket liabilities for their own health insurance resulting from. (*See King*, 871 F.3d at 744.)

28. Third, EBMS made misrepresentations to healthcare providers regarding the plan benefit levels available to Plan participants. EBMS routinely communicated benefits to healthcare providers that exceeded the actual Plan benefits contained in the SPD. Specifically, EBMS made misrepresentations to healthcare providers that the Plan would cover 70% of the medical bills, up to $21,666, after which the Plan would cover 100% of the provider's full billed charges. EBMS also made misrepresentations to healthcare providers that the Plan had a maximum out-of-pocket limit of $6,350 for all services without limitation. Moreover, EBMS knew it was MPH's agent when it incorrectly quoted Plan benefit levels to providers. Thus, EBMS created significant liability for MPH based on its misrepresentations, and these misrepresentations were a significant reason why MPH was forced to settle the outstanding litigation brought by healthcare providers against MPH.

29. EBMS' corporate designee on this issue, Stacey Crossley, testified that she knew EBMS was acting as MPH's agent when verifying Plan benefits to healthcare providers on the phone.

Ms. Crossley admitted that the statements alleged (for instance, that benefits would be paid at 70%, up to $21,667, and then at 100%) were made on MPH's behalf, and within the scope of authority delegated by MPH to EBMS under the ASA and CDS Agreement:

```
Q. Would you expect other entities besides EBMS to
provide verification of benefits given that EBMS was
doing it for the plan?

A. No.

Q. Why was EBMS providing this service for Rocket
Farms?

A. We were the chosen administrator.

Q. Okay. Are you aware that there was a contract in
place between EBMS and Rocket Farms under which EBMS
provided these administration services?

A. I'm aware, because they were one of our clients.

Q. Okay. Have you reviewed that contract?

A. No.

Q. When you were providing these benefit quotes to
providers over the phone, and when I say "you," I
mean EBMS and the CSR's that are under you, you were
doing that on behalf of Rocket Farms, right?

A. Correct. Yes.

Q. And that was something that Rocket Farms had
contracted with EBMS for you to do, correct?

A. Correct.
```

(Crossley Depo. Tr. 59:22 – 61:16.) Following Ms. Crossley's deposition, there was no doubt that the misrepresentations about benefits were imputed to MPH.

30. Ms. Crossley's testimony also confirmed that the statements about benefits that were made on MPH's behalf explicitly referred to billed charges. (Crossley Depo Tr. 74:19-75:23; ["Yes, they do reference billed charge[s] on their phone calls . . . We don't know what the billed charge[s] are going to be . . . So when they say 70 percent up to the allowable, based on billed charges."].) Ms. Crossley was head of client services (e.g., the call center team) during the three-year period that EBMS was MPH's plan administrator. Thus, to the extent that EBMS' call center team should have been informing providers that payment would be based on 140% of Medicare rates, and not on the

00194929.2                              -12-

70% - 100% of billed charges that were quoted to the providers who called to confirm benefits over the phone, there can be no doubt that the statements made were misleading.

31.  Fourth, the RBR Program, when applied to the Plan's design, guaranteed MPH's employees and employees' dependents would be subject to balance billing from healthcare providers for emergencies and other hospital services, supplies or procedures.

32.  Operationally, EBMS acted with complete discretion and authority as to the disbursement of Plan assets on all healthcare provider claims. EBMS exercised complete authority and control over Plan assets by determining what payment would be made out of Plan assets, to whom such payments would be made, and in what amounts. MPH approved aggregate funding requests, but did not determine any individual claim or vendor payment amounts.

33.  EBMS did not disclose to MPH or the Plan the full nature and scope of EBMS' business methodologies with regard to services EBMS rendered to the Plan, although EBMS had a legal duty to do so. Further, EBMS did not disclose to Plan participants the nature and scope of their liability to healthcare providers, although EBMS had a legal duty to do so.

34.  EBMS represented to MPH that the self-funded plan would protect participants against healthcare provider "balance billing." EBMS failed to disclose to Plan participants the nature, scope, and amount of monetary liability they would owe to healthcare providers as a result of the Claim Review and Validation Program and RBR Program.

35.  The SPD by its term and as administered by EBMS, operationally deceived MPH, the Plan and MPH's employees and employee beneficiaries into believing EBMS was achieving savings in claims paid by the Plan when no savings were actually realized or could ever possibly be realized.

**E.     Healthcare Providers Sue MPH and the Plan for Plan Benefits.**

36.  As a result of EBMS' failure to provide services as required by the ASA, the CDS Agreement, and the Plan documents, provider appeals were not properly adjudicated and benefits determinations were not properly decided. Healthcare providers began suing MPH and the Plan to recover monies on alleged underpaid services. See *Salinas Valley Memorial Healthcare System v. MPH Peninsula Horticulture, Inc. d/b/a Rocket Farms, et al.,* Case No. 5:17-cv-7076-VKD, United States District Court, Northern District of California, San Jose Division, and *Long Beach Memorial*

*Medical Center v. MPH Peninsula Horticulture, Inc.*, *et al.*, Case No. BC711222, Superior Court of the State of California, County of Los Angeles. The healthcare providers' lawsuits allege, among other allegations, that MPH and the Plan underpaid the healthcare providers according to the rates established in the SPD and according to representations made by EBMS to the providers.

37. EBMS' breach of the ASA and CDS Agreement forced MPH to expend significant time and resources in identifying, disputing, appealing and negotiating allegedly underpaid claims. to date, MPH has settled two lawsuits for payments in excess of $750,000 and paid legal fees to defend against the lawsuits in excess of $350,000. MPH and the Plan have suffered, and continue to suffer, monetary damages due to the actions and omissions of EBMS.

**F.     Any Applicable Statute of Limitations was Tolled.**

38. Plaintiffs initially filed their complaint against Defendants on or about January 18, 2019. (*See,* Civil Action No. 5:17-cv-07076-SVK.) Defendants thereafter successfully moved to dismiss the complaint without prejudice pending resolution of the parties' contractual mediation requirement. Defendants thereafter unreasonably delayed the mediation until December 2019. In December 2019, the parties met in Billings, Montana before mediator Richard Mainland. Though that effort did not reach a meaningful result, the parties continued the mediation process thereafter both with the aid of Mr. Mainland and directly between the parties up to and including the date of the filing of this complaint.

**FIRST CAUSE OF ACTION**
**(Breach of Fiduciary Duty)**

39. All of the factual allegations set forth above in paragraphs 1 through 38 are incorporated by reference as though set forth herein.

40. "Fiduciary status under ERISA is a functional concept, and if Defendants have acted like a fiduciary, they may have incurred fiduciary obligations." *Walsh v. Principal Life Ins. Co.*, 266 F.R.D. 232, 241 (S.D. IA 2010). In other words, ERISA imposes fiduciary obligations on individuals who are not named as fiduciaries, but nevertheless exercise actual authority over plan assets. Furthermore, the Eighth Circuit has stated that "courts should construe the term fiduciary broadly under ERISA, and in favor of finding that a fiduciary duty exists." *Id.* at 241; *Olson v. E.F. Hutton &*

*Co., Inc.*, 957 F.2d 622, 625 (8th Cir. 1992).

41. EBMS is a fiduciary because EBMS exercises authority over Plan assets. Although EBMS is not a named fiduciary under the SPD or related contracts, EBMS is a fiduciary of the Plan within the meaning of ERISA section 3(21)(A)(i) and (iii) because EBMS had authority over Plan assets; exercised discretion regarding the drafting, design and terms of the SPD; and exercised discretion regarding the adjudication of first level provider appeals.

42. A fiduciary has a duty to perform its obligations and responsibilities under the Plan prudently, in the best interest of the participants and beneficiaries, and in accordance with the terms of the Plan document. 29 U.S.C. § 1104(a)(1). As part of its fiduciary duty, EBMS had the legal duty to provide full, fair and prompt disclosure to MPH of all facts within its knowledge which were or could have been material to matters within EBMS' relationship with MPH. The facts show EBMS breached this legal duty. Specific examples are shown by the following actions and/or omissions:

    a. Drafting an SPD which violated federal law, including, but not limited to: (1) the ACA mandates, including the "minimum value" provision and rendering the Plan unaffordable, and (2) ERISA, including the disclosure requirements for plan subjects;

    b. Drafting an illusory SPD which shifted the risk for losses to MPH and MPH's employees and employees' dependents;

    c. Failing to consider the detailed factors set forth in the definition of Allowable Charge indicates that EBMS abused any discretion they were given under the Plan. (*See generally, Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 971 (9th Cir. 2006) ["[w]hen an administrator engages in wholesale and flagrant violations of the procedural requirements of ERISA, and thus acts in utter disregard of the underlying purpose of the plan as well, we review de novo the administrator's decision to deny benefits."].)

    d. Failing to act in the best interest of MPH, the Plan, MPH's employees, and employees' dependents by exposing MPH and MPH's employees and employees' dependents to collection activities from providers;

    e. Failing to disclose to MPH, the Plan, and MPH's employees and employees' dependents the nature and scope of their liability for claims left unpaid by the self-funded plan, the

Claim Review and Validation Program, and the RBR Program, and then exposing them to that liability for unpaid claims;

      f.      Failing to administer the Plan according to the SPD and discounting all medical claims paid;

      g.      Failing to correctly communicate the Plan's benefits to healthcare providers and making false representations about the Plan's benefits to healthcare providers. For example, EBMS made misrepresentations to Salinas Valley Hospital that the Plan would cover 70% of a patient's medical bills, up to $21,666, after which the Plan would cover 100% of the hospital's billed charges; and

      h.      Or otherwise as alleged above.

43. EBMS further breached its fiduciary duty by misrepresenting to MPH that the self-funded plan, Claim Review and Validation Program, and RBR Program would result in savings to MPH and the Plan. These representations were made in order to induce MPH to create a self-funded plan administered by EBMS. These misrepresentations were material because without them, MPH would not have signed the ASA with EBMS, and the CDS Agreement with EBMS and CDS. As a result of MPH reliance on EBMS' misrepresentations, MPH and the Plan were damaged.

44. In taking these and other actions, EBMS failed to act in a manner which was solely in the interest of MPH, the Plan, and MPH's employees and employees' dependents who participated in the Plan or to act with the care, skill, prudence, and diligence under the circumstances that a prudent person acting in a like capacity would use.

45. EBMS is liable under ERISA section 409 to make good any losses incurred by the Plan as a result of EBMS' breach, to restore any personal profits it received, and for such other equitable or remedial relief as the court may deem appropriate.

46. As a result of EBMS' breach of fiduciary duties, MPH and the Plan suffered damages in excess of $1,000,000.

///

///

///

**SECOND CAUSE OF ACTION**
**(Breach of Written Contract)**

47.  All of the factual allegations set forth in paragraphs 1 through 46 above are incorporated by reference as though set forth herein.

48.  MPH entered into a service agreement with EBMS in 2014. The service agreement required MPH to pay EBMS a fee. MPH paid the fee to EBMS. (Attached as **Exhibit 2** is a true and correct copy of the ASA.) In exchange for the fee, the service agreement required EBMS to perform certain services for MPH and the Plan. The services relevant to this lawsuit that were listed in the agreement were:

> The Contract Administrator agrees to perform the following administrative services for the Plan Sponsor:
>
> (a)  Assist in the preparation and printing of a Plan Document, summaries of benefits, identification cards, and other material necessary to the operation of the Plan;
>
> (b)  Process and adjudicate all claims presented for payment in accordance with the Plan Document, including but not limited to reasonable investigatory work in determining claim eligibility, and preparing and distributing benefit checks, and Explanation of Benefits to Plan Members and/or service providers, as applicable.

49.  MPH entered into the Claims Delegate Service Agreement with EBMS in 2014. (Attached as **Exhibit 3** is a true and correct copy of the CDS Agreement.) The CDS Agreement required EBMS to process all hospital and facility claim appeals, and required EBMS to be responsible for making benefit determinations on first appeals and sending out required notices regarding such determinations. EBMS agreed to make these determinations according to the "requirements of the New Plan Document and Applicable law."

50.  EBMS breached both the ASA and CDS Agreements by failing to perform the contractual services, as well as other provisions in the two contracts with MPH. For example, EBMS failed to draft ERISA compliant plan documents; misrepresented plan benefits to providers; and failed to perform the first level appeals, or make those appeal determinations in accordance with the requirements of the Plan documents and applicable law.

51.  The ASA requires mediation before any party can pursue civil litigation. MPH attended a mediation in Billings, Montana, in December 2019. EBMS was also present. MPH has

completed all conditions precedent necessary before filing this lawsuit.

52. As a result of EBMS' breach, MPH and the Plan suffered damages in excess of $1,000,000.

### THIRD CAUSE OF ACTION
(Indemnification)

53. All of the factual allegations set forth in paragraphs 1 through 52 above are incorporated by reference as though set forth herein.

54. Both the ASA and the CDS Agreement contain express indemnification provisions. The ASA states:

> The Contract Administrator [EBMS] shall indemnify and hold harmless the Plan Sponsor [MPH] against any expense, loss, lawsuit, settlement, costs, penalty, damage, liability, claim or judgment, including reasonable attorneys' fees, resulting from the negligent acts or omissions or willful misconduct of the Contract Administrator. … The provisions of this section shall apply to arbitration and all forms of alternative dispute resolution as well as litigation. These indemnifications shall survive the termination of this Agreement.

The CDS Agreement contains an indemnification provision that provides in relevant part:

> Each Party (the "Responsible Party") agrees to reimburse, indemnify, defend and hold harmless each of the other Parties … from and against any liability, damages, losses, costs and expenses (including reasonable attorneys' fees) incurred by any of them, or any claim, demand, charge, action, cause of action or other proceeding asserted by a third party against any of them, as a result of, arising out of, or based upon an uncured material breach of any covenant, agreement, representation or warranty made in this Agreement by the Responsible Party.

55. MPH has paid in excess of $1,000,000 to healthcare providers and attorneys as a direct result of EBMS not performing its contractual duties as required under both the ASA and CDS Agreement. These payments were made to Long Beach Memorial Medical Center, and Salinas Valley Memorial Healthcare System. MPH has also paid its attorneys significant sums in order to defend against the lawsuits. Pursuant to the provisions of the parties' indemnification provisions, MPH now seeks to exercise its right to indemnification from EBMS for the damages, losses, costs and expenses (including reasonable attorneys' fees) incurred by MPH as a result of EBMS failure to provide services pursuant to the two contracts.

00194929.2                               -18-
COMPLAINT

**FOURTH CAUSE OF ACTION**
**(Negligence)**

56. All of the factual allegations set forth in paragraphs 1 through 55 above are incorporated by reference as though set forth herein.

57. Throughout the course of their dealings with MPH, EBMS held themselves out as skilled, expert administrators of self-funded plans, having superior knowledge regarding their ability to administer self-funded plans. EBMS intended that MPH rely, and MPH did rely, on EBMS' alleged expertise and advice in connection with MPH's self-funded plan.

58. MPH entered into two contracts with EBMS in 2014. These agreements required EBMS to perform services for MPH and the Plan as previously described. In doing so, EBMS was required to use the skill and care that a reasonably careful administrative service organization/third-party administrator would have used in similar circumstances.

59. MPH is informed and believes, and on that basis alleges, that EBMS failed to use the skill and care that a reasonably careful administrative service organization/third-party administrator would have used in similar circumstances by, among other things:

   a. Drafting an SPD which violated federal law, including, but not limited to: (1) the ACA mandates, including the "minimum value" provision and rendering the Plan unaffordable, and (2) ERISA, including the disclosure requirements for plan subjects;

   b. Drafting an illusory SPD which shifted the risk for losses to MPH and MPH's employees and employees' dependents;

   c. Failing to act in the best interest of MPH, the Plan, MPH's employees, and employees' dependents by causing MPH and the Plan to engage AMPS and CDS' services, which exposed MPH and MPH's employees and employees' dependents to collection activities from providers;

   d. Failing to disclose to MPH, the Plan, and MPH's employees and employees' dependents the nature and scope of their liability for claims left unpaid by the self-funded plan, the Claim Review and Validation Program, and the RBR Program, and then exposing them to that liability for unpaid claims;

   e. Failing to administer the Plan according to the SPD and discounting all

medical claims paid;

      f.    Failing to correctly communicate the Plan's benefits to healthcare providers and making false representations about the Plan's benefits to healthcare providers. For example, EBMS made false representations to Salinas Valley Hospital that the Plan would cover 70% of a patient's medical bills, up to $21,666, after which the Plan would cover 100%;

      g.    Failing to provide first level appeal responses consistent with the terms of the Plan Documents, or at all; and

      h.    Otherwise acting as alleged above.

60. As a direct and proximate cause of EBMS' negligence, MPH suffered damages in excess of $1,000,000, plus costs and interest thereon.

## PRAYER FOR RELIEF

**WHEREFORE**, MPH prays for a judgment against EBMS as follows:

A. Judgment in an amount equal to MPH's actual damages for each claim;

B. Requiring EBMS to disgorge all unjust enrichment or profits received as a result of fiduciary breaches committed by them or for which they are liable;

C. Attorney's fees and costs pursuant to ERISA section 502(g) and the contractual indemnification provisions; and

D. Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

MPH demands a jury trial against EBMS.

DATED: March 6, 2020                                        KENNADAY LEAVITT PC

By: */s/ Curtis S. Leavitt*
CURTIS S. LEVITT
Attorneys for Plaintiffs
MPH PENINSULA HORTICULTURE, INC. dba ROCKET FARMS; and MPH PENINSULA HORTICULTURE / STEVEN ROBERTS ORIGINAL DESSERTS, LLC, EMPLOYEE BENEFIT PLAN