1  DANIEL A. PLATT (SBN 132665)
   dplatt@loeb.com
2  ARTHUR FELS (SBN 294802)
   afels@loeb.com
3  LOEB & LOEB LLP
   10100 Santa Monica Blvd., Suite 2200
4  Los Angeles, CA  90067
   Telephone: 310.282.2000
5  Facsimile: 310.282.2200

6  Attorneys for Defendant EMPLOYEE
   BENEFIT MANAGEMENT
7  SERVICES, LLC (misdenominated as
   Employee Benefit Management
8  Services, Inc.)

9

10              UNITED STATES DISTRICT COURT

11     NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

12

13  MONTEREY PENINSULA              ) Case No.: 5:20-cv-01660-NC
    HORTICULTURE, INC. dba ROCKET   )
14  FARMS and MONTEREY              ) Hon. Mag. Nathanael M. Cousins
    PENINSULA HORTICULTURE,         )
15  INC./STEVEN ROBERTS ORIGINAL    ) Date:  May 13, 2020
    DESSERTS, LLC, EMPLOYEE         ) Time: 1:00 p.m.
16  BENEFIT PLAN,                   ) Place: Courtroom 5, 4th Floor, San
                                    )        Jose Courthouse
17            Plaintiffs,           )
                                    )
18       v.                        ) **REQUEST FOR JUDICIAL**
                                    ) **NOTICE IN SUPPORT OF**
19  EMPLOYEE BENEFIT                ) **DEFENDANT EMPLOYEE**
    MANAGEMENT SERVICES, INC.;      ) **BENEFIT MANAGEMENT**
20                                  ) **SERVICES, LLC'S NOTICE OF**
              Defendant.            ) **MOTION AND MOTION TO**
21                                  ) **DISMISS PLAINTIFFS'**
                                    ) **COMPLAINT PURSUANT TO**
22                                  ) **FED. R. CIV. P. 12(B)(6)**
                                    )
23                                  ) Complaint Filed: March 6, 2020
                                    ) Trial Date: None Set
24  _____ )

25

26

27

28

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

18907739.1
231426-10003

Defendant Employee Benefit Management Services, LLC ("EMBS") (misdenominated as Employee Benefit Management Services, Inc.") hereby requests, pursuant Federal Rule of Evidence 201, that this Court take judicial notice of the following documents from California Northern District Case No. 5:17-cv-07076-SVK:

1.  ECF No. 1, complaint, attached hereto as Exhibit 1.

2.  ECF No. 44, third-party complaint, attached hereto as Exhibit 2.

3.  ECF No. 71, motion to dismiss third-party complaint, attached hereto as Exhibit 3.

4.  ECF No. 98, order, by Hon. Lucy H. Koh, granting motion to dismiss, attached hereto as Exhibit 4.

The existence of these public filings are not in reasonable dispute and may be the subject of judicial notice by the Court.


Dated:  April 6, 2020

LOEB & LOEB LLP
DANIEL A. PLATT
ARTHUR FELS

By:   _/s/ Arthur Fels_
Arthur Fels
Attorneys for Defendant
EMPLOYEE BENEFIT
MANAGEMENT SERVICES,
LLC. (misdenominated as
Employee Benefit Management
Services, Inc.)

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

18907739.1
231426-10003

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS

# EXHIBIT 1

1  ERIC D. CHAN (State Bar No. 253082)
   **HOOPER, LUNDY & BOOKMAN, P.C.**
2  1875 Century Park East, Suite 1600
   Los Angeles, California 90067-2517
3  Telephone: (310) 551-8111
   Facsimile: (310) 551-8181
4  E-Mail:    echan@health-law.com

5  Attorneys for Salinas Valley Memorial
   Healthcare System

6

7

8              **UNITED STATES DISTRICT COURT**

9      **NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

10

11  SALINAS VALLEY MEMORIAL          Case No.
    HEALTHCARE SYSTEM,
12                                   **COMPLAINT FOR:**
              Plaintiff,
13                                   1.  **BENEFITS UNDER SECTION**
       vs.                               **502(a)(1)(B) OF THE EMPLOYEE**
14                                       **RETIREMENT INCOME**
                                         **SECURITY ACT (ERISA)**
    MONTEREY PENINSULA
15  HORTICULTURE, INC. d/b/a/ ROCKET    2.  **AFFORDABLE CARE ACT**
    FARMS; MONTEREY PENINSULA              **SECTION 2707(b) (OUT OF**
16  HORTICULTURE, INC. / STEVEN           **POCKET MAXIMUM), VIA ERISA**
    ROBERTS ORIGINAL DESSERTS, LLC        **SECTION 502(a)(1)(B)**
17  EMPLOYEE BENEFIT PLAN; DOES 1-10,
                                       3.  **UNFAIR ADVERTISING UNDER**
18            Defendants.                 **SECTION 43(a) OF THE LANHAM**
                                          **ACT**
19
                                       4.  **INTENTIONAL**
20                                         **MISREPRESENTATION**

21                                     5.  **NEGLIGENT**
22                                         **MISREPRESENTATION**

23
                                       **DEMAND FOR JURY TRIAL**
24

25

26

27

28

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

COMPLAINT

Plaintiff Salinas Valley Memorial Healthcare System (the "Hospital") alleges as follows:

1. The Hospital brings this lawsuit to recover over $1.4 million in underpaid healthcare services that the Hospital provided to employees of Rocket Farms and their family members over a three-year period.

2. From July 1, 2014 through June 30, 2017 (the "Self-Funded Period"), Rocket Farms embarked upon a misguided and ultimately disastrous attempt to save money by shifting the bulk of its employees' healthcare expenses onto the Hospital.

3. During this period, Rocket Farms abandoned an existing contractual arrangement under which the Hospital was fairly paid for treating Rocket Farms' employees. Instead, Rocket Farms opted for a new benefit plan structure that had no network of hospitals whatsoever. As part of this move, Rocket Farms also shifted to a "self-funded" structure for its employee health benefits, meaning it became directly responsible for paying its employees' health expenses.

4. Rocket Farms made these changes as part of a deliberate strategy to underpay the Hospital. Prior to July 1, 2014, the Hospital was paid at 82-83% of its reasonable and customary charges when it treated Rocket Farms patients. After shifting to a "self-funded" structure, however, Rocket Farms began paying roughly a *third* of the total amount billed by the Hospital, on average.

5. Rocket Farms retained a small army of consultants, with names such as "EBMS," "CDS," and "AMPS," whose sole function was to deny any additional payment to the Hospital for services rendered, including by rejecting each of the Hospital's hundreds of appeal letters. All of these entities were all agents of Rocket Farms and the Plan, and acted on behalf of Rocket Farms and the Plan at all times.

6. On July 1, 2017, Rocket Farms abruptly, and without warning to the Hospital, reverted to the previous contractual arrangement for the provision of its employees' healthcare. Rocket Farms also ceased using those consultants to administer its healthcare benefits.

7. Rocket Farms now contends that does not owe the Hospital anything for its failure to adequately pay the Hospital's bills during the Self-Funded Period. Rather than admit that it was

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

COMPLAINT

1  wrong, Rocket Farms seeks to pocket the "savings" from its failed scheme for itself, and to leave

2  the Hospital financially liable.

3      8.      Rocket Farms' actions violate the Employee Retirement Income Security Act

4  (ERISA), the terms of its own ERISA-governed healthcare benefit plan, and the Affordable Care

5  Act (ACA) – and in particular, the Maximum-Out-of-Pocket (MOOP) limitations that ACA

6  imposes on patient financial responsibility.

7      9.      Rocket Farms has also engaged in unfair competition within the meaning of the

8  federal Lanham Act, and has also harmed the Hospital through its intentional and/or negligent

9  misrepresentations about its employees' healthcare benefits during the Self-Funded Period.

10     10.     The Hospital brings this lawsuit to recover its reasonable and customary charges

11 for the three years at issue, as well as 100% of its bills in instances where the MOOP thresholds

12 under the Plan and/or set by ACA have been exceeded in any given calendar year.

13                    **JURISDICTION AND VENUE**

14     11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

15 § 1331, because the action arises under the laws of the United States; pursuant to 29 U.S.C.

16 § 1132(e)(1), because the action seeks to enforce rights under ERISA; and pursuant to 15 U.S.C.

17 § 1125, because the action seeks to enforce rights under the Lanham Act.

18     12.     This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367,

19 because there is a common nucleus of facts relating to Defendants' wrongful decision to underpay

20 the Hospital for the extensive medical services it provided to Rocket Farms' employees and their

21 families during the Self-Funded Period.

22     13.     The San Jose Division of the United States District Court for the Northern District

23 of California is the appropriate venue for the filing of this case pursuant to Northern District Local

24 Rules 3-2(c) (Assignment to a Division) and 3-2(e) (San Jose), because a substantial part of the

25 events or omissions which give rise to the Hospital's claims occurred in Monterey County.

26                         **THE PARTIES**

27     14.     Plaintiff Salinas Valley Memorial Healthcare System is a highly-respected public

28 hospital district and health system located in Monterey County, which has been serving the Salinas

**HOOPER, LUNDY & BOOKMAN, P.C.**
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1240381.1

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1 Valley and Monterey Peninsula since 1953. SVMHS's flagship facility is the Salinas Valley

2 Memorial Hospital, a 266-bed acute care facility with a medical staff of more than 300 board-

3 certified physicians across a broad spectrum of specialties. The Hospital prides itself in delivering

4 exceptional, compassionate and culturally sensitive care and holding true to its mission of

5 improving the health and well-being of its community. Among other distinctions and awards, the

6 Hospital received full accreditation status to the Cancer Program of the Commission on Cancer;

7 received the Stroke Gold Plus Quality Achievement Award from the American Heart Association /

8 American Stroke Association's Get With the Guidelines program; and was the 2015 The Joint

9 Commission Top Performer on Key Quality Measures for 2014 for Heart Attack, Heart Failure,

10 Pneumonia, Surgical Care and Perinatal Care.

11       15.     On information and belief, Defendant Monterey Peninsula Horticulture, Inc.

12 ("Rocket Farms") is a California corporation with its primary place of business in Salinas, CA.

13 Defendant does business under the name Rocket Farms, and will be referred to by this name

14 throughout this Complaint. The Hospital is informed and believed that Defendant Rocket Farms

15 has significant agricultural operations in or around Monterey County. Rocket Farms' products are

16 readily available in many supermarkets around the country.

17       16.     On information and belief, the Monterey Peninsula Horticulture, Inc. / Steven

18 Roberts Original Desserts, LLC Employee Benefit Plan is a self-funded ERISA health benefits

19 plan, and a proper defendant pursuant to ERISA § 502(d), 29 U.S.C. § 1132(d). "Self-funded"

20 means that the Plan is not directly operated pursuant to one or more contracts for health insurance.

21 Rather, it is directly responsible for the medical benefits paid pursuant to the Plan. The Hospital is

22 informed and believes that Defendant Rocket Farms was the sponsor of the Monterey Peninsula

23 Horticulture, Inc. / Steven Roberts Original Desserts, LLC Employee Benefit Plan, with ultimate

24 responsibility for paying all claims under the Plan during the relevant time period. The Hospital is

25 further informed and believes that Defendant Rocket Farms was the designated Plan Administrator

26 for the Plan – as that term is understood under ERISA – during the relevant time period. The

27 Hospital is informed and believed that all of the patients described in this Complaint who received

28

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1  services during the Self-Funded Period were beneficiaries and/or participants of the Plan at the

2  relevant times when their services were rendered.

3        17.    The true names and capacities of the defendants sued herein as DOES are unknown

4  to Hospital at this time, and Hospital therefore sues such defendants by such fictitious names.

5  Hospital is informed and believe that the DOES are those individuals, corporations and/or

6  businesses or other entities that are also in some fashion legally responsible for the actions, events

7  and circumstances complained of herein, were the agents, representatives, or employees of the

8  other defendants, and may be financially responsible to Hospital for the services it has provided to

9  the Patient.  The Complaint will be amended to allege the DOES' true names and capacities when

10  they have been ascertained.

11        18.    The Defendants named above, along with the DOES, will be collectively referred to

12  herein as the "Defendants."

13  **GENERAL ALLEGATIONS**

14  **I.**    **ALLEGATIONS SUPPORTING THE FEDERAL ERISA, ACA, AND LANHAM**

15      **ACT CLAIMS**

16      **A.**    **Rocket Farms Embarks on a Disastrous Three-Year Experiment With Its**

17          **Employees' Healthcare Benefits**

18        19.    Rocket Farms is located in the Hospital's backyard.  For many employees of

19  Rocket Farms and their family, the Salinas Valley Memorial Healthcare System is the closest and

20  highest quality comprehensive healthcare provider, and their first choice for hospital services.

21        20.    On average, Rocket Farms employees and their family members make somewhere

22  between seventy-five and one-hundred visits to the Hospital each year.  This includes, among

23  other things, emergency care; babies being born at the hospital (who sometimes also require a high

24  level of care); and multi-day inpatient stays.

25        21.    Prior to July 1, 2014, Rocket Farms purchased a health insurance policy for its

26  employees and their family members through the Western Growers Association.  When Rocket

27  Farms employees and their family members went to the Hospital for treatment, the Hospital was

28

1240381.1

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1  reimbursed for 83% of its bills for inpatient care and 82% of its bills for outpatient care, pursuant

2  to a contract that Western Growers has with the Hospital.

3       22.     Beginning on July 1, 2014, however, and continuing through June 30, 2017,

4  however, Rocket Farms drastically cut the level of payment to the Hospital for medical services to

5  less than half of what it was previously. Rocket Farms began paying only about a third of the

6  Hospital's total charges for medical services overall. This was even though the Hospital was

7  providing the same kinds of health care services to the same population of employees.

8       23.     In effect, Rocket Farms sought to shift the cost of its employees' healthcare onto

9  the Hospital. Defendants' primary goal was to deny every appeal submitted by the Hospital and to

10  ensure that the Hospital did not receive any additional payment for its services.

11       24.     The costs imposed by Rocket Farms were ultimately borne by taxpayers in Salinas.

12  Salinas Valley Memorial Healthcare System is a district hospital, so it is funded in part based on

13  an annual tax that is levied per homeowner in the area around the Hospital. To the extent that the

14  Hospital is not fairly compensated for the emergency services it provides, this puts a

15  proportionally greater burden on local taxpayers.

16       25.     The Hospital is an emergency care provider that is obligated under both state and

17  federal law to treat all patients who present themselves to the emergency room. Thus, the Hospital

18  could not simply choose to stop "doing business" with Rocket Farms. The Hospital was and is

19  still required to treat every Rocket Farms patient who shows up at the emergency room, whether

20  they be car accident victims, stroke or heart attack victims, expecting mothers, or anything else.

21       26.     The Hospital recently learned that, as of July 1, 2017, Rocket Farms changed its

22  health insurance arrangement again – reverting back to the contracted, fully-insured arrangement

23  under the Western Growers' Association. On information and belief, Rocket Farms decided to

24  purchase a health insurance policy for its employees effective July 1, 2017. This means that

25  Rocket Farms is no longer directly responsible for paying its employees' health insurance benefits.

26  Rather, the Hospital is informed and believes that Anthem Blue Cross, the insurer on the policy, is

27  now responsible for doing so.

28

1240381.1

27.     None of this absolves Rocket Farms of its failure to pay over $1.4 million in its employees' healthcare expenses during the Self-Funded Period.  Rocket Farms refuses to acknowledge that it must provide a meaningful level of payment for its employees' healthcare.

28.     It is worth examining the complicated scheme that Defendants set up in order to deny fair payment to the Hospital:

**B.      Rocket Farms Set Up An Inadequate "Self-Funded" Plan For the Express Purpose of Underpaying For its Employees' Healthcare**

29.     During the Self-Funded Period, Rocket Farms stopped purchasing a group health insurance policy for its employees.  Instead, it created a new benefit structure, which it named the Monterey Peninsula Horticulture, Inc. / Steven Roberts Original Desserts, LLC Employee Benefit Plan (the "Plan," for short).

30.     On information and belief, the Plan was solely responsible for paying employee healthcare benefits between July 1, 2014 and June 30, 2017.  Under this "self-funded" arrangement, Rocket Farms was directly liable for all of benefits under the Plan.

31.     Self-funded plans are unusual for smaller employers such as Rocket Farms. Typically, only very large employers, who provide healthcare for substantial populations of employees, are experienced enough to manage the risk that comes with assuming full and direct liability for their patients' healthcare.

32.     Rocket Farms did not have this kind of experience.  The Hospital is informed and believed that Rocket Farms was nevertheless persuaded by a number of unreliable consultants and brokers to adopt a self-funded model as a means to "save money" on its employees' healthcare costs.  Unfortunately, the manner in which Rocket Farms adopted its new benefits model was flawed in significant and very concerning ways.

33.     Defendants overall strategy was to grossly underpay Plan benefits in an disclosed and unaccountable manner; to deny each and every appeal seeking additional payment; and then aggressively threaten litigation against the Hospital when the Hospital asked any of its patients to pay the balance on any unpaid bill.  Defendants' behavior violated ERISA, the ACA, the Lanham Act, and state law, as described in this Complaint.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1240381.1

**C.** **Defendants Wrongfully Administered The Plan So It Always Paid Just a Fraction of the Plan's Reasonable and Customary Level**

34. Rocket Farms set up the Plan so that payment was to be made based upon "the reasonable and customary charge" (to use a direct quote from the Plan). This is standard for self-funded benefit plans, which generally pay for out-of-network healthcare services at a level known as "usual, reasonable and customary" (or "Reasonable and Customary").

35. In the healthcare industry, the Reasonable and Customary level of payment is typically determined with reference to the rates for similar services charged by other healthcare providers in the area who have comparable qualifications. In the healthcare industry, the Reasonable and Customary level of payment is typically determined with reference to the rates for similar services charged by other healthcare providers in the area who have comparable qualifications. Other factors that are often considered in the determination of Reasonable and Customary payment include the provider's training, qualifications, and length of time in practice; the nature of the services provided; the fees usually charged by the provider, and any other aspects of the economics of the medical provider's practice that are relevant. This is in line with how the Plan is set up to pay benefits.

36. Subsection G, below, explains that the Plan's structure should have resulted in a much higher level of payment to the Hospital than what the Hospital actually received.

37. The problem was that Rocket Farms did <u>not</u> pay the Hospital at its Reasonable & Customary rates. Instead, Rocket Farms intentionally and wrongfully administered the Plan in a manner designed to save Rocket Farms as much money as possible, at the expense of the Hospital and, ultimately, its own employees and their families.

38. Aided by a small army of consultants employing a complicated set of excuses, Rocket Farms rigged the Plan's reimbursement process so that the Plan did not, in fact, have to pay Reasonable & Customary. Rather, the Plan was wrongly administered in such a fashion such that each and every one of the Hospital's services were paid a fixed amount tied to the reimbursement rates that the federal government pays under the Medicare program.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1240381.1

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

39.     To be specific, Defendants improperly paid every single one of the Hospital's reimbursement claims at 140% of Medicare rates, which represented only about a third of the actual healthcare expenses incurred by Rocket Farms' employees.  Defendants refused to ever consider any additional amount of payment, even denying hundreds of appeals by the Hospital on the basis that no further payment was necessary.

40.     140% of Medicare is an unusually low level of reimbursement for a commercial (non-governmental payor).  The Reasonable and Customary level of payment for hospitals in the Salinas area is significantly higher than 140% of Medicare.  No hospital in Salinas is willing to accept 140% of Medicare as payment in full.

41.     While it is true that many hospitals accept Medicare rates from the federal government for Medicare beneficiaries, they do it because Medicare is a high-volume payor.  Regardless, they often lose money in doing so, and this loss must be made up in the form of higher payments from commercial insurance sources.  Without these compensating payments from private sources, most major hospitals would not be able to remain financially solvent in the long term.

42.     The Hospital is informed and believes that Rocket Farms set up the Plan without explaining to its employees how switching to the Plan would "hollow out" the health care benefits available to them.  This matters because Rocket Farms' employees had other options for healthcare insurance available.

43.     Had Rocket Farms' employees and their families been made aware that Rocket Farms was shifting to a benefit structure that would pay for only a small portion of their medical care, leaving them on the hook for significant, unpaid balances, those individuals might well have chosen to purchase their own healthcare – for instance, through the Covered California exchange set up pursuant to ACA, or through an insurance broker.

44.     Instead, the Hospital is informed and believes that Rocket Farms deliberately misled its own employees – and the Hospital – about the Plan's diminished level of benefits, as explained in more detail herein.

1240381.1

**D.** **The Plan Was Deliberately Set Up Without a Network of Hospital or Facility Providers, Even Though It Covered Emergency and Inpatient Hospitalization**

45.     Rocket Farms further compounded the problem by deliberately setting up the Plan so that the Plan had no network of healthcare providers who could provide acute, inpatient or emergency care at predictable, agreed-upon reimbursement rates – which is how the vast majority of managed care arrangements work in healthcare.

46.     Under the framework of modern managed healthcare, payors establish networks of healthcare providers as a way to manage the utilization of healthcare services by their members, and ultimately, control costs and expenses.  Payors create networks by contracting with individual providers for agreed-upon reimbursement rates.  It is essential for these payors to have adequate networks of providers who can care for their members and insureds in a given geographic area.

47.     A network of hospitals, in particular, is important to ensure that a payor's members and insureds have reasonable and timely access to emergency services and inpatient care.  Such life-saving care can only be provided by specialized facilities, staffed around-the-clock by nurses and doctors who must be available on a moment's notice.

48.     Both *before* and *after* the Self-Funded Period, the health insurance that Rocket Farms offered to its employees was structured around a network of providers – Anthem's network, to be specific.  This was because the Hospital has a managed contract with Anthem, and Rocket Farms, through Western Growers, purchased Anthem's health insurance.

49.     During the times when Rocket Farms used Anthem's network, the Hospital was reimbursed at fair and reasonable rates.  For instance, prior to the Self-Funded Period, when Rocket Farms employees came to the Hospital for medical care, reimbursements to the Hospital were made at the rates pursuant to Anthem's managed care contract with the Hospital – at 82% and 83% of the Hospital's charges for outpatient and inpatient care, respectively.  This was substantially higher than 140% of Medicare.

50.     Likewise, the Hospital is informed and believes that Anthem Blue Cross funds and administers the present healthcare insurance policy for Rocket Farms employees, effective July 1, 2017.  On information and belief, since July 1, 2017, the hospital has been paid for treating Rocket

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1240381.1

1    Farms employees and their patients at the rates pursuant to Anthem's managed care contract with

2    the Hospital – which is, today, still a significant percentage of the Hospital's charges, and still

3    substantially higher than 140% of Medicare.

4        51.    In contrast, during the Self-Funded Period, Rocket Farms had no network of

5    hospital providers capable of providing the emergency and inpatient services that the Plan

6    purported to cover.

7        52.    During the Self-Funded Period it would not have been possible for an individual

8    covered by the Plan to visit an "in-network" hospital, because the Plan made the structural choice,

9    up front, not to have any network of hospitals at all.  Thus, there were no "network providers" and

10   no "non-network providers" during that period of time.  In essence, the distinction between

11   "network" and "non-network" was meaningless with respect to the Plan that was in place during

12   the Self-Funded Period.

13       53.    This is despite the fact that Rocket Farms deliberately set up the Plan to

14   (supposedly) provide substantial benefits for both emergency care and inpatient hospitalization.

15       54.    In lieu of a network of hospitals, Rocket Farms attempted, unsuccessfully, to adopt

16   a "reference pricing" model for the Plan, under which the only "in-network" providers are those

17   who accept the "reference" prices paid by the Plan for certain medical procedures, typically

18   outpatient procedures.  Rocket Farms' failure to create an adequate reference pricing structure for

19   the Plan, and the consequences with respect to ACA's MOOP requirement, are discussed in much

20   greater detail in Section I.6.

21       E.    **Rocket Farms Repeatedly Refused to Negotiate a Contract with the Hospital**

22       55.    Following Rocket Farms' elimination of its entire network of contracted hospitals,

23   the Hospital repeatedly tried to negotiate a contract directly with Rocket Farms in order to provide

24   more cost-effective care to Rocket Farms' employees and their families – to no avail.

25       56.    The Hospital's goal in these negotiations was not only to reach an agreement on

26   fair rates for the medical services provided by the Hospital.  It was also to create a partnership

27   whereby both parties would work to educate Rocket Farms' employees on how to seek the most

28

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1240381.1

1  appropriate level of care, so that they would not head straight to the emergency room in non-

2  emergency situations.

3        57.     Unfortunately, the parties' negotiations failed because Rocket Farms and the other

4  Defendants had no intention of dealing with the Hospital in good faith.  Defendants' singular goal

5  was to improperly reduce Rocket Farms' overall healthcare spend by avoiding paying the Hospital

6  fairly for the emergency and inpatient medical services.

7        58.     The Hospital gave Rocket Farms every chance to negotiate a fair commercial

8  agreement.  It engaged in serious negotiations with Defendants in 2016, until Defendants abruptly

9  cut off negotiations.  And despite making a comprehensive, good faith offer again a few months

10  ago, the Hospital never received a counter-offer of any kind.  Rocket Farms was simply not

11  interested in dealing fairly with the Hospital, and was unwilling to pay anything for past claims.

    **F.**    **Rocket Farms Misrepresented the Nature of the Hospital's Medical Services to**

12

13          **Its Employees**

14        59.     The Hospital is also informed and believed that Rocket Farms falsely reassured its

15  employees that medical care provided by the Hospital was completely covered by the plan, and

16  moreover, that they should continue to go to the Hospital and visit the emergency room if they

17  needed medical care of any kind, regardless of whether it was an emergency.

18        60.     Rocket Farms' objectively false statements about the services provided by the

19  Hospital resulted in a dramatic overutilization of the Hospital's emergency services.  Many of the

20  situations in which the emergency room was used would have been better served if Rocket Farms'

21  employees instead could have utilized the Hospital's excellent network of lower-cost outpatient

22  clinics and urgent care centers.  Rocket Farms' employees could have accessed to this network of

23  clinics prior to July 1, 2014, when it was in-network with the Hospital.  Instead, it embarked on

24  the ill-fated gamble to reduce its employee healthcare expenses and shift those expenses onto the

25  Hospital.

26        61.     The Hospital has been economically harmed in the marketplace by Rocket Farms'

27  objectively false statements, both because of this unnecessarily overutilization of the emergency

28

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1240381.1

1   room, and by Rocket Farms' determination not to adequately compensate the Hospital for the life-

2   saving care it provided to Rocket Farms employees.

3   62.    The Hospital brings its Third Cause of Action, below, specifically to redress the

4   unfair competition that has been caused by Rocket Farms' misrepresentations about the Hospital

5   and the services it provides.

6   **G.    Defendants Ignored the Plan's Reasonable and Customary Payment Language**

7   63.    The way Rocket Farms administered the plan – both directly and through certain

8   administrators, to whom it delegated certain duties under the plan – violated both the terms of the

9   Plan and ERISA.

10  64.    It was impermissible for Defendants to pay 140% of Medicare rates when the Plan

11  expressly offered a Reasonable and Customary level of payment.

12  65.    The Summary Plan Description – which is an ERISA-mandated disclosure that

13  Rocket Farms provided to its employees to explain what their benefits were under the Plan –

14  confirmed that Plan benefits should be paid at Reasonable and Customary.

15  66.    For example, a version of the Plan Document and Summary Plan Description

16  (Silver Plan) that is effective July 1, 2014 and restated July 1, 2016 ("2016 Silver Plan

17  Document") prefaces the Schedule of Benefits with the statement: "**All benefits described in this**

18  **Schedule** are subject to the exclusions and limitations described more fully herein including, but

19  not limited to, the Plan Administrator's determination that: care and treatment is Medically

20  Necessary; that **charges are reasonable and customary (as defined as an Allowable**

21  **Charge**) . . . ." (2016 Silver Plan Document at p. 12 (emphasis added).)[1]

22  67.    Consistent with this, the 2016 Silver Plan's Schedule of Benefits – which sets forth

23  the health benefits that will be paid to beneficiaries and participants of the Plan – explains that

24  "Hospital Services," including emergency and inpatient care, are paid at "70% after $250

25  copayment (per admission) and deductible." The Schedule of Benefits explains that these benefits

26  ───────────────

27  [1] While all citations are to the 2016 Silver Plan Document, the Hospital is informed and believes that the definitions of the operative Plan terms described herein are substantially the same across

28  all versions of the Plan's governing documents that were in effect during the Self-Funded Period.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1240381.1

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

are paid at the "designated percentage of Covered Charges" (e.g., 70%), subject to only three exceptions: (1) **Amounts over the Allowable Charge**" will not be paid; (2) "Ineligible charges" will not be paid, (3) and neither will "Invalid Charges (Refer to the Claims Review and Validation Program section)."

68. Nowhere does the Schedule of Benefits explain that benefits would always be paid, at most, based upon 140% of Medicare rates, no matter what.

69. The Plan's definition of Allowable Charge reinforces that the Plan offers reasonable and customary level of payment. The definition of Allowable Charge states, in relevant part:

> The **reasonable and customary charge** shall mean an amount equivalent to the 85th percentile of a **commercially available database**, or such other cost or quality-based reimbursement methodologies as may be available and adopted by the Plan. If there are insufficient charges submitted for a given procedure, the Plan will determine an Allowable Charge based upon **charges made for similar services**. Determination of the reasonable and customary charge will consider the **nature and severity of the condition being treated, medical complications or unusual circumstances that require more time, skill or experience, and the cost and quality data for that provider**. (2016 Silver Plan at p. 37 (emphasis added).)

70. Nothing else in the Schedule of Benefits adequately discloses that payment will always be made at 140% of Medicare.

    a. The term "Ineligible Charges" is not defined or used anywhere else in the Plan Document.

    b. The definition of "Invalid Charges," buried much later in the SPD, does not impose a 140% of Medicare limitation either. Invalid Charges are defined as "(a) charges that are found to be based on "Errors," "Unbundling," "Misidentification" or "Unclear Description" (as such terms are defined in this "Claim Review and Validation Program" section of the Plan); (b) charges for fees or services determined not to have been Medically Necessary, Usual, Customary and Reasonable[2] . . . ." (2016 Silver Plan Document at p. 55.)

71. If anything, all of the definitions referenced in the Schedule of Benefits confirm that the Plan must pay at a Reasonable and Customary level for services provided by hospitals.

---

[2] The Plan defines the term "Usual Customary and Reasonable Fees" – separate and apart from "Reasonable and Customary" – in a way that relates only to the fees charged by "physicians and practitioners." Thus, this term does not have anything to do with hospitals' charges.

72.     At no time did Defendants dispute that any of the services provided to beneficiaries was, in fact, medically necessary.  Nor did Defendants ever identify any billing errors made by the Hospital.  Again, the Plan paid every claim submitted by the Hospital, in recognition that all the services provided were medically necessary and appropriately billed.  The problem was that the Plan paid an inadequate rate on a take-it-or-leave-it basis.

73.     For all these reasons, Defendants had no reasonable basis under the Plan to pay less than a Reasonable and Customary rate for the Hospital's services.  Defendants misinterpreted and misapplied the terms of the Plan by administering it in such a manner that it never paid more than 140% of Medicare rates.

### H.     The Plan's Inadequately Disclosed "Claim Review and Validation" Provisions Are Unenforceable Under ERISA

74.     Defendants' entire strategy for underpaying the Hospital for medically necessary healthcare services was based upon ignoring the Plan's Reasonable and Customary payment level.  Instead, Defendants relied exclusively upon a separate series of "claim review" provisions that were buried deep in the SPD.

75.     Starting on page 53 – about 40 pages after the Schedule of Benefits – is a series of provisions titled "Claim Review and Validation Program."  This section of the SPD consists of approximately 37 dense, interlinked definitions, many of which conflict with each other and with the rest of the SPD.  The definitions in this buried section have titles like "Covered Medical Expense," "Permitted Payment Level(s)," and "Maximum Allowable Charge."

76.     None of these buried provisions bear any relation to the rest of the Plan document.  As just two examples, the SPD has its own separate glossary of terms that begins on page 37, and a separate benefit exclusions section that begins on page 43, which are entirely independent of these "Claim Review and Validation" provisions.  Defendants purport to rely upon this buried section as justification for not paying more than 140% of Medicare.

77.     Defendants' exclusive reliance upon these buried provisions is in violation of ERISA's legal disclosure requirements.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

78.    The Ninth Circuit recently explained that "ERISA's central policy goal is to protect benefit plan participants 'by requiring the disclosure and reporting to participants and beneficiaries of financial and other information . . . and by providing for appropriate remedies, sanctions, and ready access to the Federal courts." *King v. Blue Cross & Blue Shield of Illinois*, -- F.3d. --, No. 15-55880, 2017 WL 3928339 (9th Cir. Sept. 8, 2017). To further this goal, ERISA requires that benefit plans provide participants with a SPD and a "summary of any material modification in the terms of the plan." *Id.* (citing 29 U.S.C. § 1022(a).)

79.    Further, Section 1022 of ERISA requires that Summary Plan Description documents, like the ones at issue here, "shall be written in a manner calculated to be understood by the average plan participant." 29 U.S.C. § 1022(a). The SPD must also "be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." (*Id.*)

80.    The regulations implementing Section 1022 of ERISA unambiguously require that limitations and exclusions not be minimized or obscured:

> General format. The format of the summary plan description **must not have the effect to misleading, misinforming or failing to inform** participants and beneficiaries. **Any description of exception, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant**. Such exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized in a manner **not less prominent** than the style, captions, printing type, and prominence used to describe or summarize plan benefits. The advantages and disadvantages of the plan shall be presented **without either exaggerating the benefits or minimizing the limitations**.

29 C.F.R. § 2520.102-2(b) (emphasis added).

81.    The regulations only permit limitations and exclusions to be stated in a separate place from the benefits if the SPD expressly sets forth in the benefits section the specific page where the pertinent limitations and exclusions can be found. Specifically, the regulation instructs that "The description or summary of restrictive plan provisions need not be disclosed in the summary plan description in close conjunction with the description or summary of benefits, **provided that adjacent to the benefit description the page on which the restrictions are described is noted**." (*Id.* (emphasis added).)

82.     An ordinary person reading through the "Claim Review and Validation" provisions, buried at the back of the SPD, would not understand that they dramatically reduce their Plan benefits to just a fraction of the Reasonable and Customary level to which they are otherwise entitled.  Indeed, it is unlikely an ordinary person would discover them at all, given that the meaning of the provisions are not explained or highlighted anywhere else in the SPD, and are not mentioned at all in the Schedule of Benefits.

83.     The Schedule of Benefits states only that payment is to be made at the reasonable and customary" level,  as "defined as an Allowable Charge."  (2016 Silver Plan, at p. 11.)  It also states that "Hospital Services" are paid at "70% after $250 copayment (per admission) and deductible," and that the only applicable limitation on such benefits is the definition of "Allowable Charge."  In turn, the "Allowable Charge" definition confirms that payment is to be based primarily on the Plan's definition of Reasonable and Customary, which is to be calculated based upon the 85th percentile of a commercially available database.

84.     The Schedule of Benefits does not reveal that every payment to a hospital for emergency services will be limited based pursuant to any "Claim Review or Validation."

85.     Nor is the 140% of Medicare limitation disclosed in the section of the SPD titled "Plan Exclusions" – which is where an ordinary person would expect such exclusions to be listed. The Plan identifies 44 separate exclusions for which no benefits are available, or for which benefits are reduced.  These range from "Dental Services" to "Hair Loss" to "Illegal Acts."  (*Id*.) Yet the key terms relied upon Defendants to limit payment to 140% of Medicare – such as "Permitted Payment Level(s)," and "Maximum Allowable Charge" – <u>are not disclosed as "Plan Exclusions</u>."  (*See* 2016 Silver Plan at p. 44-46.)  Instead, those terms are buried deep in the plan, in a section titled Claim Review and Validation provisions, where nobody will ever read them.

86.     The only exclusion that relates to the general level of payment is exclusion No. 9 for "Excess charges," which is defined as "The part of an expense for care and treatment . . . that is in **excess of the Allowable Charge**."  (*Id*. at 43 (emphasis added).)  Again, the Allowable Charge is a term that is tied to Reasonable and Customary payment.  The definition of Allowable Charge

1  fails to disclose that benefits paid under the Plan would be limited, in every single instance, to no

2  more than 140% of Medicare.

3        87.    In light of this inadequate disclosure, an ordinary person covered by the plan would

4  not understand that their benefits would be substantially reduced from the reasonable and

5  customary benefits promised upfront.  The Claims Review and Validation provisions are therefore

6  unenforceable under basic ERISA principles, and the Hospital is entitled to reasonable and

7  customary payment under the plain terms of the Plan.

8       I.      **The Affordable Care Act Imposes an Annual MOOP Limitation**

9            **on Essential Health Benefit Expenses Incurred Under the Plan**

10        88.    There is another important reason why the Plan has failed to pay the Hospital what

11  is owed during the Self-Funded Period.

12        89.    Assuming (solely for sake of argument) that Defendants were entitled to pay just

13  140% of Medicare under the Plan, Defendants would *still* have been required, pursuant to ACA,

14  to ensure that Plan beneficiaries and participants incurred no more than roughly $6,000 to $7,000

15  in total out-of-pocket expenses each year.  The MOOP, in other words, provided a backstop on

16  patient financial liability that was ignored by Defendants.

17        90.    Defendants violated the MOOP in two crucial ways.

18        91.    First, they failed to count <u>all</u> out-of-pocket healthcare expenses towards satisfying

19  the annual MOOP threshold for each patient.  In applying the MOOP requirement embedded in

20  the Plan, Defendants' position was that only the artificially low co-payments, deductibles and co-

21  insurance amounts set by the Plan qualify.

22        92.    Under ACA's statutory scheme, however, the entire unpaid balance on each

23  reimbursement claim – the so-called "balance bill" – must count towards satisfying the MOOP.

24  This was because the Plan at issue was not a "network plan" for hospital services, meaning that

25  Defendants deliberately chose not to maintain a network of hospitals who could provide

26  emergency care or hospitalization.

27        93.    Second, Defendants failed to honor the MOOP once the threshold was met.  Once

28  the yearly MOOP threshold is met in a given calendar year for a given patient, Defendants must

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1240381.1

1    pay <u>100% of the patient's eligible healthcare expenses</u> above the threshold for the remainder of the

2    calendar year.  Yet Defendants refused to ever pay more than 140% of Medicare, even when they

3    recognized that the MOOP under the Plan was met for particular patients.

4         94.    ACA's statutory MOOP requirement – and its interplay with other aspects of

5    ACA's regulatory scheme – is important to understand, and so is explained herein at length.  This

6    requirement is separate and distinct from the annual MOOP limits set forth in the Plan itself,

7    which the Hospital seeks to enforce separate and apart from ACA's MOOP.

8         95.    The Hospital is informed and believes that between fifty and a hundred of the

9    reimbursement claims in this lawsuit – which include the most intensive, expensive medical

10   services that were provided to Rocket Farms patients – were subject to ACA's MOOP

11   requirement.  By ignoring the MOOP requirement, Rocket Farms failed to pay over $1 million due

12   and owing to the Hospital for care that routinely exceed the MOOP threshold.

13            1.    <u>**The MOOP Applies to Patients' Healthcare Expenditures For Essential**</u>

14               <u>**Health Benefits**</u>

15        96.    Beginning in 2014, ACA set a yearly MOOP threshold.  For calendar year 2014,

16   ACA required all applicable health plans (including this Plan) to have a MOOP of no more than

17   $6,350 for a single covered individual.  In calendar year 2015, ACA set a MOOP of no more than

18   $6,600 for a single covered individual.  In calendar year 2016, ACA set a MOOP of no more than

19   $6,850 for a single covered individual.  And in calendar year 2017, ACA required a MOOP of no

20   more than $7,150 for a single covered individual.[3]

21        97.    When individuals or families incur healthcare expenditures for covered Essential

22   Health Benefits ("EHBs") that exceed the ACA MOOP threshold in a given calendar year, ACA

23   mandates that the benefit plan <u>pay 100% of those expenditures for the remainder of the year.</u>

24   _____

25   [3] *See* Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters
     for 2016, 80 Fed. Reg. 10750-01 at 10825 (February 27, 2015) (2014 and 2016 MOOP

26   thresholds); Patient Protection and Affordable Care Act; Exchange and Insurance Market
     Standards for 2015 and Beyond; Final Rule, 79 Fed. Reg. 30240 (May 27, 2014) (2015 MOOP

27   threshold); Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment
     Parameters for 2017, 80 Fed. Reg. 75488 at 75543 (December 2, 2015) (2017 threshold).

28

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

98.    EHBs include items and services in ten general categories.  EHBs are defined broadly and specifically to include, among other things, hospitalization and emergency services. (ACA Section 1302(b).)

2.    **The Plan At Issue Was Designed to Provide Substantial Coverage For All Relevant EHBs, Including Emergency Care and Hospitalization**

99.    The Hospital is informed and believes that all of the medical services it provided to Rocket Farms patients during the Self-Funded Period fall within the ten basic EHB categories. Indeed, emergency care and inpatient coverage – the most common services received by Rocket Farms' employees and their families – are among the most important categories of EHBs.

100.    Technically, self-funded group health plans governed by ERISA are not required to offer any or all of the ten particular categories of EHBs.  (Individual policies offered through an ACA-governed healthcare exchange, in contrast, are required to offer all of the EHB categories.)

101.    To the extent that an ERISA group health plan *does* offer such EHBs, however, ACA's MOOP limitation requires such a plan to provide substantial coverage for those EHBs, and to limit plan members' annual out-of-pocket expenditures for such EHBs.

102.    On information and belief, the Plan at issue not only covers emergency and hospital inpatient care, but purports to provide substantial coverage for those EHBs.

103.    It is no surprise that the Plan chose to cover inpatient hospitalization and emergency care.  The Department of Treasury, along with the Department of Health and Human Services – two of the three key federal agencies tasked with implementing the ACA – recognize that inpatient hospitalization services are "fundamental benefits that are nearly universally covered, and historically have been considered integral to coverage, under typical employer sponsored group health plans."  (*See* IRS Notice 2014-69, *available at* https://www.irs.gov/pub/irs-drop/n-14-69.pdf.)

104.    Indeed, if a group health plan does not "provide substantial coverage" for such inpatient hospital benefits, then the sponsoring employer becomes subject to the dreaded ACA "employer mandate" – and potentially subject to a stiff per-employee excise tax.  (*Id.*; *see also* 45

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1240381.1

CFR § 156.145; Department of the Treasury, Internal Revenue Service, Minimum Value of Eligible Employer-Sponsored Health Plans, 80 Fed. Reg. 52678 (September 1, 2015).)

105.     The drafters of the ACA were concerned about the "free rider" problem that would be created by employer plans "that omit critical benefits used disproportionately by individuals in poor health," e.g., inpatient hospitalization. *Id*. at 52679.  Because such coverage would be so inadequate, the fear was that it would drive employees to the health insurance exchanges, where they could obtain tax credits to subsidize their purchase of insurance at taxpayer expense.  The employer mandate, which applies to employers of a certain size, is therefore designed to reimburse the government for the tax credits it provides to those employers' employees.

106.     Crucially, both Treasury and HHS require group plans to "provide **substantial** coverage for inpatient hospitalization services" in order to satisfy ACA's "minimum value" requirement and therefore avoid application of the employer mandate.  80 Fed. Reg. at 52679.  Employers that choose to omit this key EHB from their health plans, then, would generate undesirable penalties of potentially several thousand dollars per employee.

107.     The Hospital is further informed and believes that because Defendants designed the Plan this way, they were permitted to satisfy the employer mandate, not pay the excise tax, and further, enable their employees to comply with ACA's *individual* mandate (e.g., the requirement that individuals purchase health insurance).

108.     It would frustrate ACA's goals if the Plan were permitted to offer coverage for emergency and inpatient care, thus satisfying the employer mandate, yet to do provide that coverage at an extremely deficient level, without any network of hospitals who agreed to accept such poor coverage as payment in full.

### 3.     **ACA's MOOP Applies to Self-Funded Group Plans**

109.     ACA's MOOP limitation requirement is found in Section 2707 of the Public Health Service Act, captioned "Comprehensive health insurance coverage" (42 U.S.C. §300gg-6).  Subsections (a) and (b) of Section 2707 require coverage for EHBs – including hospitalization and emergency services – with strict limitations on annual cost sharing.  Section 2707(b) states:

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1240381.1

*(b) Cost-sharing under group health plans*

A group health plan shall ensure that any annual cost-sharing imposed under the plan does not exceed the limitations provided for under paragraphs (1) and (2) of section 1302(c).

110. Section 1302, in turn, is captioned "Essential Health Benefit Requirements." (42 U.S.C. §18022). Section 1302(c)(1) and (2) establish annual limits on "cost-sharing incurred under a health plan with respect to self-only coverage or coverage other than self-only coverage" in 2014 and subsequent years.

111. This requirement was in force during all of the individual calendar years during the Self-Funded Period – 2014, 2015, 2016, and 2017.

112. "Cost-sharing" is defined to include "deductibles, coinsurance, copayments, or similar charges" and any other expenditures required of an insured individual which is a qualified medical expense (within the meaning of section 223(d)(2) of title 26) with respect to essential health benefits **covered under the plan**." (*See* ACA Section 1302(c)(3)(A) (emphasis added).)

113. Read together with Sections 2707(b) and 1302(c) and in view of the "minimum value" regulations above, these provisions evidence a clear intent by Congress to require underline{substantial} coverage of such EHBs when they are offered by an employer-sponsored, group health plan. Congress did not intend to permit employers to provide coverage for inpatient hospitalization, in particular, at a substandard level that is calculated never to reach anywhere near any of the bills.

114. ACA's MOOP provisions apply directly to self-funded ERISA plans. Section 715 of ERISA, (29 U.S.C. § 1185d), which was added by ACA Section 1563(e), incorporates the provisions of part A of title XXVII of the PHS Act into ERISA. Section 2707 of ACA, which contains the MOOP requirement that is applicable to group health plans, is found in title XXVII of the PHS Act.

115. The Ninth Circuit recently affirmed that the ACA directly amended ERISA – and therefore altered the benefits that must be covered by ERISA-governed, self-funded plans – through the enactment of 29 U.S.C. § 1185d. *See, e.g.*, *King v. Blue Cross & Blue Shield of Illinois*, -- F.3d. --, No. 15-55880, 2017 WL 3928339 (9th Cir. Sept. 8, 2017) (confirming that

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1240381.1

1   ACA's ban on "lifetime maximums," another key provision found in part A of title XXVII of the

2   PHS Act, is generally applicable to self-funded ERISA plans via ERISA section 715). There can

3   be no dispute that self-funded group plans are subject to the MOOP.

4           4.      **Because The Plan Had No Network of Providers, Defendants Must**

5                   **Cover All Balance Bills Above the MOOP Threshold**

6           116.    ACA Section 1302(c)(3)(B) excludes "**balance billing** amounts for **non-network**

7   providers, or spending for non-covered services" from the kinds of cost-sharing that must be

8   covered under the MOOP. (42 U.S.C. § 18022(3)(c)(B) (emphasis added).)

9           117.    Section 1302(c)(3)(B) provides an exception to the definition of "Cost-sharing" set

10  forth in 42 U.S.C. § 18022(c)(3)(A)).

11          118.    To understand why this exception does not apply, and why the Hospital's balance

12  bills are therefore a form of "Cost-sharing" that counts towards satisfying ACA's annual MOOP,

13  it is important to understand the meaning of the terms "balance billing" and "non-network."

14          119.    In the health insurance context, a "**balance bill**" is the unpaid part of the healthcare

15  charges that are left over after the insurer (or self-funded payor) has paid benefits under the plan,

16  and the patient has paid his or her deductibles, co-insurance, and co-payments. Defendants'

17  practice of paying at an inadequate 140% of Medicare rates generated unusually large, and entirely

18  unwarranted, balance bills for each of the hundreds of patients who came to the Hospital during

19  the Self-Funded Period.

20          120.    These balance bills are a form of cost-sharing because patients themselves are

21  financially responsible for all amounts that the Plan does not pay. When each patient comes to the

22  Hospital, they sign a "Conditions of Admission" agreement with the Hospital that confirms that

23  they are responsible to pay not only their co-insurance and deductibles, but all amounts not

24  covered by their health plan. Under ERISA, plan members are generally responsible for the

25  balance bills that are incurred when they receive medical services.

26          121.    Here, because the Plan paid at such an inadequate level, a significant balance bill

27  was almost always generated due to the Plan's failure to pay. In each instance, Rocket Farms'

28  employees and their families were responsible.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

122.    These balance bills must be counted as "Cost-sharing" under Section 1302(c)(2)(A), which count towards the satisfaction of ACA's annual MOOP, because these balance bills were not generated with respect to a "non-network provider," such that the exception to "Cost-sharing" in Section 1302(c)(2)(B) does not apply.

123.    The Hospital does not qualify as a "non-network provider," as that term is used in Section 1302(c)(2)(B), because there are simply no "network providers" or "non-network providers" for hospital services covered under the Plan at issue.

124.    Here, Rocket Farms deliberately adopted a self-funded Plan structure that included no network of providers whatsoever who could provide emergency or inpatient hospital care, leaving its employees with no adequate options for obtaining these covered medical services from network providers.  This is even though emergency and inpatient hospitalization were EHBs that were explicitly and substantially covered under the Plan.

125.    The implementing regulation for Section 1302, which is found at 45 C.F.R. § 156.130, confirms this conclusion:

> (c) **Special rule for network plans**. **In the case of a plan using a network of providers**, cost sharing paid by, or on behalf of, an enrollee for benefits provided outside of such network is not required to count toward the annual limitation on cost sharing (as defined in paragraph (a) of this section).  45 C.F.R. § 156.130(c) (emphasis added).

126.    The wording of this regulation provides important context for the term "non-network provider" in Section 1302(c)(3)(B), because it affirms that a "network plan" means one that is "using a network of providers."

127.    Unless a group health plan has established a network, then, the terms "network providers" and "non-network providers" have no meaning.  It cannot be the case that absent a network, all providers are "non-network providers."

128.    Moreover, it is not enough for a plan to have a partial or incomplete network that covers only some, but not all, of the EHBs covered by the Plan.

129.    For example, if a plan covered physician services, inpatient hospital care, laboratory tests, and acupuncture, but had a "network" consisting of a single acupuncturist, the plan could not be considered a network plan for all EHBs because the acupuncturist is incapable of

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1240381.1

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1  lawfully furnishing physician services, inpatient hospital care, and laboratory tests.  In other

2  words, the provision of a network for some EHBs does not thereby convert the plan to a network

3  plan for all categories of EHBs.

4      130.    Even though the Plan at issue purported to provide <u>substantial</u> coverage for

5  emergency and inpatient hospitalization care, the Plan deliberately chose not to enter into any

6  contracts with hospitals who could provide such care.  Provider networks play an extremely

7  important role in the world of managed care.  Networks of hospitals are especially important.  The

8  Plan's failure to set up a network made it impossible for its members to receive emergency and

9  inpatient care in a cost effective manner during the Self-Funded Period.

10     131.    For all intents and purposes, then, the Plan had no provider network during the

11  Self-Funded Period that could provide emergency or inpatient hospital care.  Therefore, not only

12  do deductibles and co-payments count towards the annual MOOP threshold, but the balance bills

13  for covered hospital services (and other covered EHBs) do as well.

14     132.    And once the MOOP threshold was met, the Plan was obligated to pay 100% of its

15  members' medical bills for covered EHBs above and beyond that threshold.

16          5.      **Limiting Total Annual Out-of-Pocket Expenditures Is Strongly**

17                  **Consistent with Congress' Intent in Enacting the ACA**

18     133.    ACA imposed the MOOP requirement upon a wide array of health plans, including

19  self-funded, employer-sponsored plans, precisely because Congress wanted to ensure that

20  individuals who obtain health insurance through their employers are obtaining sufficiently

21  substantial health coverage.  Obviously, if a self-funded plan purported to cover an EHB such as

22  hospitalization, but imposed a cap on the benefits paid to $10.00 maximum per hospital stay, such

23  coverage would be inadequate.  The MOOP requirement ensures that employers like Rocket

24  Farms do not skimp on their employees' health coverage as to EHBs that the employers choose to

25  cover – and are strongly encouraged by the federal government to cover.

26     134.    The application of the MOOP is also consistent with the overarching purposes of

27  the ACA.  Jonathan Gruber, a MIT professor who was one of the key architects of ACA,

28

COMPLAINT

1240381.1

explained to Congress that it was imperative to provide real and substantial coverage for hospital care, not just a token amount:

> "*No Lifetime or Annual Limits:* To my mind this is one of the most important aspects of insurance reform. Many individuals buy insurance today where they do not understand the risk they are taking on by accepting limits on the insurance company's exposure either on a lifetime or annual basis. <u>Real insurance reform requires that individuals be protected against extreme health shocks, and that in turn requires that insurance be an open-ended commitment to pay the medical bills associated with those shocks.</u>

> Moreover, I would amend this section to say that <u>the government should more broadly rule out 'mini-med' or 'indemnity' plans that don't necessarily include annual or lifetime limits, but instead impose a reimbursement schedule to the consumer which is well below the likely cost of the service. Plans which only cover, for example, $500/day towards the cost of a hospital stay place consumers at needless and unanticipated risk. . . .</u>

> *Healthcare Reform Roundtable (Part I): Hearing Before the S. Comm. on Health, Education, Labor & Pensions,* 111th Cong. (2009) (statement of Jonathan Gruber, Ph.D.) (underlined emphasis added).

135. In the end, Congress took Professor Gruber's advice. His concerns were ultimately addressed by the ACA's lifetime and annual limit prohibitions, the MOOP limit, among other market protections that ACA made applicable to most health plans.

136. As an aside, certain indemnity or "mini-med" plans are still permitted post-ACA, but they are treated very differently than full health-insurance coverage. ACA categorizes them as a form of what it calls "excepted benefits." While "excepted benefits" are not subject to ACA's bans on lifetime or annual benefit maximums, they also do not satisfy employers' ACA obligations to offer substantial health insurance, nor do they satisfy the individual mandate obligating individuals to purchase health insurance. In fact, federal rules require that the marketing enrollment materials for such limited policies announce, in at least 14-point font, that they are not *really* "health insurance," and do not satisfy ACA requirements.

137. Defendants held out the Plan as full and comprehensive health insurance, not some limited form of "excepted benefits." Yet Defendants also sought to limit their exposure to by paying just 140% of Medicare, just like under the "mini-med" plans of old. In other words, Defendants sought to have it both ways: to superficially comply with all of the new requirements imposed by ACA upon the Plan, while blatantly violating both the spirit and the letter of ACA.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

138.    The entire structure set up by Defendants is simply designed to offer the "illusion" of coverage, which goes against the letter and spirit of the ACA.  For instance, Defendants misleadingly offered two variations of Rocket Farms' self-funded plan, known as the "Silver Plan" and the "Gold Plan."  The terms "Silver" and "Gold" are closely associated with the "metal tiers" of health plans offered on Covered California and other ACA insurance exchanges. Employees of Rocket Farms and their families may very well have relied on these labels in order to conclude, erroneously, that coverage under the Plan was just as good as the coverage based on comparable metal tiers through Covered California.

139.    The Plan represents nothing more than an attempt to turn back the clock to the "bad old days" by subjecting Defendants' own employees to unlimited, and astronomical, out of pocket liability in any given year for the large balance bills left after Defendants' inadequate payments.

140.    Had Rocket Farms' employees been aware that they were covered under what is essentially a deficient indemnity plan, they could have purchased healthcare elsewhere, including through Covered California health insurance exchange that was set up pursuant to the ACA. Exchange policies certainly would have provided "substantial" coverage for EHBs, including hospitalization, which the Plan lacked.

141.    It is Rocket Farms' employees and their families who are on the hook for their employer's refusal to provide adequate healthcare benefits that they could have easily obtained elsewhere.  This is why the large and unnecessary balance bills generated by Defendants must be counted towards satisfying the ACA annual MOOP threshold; and further, why Defendants should be forced to honor the MOOP once it was met.

6.      **The Plan Does Not Fall Within the "Reference Pricing" Exception to the MOOP Requirement**

142.    The Hospital is further informed and believes the Plan was set up using an improper "reference pricing" network model.  Defendants failed to make a reasonable effort to implement reference pricing, and their attempt to do so was nothing more than a subterfuge to avoid ACA's prohibitions on benefit maximums.  This reinforces the applicability of the MOOP in

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1240381.1

this case to all unpaid balance bills resulting from Defendants' attempt to limit payment to 140% of Medicare rates.

a.     Reference Pricing Explained

143.     Under a "reference pricing" model, a plan sets a "reference price" for certain kinds of elective procedures, such as a knee replacement.  The "reference price" is explicitly disclosed to plan members in advance – for instance, in the SPD – and represents the maximum price that the plan will pay for the procedure.  This incentivizes Plan members to shop around to shop around for the best price for certain kinds of elective procedures, such as a knee replacement.

144.     Reference pricing works as a sort of "reverse deductible."  Take, for instance, the example of a plan that sets a reference price of $30,000 for a knee replacement.  If a patient goes to a hospital that accepts the $30,000 (or less than that amount) as payment in full, then he or she pays nothing.

145.     In contrast, if a patient goes to a hospital that charges $45,000 for a knee replacement, and does not accept $30,000 as payment in full, then the plan still pays its share of the $30,000 after the patient's deductible or copayment, and the patient is liable for the remaining $15,000 in addition to any deductible or copayment obligations.

146.     Under a reference pricing model, the only "in-network providers" for a service subject to the reference price are those providers who agree to accept the reference price for the particular procedures at issue as payment in full.  In this context, the term "network" is used in a broader sense than merely whether a plan has contracted with healthcare providers in the abstract. For purposes of reference pricing and enforcing compliance with the MOOP, what matters is whether there are providers who (1) can in fact offer the medical services that are subject to reference pricing, and (2) do in fact agree to accept the reference price as payment in full.

147.     By way of example, a plan might have a network of 10 hospitals and ambulatory surgery centers that are generally considered network providers for outpatient surgeries but then apply a reference pricing model for one type of covered outpatient surgery—knee replacements. If 7 of those hospital and ambulatory surgery centers accept the reference payment amount for knee replacements and the plan adheres to all of the reference pricing requirements, then those

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1240381.1

1    would be treated as the only network providers for knee replacements but all 10 would be

2    considered network providers for other outpatient procedures.

3        148.    The concept of "reference pricing" typically applies to services provided by

4    hospitals or other facilities (such as ambulatory surgery centers).  It is almost never invoked in

5    connection with a physician's services alone, which are typically far less intensive and expensive

6    to provide.  Thus, one would almost never expect to see reference pricing with respect to primary

7    care doctor visits, which are provided in an physician office setting, and for which no separate fee

8    is charged by any facility.

9        149.    In order to work properly, the "reference prices" for each procedure must also be

10   thoughtfully set so that a sufficient number of facilities in a given geographic region will accept

11   them as payment in full.  If prices are set too low, and no provider will accept the price, then the

12   result is both inadequate coverage and an inadequate network of providers.

13       150.    This is why CalPERS, the California employee retirement system, and Anthem

14   Blue Cross, CalPERS' benefits administrator, took a careful, limited approach to reference pricing

15   when they popularized the concept about five years ago.  CalPERS implemented reference pricing

16   with respect to only a handful of procedures, such as knee and hip replacements.[4]  It did so by

17   treating all hospitals as being out of network unless they accepted CalPERS' specific reference

18   price – even if CalPERS or Anthem had managed care contracts of general applicability with those

19   hospitals.

20       151.    CalPERS also selected its "reference prices" for those procedures very carefully,

21   based on a statistical analysis of facility charges across California, to ensure that there were high

22   quality providers in every geographic market who would offer the procedure at the selected

23   reference price.  This is a crucial fact that is key to the success of any specific reference pricing

24   scheme.

25

26   [4] *See* David Cowling, PhD, <u>CalPERS Reference Pricing for Hip or Knee Replacement</u> (slide
     presentation by Chief of CalPERS Center for Innovation), *available at*
27   https://www.nga.org/files/live/sites/NGA/files/pdf/2013/1306StateEmployeeAndRetireeHealthCar
     eCowling.pdf

28

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

152.   A corollary of all this is that "reference pricing" does not make sense in the context of *emergency or inpatient care*.  Individuals cannot typically choose what hospital they will go to when they suffer a medical emergency, or what hospital they will be admitted to following such an emergency.  Setting a specific price will not permit patients to "shop around" in advance when they get in a car accident, for instance.

153.   In short, reference pricing can lead to the provision of higher quality care at lower cost, but it must be implemented with care on a per-procedure basis, keeping in mind whether the prices selected will result in an adequate network of providers willing to accept the payments offered.  As explained next, this is precisely what Defendants failed to do with the Plan.

b.   <u>Defendants Imposed an Improper "Reference Price" of 140% of Medicare Across the Board</u>

154.   Throughout the Self-Funded Period, Defendants made clear that Plan benefits were being paid on a "reference pricing" basis.

155.   After the Hospital submitted each bill for services rendered, one of Defendant's consultants issued a "Report and Recommendation" for a "Reference Based Pricing Review" for each claim submitted by the Hospital.  This report calculated a reference price to be paid for the procedure.  This price was inevitably set at 140% of Medicare.  The Plan in every instance adopted the recommendation as to the "allowable amount" for reimbursement and paid based on this "reference price."

156.   The Hospital is informed and believes, however, that Defendants put no effort into setting specific reference prices for individual procedures at any level that any hospital in the geographic area was willing to accept.  140% of Medicare paid by the Plan for every conceivable medical service represents an inadequate level of payment that no hospital in the Monterey Peninsula area – or for that matter, no hospital in California – will accept as payment in full.

157.   Moreover, Defendants did not limit their attempt at "reference pricing" to elective procedures.  Rather, Defendants imposed the 140% of Medicare "reference price" <u>largely</u> upon bills for emergency and inpatient care provided by the Hospital.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1240381.1

158.     Defendants' efforts to implement reference pricing were not reasonable, and they were not targeted to any level of payment that hospitals in the region were willing to accept.

c.     Since Defendants' "Reference Pricing" Violated Federal Guidelines, All Balance-Bills Must Count Towards the MOOP Threshold

159.     After the enactment of the ACA, an obvious problem for group health plans seeking to adopt reference pricing is ACA's MOOP requirement.  As explained, where a group health plan has no network of providers, ACA Section 2707 requires the plan to pay 100% of members' out-of-pocket medical expenses, including balance bills, that exceed the MOOP threshold for a given year.  Yet a reference pricing model does not rely on a conventional network of providers, and therefore triggers the MOOP's applicability to balance bills.

160.     It goes without saying that requiring a plan to cover a patient's balance bills runs contrary to the goals of reference pricing.  Reference pricing seeks to ensure that a patient is liable for balance-bill amounts *above* the reference price in order to incentivize him or her to choose hospital facilities that *do* accept the reference price.

161.     The federal agencies tasked with implementing the ACA – the Departments of Labor, Treasury, and Health and Human Services – were determined to find a way to permit reference pricing designs to be incorporated into group health plans in a manner consistent with the ACA's purposes and goals.  Based on the timing of their initiative, they appear to have been inspired to undertake this initiative after learning of CalPERS' success with reference pricing.

162.     Thus, beginning in 2014, the three agencies issued joint written guidance that outlined how a plan could implement reference pricing in a way that would not trigger ACA's MOOP's with respect to balance bills.  The Departments developed their guidance in a deliberative manner over the course of several years, seeking feedback and comments from commenters as to how it should be implemented.

163.     In joint guidance issued on May 2, 2014, the three agencies posed and answered the following question under the heading "Limitations on Cost-Sharing under the Affordable Care Act":

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1240381.1

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

**Q4: If large group market coverage or self-insured group health plan has a reference-based pricing structure, under which the plan pays a fixed amount for a particular procedure (for example, a knee replacement), which certain providers will accept as payment in full, how does the out-of-pocket limitation apply when an individual uses a provider that does not accept that amount as payment in full?**

Reference pricing aims to encourage plans to negotiate cost effective treatments with high quality providers at reduced costs. *At the same time, the Departments are concerned that such a pricing structure may be a subterfuge for the imposition of otherwise prohibited limitations on coverage, without ensuring access to quality care and an adequate network of providers.*

Accordingly, the Departments invite comment on the application of the out-of-pocket limitation to the use of reference based pricing. The Departments are particularly interested in standards that plans using reference-based pricing structures should be required to meet to ensure that individuals have meaningful access to medically appropriate, quality care. Please send comments by August 1, 2014 to E-OHPSCA-FAQ.ebsa@dol.gov.

Until guidance is issued and effective, with respect to a large group market plan or self-insured group health plan that utilizes a reference-based pricing program, the Departments will not consider a plan or issuer as failing to comply with the out-of-pocket maximum requirements of PHS Act section 2707(b) because it treats providers that accept the reference amount as the only in-network providers, *provided the plan uses a reasonable method to ensure that it provides adequate access to quality providers.*

Departments of Labor, Health and Human Services, and Treasury, FAQs About Affordable Care Act Implementation, Part XIX, at p. 3, 5 (underlined and italicized emphasis added), *available at* https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/aca_implementation_faqs19.html.

164.     This guidance reflects the Departments' determination to fashion some sort of allowance for reference pricing in spite of their fundamental concern that such a model could be used as a "subterfuge" to avoid paying substantial plan benefits.  After all, the distinction between a "mini-med" or health "indemnity" policy, on one hand, and reference pricing scheme that pays a fixed amount per procedure, on the other, is merely one of degree.

165.     Also of note is the fact that this guidance is aimed squarely at "large group," "self-insured" health plans.  This confirms that, as of early 2014, all three Departments found it uncontroversial that ACA's "out-of-pocket limitation" (e.g., MOOP) applied to such plans.

166.     In subsequent guidance, issued October 2, 2014, the Departments established what their guidelines for reference based pricing.  (*See* Departments of Labor, Health and Human Services, and Treasury, FAQs About Affordable Care Act Implementation, Part XIX at p. 3-4,

*available at* https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-

FAQs/Downloads/Reference_Pricing_FAQ_101014.pdf.)  After summarizing the comments they

received, the three agencies set forth the following principles:

a. **Not used as a subterfuge to underpay benefits.**  The Departments again reiterated their overarching concern that the reference pricing scheme "does not function as a subterfuge for otherwise prohibited limitations on coverage" – a clear and deliberate reference to ACA's ban on lifetime and annual maximums, and the MOOP.

b. **Inapplicable to emergency services.** The medical services procedures to which reference pricing applies should be limited to those for which a plan member has an opportunity to make "an informed choice of provider." Therefore, "[l]imiting or excluding cost-sharing from counting toward the MOOP with respect to providers who do not accept the reference-based price would not be considered reasonable with respect to emergency services."

c. "**Reasonable access**.  Plans should have procedures to ensure that an adequate number of providers that accept the reference price are available to participants and beneficiaries. For this purpose, plans are encouraged to consider network adequacy approaches developed by States, as well as reasonable geographic distance measures, and whether patient wait times are reasonable. . . ."

d. "**Quality standards**. Plans should have procedures to ensure that an adequate number of providers accepting the reference price meet reasonable quality standards."

e. "**Exceptions process**. Plans should have an easily accessible exceptions process, allowing services rendered by providers that do not accept the reference price to be treated as if the services were provided by a provider that accepts the reference price. . . ."

f. **Disclosure in SPD**. "Plans should provide information regarding the pricing structure, including a list of services to which the pricing structure applies and the exceptions process," in an easily accessible form, such as in the SPD.

167.    These guidelines make clear that any attempt to impose "reference pricing" only in the sense that a plan pays a fixed amount will be found insufficient unless there are additional safeguards for quality and reasonable access.  These safeguards are needed to ensure that "reference pricing" is not used merely as a subterfuge to avoid the MOOP.

168.     The Departments' guidelines also confirm that a plan that adopts a reference pricing model cannot and should not cover every conceivable medical service that can be provided by a hospital.  In particular, emergency care and related services are not suitable candidates for reference pricing.

169.     Perhaps not surprisingly, Defendants violated <u>all</u> of the above guidelines in their flawed attempts at reference pricing.  They deliberately and repeatedly paid emergency and inpatient care at the "reference price" of 140% of Medicare – a strategy that Departments agree would "not be considered reasonable."  On information and belief, Defendants also failed to disclose the reference prices up front, whether in the SPD or otherwise.  (Section H explained how Defendants buried certain Claim Review provisions, which were the basis for pricing at 140% of Medicare, deep within the SPD.)

170.     The Hospital is also informed and believes that Defendants took no steps to ensure that Plan members had reasonable access to quality hospitals at the 140% of Medicare reference price.  This was particularly egregious given the close proximity of the Hospital to the large majority of Rocket Farms' employees, and the fact that those employees used the Hospital as their primary source of healthcare.

171.     Last, Defendants did not have any exceptions process, easily accessible or otherwise, for treating the Hospital as an in-network provider who accepted the reference price.  Defendants never made a single exception.  In fact, they denied each and every one of the Hospital's roughly 500 appeals.

172.     Implicit in the Departments' written guidance are the consequences for a health plan – like the Plan here – that makes an unreasonable attempt to implement reference pricing, or that does so as a subterfuge to evade ACA's bans on benefit limits.

173.     By definition, plans that adopt reference pricing have no traditional network of providers who can provide the medical procedures for which reference prices have been set.  Thus, the exception for "network plans" does not apply, and under ACA Section 2707, balance bills for which patients are responsible must therefore counted as part of the "cost-sharing" towards satisfying the MOOP.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1240381.1

174.     As a consequence, a plan that attempts, but fails, to establish a reasonable reference pricing scheme must count <u>all</u> unpaid balance bills towards satisfying the MOOP threshold, and then pay 100% of remaining EHB expenses above that amount for the rest of that calendar year. The Departments made these consequences *crystal clear* in their subsequent joint guidance, published on April 20, 2016:

> **Q7: If a non-grandfathered large group market or self-insured group health plan as a pricing structure in which the plan pays a fixed amount (sometimes called a reference price) for a particular procedure, but the plan does not ensure that participants have adequate access to quality providers that will accept the reference price as payment in full, is the plan required to count an individual's out-of-pocket expenses for providers who do not accept the reference price toward the individual's MOOP limit?**
>
> *Yes.* The Departments' previous guidance explained that, for purposes of PHS Act section 2707(b), a plan that utilizes a reference-based pricing design (or similar network design) may treat those providers that accept the reference-based price as the only in network providers and not count an individual's out-of-pocket expenses for services rendered by other providers towards the MOOP limit only if the plan is using a reasonable method to ensure adequate access to quality providers at the reference price. **A plan that merely establishes a reference price without using a reasonable method to ensure adequate access to quality providers at the reference price will not be considered to have established a network for purposes of PHS Act section 2707(b)**. . . .

175.     In other words, the Departments unambiguously conclude that the exception to "Cost-sharing" found in Section 1302(c)(3)(B) for "balance billing amounts for non-network providers" **is not applicable** where (1) the only providers that the plan who can provide the medical procedures for which the plan offers a reference price, are those who accept the reference price and (2) the Departments' guidelines have not been met.

176.     The Departments' deliberative and thoughtful approach to these guidelines leaves no doubt that the MOOP applies to all out-of-pocket expenses, including balance bills, where a plan has engaged in subterfuge and fails to ensure reasonable access to quality providers under a reference pricing scheme.

177.     What is also clear is that, in the absence of the Departments' guidance, a group plan that does not have a network of hospitals – such as the Plan here – could not pay a fixed price for medical services without also triggering ACA's MOOP limitation, as described above.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

178. Accordingly, the Plan's attempt to impose payment at a flat 140% of Medicare cannot be considered a reasonable "reference pricing" scheme, and the Plan had no network for purposes of Section 2707 with respect to any category of EHBs provided by hospitals. Defendants were therefore required to count all balance bills improperly generated by their scheme towards ACA's annual MOOP threshold for each patient at issue in this case, and to pay 100% of each patients' EHB expenses for the remainder of each calendar year when that threshold was met.

**J.** **The Hospital Exhausted Its Administrative Remedies, And Further Appeals Would Have Been Futile**

179. The Hospital pursued both levels of appeal that were available for each of the two-hundred plus reimbursement claims that were submitted to the Plan during the Self-Funded Period. Each appeal was met by a generic response issued by one of Defendants' "alphabet soup" of consultants. No matter how many times the Hospital appealed, each of the appeals was denied without further payment.

180. The Hospital has exhausted all of its administrative remedies under ERISA.

181. Further appeals, even if they had been available, were entirely futile. The Hospital estimates that it sent nearly five hundred appeal letters – two levels of appeal for each claim – during the Self-Funded Period. *All* of them were denied without additional payment.

182. Two details about the Hospital's appeals underscore the extent of the futility of these appeals.

183. *First*, during the appeal process, Defendants repeatedly offered to reconsider the level of payment <u>if</u> the Hospital were to provide more information about how the Hospital was paid by other payors – such as the major insurance companies – for the same services.

184. In response to these repeated offers, the Hospital regularly explained to Defendants that all of the major commercial payors paid the Hospital somewhere between 75-90% of the Hospital's billed charges. Despite being provided with the information that they themselves had requested and admitted was relevant to the payment of claims under the Plan, Defendants persisted in denied each and every appeal made by the Hospital.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1240381.1

185.    *Second*, at some point, the Hospital was sending so many appeals that Defendants began *consolidating* their appeal denial letters, such that several completely separate and unrelated claims would be denied in a single letter.  In fact, at some point, they began sending one appeal letter each month for all of the separate appeals it denied in that particular month.  These "consolidated" letters did not identify separate and distinct reasons why each individual appeal was denied.  Moreover, each of these letters was identical.  Each merely repeated the same, boilerplate excuses for not considering the Hospital's appeals as the month before.

186.    This is further evidence not only of the futility of the Hospital's appeals; but of the fact that Defendants failed to follow ERISA claims regulations – which require that plan administrators provide the "specific reason or reasons for [each] adverse determination" of benefits.  (29 C.F.R. § 2650.503-1(g)(1)(i).)  Defendants' impermissible lumping of appeal denials on the same, generic grounds means that all appeals must be "deemed exhausted" within the meaning of 29 C.F.R. § 2650.503-1(l)(1).

## K.    The Plan Cannot Rely Upon the Purported One-Year Limitation on Suit to Avoid Paying Anything For Most of the Self-Funded Period

187.    Defendants have recently taken the position that the Hospital cannot recover in this lawsuit for any claims for which the second level appeal was denied over one year ago.  Defendants rely upon a single, obscure sentence buried deep within the 90-page Plan document, which states that "A legal action to obtain benefits must be commenced within one (1) year of the date of the Notice of Determination on the final level of internal or external review, whichever is applicable."  (*See* 2016 Silver Plan at p. 68.)  This statement is insufficiently disclosed and, under ERISA, not enforceable.

188.    As explained in detail above, ERISA does not permit the enforcement of improper, undisclosed limitations on benefits.  *See* 29 U.S.C. § 1022; 29 C.F.R. § 2520.102-2.  Courts routinely hold that, where a time limitation on suit is not properly disclosed in the Summary Plan Description, it is unenforceable.  *See, e.g.*, *Spinedex Physical Therapy USA Inv. v. United Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1294 (9th Cir. 2014) (applying 29 U.S.C. § 1022(b) to bar contractual time limitation, which was "buried deep" in plan document, from being enforced

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1240381.1

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1    against healthcare provider).  Such limitations "must be clearly disclosed in the SPD" in

2    accordance with § 1022(a).  *Id.*  The limitation here was not.

3        189.    To further underscore this point, Defendants *did not* once inform the Hospital about

4    the supposed one-year limitation on suit despite literally hundreds of letters, e-mails, and other

5    correspondence between the Hospital and the various Defendants over three years.

6        190.    None of the Explanation of Benefit (EOB) forms issued by Defendants, for

7    instance, ever identified an one-year limitation on payment.  Nor did any of the letters denying the

8    Hospital's appeals at any level identify the one-year limitation on suit.

9        191.    Indeed, it was not until a few months ago that the Hospital received all of the

10   documents pursuant to which Defendants claim that the Plan was governed during the Self-Funded

11   Period, and in which the supposed one-year limitation is buried.

12       192.    For these reasons, the provision cannot be enforced, and the Hospital is entitled to

13   recover for the underpayments that Defendants made for all three years of the Self-Funded Period.

14   **II.    ALLEGATIONS SUPPORTING THE STATE LAW CAUSES OF ACTION FOR**

15   **MISREPRESENTATION**

16       193.    Separate and apart from Defendants' numerous violation of federal laws,

17   Defendants are also liable to the Hospital because they repeatedly misrepresented the nature of

18   their patients' coverage for important healthcare services.

19       194.    **Inpatient Stay.** For example, patient R.P. was admitted to the Hospital as an

20   inpatient in late April 2017 for approximately a week and a half.  Around that time, the Hospital

21   called Defendants to verify the terms of Rocket Farms' coverage for this patient.  The Hospital

22   was told that the Plan would cover 70% of the patient's medical bills, up to $21,666, after which,

23   it would cover 100%.  The Plan also affirmatively represented to the Hospital with respect to each

24   claim that the Plan had a maximum out-of-pocket limit of $6,350.

25       195.    Taken together, the customary meaning of the Plan's representations is that the

26   Plan would pay 70% of the Hospital's total bill up to the $21,666 amount stated, and beyond that,

27   the Plan would pay 100% of the Hospital's charges.

28

1240381.1

196.     Yet Defendants did not pay as they promised.  Out of the roughly $353,678.10 in charges incurred by R.P., Defendants chose to pay just $133,447.66 – about a third of the total.

197.     At no point during these conversations did they tell the Hospital that the Plan would not pay more than 140% of Medicare for hospital services.  Defendants also never disclosed that the Plan had a Medicare-based limitation that superseded the Reasonable and Customary benefits otherwise payable under the Plan.

198.     Thus, the Hospital had no reason to expect, based on Defendants' representations, that the Plan would really only pay at 140% of Medicare rates – as opposed to 70% and then later 100% of the Hospital's reasonable charges.

199.     Defendants also did not disclose to the Hospital during the verifications and authorizations any alleged limitation or exclusion that applied to the plan's stated MOOP.  For instance, according to Defendants' arbitrary, capricious and previously undisclosed reading of the Plan, (a) the Patient would have to incur tens or hundreds of thousands of dollars in actual, balance bill liability before the MOOP would be considered met, rather than just the stated MOOP limitation of $6,350; and (b) even after the Plan considered the MOOP met, reading the Plan still only would cover 140% of Medicare rates for the Patient's bills, leaving the Patient to incur substantial out-of-pocket liability far above the MOOP.  These concepts were not disclosed when the Hospital obtained verification and authorization.

200.     Likewise, at no point did Defendants tell the Hospital that the Plan's undisclosed cap on payment at 140% of Medicare would trump the stated MOOP for the year 2016.  And there is no reason why it should since doing so would eviscerate the MOOP.

201.     The Hospital was harmed by Defendants' false statements. Had the Hospital been aware that Defendants did not intend to pay in the manner they represented during the call, and had the patient been aware that his/her health plan intended to pay only a third of the total hospital bill, they would been able to make alternative arrangements.

202.     **Outpatient Surgery**.  Similarly, patient M.G. had outpatient surgery at the hospital in December 2016.  Around that time, the Hospital called Defendants to verify the terms of Rocket Farms' coverage for this patient.  The Hospital was told that the Plan would cover 70% of the

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1  patient's medical bills, up to $21,666, after which, it would cover 100%. The Plan again

2  affirmatively represented to the Hospital with respect to each claim that the Plan had a maximum

3  out-of-pocket limit of $6,350.

4        203.    Again, Defendants did not make any of the disclosures, described above, that

5  would have been necessary to render their statements truthful and not misleading.

6        204.    Again, the Hospital was harmed by its reliance upon Defendants' false statements.

7  Had the Hospital been aware that Defendants did not intend to pay in the manner they represented

8  during the call, and had the patient been aware that his/her health plan intended to pay only a third

9  of the total hospital bill, both would been able to make alternative arrangements for this surgical

10  procedure.

11        205.    **Cesarean Delivery**. Patient E.E. came to the Hospital in September 2016 to

12  undergo a Cesarean delivery of multiple babies. Around that time, the Hospital called Defendants

13  to verify the terms of Rocket Farms' coverage for this patient. The Hospital was given two

14  slightly different representations over the phone. First, it was told that the Plan would cover 70%

15  of the patient's medical bills, up to $21,666, after which, it would cover 100%. Then it was told

16  that the Plan would cover the services at 80% up to $22,500, then afterwards, at 100%. The Plan

17  also represented to the Hospital that the Plan had a maximum out-of-pocket limit of $6,350. It

18  also told the Hospital that the patient's plan had no lifetime maximum.

19        206.    Again, Defendants did not make any of the disclosures, described above, that

20  would have been necessary to render their statements truthful and not misleading.

21        207.    Again, the Hospital was harmed by its reliance upon Defendants' false statements.

22  Had the Hospital been aware that Defendants did not intend to pay in the manner they represented

23  during the call, and had the patient been aware that his/her health plan intended to pay only a third

24  of the total hospital bill, both would been able to make alternative arrangements for this surgical

25  procedure.

26        208.    While the details vary somewhat from call to call, the constant in all of these

27  telephonic verifications was that 70% of the patient's medical bills would be covered up to

28

1    $21,666, after which the Plan would cover 100%; and further, that the Plan had a MOOP of

2    $6,350.

3    209.    Defendants knew that these incomplete statements were false at the time they were

4    made, or at least knew that they had no reasonable basis for making them.  Defendants made them

5    anyway, in the hope that the Hospital would provide care to Rocket Farms' employees and their

6    family members without first requiring payment upfront.

7    210.    Defendants should be required to pay the Hospital's reimbursement claims

8    consistent with the representations they made when the Hospital called to verify each patient's

9    insurance.

10   **FIRST CAUSE OF ACTION**

11   **(ERISA Section 502(a)(1)(B))**

12   (Against All Defendants)

13   211.    Hospital incorporates all allegations set forth in the above paragraphs.

14   212.    Pursuant to "Conditions of Admission" form executed by each Rocket Farms

15   beneficiary or participant (and/or a representative of such individual), the Hospital is the assignee

16   of all benefits under the Plan for each of the claims at issue in this case.

17   213.    Accordingly, the Hospital is entitled under ERISA to pursue all payment that is due

18   to any Rocket Farms beneficiary or participant under the Plan for the medical services rendered to

19   those individuals at the Hospital.

20   214.    The Hospital diligently pursued all internal appeals available under the Plan and

21   exhausted all appeal remedies.  In doing so, the Hospital corresponded directly with entities and/or

22   individuals that the Plan held out to be the correct entities to communicate with regarding the

23   failure to pay the whole bill.

24   215.    Defendants' (a) deliberate disregard of the "Reasonable and Customary" level of

25   payment called for under the Plan (b) payment at 140% of Medicare in every instance was

26   arbitrary and capricious and an abuse of discretion, to the extent that Defendants were delegated

27   discretion under the Plan.

28

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1240381.1

216.    In addition, Defendants' reliance on certain provisions buried deep in the SPD, termed the "Claims Review and Validation Program" provisions, was arbitrary and capricious, because the provisions (1) conflict with the Plan's definition of Reasonable and Customary, and (2) violate ERISA's regulations by not being properly disclosed in the SPD in a way that was clear and proximate to the other coverage provisions.  Therefore the Plan's attempt to impose an upper payment limit of 140% of Medicare is unenforceable as a matter of law.

217.    The Hospital is entitled to payment at its full billed charges, which it contends, and will prove at trial, are Reasonable and Customary within the meaning of the Plan.

218.    **Structural Conflict of Interest**.  Further, to the extent that any of the Defendants had discretion to determine the level of payment under the plan, those Defendants' decisions should be reviewed *de novo*, because Defendants labored under a structural conflict of interest:

   a.    Specifically, as the sponsor of the self-funded Plan, Defendant Rocket Farms had a direct financial interest in paying as few benefits as possible.

   b.    Next, the other entities hired by Rocket Farms to make benefit decisions, EBMS AMPS, and CDS were directly responsible for setting up the Plan as a self-funded benefit arrangement with no reasonable network of hospitals. The Hospital is informed and believes that these entities promised that Rocket Farms could save money by setting up such an unusual structure, and in fact guaranteed Rocket Farms that Rocket Farms would achieve a significant level of cost savings.

   c.    On information and belief, the guarantees made by EBMS, AMPS and CDS may have even taken the form of contractual guarantees to Rocket Farms as to the amount of money saved, or promises of legal assistance or representation in the event that a hospital challenged the 140% of Medicare methodology.

219.    For these reasons, the non-Defendant administrators (EBMS, AMPS, and CDS) had a vested interest in denying all of the Hospital's appeals and refusing to pay more than 140% of

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1240381.1

1    Medicare; and to the extent they were vested with discretion to administer the terms of the Plan,

2    their decisions are entitled to no deference whatsoever.

3        220.    The Hospital also is entitled to its reasonable attorneys' fees under ERISA, given

4    Defendants' repeated insistence on adhering to their unjustifiable interpretations of the Plan over

5    the period of several years.

6        221.    Finally, the Hospital reserves all its rights under ERISA, including the right to

7    balance bill the patients at issue, notwithstanding any language in the Plan that purports to force

8    the Hospital to give up such rights.

9                              **SECOND CAUSE OF ACTION**

10                **(ACA Section 2707(b) via ERISA Section 502(a)(1)(B))**

11                              (Against All Defendants)

12       222.    Hospital incorporates all allegations set forth in the above paragraphs.

13       223.    The Hospital proceeds on this cause of action under ERISA pursuant to an

14    assignment of benefits it has obtained from the patients, as alleged above.

15       224.    In the alternative, and to the extent that Defendants' interpretation of and reliance

16    upon the "Claim Review and Validation" provisions buried deep within the Plan is not held to be

17    an abuse of discretion in violation of ERISA, the Plan has nevertheless violated – for dozens or

18    hundreds of the Hospital's benefit claims – ACA's mandate that self-funded ERISA plans offer a

19    MOOP applicable to all offered EHBs of no more than $6,350 in calendar year 2014, $6,600 in

20    calendar year 2015, $6,850 in calendar year 2016, and/or $7,150 in calendar year 2017.

21       225.    ERISA is an appropriate mechanism for the enforcement of the federal ACA

22    requirements imposed on self-funded ERISA plans.  *See, e.g.*, 29 U.S.C. § 1185d (incorporating

23    the provisions of part A of title XXVII of the PHS Act, including ACA Section 2707, into

24    ERISA); *see also King v. Blue Cross & Blue Shield of Illinois*, -- F.3d. --, No. 15-55880, 2017 WL

25    3928339 (9th Cir. Sept. 8, 2017) (recognizing that ACA amended ERISA and therefore imposes

26    additional benefit mandates upon self-funded ERISA plans).

27

28

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1240381.1

226.     The Hospital therefore, and in the alternative, seeks payment for the entire amount charged by the Hospital that is above the applicable MOOP limit in each calendar year in which the MOOP threshold was incurred by any Rocket Farms beneficiary or participant.

227.     Because the Plan deliberately chose not to maintain a network of hospital facilities that could provide emergency or inpatient care, all out-of-pocket cost sharing amounts, including balance billing, must count towards the MOOP limit.  After the MOOP limit has been met in any given calendar year for any given participant or beneficiary (whether on an individual or family basis), the Plan must pay 100% of the Hospital's charges.

228.     The Hospital also is entitled to its reasonable attorneys' fees under ERISA.

## THIRD CAUSE OF ACTION

### (Unfair Competition Under Section 43(a) of the Federal Lanham Act)

(Against Defendant Rocket Farms)

229.     The Hospital incorporates all allegations set forth in the above paragraphs.

230.     In the alternative, the Hospital seeks to recover for the harm caused by Rocket Farms' false and unfair statements about the nature of the services provided by the Hospital and the availability of those services to Rocket Farms employees.

231.     During the Self-Funded Period, the Hospital is informed and believes that Rocket Farms falsely reassured its employees that medical care provided by the Hospital was completely covered by the plan, and moreover, that they should continue to go to the Hospital and visit the emergency room for any kind of medical care, regardless of whether it was an emergency.

232.     Rocket Farms knew that these representations were false when they made them. First, Rocket Farms knew that the Hospital's emergency services were no longer covered at an adequate level by the Plan set up by Rocket Farms.  Regardless, Rocket Farms repeatedly encouraged its employees and families to go to the Hospital.

233.     Second, Rocket Farms knew at the time that the Plan was set up to be administered in such a way that was not intended to compensate the Hospital fairly for emergency services rendered.  Yet Rocket Farms told its employees and their families that treatment at the Hospital was covered, when in fact, it was not.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1240381.1

234.     These statements were not only likely to deceive Rocket Farms' employees and their families in a material way, but they did in fact deceive these individuals, who proceeded to overutilize the Hospital's emergency room.  At the same time, by shifting to an out-of-network arrangement, Rocket Farms made it impossible for its employees to seek a more cost-effective level of outpatient care, when appropriate, at the Salinas Valley Memorial Clinic or at Doctors on Duty, the Hospital's network of urgent care centers.

235.     The Hospital was substantially harmed by Rocket Farms' false and unfair statements.  The Hospital is obligated, by law, to treat all individuals who present at its emergency room, even where, as here, those individuals had inadequate coverage under the Plan.  Not only was the Hospital forced to expend emergency room resources to treat each and every Rocket Farms patient, regardless of whether there was an emergency; but the Hospital was also forced to accept an extremely low level of payment, which Rocket Farms and the Plan refused to reconsider despite hundreds of requests.

236.     For these reasons, Rocket Farms' unfair competition made it more difficult for the Hospital to compete in the market for healthcare services.

237.     There can be no doubt that the Hospital engages in interstate commerce.  Healthcare, as a field, is widely considered to implicate interstate commerce: witness Congress's power to enact the Affordable Care Act and its accompanying mandates on a nationwide level.

238.     In addition to being compensated for the damages it has suffered, the Hospital is entitled to force Rocket Farms to disgorge all of its ill-gotten gains from improperly shifting its employees' healthcare costs onto the Hospital during the Self-Funded Period.

239.     The Hospital is further entitled to a finding that such damages should be trebled because this is an "exceptional" case.

240.     Finally, the Hospital is entitled to an injunction preventing Rocket Farms from repeating its unfair and unlawful behavior in the future.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1240381.1

## **FOURTH CAUSE OF ACTION**

### **(Intentional Misrepresentation)**

(Against all Defendants)

241.  Hospital incorporates all allegations set forth in the above paragraphs.

242.  As alleged above, the Plan, through its agents, affirmatively represented to the Hospital with respect to each patient at issue that the Plan would cover 70% of the patient's medical bills, up to $21,666, after which, it would cover 100%.  The Plan also affirmatively represented to the Hospital with respect to each claim that the Plan had a maximum out-of-pocket limit of $6,350.

243.  Defendants never stated any of the limitations or exclusions at the time, which they subsequently have sought to apply to pay far less.  Stating the coverage without stating the alleged limits and exclusions to that coverage made the coverage statements misleading and the concealments into omissions of material facts.

244.  At the times that these representations and concealments occurred, Defendants knew that the representations were false under Defendants' interpretation of the concealed parts of the SPD, and knew that they intended never to pay more than 70% of a much smaller base amount, e.g., 140% of Medicare rates, or to comply with the Plan's MOOP provision. Defendants' statements also were materially misleading because they failed to disclose that payments towards the Plan's MOOP provision would not count the substantial unpaid balance for each claim above 140% of Medicare rates.  Defendants nonetheless made these representations knowing that they were false, and/or made recklessly and without regard for their truth.

245.  The Hospital reasonably relied upon Defendants' representations.  At no point did Defendants explain to the Hospital that the Plan purported to have a limitation or exclusion on benefits, whereby the Plan would not pay more than 140% of Medicare for all of the hospital services.

246.   The Hospital was substantially harmed when Defendants instead chose to pay just a fraction of the bills for the patients' care.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1240381.1

247. The Hospital brings this cause of action in its own right, and not on behalf of any of its patients. This cause of action is distinct and separate from the ERISA causes of action, and is not preempted by ERISA. *See, e.g.*, *The Meadows v. Employers Health Ins.*, 47 F.3d 1006 (9th Cir. 1995) (holding provider misrepresentation claims not preempted); *Morris B. Silver M.D., Inc. v. Int'l Longshore & Warehouse Union—Pacific Mar. Ass'n Welfare Pla*n, 206 Cal.Rptr.3d 461, 469-471 (2016) (same); *Mem'l Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236 (5th Cir. 1990) (same).

248. Accordingly, the Hospital seeks payment for 70% of each patient's medical bills, up to $21,666, and 100% of the patients' bills above that threshold, consistent with Defendants' promises to the Hospital.

249. The Hospital also seeks payment of all out-of-pocket expenses incurred for each patient above the $6,350 MOOP limitation that Defendants described in their calls with the Hospital.

## FIFTH CAUSE OF ACTION

### (Negligent Misrepresentation)

(Against all Defendants)

250. Hospital incorporates all allegations set forth in the above paragraphs.

251. As alleged above, the Plan, through one or more of the Defendants, affirmatively represented to the Hospital that it would cover would cover 70% of the patient's medical bills, up to $21,666, after which it would cover 100%, and also, that the Plan had a $6,350 out-of-pocket maximum. Defendants never stated any of the limitations or exclusions at the time which they subsequently have sought to apply to pay far less.

252. At the times that these representations were made, Defendants had no reasonable basis for believing that they were true. Defendants' statements were materially misleading because they failed to disclose that the "70%" and the "100%" they promised to pay were, in fact, based on a much smaller amount, calculated at 140% of Medicare, and not the entire bill. Defendants' statements also were materially misleading because they failed to disclose that payments towards the Plan's MOOP provision would not count the substantial unpaid balance for

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1240381.1

1  each claim above 140% of Medicare rates.  Defendants' statements were materially misleading

2  because they failed to disclose that 70% would be calculated not based on the Hospital's full billed

3  charges, but based on a much smaller, arbitrary, and inadequate level of payment.

4       253.    The Hospital reasonably relied upon Defendants' representations.  At no point did

5  Defendants explain to the Hospital that the Plan purported to have a limitation or exclusion on

6  benefits, whereby the Plan would not pay more than 140% of Medicare for all of the hospital

7  services.

8       254.    The Hospital was substantially harmed when Defendants instead chose to pay just

9  a fraction of the bills for the patients' care.

10       255.    The Hospital brings this cause of action in its own right, and not on behalf of any of

11  its patients.  This cause of action is distinct and separate from the ERISA causes of action, and is

12  not preempted by ERISA.

13       256.    Accordingly, the Hospital seeks payment for 70% of each patient's medical bills,

14  up to $21,666, and 100% of the patients' bills above that threshold, consistent with Defendants'

15  promises to the Hospital.

16       257.    The Hospital also seeks payment of all out-of-pocket expenses incurred for each

17  patient above the $6,350 MOOP limitation that Defendants described in their calls with the

18  Hospital.

19

20      **WHEREFORE**, The Hospital prays for and demand judgment against the Defendants as

21  set forth above and as follows:

22      A.    On the First Claim for Relief under ERISA, for an order compelling Defendants to

23  immediately pay for the care provided to all of the patients under the Plan in accordance with

24  ERISA and the terms of the Plan, based on a fair interpretation of Reasonable and Customary and

25  the MOOP limitation in the plan, in the amount of $1,438,557.75, or alternatively, an amount to be

26  proved at trial;

27      B.    On the Second Claim for Relief under ERISA and ACA, for an order compelling

28  Defendants to immediately and timely re-process the reimbursement claims for the care provided

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

47

1240381.1

to the patients in accordance with the ACA MOOP requirements for the applicable calendar year, such that the Plan must pay 100% of the Hospital's charges after accounting for the Plan's Deductible, in the total amount of $1,438,557.75, or in an amount to be proved at trial;

C.      On the Third Claim for Relief (Unfair Competition, Section 43(a) of the Lanham Act), for an order requiring Rocket Farms to disgorge the illicit profits from improperly shifting its employees' healthcare costs onto the hospital, along with an award of the damages suffered by the Hospital, along with a finding that such damages should be trebled because this is an "exceptional" case, plus an injunction preventing Defendants from repeating their unlawful behavior in the future;

D.      On the Fourth Claim for Relief, payment for 70% of each patient's medical bills, up to $21,666, and 100% of the patients' bills above that threshold, consistent with Defendants' promises to the Hospital, and in the alternative, payment of all out-of-pocket expenses incurred for each patient above the $6,350 MOOP limitation that Defendants represented to the Hospital.

E.      On the Fifth Claim for Relief, payment for 70% of each patient's medical bills, up to $21,666, and 100% of the patients' bills above that threshold, consistent with Defendants' promises to the Hospital, and in the alternative, payment of all out-of-pocket expenses incurred for each patient above the $6,350 MOOP limitation that Defendants represented to the Hospital.

F.      Awarding costs, including attorneys' fees to the full extent permitted under the law, including without limitation, pursuant to ERISA, the Lanham Act, and any other applicable law;

G.      Awarding pre- and post-judgment interest to the full extent permitted under law;

H.      Awarding punitive damages to the full extent permitted under law;

I.      And awarding such other relief as the Court deems just, proper and available under the law.

Dated:  December 12, 2017              HOOPER, LUNDY & BOOKMAN, P.C.


By:      _/s/ Eric D. Chan_
                    ERIC D. CHAN
         Attorneys for Salinas Valley Memorial Hospital System

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all claims so triable.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1240381.1

# EXHIBIT 2

1  KENNADAY LEAVITT OWENSBY PC
   CURTIS S. LEAVITT (SBN 162032)
2  cleavitt@kennadayleavitt.com
   LANCE M. MARTIN (SBN 294457)
3  lmartin@kennadayleavitt.com
   621 Capitol Mall, Suite 2500
4  Sacramento, California 95814
   Telephone:     (916) 732-3060
5
   Attorneys for Defendants
6  MONTEREY PENINSULA
   HORTICULTURE, INC. dba ROCKET
7  FARMS;
   MONTEREY PENINSULA
8  HORTICULTURE, INC. / STEVEN
   ROBERTS ORIGINAL DESSERTS, LLC,
9  EMPLOYEE BENEFIT PLAN

10
                    UNITED STATE DISTRICT COURT
11
           NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION
12

13  SALINAS VALLEY MEMORIAL                    Case No. 5:17-cv-07076-VKD
    HEALTHCARE SYSTEM,
14                                             **MONTEREY PENINSULA
                   Plaintiff,                  HORTICULTURE, INC.'S
15                                             THIRD-PARTY COMPLAINT**
          v.
16                                             Judge: Hon. Mag. Judge Virginia K. DeMarchi
    MONTEREY PENINSULA
17  HORTICULTURE, INC. dba ROCKET             Complaint Filed: December 13, 2017
    FARMS; MONTEREY PENINSULA                 Trial Date: None set.
18  HORTICULTURE, INC. / STEVEN
    ROBERTS ORIGINAL DESSERTS, LLC,
19  EMPLOYEE BENEFIT PLAN,

20                 Defendants.

21

22

23       Third-Party Plaintiff, MONTEREY PENINSULA HORTICULTURE, INC. ("Monterey"),

24  for itself and as fiduciary of the Monterey Peninsula Horticulture / Steven Roberts Original Desserts,

25  LLC, Employee Benefit Plan (the "Plan" or Self-Funded Plan), files this Third-Party Complaint

26  against Third-Party Defendants, EMPLOYEE BENEFIT MANAGEMENT SERVICES, INC.

27  ("EBMS"), CLAIMS DELEGATE SERVICES, LLC ("CDS"), ADVANCED MEDICAL PRICING

28  SOLUTIONS, INC. ("AMPS"), and ALLIANT INSURANCE SERVICES, INC. ("Alliant")

KENNADAY LEAVITT OWENSBY PC
ATTORNEYS AT LAW
621 CAPITOL MALL, SUITE 2500
SACRAMENTO, CA 95814

(collectively, Third-Party Defendants") for breach of fiduciary duty, breach of written contract and professional negligence.

**JURISDICTION AND VENUE**

1.     Jurisdiction is proper in this Court under 28 U.S.C. sections 1331, 1332 and 1367. Federal questions exist under 28 U.S.C. section 1331 because Monterey alleges claims under the following federal statute: the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(e)(1). Diversity jurisdiction exists under 28 U.S.C. section 1332 because this case is between citizens of different states and the amount in controversy exceeds $75,000 to each of them. Supplemental jurisdiction exists under 28 U.S.C. section 1367 because Monterey's claims are based on, arise from, and are factually interrelated with Salinas' allegations against Monterey.

2.     This Court has personal jurisdiction over the parties because each Defendant systematically and continuously conducts business in this State, and otherwise has minimum contacts with this State sufficient to establish personal jurisdiction over each of them.

3.     Venue is proper in the San Jose Division of the United States District Court for the Northern District of California under 28 U.S.C. sections 1391(b) and (c), and 29 U.S.C. section 1132(e)(2). This judicial district is the appropriate venue under 28 U.S.C. sections 1391(b) and (c) because this district is where the acts, omissions and events giving rise to Monterey's causes of action occurred, and where EBMS, CDS (now known as AMPS) conduct business. This judicial district is the appropriate venue under 29 U.S.C. section 1132(e)(2) because this district is where the Plan was administered and where the breaches too laces that causes loss and damage to Monterey.

**THE PARTIES**

4.     Third-Party Plaintiff Monterey is a California corporation with its principle place of business in Salinas, California. Monterey is in the agricultural business and provides nursery products, including greenhouse growers, indoor potted foliage plants, and edible herbs, fruits and vegetables to its customers. Monterey is the sponsor and plan administer of the Plan. Monterey is a fiduciary of the Plan under ERISA section 3(21)(A)(i) and (iii).

5.     Third-Party Defendant Employee Benefit Management Services, Inc. is a Montana corporation with its principle place of business at 1075 Overland Ave, Billings, MT. EBMS conducts

KENNADAY LEAVITT OWENSBY PC
ATTORNEYS AT LAW
621 CAPITOL MALL | SUITE 2500
SACRAMENTO, CA 95814

business in California and is a third-party administrator providing administrative services, including plan design, medical bill review, and claims administrative services, to self-funded plans. EBMS is the claims administrator of the Plan. EBMS drafted and provided Monterey with its plan documents. In addition to its third-party administrative services, EBMS adjusted, reviewed and paid claims under the Plan. Specifically, EBMS determined what healthcare providers would be paid by the Plan, and in what amount. EBMS received compensation from Monterey and/or the Plan for services provided to Monterey and the Plan. EBMS is a fiduciary of the Plan under ERISA section 3(21)(A)(i) and (iii) with regard to the design and terms of the Plan document, with regarding to cost saving mechanism for claims processing, and with regard to the decision to retain AMPS and CDS.

6.      Third-Party Defendant Advanced Medical Pricing Solutions is an Arizona corporation with its principal place of business at 35 Technology Parkway, Suite 100, Peachtree Corners, GA. AMPS conducts business in California, and provides administrative services, including medical bill review and reference based pricing and reimbursement processes, and the determination of what health claims should be paid and in what amount. Monterey contracted with AMPS (through Monterey's contract with CDS) for administrative services, and AMPS provided administrative services, including whether the Plan should be amended to reflect AMPS' medical bill review and reference based pricing and reimbursement processes, setting out-of-network reimbursement rates for healthcare provider claims, negotiation of direct provider contracts, medical bill or claim review, and the determination of what health claims should be paid and in what amount. Thus, AMPS is a fiduciary of the Plan under ERISA section 3(21)(A)(i) and (iii).

7.      Third-Party Defendant CDS is a Florida limited liability company with its principal place of business at 420 Technology Parkway, Norcross, GA. On or around August 1, 2014, CDS became a wholly-owned subsidiary of AMPS. CDS conducts business in California, both on its own and through its parent company AMPS. CDS provides administrative services, including medical bill review and reference based pricing and reimbursement processes, and the determination of what health claims should be paid and in what amount. Monterey contracted with CDS for administrative services, and CDS provided administrative services, including whether the Plan should be amended to reflect CDS' medical bill review and reference based pricing and reimbursement process, setting

KENNADAY LEAVITT OWENSBY PC
ATTORNEYS AT LAW
621 CAPITOL MALL, SUITE 2500
SACRAMENTO, CA 95814

out-of-network reimbursement rates for healthcare provider claims, negotiation of direct provider contracts, medical bill or claim review, referenced based pricing and referenced based reimbursement of claims, and the determination of what health claims should be paid and in what amount. Thus, AMPS is a fiduciary of the Plan under ERISA section 3(21)(A)(i) and (iii).

8. Third-Party Defendant Alliant is a Delaware corporation with its principal place of business at 1301 Dove Street, Suite 200, Newport Beach, CA. Alliant conducts business in California, and provides insurance broker and employee benefit plan consulting services to employers. Alliant serves Monterey as insurance broker, employee benefits consultants, and trusted advisors. Alliant counseled and assisted Monterey on the Plan's design, legal compliance aspects, administration, and by procuring stop-loss insurance coverage for the Plan. Alliant received compensation from Monterey and/or the Plan for services provided to Monterey and the Plan. Alliant is a part in interest under ERISA section 3(14)(A) with regard to the Plan.

## **FACTUAL ALLEGATIONS**

The Plan Provides Healthcare Services for Monterey's Employees and Employees' Dependents.

9. The Plan was a health benefit plan that was sponsored by Monterey from July 1, 2014 through June 30, 2017. The Plan was self-funded by Monterey through employer and participant contributions.

10. The Plan is an employee benefit plan within the meaning of ERISA section 3(1), and is subject to Title I of ERISA and its fiduciary standards. The Plan is required to file Form 5500s for each plan year.

11. Monterey's employees and employees' dependents are participants of the Plan ("Plan participants"). The Plan insures Monterey's employees and employees' dependents against losses arising from their medical care. Monterey's employees and employees' dependents rely upon the Plan's benefits to cover the costs of their healthcare in the same manner as a health insurance policy.

12. Monterey intended for the Plan to cover health claims of its employees and employees' dependents similar to the health insurance policies Monterey utilized to provide healthcare coverage before July 1, 2014.

///

KENNADAY LEAVITT OWENSBY PC
ATTORNEYS AT LAW
621 CAPITOL MALL, SUITE 2500
SACRAMENTO, CA 95814

13.     To limit its maximum potential liability, Monterey purchased excess liability insurance (stop-loss) policy for the Plan. Defendants advised Monterey in procuring stop-loss insurance coverage for the plan.

Monterey Creates the Plan at The Recommendation of Alliant, EBMS, AMPS and CDS.

14.     The relationship and transaction between Monterey and the Third-Party Defendants began with the Plan and arose from the trusted relationship of Monterey with insurance agent and benefit consultants, Alliant, in 2014.

15.     In 2014, Monterey was presented by Alliant, itself and on behalf of EBMS, CDS and/or AMPS, with a proposal to change Monterey healthcare insurance coverage for its employees and employees' dependents from a fully insured plan to a self-insured plan.

16.     As part of the switch to a self-insured plan, EBMS, AMPS, CDS, and Alliant presented the self-insured plan as a cost-savings mechanism. As part of the self-funded plan, AMPS, CDS, EBMS, and Alliant also presented a Claim Review and Validation Program and a Reference Based Reimbursement ("RBR") program to Monterey and the Plan. AMPS, CDS, EBMS, and Alliant represented to Monterey and the Plan that their self-funded plan was the type of RBR program that was accepted and would enable Monterey to reduce its costs for providing health insurance to its employees and employees' dependents.

17.     At the time the self-funded plan, the Claim Review and Validation Program, and RBR Program were presented to Monterey, EBMS, AMPS, CDS, and Alliant represented they were knowledgeable in self-funded plans, claim review and validation, and RBR and pricing programs, and Monterey relied upon them and their representations.

18.     Alliant advised Monterey to utilize EBMS, AMPS and CDS' services with respect to the Plan.

19.     Alliant, EBMS, AMPS, and CDS were in a position of trust and confidence with regard to Monterey, often rendered compliance advice to Monterey concerning the Plan, and represented to Monterey that changing to a self-funded plan would help manage costs. Monterey relied upon the advice of Alliant, EBMS, AMPS, and CDS, and amended Monterey's healthcare insurance coverage from a fully-insured plan to a self-funded plan, and implemented the Claim

MONTEREY PENINSULA HORTICULTURE, INC.'S THIRD-PARTY COMPLAINT

KENNADAY LEAVITT OWENSBY PC
ATTORNEYS AT LAW
621 CAPITOL MALL, SUITE 2500
SACRAMENTO, CA 95814

Review and Validation Program and the RBR under the self-funded plan.

20.     In 2014, Monterey established the Plan as a self-funded plan.

<u>Alliant, EBMS, AMPS and CDS Neither Properly Created Nor Properly Administered the Plan</u>.

21.     The operative Plan document, the Summary Plan Description ("SPD"), stated that EBMS was the Claims Administrator for the Plan. The services agreement between Monterey and EBMS listed EBMS' duties and responsibilities as Claim Administrator. As Claim Administrator, EBMS' duties and responsibilities included, but were not limited to, preparing the SPD, processing and adjudicating all claims, reviewing and responding to appeals regarding benefit determinations, facilitating reviews by independent review organizations, and answering medical benefit and claim questions.

22.     The services agreement between Monterey and AMPS and CDS listed AMPS and CDS' duties and responsibilities as third-party administrators. As the third-party administrator, AMPS and CDS' duties and responsibilities included, but were not limited to, implementing and administering the Claim Review and Validation Program and the RBR Program, engaging billing review specialists and medical review specialists, making benefit determinations under the SPD, and handling benefit determination appeals. Additionally, the service agreement mandated that the Plan be amended to include a list of "Required Modifications." These "Required Modifications" change the Plan materially, impacting the Plan's "structure, design, concepts, definitions, terms and provisions" applicable to all benefit claims submitted to the Plan. The result of the "Required Modifications" that AMPS and CDS dictate be made to the Plan was that AMPS and CDS were given total discretion and authority over benefit claims.

23.     The service agreements between Monterey and the Defendants and the SPD purport to be legitimate, but operationally, the agreements were not followed and the Plan operated nothing like the plan presented to Monterey. The services actually perpetrated upon Monterey, the Plan and Monterey's employees and employees' dependents who participated in the Plan was nothing like what Monterey and the Plan contracted to receive for the following reasons:

a.     The SPD prepared and modified by EBMS, AMPS, and CDS violates federal law. Specifically, AMPS' and CDS' Claim Review and Validation Program and RBR

KENNADAY LEAVITT OWENSBY PC
ATTORNEYS AT LAW
621 CAPITOL MALL | SUITE 2500
SACRAMENTO, CA 95814

Program shifted healthcare costs to participants and violated the Affordable Care Act ("ACA") mandates, including the "minimum value" provision to participants from the Plan and rendering the Plan unaffordable. Additionally, the Claims Review and Validation Program and Plan Limitations violate ERISA, including the disclosure rules;

b.     EBMS, AMPS, and CDS did not administer the Plan in accordance with the SPD. EBMS, AMPS, and CDS discounted virtually all substantive medical claims submitted to the Plan by healthcare providers in a similar fashion for claims incurred or presented in the 2014 and 2017 time period. Specifically, EBMS, AMPS, and CDS did not administer the Plan according to the SPD and did not utilize the RBR program;

c.     EBMS, AMPS, and CDS made false communications to healthcare providers regarding the level of plan benefits under assignment of benefits received from Plan participants. EBMS, AMPS, and CDS communicated benefits to healthcare providers that exceeded the actual Plan benefits. Specifically, EBMS, AMPS, and CDS made false representations to healthcare providers that the Plan would cover 70% of the medical bills, up to $21,666, after which, the Plan would cover 100%. EBMS, AMPS, and CDS also made false representations to healthcare providers that the Plan had a maximum out-of-pocket limit of $6,350 for all services without limitation; and

d.     AMPS' and CDS' Claim Review and Validation Program and RBR Program, when applied to the Plan's design, guaranteed Monterey's employees and employees' dependents would be subject to balance billing from healthcare providers.

24.     Operationally, EBMS, CDS, and AMPS act with complete discretion and authority as to the disbursement of Plan assets on all healthcare provider claims. EBMS, CDS and AMPS exercised complete authority and control over Plan assets by determining what payment would be made out of Plan assets, to whom such payments would be made, and in what amount. Monterey approved aggregate funding requests, but did not determine any individual claim or vendor payment amounts.

25.     EBMS, AMPS, and CDS did not disclose to Monterey or the Plan the full nature and

KENNADAY LEAVITT OWENSBY PC
ATTORNEYS AT LAW
621 CAPITOL MALL | SUITE 2500
SACRAMENTO, CA 95814

MONTEREY PENINSULA HORTICULTURE, INC.'S THIRD-PARTY COMPLAINT

scope of EBMS', AMPS', and CDS' business methodologies with regard to services EBMS, AMPS, and CDS rendered to the Plan, although EBMS, AMPS, and CDS had a legal duty to do so. Further, EBMS, AMPS and CDS did not disclose to Plan participants the nature and scope of their liability to healthcare providers, although EBMS had a legal duty to do so.

26.     EBMS, AMPS, and CDS represented to Monterey that the self-funded plan would protect participants against healthcare provider "balance billing." EBMS, AMPS, and CDS failed to disclose to Plan participants the nature, scope, and amount of monetary liability they would owe to healthcare providers as a result of the Claim Review and Validation Program and RBR Program utilized by AMPS and CDS. AMPS and CDS (and other Defendants) also failed to disclosure to Plan participants that virtually all significant claims administered by them would subject participants to monetary liabilities for balances due providers who rendered healthcare services.

27.     The SPD by its term and as administered by EBMS, AMPS, and CDS operationally, deceived Monterey, the Plan and Monterey's employees and employee beneficiaries into believing EBMS, AMPS, and CDS were achieving savings in claims paid by the Plan when no savings were actually realized or could ever possibly be realized.

<u>Healthcare Providers Sue Monterey and the Plan for Plan Benefits.</u>

28.     As a result of both the flawed design of the Plan as stated in the SPD and the improper administration of the Plan by EBMS, AMPS, and CDS, healthcare providers appealed the benefit determinations. These appeals were adjudicated by EBMS at the first level, and AMPS, and CDS at the second level, as stated in the SPD.

29.     After exhausting the first and second appeal levels, healthcare providers sued Monterey and the Plan to recover monies on alleged underpaid services. See *Salinas Valley Memorial Healthcare System v. Monterey Peninsula Horticulture, Inc. d/b/a Rocket Farms, et al.,* Case No. 5:17-cv-7076-VKD, United States District Court, Northern District of California, San Jose Division, and *Long Beach Memorial Medical Center v. Monterey Peninsula Horticulture, Inc.*, *et al.*, Case No. BC711222, Superior Court of the State of California, County of Los Angeles. The healthcare providers' lawsuit alleges, among other allegations, that Monterey and the Plan underpaid the healthcare providers according to the rates established in the SPD and according to representations

KENNADAY LEAVITT OWENSBY PC
ATTORNEYS AT LAW
621 CAPITOL MALL, SUITE 2500
SACRAMENTO, CA 95814

made by EBMS, AMPS, and CDS on behalf of Monterey and the Plan.

30.     Defendants' deceitful business practices forced Monterey to expend significant time and resources in identifying, disputing, appealing and negotiating allegedly underpaid claims. Defendants' deceitful self-funded plan and RBR scheme resulted in at least $1.6 million in gross claims contested. Monterey and the Plan have suffered, and continue to suffer, monetary damages in excess of $1.6 million due to the actions and omissions of Defendants.

## FIRST CAUSE OF ACTION

### (Breach of Fiduciary Duty against All Defendants)

Breach of Fiduciary Duty under Section 502(a)(2) against EBMS

31.     All of the factual allegations set forth above in paragraphs 1 through 30 are incorporated by reference as though set forth herein.

32.     "Fiduciary status under ERISA is a functional concept, and if Defendants have acted like a fiduciary, they may have incurred fiduciary obligations." *Walsh v. Principal Life Ins. Co.*, 266 F.R.D. 232, 241 (S.D. IA 2010). In other words, ERISA imposes fiduciary obligations on individuals who are not named as fiduciaries, but nevertheless exercise actual authority over plan assets. Furthermore, the Eighth Circuit has stated that "courts should construe the term fiduciary broadly under ERISA, and in favor of finding that a fiduciary duty exists." *Id.* at 241; *Olson v. E.F. Hutton & Co., Inc.*, 957 F.2d 622, 625 (8th Cir. 1992).

33.     Here, EBMS is a fiduciary because EBMS exercises authority over Plan assets. Although EBMS is not a named fiduciary under the SPD, EBMS is a fiduciary of the Plan within the meaning of ERISA section 3(21)(A)(i) and (iii) because EBMS had authority over Plan assets, exercised discretion regarding the design and terms of the SPD, with regard to cost savings mechanisms for claim processing, and with regard to the decision to retain AMPS and CDS.

34.     A fiduciary has a duty to perform its obligations and responsibilities under the Plan prudently, in the best interest of the participants and beneficiaries, and in accordance with the terms of the Plan document. 29 U.S.C. § 1104(a)(1).

35.     As part of its fiduciary duty, EBMS has the legal duty to provide full, fair and prompt disclosure to Monterey of all facts within its knowledge which were or could have been material to

KENNADAY LEAVITT OWENSBY PC
ATTORNEYS AT LAW
621 CAPITOL MALL | SUITE 2500
SACRAMENTO, CA 95814

matters within EBMS' relationship with Monterey. The facts show EBMS breached this legal duty. Specific examples are shown by the following actions and/or omissions:

    a.    Drafting an SPD which violated federal law, including, but not limited to: (1) the ACA mandates, including the "minimum value" provision and rendering the Plan unaffordable, and (2) ERISA, including the disclosure requirements for plan subjects;

    b.    Drafting an illusory SPD which shifted the risk for losses to Monterey and Monterey's employees and employees' dependents;

    c.     Failing to act in the best interest of Monterey, the Plan, Monterey's employees, and employees' dependents by causing Monterey and the Plan to engage AMPS and CDS' services, which exposed Monterey and Monterey's employees and employees' dependents to collection activities from providers;

    d.    Failing to disclose to Monterey, the Plan, and Monterey's employees and employees' dependents the nature and scope of their liability for claims left unpaid by the self-funded plan, the Claim Review and Validation Program, and the RBR Program, and then exposing them to that liability for unpaid claims;

    e.    Failing to administer the Plan according to the SPD and discounting all medical claims paid;

    f.    Failing to correctly communicate the Plan's benefits to healthcare providers and making false representations about the Plan's benefits to healthcare providers. For example, EBMS made false representations to Salinas Valley Hospital that the Plan would cover 70% of a patient's medical bills, up to $21,666, after which the Plan would cover 100%; and

    g.    Or otherwise as alleged above.

36.    EBMS further breached its fiduciary duty by misrepresenting to Monterey that the self-funded plan, Claim Review and Validation Program, and RBR Program would result in savings to Monterey and the Plan. These representations were made in order to induce Monterey to create a self-funded plan administered by EBMS and to retain AMPS and CDS to administer the Claim Review and Validation and RBR Programs. These misrepresentations were material because without

KENNADAY LEAVITT OWENSBY PC
ATTORNEYS AT LAW
621 CAPITOL MALL | SUITE 2500
SACRAMENTO, CA 95814

them, and the trust that Monterey had in Alliant and EBMS, Monterey would not have signed the services agreement with EBMS, AMPS, and CDS. As a result of Monterey reliance on EBMS' misrepresentations, Monterey and the Plan was damaged in the amount of claims payments that it has incurred as a result of healthcare providers' refusal to accept the amount processed by EBMS, AMPS, and CDS.

37.     In taking these and other actions, EBMS failed to act in a manner which was solely in the interest of Monterey, the Plan, and Monterey's employees and employees' dependents who participated in the Plan or to act with the care, skill, prudence, and diligence under the circumstances that a prudent person acting in a like capacity would use.

38.     EBMS is liable under ERISA section 409 to make good any losses incurred by the Plan as a result of EBMS' breach, to restore any personal profits it received, and for such other equitable or remedial relief as the court may deem appropriate.

39.     As a result of EBMS' breach of fiduciary duties, Monterey and the Plan suffered damages in excess of $1.6 million.

Breach of Fiduciary Duty under Section 502(a)(2) against CDS

40.     All of the factual allegations set forth above in paragraphs 1 through 39 are incorporated by reference as though set forth herein.

41.     CDS is a named fiduciary of the Plan in Monterey's service agreement with CDS and AMPS. Additionally, CDS is also fiduciary of the Plan within the meaning of ERISA sections 3(21)(A)(i) and (iii) because CDS had authority over Plan assets, and exercised discretion regarding the design and terms of the SPD as well as cost savings mechanisms for claim processing.

42.     As part of its fiduciary duty, CDS has the legal duty to provide full, fair and prompt disclosure to Monterey of all facts within its knowledge which were or could have been material to matters within CDS' relationship with Monterey. The facts show CDS breached this legal duty. Specific examples are shown by the following actions and/or omissions:

a.      Drafting an SPD which violated federal law, including, but not limited to: (1) the ACA mandates, including the "minimum value" provision and rendering the Plan unaffordable, and (2) ERISA, including the disclosure requirements for plan subjects;

KENNADAY LEAVITT OWENSBY PC
ATTORNEYS AT LAW
621 CAPITOL MALL, SUITE 2500
SACRAMENTO, CA 95814

00141025.1

-11-

MONTEREY PENINSULA HORTICULTURE, INC.'S THIRD-PARTY COMPLAINT

b.  Drafting an illusory SPD which shifted the risk for losses from to Monterey and Monterey's employees and employees' dependents;

c.  Failing to disclose to Monterey, the Plan, and Monterey's employees and employees' dependents the nature and scope of their liability for claims left unpaid by the self-funded plan and the Claim Review and Validation and RBR Programs, and then exposing them to that liability for unpaid claims;

d.  Failing to administer the Plan according to the SPD and discounting all medical claims paid;

e.  Failing to correctly communicate the Plan's benefits to healthcare providers and making false representations about the Plan's benefits to healthcare providers. For example, EBMS made false representations to Salinas Valley Hospital that the Plan would cover 70% of a patient's medical bills, up to $21,666, after which the Plan would cover 100%; and

f.  Engaging in a pricing scheme and exposing Monterey and the Plan to litigation from hospitals.

g.  Or otherwise as alleged above.

43.  CDS further breached its fiduciary duty by misrepresenting to Monterey that the self-funded plan and Claim Review and Validation and RBR Programs would result in savings to Monterey and the Plan. These representations were made in order to induce Monterey to create a self-funded plan administered by EBMS and retain AMPS and CDS to administer the Claim Review and Validation and RBR Programs. These misrepresentations were material because without them, Monterey would not have signed the services agreement with AMPS and CDS. As a result of Monterey's reliance on CDS' misrepresentations, Monterey was damaged in the amount of claims payments that it has incurred as a result of healthcare providers' refusal to accept the amount processed by EBMS, AMPS, and CDS.

///

44.  In taking these and other actions, CDS failed to act in a manner which was solely in the interest of Monterey, the Plan, and Monterey's employees and employees' dependents who

KENNADAY LEAVITT OWENSBY PC
ATTORNEYS AT LAW
621 CAPITOL MALL, SUITE 2500
SACRAMENTO, CA 95814

1  participated in the Plan, or to act with the care, skill, prudence, and diligence under the circumstances

2  that a prudent person acting in a like capacity would use.

3      45.    CDS is liable under ERISA section 409 to make good any losses incurred by the Plan

4  as a result of EBMS' breach, to restore any personal profits it received, and for such other equitable

5  or remedial relief as the court may deem appropriate.

6      46.    As a result of CDS' breach of fiduciary duties, Monterey and the Plan suffered

7  damages in excess of $1.6 million.

8  Breach of Fiduciary Duty under Section 502(a)(2) against AMPS

9      47.    All of the factual allegations set forth above in paragraphs 1 through 46 are

10  incorporated by reference as though set forth herein.

11      48.    AMPS purchased CDS in 2014, and took full managerial control of CDS in 2016.

12  Pursuant to Monterey's service agreement with CDS, CDS assigned all of its rights and obligations

13  under the services agreement to AMPS.

14      49.    AMPS (through CDS) is a named fiduciary of the Plan in Monterey's service

15  agreement. Additionally, AMPS is also a fiduciary of the Plan within the meaning of ERISA sections

16  3(21)(A)(i) and (iii) because AMPS had authority over Plan assets, and exercised discretion regarding

17  the design and terms of the SPD, and cost savings mechanisms for claim processing.

18      50.    As part of its fiduciary duty, AMPS had the legal duty to provide full, fair and prompt

19  disclosure to Monterey of all facts within its knowledge which were or could have been material to

20  matters within AMPS' relationship with Monterey. The facts show AMPS breached this legal duty.

21  Specific examples are shown by the following actions and/or omissions:

22      a.    Drafting an SPD which violated federal law, including, but not limited to: (1) the ACA

23      mandates including the "minimum value" provision and rendering the Plan

24      unaffordable, and (2) ERISA, including the disclosure requirements for plan subjects;

25      b.    Drafting an illusory SPD which shifted the risk for losses to Monterey and Monterey's

26      employees and employees' dependents;

27      c.    Failing to disclose to Monterey, the Plan, and Monterey's employees and employees'

28      dependents the nature and scope of their liability for claims left unpaid by the self-

KENNADAY LEAVITT OWENSBY PC
ATTORNEYS AT LAW
621 CAPITOL MALL, SUITE 2500
SACRAMENTO, CA 95814

00141025.1

-13-

MONTEREY PENINSULA HORTICULTURE, INC.'S THIRD-PARTY COMPLAINT

funded plan and Claim Review and Validation and RBR Programs, and then exposing them to that liability for unpaid claims;

d.  Failing to administer the Plan according to the SPD and discounting all medical claims paid;

e.  Failing to correctly communicate the Plan's benefits to healthcare providers; and making false representations about the Plan's benefits to healthcare providers. For example, EBMS made false representations to Salinas Valley Hospital that the Plan would cover 70% of a patient's medical bills, up to $21,666, after which the Plan would cover 100%; and

f.  Engaging in a pricing scheme and exposing Monterey and the Plan to litigation from hospitals.

g.  Or otherwise as alleged above.

51.  AMPS further breached its fiduciary duty by misrepresenting to Monterey that the self-funded plan and the Claim Review and Validation and RBR Programs would result in savings to Monterey and the Plan. These representations were made in order to induce Monterey to create a self-funded plan administered by EBMS and retain AMPS and CDS to administer the Claim Review and Validation and RBR Programs. These misrepresentations were material because without them, Monterey would not have signed the services agreement with AMPS and CDS. As a result of Monterey's reliance on AMPS' misrepresentations, Monterey and the Plan were damaged in the amount of claims payments that they have incurred as a result of healthcare providers' refusal to accept the amount processed by EBMS, AMPS, and CDS.

52.  In taking these and other actions, AMPS failed to act in a manner which was solely in the interest of Monterey, the Plan, and Monterey's employees and employees' dependents who participated in the Plan or to act with the care, skill, prudence, and diligence under the circumstances that a prudent person acting in a like capacity would use.

53.  AMPS is liable under ERISA section 409 to make good any losses incurred by the Plan as a result of EBMS' breach, to restore any personal profits it received, and for such other equitable or remedial relief as the court may deem appropriate.

KENNADAY LEAVITT OWENSBY PC
ATTORNEYS AT LAW
621 CAPITOL MALL | SUITE 2500
SACRAMENTO, CA 95814

00141025.1

-14-

MONTEREY PENINSULA HORTICULTURE, INC.'S THIRD-PARTY COMPLAINT

54.     As a result of AMPS' breach of fiduciary duties, Monterey and the Plan suffered damages in excess of $1.6 million.

Breach of Fiduciary Duty under Section 502(a)(3) against ALLIANT

55.     All of the factual allegations set forth in paragraphs 1 through 54 above are incorporated by reference as though set forth herein.

56.     Alliant is liable as a non-fiduciary service provider to the Plan for the breach of fiduciary duty by EBMS, AMPS, and CDS because Alliant knowingly participated in the violations against the Plan. 29 U.S.C. § 1105.

57.     The facts, as outlined above, show that Alliant knew EBMS, AMPS, and CDS were fiduciaries of the Plan and that they owed special duties to Monterey and the Plan as a result of that relationship. Alliant was aware of the misrepresentations made to the Plan and Monterey relating to purported savings of utilizing a self-funded plan and the Claim Review and Validation and RBR programs, and how the Claim Review and Validation and RBR programs worked. However, Alliant never informed Monterey or the Plan that these representations were false. Instead, Alliant permitted EBMS, AMPS, and CDS to proceed with their scheme against Monterey and the Plan and their breach of fiduciary duties.

58.     As a result of Alliant's knowing participation in EBMS, AMPS, and CDS' breach of fiduciary duties, Alliant is liable to Monterey and the Plan for damages it incurred as a result of these breaches.

## **SECOND CAUSE OF ACTION**

### **(Breach of Written Contract against All Defendants)**

Breach of Written Contract against EBMS

59.     All of the factual allegations set forth in paragraphs 1 through 58 above are incorporated by reference as though set forth herein.

60.     Monterey entered into a service agreement with EBMS in 2014. The service agreement required Monterey to pay EBMS a fee. Monterey paid the fee to EBMS. In exchange for the fee, the service agreement required EBMS to perform services for Monterey and the Plan. These

KENNADAY LEAVITT OWENSBY PC
ATTORNEYS AT LAW
621 CAPITOL MALL, SUITE 2500
SACRAMENTO, CA 95814

services, included, but are not limited to:

**SEC. II**      **DUTIES AND RESPONSIBILITIES OF THE CONTRACT ADMINISTRATOR**

2.01      The Contract Administrator agrees to perform the following administrative services for the Plan Sponsor:

    (a)      assist in the preparation and printing of a Plan Document, summaries of benefits, identification cards, and other material necessary to the operation of the Plan;

    (b)      process and adjudicate all claims presented for payment in accordance with the Plan Document, including but not limited to reasonable investigatory work in determining claim eligibility, and preparing and distributing benefit checks, and Explanation of Benefits to Plan Members and/or service providers, as applicable;

    (c)      Contract Administrator shall review and respond to appeals made by Plan Members of adverse benefit determinations as may be required in the Plan Document.

    (d)      To the extent set forth in the Plan Document, Contract Administrator, on behalf of Plan Sponsor, will facilitate reviews required by an Independent Review Organization (IRO). The Contract Administrator will submit all documentation regarding the appeal to the IRO and work with the IRO as needed to complete its review. The Contract Administrator will pass all costs of the IRO review on to the Plan Sponsor as described on Schedule A. Plan Sponsor will be responsible for collecting any allowable reimbursements from the Plan Member;

    (e)      corresponding with Plan Members and their representatives regarding possible third-party liability for expenses paid by the Plan on Plan Member's behalf, as set forth in Schedule L, Contract Administrator shall have no responsibility or liability for the refusal of Plan Members or their representatives to reimburse the Plan for such expenses. Contract Administrator shall have no obligation to take any legal action to enforce the Plan's subrogation rights;

    (f)      respond to inquiries from the Plan Sponsor, Plan Members and service providers concerning requirements, procedures or benefits of the Plan, though such information shall not constitute a determination of benefits that will be paid under the Plan or a guarantee or certification to anyone that any amount will be paid. Benefit determinations can only be made after a complete claim is submitted and fully processed by the Contract Administrator, and are subject to all eligibility requirements, limitations, exclusions and other provisions in effect when a claim is processed;

61. EBMS breached the services agreement by failing to perform these services, as well as other provisions in the services agreement with Monterey.

62. As a result of EBMS' breach, Monterey and the Plan suffered damages in excess of $1.6 million.

Breach of Written Contract against CDS

63. All of the factual allegations set forth in paragraphs 1 through 62 above are incorporated by reference as though set forth herein.

64. Monterey entered into a service agreement with CDS in 2014. The services agreement required Monterey to pay CDS a fee. Monterey paid the fee to CDS. In exchange for the fee, the service agreement required CDS to perform services for Monterey and the Plan. These services

KENNADAY LEAVITT OWENSBY PC
ATTORNEYS AT LAW
621 CAPITOL MALL, SUITE 2500
SACRAMENTO, CA 95814

00141025.1

-16-

included, but were not limited to:

65.     CDS breached the services agreement by failing to perform these services, as well as

- **Description of Services**.  CDS assumes the obligations will provide the services described below (the "Services"), subject to and in accordance with the Required Modifications and the New Plan Document.  CDS agrees to:
- **Manage and oversee** the Claim Review and Validation Program and subject Hospital and Facility Claims to the level of review that, in the discretion of CDS, is appropriate or desirable under the facts and circumstances relating to such Claims;

- **Make the Delegated Claims Decisions** and engage, at its own expense, such Billing Review Specialists, Medical Review Specialists and other expert or professional advisors as CDS, in its discretion, deems appropriate based on the relevant facts and circumstances (it being understood that, barring a material reason to do otherwise, CDS intends to use Anasazi Medical Payment Systems, Inc. d/b/a "AMPS" as the primary Billing Review Specialist);

- **Handle HFC Benefit Determinations** and Final HFC Appeals in accordance with the New Plan Document, and advise the Plan Administrator and Claims Administrator regarding the same;

- **Maintain the Advocacy Program** and offer Balance-Billing Advocacy for Participants who need and desire it;

- **Provide an explanatory video** (in both English and English with Spanish subtitles) to educate Company employees about the Claim Review and Validation Program, the Permitted Payment Levels for Hospital and Facility benefits, and the Advocacy Program; and

other provisions in the services agreement with Monterey.

66.     As a result of CDS' breach, Monterey and the Plan suffered damages in excess of $1.6 million.

Breach of Written Contract against AMPS

67.     All of the factual allegations set forth in paragraphs 1 through 66 above are incorporated by reference as though set forth herein.

68.     Monterey entered into a service agreement with CDS in 2014.

69.     AMPS purchased CDS in 2014, and took full managerial control of CDS in 2016. Pursuant to Monterey's service agreement with CDS, CDS assigned all of its rights and obligations under the services agreement with Monterey to AMPS. The services agreement required Monterey to pay AMPS a fee otherwise payable to CDS. Monterey paid the fee to AMPS. Exchange for the fee, the service agreement required AMPS to perform the Services for Monterey and the Plan as stated in CDS services agreement with Monterey.

///

///

KENNADAY LEAVITT OWENSBY PC
ATTORNEYS AT LAW
621 CAPITOL MALL | SUITE 2500
SACRAMENTO, CA 95814

00141025.1

-17-

MONTEREY PENINSULA HORTICULTURE, INC.'S THIRD-PARTY COMPLAINT

70.     Monterey's service agreement with CDS required AMPS to perform services for Monterey and the Plan. These services included, but were not limited to:

- Description of Services. CDS assumes the obligations will provide the services described below (the "Services"), subject to and in accordance with the Required Modifications and the New Plan Document. CDS agrees to:
- Manage and oversee the Claim Review and Validation Program and subject Hospital and Facility Claims to the level of review that, in the discretion of CDS, is appropriate or desirable under the facts and circumstances relating to such Claims;

- Make the Delegated Claims Decisions and engage, at its own expense, such Billing Review Specialists, Medical Review Specialists and other expert or professional advisors as CDS, in its discretion, deems appropriate based on the relevant facts and circumstances (it being understood that, barring a material reason to do otherwise, CDS intends to use Anasazi Medical Payment Systems, Inc. d/b/a "AMPS" as the primary Billing Review Specialist);

- Handle HFC Benefit Determinations and Final HFC Appeals in accordance with the New Plan Document, and advise the Plan Administrator and Claims Administrator regarding the same;

- Maintain the Advocacy Program and offer Balance-Billing Advocacy for Participants who need and desire it;

- Provide an explanatory video (in both English and English with Spanish subtitles) to educate Company employees about the Claim Review and Validation Program, the Permitted Payment Levels for Hospital and Facility benefits, and the Advocacy Program; and

71.     AMPS, independently and through CDS, breached the services agreement by failing to perform these services, as well as other provisions in the services agreement with Monterey.

72.     Moreover, as the owner of CDS, AMPS is liable for CDS' breaches of the services agreement between Monterey and CDS.

73.     As a result of AMPS breach, Monterey and the Plan suffered damages in excess of $1.6 million.

Breach of Written Contract against Alliant

74.     All of the factual allegations set forth in paragraphs 1 through 73 above are incorporated by reference as though set forth herein.

75.     Monterey entered into an agreement with Alliant in 2014.

76.     The agreement required Monterey to pay Alliant a fee. Monterey paid the fee to Alliant. In exchange for the fee, the agreement required Aliant to perform services for Monterey and the Plan. These services included, but were not limited to:

a.     Prepare a self-funded plan for Monterey that complied with federal law including, but not limited to, the ACA and ERISA;

b.     Select administrative services entities that provided services that complied with

KENNADAY LEAVITT OWENSBY PC
ATTORNEYS AT LAW
621 CAPITOL MALL, SUITE 2500
SACRAMENTO, CA 95814

00141025.1

-18-

MONTEREY PENINSULA HORTICULTURE, INC.'S THIRD-PARTY COMPLAINT

federal law including, but not limited, to the ACA and ERISA;

c.  Prepare and analyze business proposals and supporting documents in the best interest of Monterey and the proposed self-funded plan;

d.  Review contracts, amendments, and the SPD for accuracy and coverage, and identify errors and coordinate the corrections; and

e.  Provide claims, eligibility, billing and plan administration advocacy and resolution.

f.  Otherwise acting as alleged above.

77.  Alliant breached the agreement by failing to perform these services, as well as other terms in the agreement with Monterey.

78.  As a result of Alliant's breach, Monterey and the Plan suffered damages in excess of $1.6 million.

## THIRD CAUSE OF ACTION
### (Professional Negligence against All Defendants)

Professional Negligence against EBMS

79.  All of the factual allegations set forth in paragraphs 1 through 78 above are incorporated by reference as though set forth herein.

80.  Throughout the course of their dealings with Monterey, EBMS held themselves out as skilled administrators of self-funded plans, having superior knowledge regarding their ability to administer self-funded plans. EBMS intended that Monterey rely, and Monterey did rely, on EBMS' alleged expertise and advice in connection with Monterey's self-funded plan.

81.  Monterey entered into a service agreement with EBMS in 2014. Monterey's service agreement with EBMS required EBMS to perform services for Monterey and the Plan as stated previously in this Third-Party Complaint, including paragraph 60. In doing so, EBMS was required to use the skill and care that a reasonably careful administrative service organization/third-party administrator would have used in similar circumstances.

82.  Monterey is informed and believes, and on that basis alleges, that EBMS failed to use the skill and care that a reasonably careful administrative service organization/third-party

KENNADAY LEAVITT OWENSBY PC
ATTORNEYS AT LAW
621 CAPITOL MALL, SUITE 2500
SACRAMENTO, CA 95814

administrator would have used in similar circumstances by, among other things:

    a.    Drafting an SPD which violated federal law, including, but not limited to: (1) the ACA mandates, including the "minimum value" provision and rendering the Plan unaffordable, and (2) ERISA, including the disclosure requirements for plan subjects;

    b.    Drafting an illusory SPD which shifted the risk for losses to Monterey and Monterey's employees and employees' dependents;

    c.    Failing to act in the best interest of Monterey, the Plan, Monterey's employees, and employees' dependents by causing Monterey and the Plan to engage AMPS and CDS' services, which exposed Monterey and Monterey's employees and employees' dependents to collection activities from providers;

    d.    Failing to disclose to Monterey, the Plan, and Monterey's employees and employees' dependents the nature and scope of their liability for claims left unpaid by the self-funded plan, the Claim Review and Validation Program, and the RBR Program, and then exposing them to that liability for unpaid claims;

    e.    Failing to administer the Plan according to the SPD and discounting all medical claims paid;

    f.    Failing to correctly communicate the Plan's benefits to healthcare providers and making false representations about the Plan's benefits to healthcare providers. For example, EBMS made false representations to Salinas Valley Hospital that the Plan would cover 70% of a patient's medical bills, up to $21,666, after which the Plan would cover 100%; and

    g.    Otherwise acting as alleged above.

83.    As a direct and proximate cause of EBMS' negligence, Monterey suffered damages in excess of $1.6 million, plus costs and interest thereon.

Professional Negligence against CDS

84.    All of the factual allegations set forth in paragraphs 1 through 83 above are incorporated by reference as though set forth herein.

85.    Throughout the course of their dealings with Monterey, CDS held itself out as a skilled

KENNADAY LEAVITT OWENSBY PC
ATTORNEYS AT LAW
621 CAPITOL MALL | SUITE 2500
SACRAMENTO, CA 95814

third-party administrator of self-funded plans, having superior knowledge regarding its ability to administer self-funded plans, including pricing and adjudicating healthcare claims. CDS intended that Monterey rely, and Monterey did rely, on CDS' alleged expertise and advice in connection with Monterey's self-funded plan.

86. Monterey entered into a service agreement with CDS in 2014. Monterey's service agreement with CDS required CDS to perform services for Monterey and the Plan as stated previously in this Third-Party Complaint, including paragraph 64. In doing so, CDS was required to use the skill and care that a reasonably careful third-party administrator would have used in similar circumstances.

87. Monterey is informed and believes, and on that basis alleges, that CDS failed to use the skill and care that a reasonably careful third-party administrator would have used in similar circumstances by, among other things:

a. Drafting an SPD which violated federal law, including, but not limited to: (1) the ACA mandates, including the "minimum value" provision and rendering the Plan unaffordable, and (2) ERISA, including the disclosure requirements for plan subjects;

b. Drafting an illusory SPD which shifted the risk for losses from to Monterey and Monterey's employees and employees' dependents;

c. Failing to disclose to Monterey, the Plan, and Monterey's employees and employees' dependents the nature and scope of their liability for claims left unpaid by the self-funded plan and the Claim Review and Validation and RBR Programs, and then exposing them to that liability for unpaid claims;

d. Failing to administer the Plan according to the SPD and discounting all medical claims paid;

e. Failing to correctly communicate the Plan's benefits to healthcare providers and making false representations about the Plan's benefits to healthcare providers. For example, EBMS made false representations to Salinas Valley Hospital that the Plan would cover 70% of a patient's medical bills, up to $21,666, after which the Plan would cover 100%;

f. Engaging in a pricing scheme and exposing Monterey and the Plan to litigation from

KENNADAY LEAVITT OWENSBY PC
ATTORNEYS AT LAW
621 CAPITOL MALL, SUITE 2500
SACRAMENTO, CA 95814

1  hospitals; and

2  g.  Otherwise acting as alleged above.

3  88.  As a direct and proximate cause of CDS' negligence, Monterey suffered damages in

4  excess of $1.6 million, plus costs and interest thereon.

5  Professional Negligence against AMPS

6  89.  All of the factual allegations set forth in paragraphs 1 through 88 above are

7  incorporated by reference as though set forth herein.

8  90.  Throughout the course of their dealings with Monterey, AMPS held itself out as a

9  skilled third-party administrator of self-funded plans, having superior knowledge regarding its ability

10 to administer self-funded plans, including pricing and adjudicating healthcare claims. AMPS intended

11 that Monterey rely, and Monterey did rely, on AMPS' alleged expertise and advice in connection

12 with Monterey's self-funded plan.

13 91.  Monterey entered into a service agreement with CDS in 2014.

14 92.  AMPS purchased CDS in 2014, and took full managerial control of CDS in 2016.

15 Pursuant to Monterey's service agreement with CDS, CDS assigned all of its rights and obligations

16 under the services agreement with Monterey to AMPS.

17 93.  Monterey's service agreement with CDS required AMPS to perform services for

18 Monterey and the Plan as stated previously in this Third-Party Complaint, including paragraph 70. In

19 doing so, AMPS was required to use the skill and care that a reasonably careful third-party

20 administrator would have used in similar circumstances.

21 94.  Monterey is informed and believes, and on that basis alleges, that AMPS failed to use

22 the skill and care that a reasonably careful administrative service organization/third-party

23 administrator would have used in similar circumstances by, among other things:

24 a.  Drafting an SPD which violated federal law, including, but not limited to: (1) the ACA

25 mandates, including the "minimum value" provision and rendering the Plan

26 unaffordable, and (2) ERISA, including the disclosure requirements for plan subjects;

27 b.  Drafting an illusory SPD which shifted the risk for losses to Monterey and Monterey's

28 employees and employees' dependents;

KENNADAY LEAVITT OWENSBY PC
ATTORNEYS AT LAW
621 CAPITOL MALL | SUITE 2500
SACRAMENTO, CA 95814

00141025.1

-22-

c.    Failing to act in the best interest of Monterey, the Plan, Monterey's employees, and employees' dependents by causing Monterey and the Plan to engage AMPS and CDS' services, which exposed Monterey and Monterey's employees and employees' dependents to collection activities from providers;

d.    Failing to disclose to Monterey, the Plan, and Monterey's employees and employees' dependents the nature and scope of their liability for claims left unpaid by the self-funded plan, the Claim Review and Validation Program, and the RBR Program, and then exposing them to that liability for unpaid claims;

e.    Failing to administer the Plan according to the SPD and discounting all medical claims paid;

f.    Failing to correctly communicate the Plan's benefits to healthcare providers and making false representations about the Plan's benefits to healthcare providers. For example, EBMS made false representations to Salinas Valley Hospital that the Plan would cover 70% of a patient's medical bills, up to $21,666, after which the Plan would cover 100%; and

g.    Otherwise acting as alleged above.

95.    As a direct and proximate cause of AMPS' negligence, Monterey suffered damages in excess of $1.6 million, plus costs and interest thereon.

Professional Negligence against Alliant

96.    All of the factual allegations set forth in paragraphs 1 through 95 above are incorporated by reference as though set forth herein.

97.    Throughout the course of its dealings with Monterey, Alliant held itself out as a skilled insurance broker, having superior knowledge regarding its ability to procure insurance policies for Monterey. Alliant intended that Monterey rely, and Monterey did rely, on Alliant' alleged expertise and advice in connection with Monterey's self-funded plan.

98.    Monterey entered into an agreement with Alliant. Monterey's agreement with Alliant required Alliant to perform services for Monterey and the Plan as stated previously in this Third-Party Complaint, including paragraph 76. In doing so, EBMS was required to use the skill and care

KENNADAY LEAVITT OWENSBY PC
ATTORNEYS AT LAW
621 CAPITOL MALL, SUITE 2500
SACRAMENTO, CA 95814

that a reasonably careful insurance broker would have used in similar circumstances.

99. Monterey is informed and believes, and on that basis alleges, that EBMS failed to use the skill and care that a reasonably careful insurance broker would have used in similar circumstances by, among other things:

    a. Prepare a self-funded plan for Monterey that complied with federal law including, but not limited, to the ACA and ERISA;

    b. Select administrative services entities that provided services that complied with federal law including, but not limited, to the ACA and ERISA;

    c. Prepare and analyze business proposals and supporting documents in the best interest of Monterey and the proposed self-funded plan;

    d. Review contracts, amendments, and the SPD for accuracy and coverage, and identify errors and coordinate the corrections;

    e. Provide claims, eligibility, billing and plan administration advocacy and resolution; and

    f. Otherwise acting as alleged above.

100. As a direct and proximate cause of EBMS' negligence, Monterey suffered damages in excess of $1.6 million, plus costs and interest thereon.

## PRAYER FOR RELIEF

**WHEREFORE**, Monterey prays for a judgment against Defendants as follows:

A. Judgment in an amount equal to Monterey's actual damages for each claim;

B. Ordering EBMS, AMPS, CDS, and Alliant to each pay all reasonable costs and expenses of an independent administrator in re-adjudicating the claims set forth above and the reasonable costs and expenses associates with correcting all improperly adjudicated claims identified in this Complaint;

C. Requiring each Defendant to disgorge all unjust enrichment or profits received as a result of fiduciary breaches committed by them or for which they are liable;

D. For an injunction against each EBMS, AMPS, CDS, and Alliant for any and all such continuing conduct;

KENNADAY LEAVITT OWENSBY PC
ATTORNEYS AT LAW
621 CAPITOL MALL, SUITE 2500
SACRAMENTO, CA 95814

E.     Attorney's fees and costs pursuant to ERISA section 502(g); and

F.     Such other and further relief as the Court deems just and proper.

**<u>DEMAND FOR JURY TRIAL</u>**

Monterey demands a jury trial against EBMS, CDS, AMPS and Alliant, and each of them.

DATED: December 13, 2018                          KENNADAY LEAVITT OWENSBY PC

By: _____

LANCE M. MARTIN
Attorneys for Defendants
MONTEREY PENINSULA
HORTICULTURE, INC. dba ROCKET
FARMS; and MONTEREY PENINSULA
HORTICULTURE / STEVEN ROBERTS
ORIGINAL DESSERTS, LLC, EMPLOYEE
BENEFIT PLAN

KENNADAY LEAVITT OWENSBY PC
ATTORNEYS AT LAW
621 CAPITOL MALL, SUITE 2500
SACRAMENTO, CA 95814

00141025.1                                    -25-
MONTEREY PENINSULA HORTICULTURE, INC.'S THIRD-PARTY COMPLAINT

## **PROOF OF SERVICE**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Sacramento, State of California. My business address is 621 Capitol Mall, Suite 2500, Sacramento, CA 95814.

On December 13, 2018, I served true copies of the following document(s) described as **MONTEREY PENINSULA HORTICULTURE, INC.'S THIRD-PARTY COMPLAINT** on the interested parties in this action as follows:

[x] **BY EMAIL:** I caused such documents to be served via electronic mail transmittal to the offices of the email addresses herein described.

Eric D. Chan
HOOPER, LUNDY & BOOKMAN, P.C.
1875 Century Park East, Suite 1600
Los Angeles, California 90067
echan@health-law.com

cc: Griselda Rodriguez (grodriguez@health-law.com)

[x] **BY PERSONAL SERVICE:** By causing delivery by hand via reliable messenger service to the interested parties at the address(es) set forth herein.

| | |
|---|---|
| EMPLOYEE BENEFIT MANAGEMENT SERVICES, INC.<br>1075 Overland Ave.<br>Billings, MT 59102 | ADVANCED MEDICAL PRICING SOLUTIONS, INC.<br>35 Technology Parkway, Suite 100<br>Peachtree Corners, GA 30092 |
| CLAIMS DELEGATE SERVICES, LLC<br>420 Technology Parkway<br>Norcross, GA 30092 | ALLIANT INSURANCE SERVICES, INC.<br>1301 Dove Street, Suite 200<br>Newport Beach, CA 92660 |

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made. Executed on December 13, 2018, at Sacramento, California.



Erin Harris

KENNADAY LEAVITT OWENSBY PC
ATTORNEYS AT LAW
621 CAPITOL MALL, SUITE 2500
SACRAMENTO, CA 95814

00141025.1

-26-

MONTEREY PENINSULA HORTICULTURE, INC.'S THIRD-PARTY COMPLAINT

# EXHIBIT 3

1   DANIEL A. PLATT (SBN 132665)
    dplatt@loeb.com
2   ARTHUR FELS (SBN 294802)
    afels@loeb.com
3   LOEB & LOEB LLP
    10100 Santa Monica Blvd., Suite 2200
4   Los Angeles, CA 90067
    Telephone: 310.282.2000
5   Facsimile: 310.282.2200

6   Attorneys for Third Party Defendant
    EMPLOYEE BENEFIT
7   MANAGEMENT SERVICES, INC.

8

9                  UNITED STATES DISTRICT COURT

10      NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

11

12  SALINAS VALLEY MEMORIAL        )  Case No.: 5:17-cv-07076-VKD
    HEALTHCARE SYSTEM,             )
13                                 )  Hon. Mag. Judge Virginia K.
                   Plaintiff,      )  DeMarchi
14                                 )
           vs.                     )  Date: April 2, 2019
15                                 )  Time: 10:00 a.m.
    MONTEREY PENINSULA             )  Place: Courtroom 2
16  HORTICULTURE, INC. d/b/a       )
    ROCKET FARMS; MONTEREY         )
17  PENINSULA HORTICULTURE,        )  **THIRD-PARTY DEFENDANT**
    INC./STEVEN ROBERTS, ORIGINAL  )  **EMPLOYEE BENEFIT**
18  DESSERTS, LLC EMPLOYEE         )  **MANAGEMENT SERVICES,**
    BENEFIT PLAN; EMPLOYEE         )  **INC.'S NOTICE OF MOTION**
19  BENEFIT MANAGEMENT             )  **AND MOTION TO DISMISS**
    SERVICES, INC.; ANASAZI        )  **MONTEREY PENINSULA**
20  MEDICAL PAYMENT SOLUTIONS,     )  **HORTICULTURE, INC.'S THIRD-**
    INC. d/b/a ADVANCED MEDICAL    )  **PARTY COMPLAINT**
21  PRICING SOLUTIONS;             )  **PURSUANT TO FED. R. CIV. P.**
                                   )  **12(B)(6); MEMORANDUM OF**
22                 Defendants.     )  **LAW IN SUPPORT THEREOF**
                                   )
23                                 )  Complaint Filed: December 13, 2017
                                   )  Trial Date: None Set
24                                 )

25

26

27

28

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

17407183.4          NOTICE OF MOTION AND MOTION TO DISMISS;
231426-10003                   MEMORANDUM OF LAW

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on April 2, 2019 at 10:00 a.m., or as soon thereafter as counsel may be heard, in Courtroom 2 of the San Jose Courthouse at 280 South 1st Street in San Jose, California, third-party defendant Employee Benefit Management Services, Inc. ("EBMS") will, and hereby does, move this Court for an order dismissing defendant and third-party counterclaimant Monterey Peninsula Horticulture, Inc. dba Rocket Farm's causes of action for Breach of Fiduciary Duty, Breach of Written Contact, and Professional Negligence, to the extent they relate to EBMS, pursuant to Federal Rules of Civil Procedure, Rule 12(b)(6) on the grounds that the Complaint fails to state a claim upon which relief may be granted.

This motion is based upon this Notice of Motion, Motion, and Memorandum of Law, the concurrently filed Declaration of J. Matthew Johnson, all pleadings and papers on file in this action, any reply papers that may be filed in support of the Motion, and upon such other evidence and arguments as may be presented to the Court at the time of the hearing.

Dated: February 21, 2019

LOEB & LOEB LLP
DANIEL A. PLATT
ARTHUR FELS


By:    /s/ Arthur Fels
ARTHUR FELS
ATTORNEYS FOR THIRD-
PARTY COUNTER-
DEFENDANT EMPLOYEE
BENEFIT MANAGEMENT
SERVICES, INC.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

17407183.4
231426-10003

NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF LAW

# MEMORANDUM OF LAW

## I.   INTRODUCTION

Defendant and counterclaimant Monterey Farms Peninsula Horticulture, Inc. dba Rocket Farms ("Rocket Farms") filed its third-party complaint (the "TPC") against, among others, third party counter defendant Employee Benefit Management Services, Inc. ("EBMS")[1] based on claims arising out of an Administrative Services Agreement ("ASA") among them.  The ASA requires the parties to mediate before filing a lawsuit.  Because Rocket Farms never initiated such a procedure, the claims are not ripe and the TPC should be dismissed as to EBMS.

## II.   FACTS ALLEGED IN THE TPC

Rocket Farms alleges, in relevant part, that it retained EBMS to act as a third-party administrator for the Monterey Peninsula Horticulture/Steven Roberts Original Desserts, LLC, Employee Benefit Plan (the "Plan").  (TPC, ¶ 5.)  The relationship between Rocket Farms and EBMS was governed at all times by the ASA, which "listed EBMS'[s] duties and responsibilities as Claim Administrator."  (TPC, ¶ 21.)  The ASA specifically provides that "[t]his agreement, together with the Schedule(s) and any Amendments, constitutes the entire Agreement between [EBMS] and [Rocket Farms] with respect to the subject matter hereof, and supersedes all prior proposals, discussions, negotiations, and writings between the parties relating to such subject matter."[2]  In addition to adjusting, reviewing, and paying claims, EBMS's duties under the ASA included "preparing the SPD [Summary Plan Description], processing

---

[1]   EBMS has also been named as a defendant, but has not been served.

[2]   Although referenced extensively by Rocket Farms in the TPC, Rocket Farms did not attach the ASA as an exhibit to the TPC.  The Court may consider the contents of the ASA because it is "integral to the plaintiff's claims" and is referred to extensively in the TPC. *Parrino v. FHP, Inc.*, 146 F.3d 699, 706, fn. 4 (9th Cir. 1998); *U.S. v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011) (the court may "consider unattached evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to plaintiff's claim; and (3) no party questions the authenticity of the document.") (Internal citations omitted). The ASA is attached to the Declaration of J.M. Johnson ("Johnson Decl."), filed concurrently herewith, as Exhibit A.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

17407183.4
231426-10003

NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF LAW

1  and adjudicating all claims, reviewing and responding to appeals regarding benefit
2  determinations, facilitating reviews by independent review organizations, and
3  answering medical benefit and claim questions." (TPC, ¶ 21.)

4      Section 11.01 of the ASA provides:

5          **Dispute Resolution**. Plan Sponsor [the Plan] and Contract
6          Administrator [EBMS] will <u>meet and confer in an attempt</u>
7          <u>to resolve any dispute arising out of or relating to this</u>
8          <u>Agreement</u>. A dispute not resolved within 60 days of this
9          meeting will be <u>submitted to mediation</u>. . . . * * * If the
10         dispute is not resolved through mediation, the parties will
11         be free to pursue all legal and equitable remedies otherwise
12         available. . . . (Emphasis added.)

13     Rocket Farms alleges EBMS is liable to it for failing to perform its duties under
14  the ASA, or for failure to do so with the required professional skill and care which
15  arises out of the ASA. (*See, e.g.*, TPC, ¶¶ 59-62.) As a result of EBMS's alleged
16  failure to perform according to the ASA, Rocket Farms alleges that it "suffered
17  damages in excess of $1.6 million, plus costs and interest thereon." (TPC, ¶¶ 39, 62,
18  83.)

19  **III.   ARGUMENT**

20      **A.   The Legal Standard on a Motion to Dismiss.**

21     A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is similar to the
22  common law general demurrer in that it tests the legal sufficiency of the claims stated
23  in a plaintiff's complaint. *Strom v. United States*, 641 F.3d 1051, 1067 (9th Cir.
24  2011); *SEC v. Cross Fin'l Services, Inc.*, 908 F.Supp. 718, 726-27 (CD Cal. 1995);
25  *Beliveau v. Caras*, 873 F.Supp. 1393, 1395 (CD Cal. 1995). A "claim" for purposes
26  of Fed. R. Civ. P. 12(b)(6) refers to a set of facts that, if established, entitle the pleader
27  to relief. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Dismissal is
28  warranted under 12(b)(6) when the complaint either fails to allege a cognizable legal

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

17407183.4
231426-10003

NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF LAW

1  theory or is plagued by the absence of sufficient facts alleged under a cognizable legal

2  theory. *Shroyer v. New Cingular Wireless Services, Inc.*, 622 F.3d 1035, 1041 (9th

3  Cir. 2010).

4    In deciding a motion to dismiss under Rule 12(b)(6), the Court must accept as

5  true all well-pleaded factual allegations and draw all reasonable inferences in the

6  plaintiff's favor. *See Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 722 F. Supp.

7  2d 1157, 1162-63 (C.D. Cal. 2010). However, "the Court is not required to accept as

8  true allegations that are merely conclusory, unwarranted deductions of fact, or

9  unreasonable inferences." *Id.* at 1162-63 (internal quotations omitted); *see also*

10  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ("[T]he tenet that a court must accept

11  as true all of the allegations contained in a complaint is inapplicable to legal

12  conclusions. Threadbare recitals of the elements of a cause of action, supported by

13  mere conclusory statements, do not suffice.").

14    **B.** **The ASA Mandates Dismissal Because Rocket Farms Failed to**

15      **Mediate.**

16    If a contract requires mediation as a condition precedent to litigation, any action

17  brought prior to mediation is subject to dismissal. *See e.g. Brosnan v. Dry Cleaning*

18  *Station Inc.*, No. C-08-02028 EDL, 2008 U.S. Dist. LEXIS 44678, at *2 (N.D. Cal.

19  June 6, 2008) ("Failure to mediate a dispute pursuant to a contract that makes

20  mediation a condition precedent to filing a lawsuit warrants dismissal."); *Dalameter*

21  *v. Anytime Fitness, Inc.*, 722 F. Supp. 2d 1168, 1180-81 (E.D. Cal. 2010) (dismissing

22  lawsuit where "[t]here [was] no dispute that the parties have not engaged in

23  mediation" because "[f]ailure to mediate a dispute pursuant to a contract that makes

24  mediation a condition precedent to filing a lawsuit warrants dismissal.").

25    As noted above, the ASA states that "the parties will be free to pursue all legal

26  and equitable remedies otherwise available" <u>only after</u> participating in a mediation

27  according to the AAA Rules of Procedure for Mediation. (Johnson Decl., ¶ 2, Ex. A

28  at § 11.01.) The ASA further mandates that the "parties meet and confer in an attempt

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

17407183.4
231426-10003

NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF LAW

1  to resolve any dispute arising out of or relating to this Agreement" prior even to

2  engaging in a mediation. *Id.*

3      The parties did not mediate, and the TPC does not allege so. (Johnson Decl., ¶

4  3.) The case is therefore not ripe and must be dismissed. *See, Brosnan,* 2008 U.S.

5  Dist. LEXIS at *2; *Dalameter,* 722 F. Supp. 2d at 1180-81.

6  **IV.   CONCLUSION**

7      Rocket Farms has failed to mediate this dispute as required by the ASA.

8  Accordingly, Rocket Farms' TPC, as it relates to EBMS, is not ripe and must be

9  dismissed.

10

11  Dated: February 21, 2019             LOEB & LOEB LLP
                                         DANIEL A. PLATT
12                                       ARTHUR FELS

13

14                                       By:   /s/ Arthur Fels
                                               ARTHUR FELS
15

16                                       ATTORNEYS FOR THIRD-
                                         PARTY COUNTER-
17                                       DEFENDANT EMPLOYEE
                                         BENEFIT MANAGEMENT
18                                       SERVICES, INC.

19

20

21

22

23

24

25

26

27

28

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

17407183.4
231426-10003

NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF LAW

1

## **CERTIFICATE OF SERVICE**

2

3      I certify that a true and correct copy of the foregoing was served on all

counsel of record by electronic service through the Clerk of the Court's CM/ECF

4
filing system on February 22, 2019.

5

6

7   Dated: February 22, 2019                    /s/ Bernard Given
                                                Bernard Given
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

17407183.4
231426-10003

6

NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF LAW

1   DANIEL A. PLATT (SBN 132665)
    dplatt@loeb.com
2   ARTHUR FELS (SBN 294802)
    afels@loeb.com
3   LOEB & LOEB LLP
    10100 Santa Monica Blvd., Suite 2200
4   Los Angeles, CA 90067
    Telephone: 310.282.2000
5   Facsimile: 310.282.2200

6   Attorneys for Defendant
    EMPLOYEE BENEFIT
7   MANAGEMENT SERVICES, INC.

8

9                 UNITED STATES DISTRICT COURT

10      NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

11

12  SALINAS VALLEY MEMORIAL          )  Case No.: 5:17-cv-07076-VKD
    HEALTHCARE SYSTEM,               )
13                                   )  Hon. Mag. Judge Virginia K.
           Plaintiff,                )  DeMarchi
14                                   )
        vs.                          )  Date: April 2, 2019
15                                   )  Time: 10:00 a.m.
    MONTEREY PENINSULA               )  Place: Courtroom 2
16  HORTICULTURE, INC. d/b/a         )
    ROCKET FARMS; MONTEREY           )  DECLARATION OF J.
17  PENINSULA HORTICULTURE,          )  MATTHEW JOHNSON IN
    INC./STEVEN ROBERTS, ORIGINAL    )  SUPPORT OF THIRD-PARTY
18  DESSERTS, LLC EMPLOYEE           )  DEFENDANT EMPLOYEE
    BENEFIT PLAN; EMPLOYEE           )  BENEFIT MANAGEMENT
19  BENEFIT MANAGEMENT               )  SERVICES, INC.'S MOTION TO
    SERVICES, INC.; ANASAZI          )  DISMISS MONTEREY
20  MEDICAL PAYMENT SOLUTIONS,       )  PENINSULA HORTICULTURE,
    INC. d/b/a ADVANCED MEDICAL      )  INC.'S THIRD-PARTY
21  PRICING SOLUTIONS;               )  COMPLAINT PURSUANT TO
                                     )  FED. R. CIV. P. 12(B)(6)
22         Defendants.               )
                                     )  Complaint Filed: December 13, 2017
23                                   )  Trial Date: None Set
                                     )
24  _____ )

25

26

27

28

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

17408088.1
231426-10003

DECLARATION OF J. MATTHEW JOHNSON IN SUPPORT OF
MOTION TO DISMISS

## DECLARATION OF J. MATTHEW JOHNSON

I, J. Matthew Johnson, declare as follows:

1.      I am Corporate Counsel and Vice President of Legal at Employee Benefit Management Services, Inc. ("EBMS"). I make this declaration in support of the motion to dismiss filed by EBMS in Case No. 5:17-cv-07076-VKD. The facts stated below are true of my own personal knowledge except for those matters stated on information and belief, which matters I believe to be true.

2.      I have been employed by EBMS since June 2018. I am familiar with and maintain, among other things, the various agreements between EBMS and its clients. The documents attached collectively as <u>Exhibit A</u> are a true and correct copy of the 2014 Administrative Services Agreement and corresponding renewals for 2015 and 2016 between EBMS and Rocket Farms (except for pricing information, which has been redacted).

3.      I am also familiar with the legal dispute which is the subject of this action. As of the date of this declaration, the parties have not mediated this dispute. EBMS was at all times, and remains, ready, willing and able to mediate in good faith.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February __, 2019, at Billings, Montana



J. Matthew Johnson

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

17408088.3
231426-10003

DECLARATION OF J. MATTHEW JOHNSON IN SUPPORT OF
MOTION TO DISMISS

# EXHIBIT A

**EMPLOYEE BENEFIT MANAGEMENT SERVICES, INC.**

**ADMINISTRATIVE SERVICES AGREEMENT**

**for**

**MONTEREY PENINSULA HORTICULTURE, INC.**
**&**
**STEVEN ROBERTS ORIGINAL DESSERTS, LLC.**

RECEIVED

JAN 1 2015

EBMS - BILLINGS

# EMPLOYEE BENEFIT MANAGEMENT SERVICES, INC.

## ADMINISTRATIVE SERVICES AGREEMENT

THIS Agreement is dated this 1ˢᵗ day of July, 2014, by and between Monterey Peninsula Horticulture, Inc. and Steven Roberts Original Desserts, LLC., 360 Espinosa Rd., Salinas, CA 93907, hereinafter referred to as the "Plan Sponsor," and Employee Benefit Management Services, Inc., of 2075 Overland Avenue, Billings, Montana 59102, hereinafter referred to as the "Contract Administrator."

WHEREAS, The Plan Sponsor has established an employee benefit plan, hereinafter called the "Plan", which provides for payment of certain welfare benefits to and for certain eligible individuals as defined by the Plan's master plan document, hereinafter called the "Plan Document", such individuals being hereinafter referred to as "Plan Members"; and,

WHEREAS, The Plan Sponsor desires to engage the services of the Contract Administrator to provide certain services with respect to the Plan as enumerated below;

NOW, THEREFORE, in consideration of the mutual covenants and conditions contained herein, the parties hereto agree as follows:

## SEC. I        DUTIES AND RESPONSIBILITIES OF PLAN SPONSOR

1.01      The Plan Sponsor is the Plan Administrator and retains ultimate discretionary authority and all final authority and responsibility for the Plan and its operation.  The Contract Administrator is empowered to act only as expressly stated in this Agreement or as mutually agreed to in writing.

1.02      The Plan Sponsor retains all final authority and responsibility in developing, and determining in accordance with applicable law, benefit provisions, and Plan language describing such benefit provisions, as outlined in the Plan Document, and, where necessary, trust document.  Plan Sponsor will secure legal review of such documents from Plan Sponsor's legal counsel.

1.03      The Plan Sponsor shall have final authority in determining issues of eligibility and coverage under the Plan and claims to be paid by the Plan with the express exception of the amount of any claim eligible for reimbursement.

1.04      The Plan Sponsor shall have final authority as to the investment (if any) and use of any assets to fund the Plan.

1.05      The Plan Sponsor shall procure stop-loss coverage at levels sufficient to ensure the viability of the Plan, and shall determine and maintain the funding level required for prompt payment of all expenses incurred by the Plan.  Such expenses shall include but shall not be limited to:

      (a)      specific and/or aggregate stop-loss insurance premiums;

      (b)      other insurance premiums;

      (c)      appropriate reserves for both reported and unreported claims; and

      (d)      payment of benefits pursuant to the Plan.

1.06      The Plan Sponsor shall be responsible for collecting all appropriate contributions to the Plan from all Plan Members.  Failure to collect any such contributions shall not relieve the Plan Sponsor from its funding obligation to the Plan.

1.07     The Plan Sponsor shall be responsible for taking the following actions to facilitate the proper performance of the Contract Administrator's responsibilities:

(a)     provide the Contract Administrator with a complete and accurate list of all individuals eligible for benefits under the Plan, and who are enrolled in the Plan, by online entry of such information or by such other method as the parties may agree from time to time prior to the effective date;

(b)     notify the Contract Administrator, no less than monthly, of any changes in eligibility and participation. Notice of Plan Member termination must be given within thirty (30) days of the termination. Under no circumstances shall credits for administrative fees be retroactive beyond two (2) months, or to the beginning of the current Administrative Services Agreement, whichever time period is shorter;

(c)     review, approve and distribute to all eligible Plan Members (and return to Contract Administrator when necessary) all appropriate and necessary materials and documents, including but not limited to, Plan Documents, summaries of benefits, identification cards, enrollment forms, applications and notice forms as may be necessary for the operation of the Plan or to satisfy the requirements of State or Federal laws or regulations;

(d)     provide the Contract Administrator with copies of any and all revisions or changes to the Plan Document as soon as is reasonably known, but no later than sixty (60) days before the effective date of the changes, or as otherwise required under applicable law;

(e)     satisfy any and all required reporting, required responses, and disclosure requirements imposed by law and/or solicited from any and all governmental agencies;

(f)     maintain bank account(s) in the name of the Plan, in a financial institution mutually agreed upon by the Plan Sponsor and Contract Administrator, from which checks or drafts are issued to cover expenses of the Plan, hereinafter referred to as the "Plan Sponsor Account;"

(g)     provide the Contract Administrator with any additional information incidental to the Plan, as may be requested by the Contract Administrator from time to time;

(h)     review and respond to all final internal adverse benefit determinations as may be required in the Plan Document; and

(i)     perform any non-discrimination testing on the Plan as required by law.

(j)     provide adequate and timely funding and/or payment to satisfy all state and/or federal regulations, including but not limited to PPACA assessments, taxes, fees, and/or penalties, state or other federal agency fees, assessments, and taxes, upon the applicable effective date, whether known or unknown at the time of executing this Agreement . This provision shall survive the termination of this Agreement, as Plan Sponsor is solely responsible for any applicable assessments, taxes, fees and/or penalties associated with the Plan or related to the Plan Sponsor's requirements to offer coverage.

## SEC. II     DUTIES AND RESPONSIBILITIES OF THE CONTRACT ADMINISTRATOR

2.01     The Contract Administrator agrees to perform the following administrative services for the Plan Sponsor:

(a)     assist in the preparation and printing of a Plan Document, summaries of benefits, identification cards, and other material necessary to the operation of the Plan;

(b)     process and adjudicate all claims presented for payment in accordance with the Plan Document, including but not limited to reasonable investigatory work in determining claim eligibility, and preparing and distributing benefit checks, and Explanation of Benefits to Plan Members and/or service providers, as applicable;

(c)     Contract Administrator shall review and respond to appeals made by Plan Members of adverse benefit determinations as may be required in the Plan Document.

(d)     To the extent set forth in the Plan Document, Contract Administrator, on behalf of Plan Sponsor, will facilitate reviews required by an Independent Review Organization (IRO).  The Contract Administrator will submit all documentation regarding the appeal to the IRO and work with the IRO as needed to complete its review.  The Contract Administrator will pass all costs of the IRO review on to the Plan Sponsor as described on Schedule A.  Plan Sponsor will be responsible for collecting any allowable reimbursements from the Plan Member;

(e)     corresponding with Plan Members and their representatives regarding possible third-party liability for expenses paid by the Plan on Plan Member's behalf, as set forth in Schedule L, Contract Administrator shall have no responsibility or liability for the refusal of Plan Members or their representatives to reimburse the Plan for such expenses.  Contract Administrator shall have no obligation to take any legal action to enforce the Plan's subrogation rights;

(f)     respond to inquiries from the Plan Sponsor, Plan Members and service providers concerning requirements, procedures or benefits of the Plan, though such information shall not constitute a determination of benefits that will be paid under the Plan or a guarantee or certification to anyone that any amount will be paid.  Benefit determinations can only be made after a complete claim is submitted and fully processed by the Contract Administrator, and are subject to all eligibility requirements, limitations, exclusions and other provisions in effect when a claim is processed;

(g)     maintain all claim files for the Plan in accordance with Section VI hereof;

(h)     in addition to utilization reports, prepare and provide monthly reports of contributions received from the Plan Sponsor and all disbursements made from the Plan.  Standard reports that can be produced by the automated claims system in use by the Contract Administrator, will be available to the Plan Sponsor.  These reports will be made available only to authorized individuals who will protect the privacy of such information in accordance with HIPAA and other applicable laws, as amended.  Unless required by law, under no conditions will the Plan Sponsor use the information provided in any manner that could jeopardize an individual's privacy;

(i)     once a year, provide the Plan Sponsor with an annual summary report of the operation of its Plan;

(j)     provide information necessary for, and assist the Plan Sponsor in, preparing reports required by any local, state or federal government pertaining to the operation of the Plan.  Additional compensation shall be negotiated between the parties for any unusual reporting or disclosure obligations;

(k)     assist the Plan Sponsor with the establishment of rates and provide the Plan Sponsor with information on rate structures for comparable benefit programs; and

(l)     obtain quotations, as requested by Plan Sponsor, for policies of insurance, if available, including stop-loss or excess risk coverage and/or ancillary coverages such as life and AD&D.  The decision to purchase any such insurance shall be made solely by Plan Sponsor.  Contract Administrator makes no representations or warranties regarding the adequacy of any particular coverage or carrier.  Contract Administrator may receive commissions or other compensation in connection with Plan Sponsor's purchase of such insurance as described in the accompanying disclosure Schedule.

2.02     The Plan Sponsor may contract with Contract Administrator to provide claim payment services (run-in) for those claims which were incurred prior to the effective date of this Agreement.  A fee may be charged on a per transaction basis.  A transaction is considered any and all activities that generate an Explanation of Benefit or other benefit determination.

2.03 Contract Administrator shall cooperate with the Plan Sponsor in the defense of any action arising out of matters related to this Agreement. The defense of any legal action involving the Plan shall not be the obligation of the Contract Administrator..

2.04 Contract Administrator will perform the function of filing the information reporting returns (Form 1099) with the IRS under the Tax Identification Number of Contract Administrator. Both the Contract Administrator and the Plan Sponsor agree that the responsibility for said reporting is that of the Plan Sponsor.

2.05 Contract Administrator and Plan Sponsor agree that any and all functions performed by Contract Administrator on behalf of the Plan Sponsor do not give rise to Contract Administrator acting as a "fiduciary" of the Plan. Both parties agree that the Contract Administrator is not a fiduciary of or for the Plan; that Contract Administrator does not have discretionary authority or discretionary control with respect to the management of the Plan; that Contract Administrator does not exercise any authority or control with respect to the management or disposition of the assets of the Plan; that Contract Administrator does not render investment advice; and with respect to the foregoing, the Contract Administrator has no authority or responsibility to do so.

## <u>SEC. III</u> <u>FEES OF THE CONTRACT ADMINISTRATOR</u>

3.01 The Contract Administrator shall receive consideration in accordance with Schedule A herein incorporated by reference or as otherwise specifically denoted on another Schedule.

3.02 The Administrative Fees must be received by the Contract Administrator on or before the 10th day of the month for which they are due. The Administrative Fees described in Schedule A are payable in advance and may be deducted monthly by the Contract Administrator from the Plan Sponsor Account.

3.03 If the Plan Sponsor, for any reason whatsoever, fails to make a required fee payment by the 30th day of the month in which it is due, the Contract Administrator may:

 (a) after written notice to Plan Sponsor, suspend the performance of its services to the Plan Sponsor until such time as the Plan Sponsor makes the proper remittance;

 (b) charge interest to the Plan Sponsor on all past due fees at the rate of one and one-half percent (1½%) per month or the maximum rate allowed by law, whichever is less;

 (c) cease retroactively to the end of the month for which full payment was last received, all administrative services; and/or

 (d) commence termination of this Agreement in accordance with Section VIII.

3.04 In the event Contract Administrator advances any sums to a vendor or a state and/or federal agency on behalf of the Plan Sponsor, Plan Sponsor agrees to immediately reimburse Contract Administrator in full and the remedies in Section 3.03 will apply. This provision shall survive the termination of this Agreement.

3.05 If the number of participants enrolled in the Plan decreases by twenty-five percent (25%) or more when compared to the number of participants enrolled on the effective date of this Administrative Services Agreement, Contract Administrator shall have the right to prospectively adjust its administrative fee immediately upon written notice to the Plan Sponsor. The adjustment may be made regardless of any rate guarantee that may be in place for that period of time. If Plan Sponsor does not give its written consent within five (5) business days to the adjustment in fees, Contract Administrator may immediately terminate this Agreement.

3.06      The Contract Administrator shall not provide or be responsible for the expenses and cost of legal counsel, actuaries, certified public accountants, consulting physicians, consulting dentists, medical and other review charges for special claims investigations, independent medical review services or similar services performed for the Plan Sponsor. With the exception of independent medical reviews, the Contract Administrator shall not be authorized to engage such services or incur expense or cost therefore without the consent of the Plan Sponsor. Plan Sponsor hereby consents to reimburse Contract Administrator for any expense or cost incurred on behalf of the Plan Sponsor for said independent medical review services as set forth on Schedule A.

3.07      If Plan Sponsor fails to pay any undisputed fee, expense, tax, assessment, penalty, and/or any other sum due under this Agreement, Plan Sponsor shall pay all reasonable expenses incurred by Contract Administrator in collecting those sums, including reasonable attorney fees and costs.

## SEC. IV      CLAIMS PAYMENT

4.01      On a weekly basis, or as otherwise directed by the Plan Sponsor, the Contract Administrator shall provide a list of claims approved for payment under the Plan. The Plan Sponsor shall deposit sufficient funds in the Plan Sponsor Account to cover the approved claims within five (5) business days. The Contract Administrator shall issue checks from the Plan Sponsor Account to pay approved claims.

4.02      If the Plan Sponsor, for any reason whatsoever, fails to deposit sufficient funds in the Plan Sponsor Account within twenty (20) business days from the daterequested by the Contract Administrator, or if the Contract Administrator has reasonable concerns regarding the Plan Sponsor's ability to sufficiently fund claims, the Contract Administrator may immediately, with prior notice to the Plan Sponsor, suspend or terminate the prescription drug card (if applicable), suspend all claims paying activities, notify PPO networks, the DOL, healthcare providers, participants, beneficiaries, and vendors, as applicable and/or take other necessary legal action until sufficient and timely claims funding is established.

4.03      Plan Sponsor acknowledges that Preferred Provider Organization (PPO) discounts may not be available for any claim "paid" outside of the terms of the PPO contract. Paid typically means processed, funded and mailed.

4.04      Plan Sponsor acknowledges that claims must be paid according to the terms of the underlying stop loss contract, if applicable, or the Plan Sponsor may not be reimbursed for claims that may otherwise qualify for reimbursement. Paid typically means processed, funded and mailed.

4.05      The Contract Administrator shall not be responsible for any late filings, penalties, fines, taxes, assessments, lost PPO discounts, unrealized stop-loss reimbursements, etc., that may result from late or inadequate funding (from any source), suspension or cessation of performance described herein.

4.06      Contract Administrator has no financial responsibility to the Plan Sponsor, or any other party, to pay for any professional, hospital or other bills related to a Member. Plan Sponsor will resolve billing and administrative issues directly with Providers. Upon request, the Contract Administrator will facilitate communications between Provider and Plan Sponsor to resolve billing and administrative issues.

## SEC. V      LIMITS OF THE CONTRACT ADMINISTRATOR'S RESPONSIBILITY

5.01      If a claim adjudication error should be discovered, the Contract Administrator shall use diligent efforts toward the recovery of any loss therefrom. Contract Administrator shall not be required to initiate legal proceedings for any such recovery and shall have no liability for such errors, provided they are reasonable, made in good faith, and within acceptable industry standards.

5.02      It is understood and agreed that the Contract Administrator is, and shall remain, an independent contractor with respect to the services being performed and shall, for no purpose, be deemed an employee or fiduciary of the Plan Sponsor.

5.03    It is understood and agreed that the Contract Administrator is not a "Plan Sponsor", "Plan Administrator" or "Fiduciary" of or for the Plan within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA") or applicable state law. Notwithstanding anything in the Agreement to the contrary, any delegation of authority or duties pursuant to this Agreement construed by a court of law or governmental agency to make the Contract Administrator such a Plan Administrator or fiduciary shall be null and void, and such duties are hereby retained by the Plan Sponsor. Accordingly, the services to be performed by Contract Administrator shall be limited to the ministerial services set forth in this Agreement and the performance by Contract Administrator of such services shall be subject to review by the Plan Sponsor.

5.04    The Contract Administrator shall have no responsibility, risk, liability or obligation for the funding of the Plan. The responsibility and obligation for funding the Plan shall be solely and totally the responsibility of the Plan Sponsor. Contract Administrator shall have no final discretionary authority or control over the management or disposition of Plan assets, and no authority over, or responsibility for, Plan administration. Contract Administrator is neither the Plan Sponsor or Plan Administrator, nor a provider of health care services. Contract Administrator shall have no responsibility for any insurance coverage relating to the Plan, Plan Members, or Plan Sponsor; or the nature or quality of professional health services rendered to Plan Members.

5.05    Contract Administrator and Plan Sponsor shall each be solely responsible for compliance with all laws, rules and regulations that are now or hereafter applicable to each of them and their own performance under this Agreement. Contract Administrator shall not be responsible for establishing or maintaining the Plan or ensuring the Plan Sponsor is in compliance with applicable State or Federal legal requirements, nor shall Contract Administrator be an entity that is responsible for payment under the Plan or for payment of any fees, assessments, penalties or taxes, regardless of whether such fees, assessments, penalties or taxes are assessed against the Plan, the Plan Sponsor, or the Contract Administrator on behalf of the Plan Sponsor. The Plan Sponsor shall, in its sole discretion, determine the source of funding for such fees, assessments, penalties, or taxes, and shall assume all liability for the appropriateness of use of Plan assets or Plan Sponsor general funds to pay such fees, assessments, penalties and taxes.

5.06    It is understood by the Plan Sponsor that the Contract Administrator is not an insurance company, investment advisor, plan administrator, fiduciary, custodian, law firm or actuarial firm.

5.07    Contract Administrator shall, when requested by Plan Sponsor, assist Plan Sponsor with the application for stop-loss insurance including completion of required disclosure documents. If Contract Administrator has provided administrative services under this or a prior Agreement in the twelve (12) consecutive months prior to the application for stop-loss insurance then Contract Administrator will complete the disclosure documents based on claims it has adjudicated and information it has received through utilization review. If the Contract Administrator has not provided administrative services during the prior twelve (12) consecutive month period, then it has no responsibility for the completeness of information submitted on the disclosure document.

5.08    In the event Contract Administrator does not procure stop-loss insurance for Plan Sponsor or assist Plan Sponsor in such procurement, Plan Sponsor shall indemnify and hold harmless Contract Administrator and its respective officers, partners, employees and agents from and against any and all expenses, claims, settlement costs, penalty, damages, judgments, attorney's fees, actions or causes of action whatsoever to the extent that such results from the stop-loss carrier, stop-loss coverage, or lack thereof, and/or in any way connected with any act, failure to act, the performance of and/or failure to perform any and all obligations by or related to the stop-loss coverage selected and procured by the Plan Administrator/Sponsor or its Broker/agent. This provision shall survive the termination of any applicable stop-loss policy and/or contract as well as this Agreement.

5.09    Contract Administrator, on behalf of the Plan Sponsor, has agreed to perform the required duties and act as the Responsible Reporting Entity (RRE) with regard to and as defined by the Medicare Secondary Payer Mandatory Reporting Provisions in Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007. In the event the Contract Administrator is unable to report timely, accurate information, as required by law, due to the Plan Sponsor's failure to provide timely and accurate information, the Plan Sponsor agrees to hold the Contract Administrator harmless and indemnify the Contract Administrator for any and all resulting penalties and/or damages.

| SEC. VI | **RECORDS** |
|---------|-------------|

6.01    The Contract Administrator shall maintain for seven (7) years following receipt or until they are provided to Plan Sponsor as provided in Section 8.04 below, in either electronic or paper form, all records and files in conjunction with the administrative services to be performed hereunder. The term "records and files" shall include, but shall not be limited to, the claim files, unissued and canceled checks, bank statements, copies of stop-loss applications and contracts, and copies of the account ledger sheets of the applicable bank accounts.

6.02    During normal business hours, individual claim files shall be available for inspection and copying by the Plan Sponsor and at the Plan Sponsor's expense, if appropriate releases and authorizations from all applicable claimants are executed and presented to the Contract Administrator or an appropriate Business Associate Agreement is in place.

6.03    The Contract Administrator shall, within thirty (30) days following written notice from the Plan Sponsor, allow the Plan Sponsor, or an authorized agent, to inspect or audit relevant records and files maintained by the Contract Administrator, at the administrative office of the Contract Administrator, during normal business hours. The Plan Sponsor shall be liable for any and all fees charged by the auditor. Any such agent or auditor that has access to the records and files maintained by the Contract Administrator shall, prior to beginning such inspection or audit, sign a written Business Associate Agreement and an agreement regarding the use of proprietary and confidential information and the right of the Contract Administrator to review and respond to the agent's or auditor's final report. Plan Sponsor agrees it will not contract with any entity to perform what can be categorized as a "contingency audit" (in which an auditing firm will retain a dollar percentage fee from claims they believe have been paid in error) or "database audit" (in which claims are screened against a database) of records and files maintained by Contract Administrator.

| SEC. VII | **TERM OF AGREEMENT** |
|----------|------------------------|

7.01    This agreement shall become effective at 12:01 a.m. on the 1st day of July, 2014, and shall remain in effect until terminated pursuant to Section VIII of this Agreement.

| SEC. VIII | **TERMINATION** |
|-----------|------------------|

8.01    This Agreement may be terminated:

    (a)    by either party by giving written notice of non-renewal to the other party at least forty five (45) days prior to the end of the then current term;

    (b)    immediately by the non-breaching party in the event the breaching party fails to correct a material breach to the reasonable satisfaction of the non-breaching party within fifteen (15) days after the breaching party receives written notification of breach from the non-breaching party;

    (c)    simultaneously upon the Chapter 7 bankruptcy filing of the Plan Sponsor and/or the Plan Administrator;

    (d)    upon written agreement of the parties; or

    (e)    upon the termination of the Plan.

8.02    A penalty for early termination will apply, equal to the Administrative Fees listed on Schedule A and payable for the remainder of the required forty five (45) day notice of termination.

8.03    Application of this Agreement to any state or jurisdiction may be prospectively discontinued by either party as of the date such party determines that it will be penalized, by such state or jurisdiction, for performance of its responsibilities under this Agreement.

8.04     Upon termination by either party, the Contract Administrator shall, within sixty (60) days, deliver to the Plan Sponsor a paid claims analysis, abbreviated case management summaries (if applicable), complete eligibility listings as well as a complete and final accounting of the financial status of the Plan if applicable. The cost of producing additional reports shall be the responsibility of the Plan Sponsor. The Contract Administrator shall retain, for seven (7) years after termination of this Agreement, all records and files, in either paper or electronic form, in accordance with standards of insurance record keeping. If the Plan Sponsor desires copies of all records and files, Plan Sponsor shall allow Contract Administrator reasonable time in which to duplicate this material and will reimburse Contract Administrator for reasonable costs incurred in its retrieval and duplication. If the Plan Sponsor desires possession of the records and files, the Contract Administrator shall, upon the request and at the expense of the Plan Sponsor, arrange for the delivery of this material to the Plan Sponsor or its authorized agent. Upon receipt of all records and files, the Plan Sponsor agrees to defend, indemnify and hold harmless the Contract Administrator, its directors, officers, representatives and employees against any and all claims, lawsuits, settlements, judgments, costs, penalties, damages and liabilities, including attorneys' fees, resulting from, or arising out of or in connection with, any function of the Contract Administrator under this agreement or with a claim for benefits under the Plan. The Plan Sponsor further understands and agrees that, upon receipt of the records and files, the Contract Administrator is forever released from all liability, loss or damage arising from any subsequent audit.

8.05     Upon termination of this Agreement, and for an additional fee, the Plan Sponsor and Contract Administrator may enter into a subsequent agreement whereby Contract Administrator will provide run-out claim payment services for claims received after the termination of this Agreement, but incurred prior to termination of this Agreement. The Contract Administrator may require payment in advance, and services will be provided only to the extent that Plan Sponsor provides sufficient and timely funding of claims payments.

8.06     Within four (4) months following termination, when requested by the Plan Sponsor, Contract Administrator shall deliver to the Plan Sponsor, data related to assist the Plan Sponsor's completion of Form 5500.

8.07     After termination of this Agreement and upon receipt of any funds received by the Contract Administrator on behalf of the Plan Sponsor, the Contract Administrator may keep all or a portion of said funds to the extent that any amounts are due to the Contract Administrator for the services discussed herein.

8.08     Upon termination of this Agreement all duties and responsibilities of the Contract Administrator shall cease unless specifically addressed within this agreement or as set forth in a separate run-out Agreement.

## SEC. IX      MISCELLANEOUS

9.01     This Agreement shall be governed by the laws of the State of Montana or, where applicable, Federal law.

9.02     The Contract Administrator shall indemnify and hold harmless the Plan Sponsor against any expense, loss, lawsuit, settlement costs, penalty, damage, liability, claim or judgment, including reasonable attorneys' fees, resulting from the negligent acts or omissions or willful misconduct of the Contract Administrator. The Plan Sponsor agrees to indemnify and hold harmless the Contract Administrator against any expense, loss, lawsuit, settlement costs, penalty, damage, liability, claim or judgment, including reasonable attorneys' fees, arising out of, or resulting from the Contract Administrator's performance of its services hereunder where the Contract Administrator has adhered to the framework of policies, interpretations, rules, practices and procedures made or established by the Plan Sponsor, or has otherwise performed its services without negligence or willful misconduct and, in accordance with industry practices, or is being considered an entity responsible for payment under the Plan, as referenced in Federal Medicare Secondary Payer laws and regulations. The provisions of this section shall apply to arbitration and all forms of alternative dispute resolution as well as litigation. These indemnifications shall survive the termination of this Agreement.

9.03     Contract Administrator shall not be responsible or obligated for the investment of any assets or funds of the Plan.

9.04    Payments to the Plan, and other Plan obligations, may pass through Contract Administrator's non-interest bearing disbursement account as a matter of convenience and for efficiency. Contract Administrator will incorporate sound business practices and be responsible for reasonable internal audits. Banking charges incurred in the ordinary course of business will be the responsibility of the Contract Administrator.

9.05    This Agreement, together with the Schedule(s) and any Amendments, constitutes the entire Agreement between Contract Administrator and Plan Sponsor with respect to the subject matter hereof, and supersedes all prior proposals, discussions, negotiations, and writings between the parties relating to such subject matter. This Agreement may only be modified in writing and executed by authorized representatives of both Contract Administrator and Plan Sponsor.

9.06    If any provision of this Agreement is held to be illegal or unenforceable by a court of competent jurisdiction, the remaining provisions shall remain in effect and the illegal or unenforceable provision shall be modified so as to conform to the original intent of this Agreement to the greatest extent legally permissible.

9.07    The obligations of either Contract Administrator or Plan Sponsor under this Agreement, shall be suspended during the continuance of any force majeure applicable to the party. The term "force majeure" shall mean any cause not reasonably within the control of the party claiming suspension, including, without limitation, on act of God, industrial disturbance, war, riot, weather-related disasters, earthquake, governmental action, and unavailability or break down of equipment. The party claiming suspension under this provision shall take reasonable steps to resume performance as soon as possible without incurring unreasonably excessive costs. If a force majeure suspension affecting one of the parties continues for more than thirty (30) days, the other party may elect to immediately terminate this Agreement by written notice on any business day thereafter.

9.08    Neither party may assign its rights or duties under this Agreement without the prior written consent of the other, except that either party may assign this Agreement to a subsidiary or affiliate of that party and may subcontract certain duties to non-affiliated third parties, provided that such assignments and subcontracts shall not relieve such party of any obligations or liability under this Agreement. This Agreement shall be binding upon and inure to the benefit of the parties' respective successors and permitted assigns.

9.09    Any failure by a party to enforce or require performance by the other party of any of the terms or conditions of this Agreement shall not constitute a waiver or a breach of any such term or condition thereafter occurring.

## SEC. X    PROVISIONS REQUIRED BY STATE STATUTES

10.01   Montana Code Annotated 33-17-602 requires that the following provisions be included in this Agreement. These provisions shall be disregarded and inapplicable unless they relate to state-regulated functions performed by the Contract Administrator for this particular Plan.

(a)    All insurance charges or premiums collected by the Contract Administrator, on behalf of the Plan Sponsor, and return premiums received from the Plan Sponsor, shall be held by the Contract Administrator in a fiduciary capacity. Such funds shall be immediately remitted to the person entitled to them or deposited promptly in a fiduciary bank account established and maintained by the Contract Administrator. The Contract Administrator shall cause the bank, in which the fiduciary account is maintained, to keep records clearly recording the deposits in and withdrawals from such account on behalf of the Plan Sponsor. The Contract Administrator shall promptly obtain and keep copies of all such records and, upon request of the Plan Sponsor, shall furnish copies of such records pertaining to deposits and withdrawals on behalf of the Plan Sponsor.

The Contract Administrator shall not pay any claim by withdrawals from such fiduciary account. Withdrawals from such account shall be made, as provided in this agreement, for:

(1)    remittance to the Plan Sponsor;
(2)    deposit in an account maintained in the name of the Plan Sponsor;
(3)    transfer to and deposit in a claims paying account;

(4)     payment of commissions, fees, or charges; or
(5)     remittance of return premiums to the person entitled to the premium.

(b)     Any policies, certificates, booklets, termination notices, or other written communications delivered by the Plan Sponsor to the Contract Administrator for delivery to Plan Members shall be delivered promptly after receipt of instructions to do so.

(c)     Compensation to the Contract Administrator where the Contract Administrator adjusts or settles claims, shall in no way be contingent on claim experience.  This shall not prevent the compensation of the Contract Administrator from being based on premiums or charges collected or number of claims paid or processed.

## SEC. XI     DISPUTE RESOLUTION

11.01     Plan Sponsor and Contract Administrator will meet and confer in an attempt to resolve any dispute arising out of or relating to this Agreement. A dispute not resolved within 60 days of this meeting will be submitted to mediation, which will be held in Billings, Montana in accordance with the American Arbitration Association ("AAA") Rules of Procedure for Mediation. A single mediator, either mutually selected by the parties or AAA and having at least 10 years' legal experience in healthcare, including but not limited to self-funding and ERISA, will mediate the dispute. If the dispute is not resolved through mediation, the parties will be free to pursue all legal and equitable remedies otherwise available, provided, however that any action taken or remedy sought must be initiated within one year of the parties' first meeting to resolve the dispute.

## SEC. XII     SCHEDULES TO THE AGREEMENT

12.01     The Schedules attached hereto, become part of the body of this Agreement, and are herein incorporated by reference when selected by the Plan Sponsor.  Schedules or Amendments subsequently executed by both parties and attached hereto, shall become part of the body of this Agreement and incorporated herein.

IN WITNESS THEREOF the Parties hereto sign their names as duly authorized officers and have executed this Agreement.

PLAN SPONSOR:                                    CONTRACT ADMINISTRATOR:

Monterey Peninsula Horticulture, Inc./          Employee Benefit Management Services, Inc.
Steven Roberts Original Desserts, L.L.C.

By: _____                   By: _____

Its:     C F O                                   Its:     President

**SCHEDULE A**

**FEES**

A.  In accordance with Section III of the Administrative Services Agreement, the Plan Sponsor agrees to pay to the Contract Administrator the following Administrative Fees:



B.  Plan Sponsor agrees to remit the following amounts to Contract Administrator or its designee for services performed by certain vendors on behalf of the Plan Sponsor or Plan. Unless noted otherwise in Section C below, Contract Administrator shall forward all amounts received to the appropriate vendor or vendor account.



C.  The Plan Sponsor acknowledges and agrees that the Contract Administrator may receive additional compensation in connection with services provided to Plan Sponsor from sources other than the Plan Sponsor or Plan. Contract Administrator may receive any of the following:

1. Wrap Networks:

The Contract Administrator contracts with wrap network arrangements for discounted pricing of non-network claims. If a wrap network is utilized on claims for Plan Sponsor, the Contract Administrator will retain a portion of the fee to offset administrative expenses including claims data analysis, EDI Routing and processing services.

2. Claims Negotiation Services:

The Contract Administrator contracts with certain entities to perform large claim negotiation services. If a large claim negotiation service is utilized on claims for Plan Sponsor's Plan, the Contract Administrator will retain a percentage of the total savings realized and paid by Plan Sponsor under Section B up to a maximum of 25%, for claims processing and coordination, and related communications with the provider, Plan participant and applicable carriers.

3. PBM Services and Audit Support:

The Contract Administrator contracts with PBM vendors to provide prescription drug benefits for Plan Sponsor's Plan. In conjunction with the services provided to Plan Sponsor by the PBM, Contract Administrator provides client support services, benefit design assistance, auditing services, data integration services, On line Health portal and decision support, PBM Contract Negotiation, PBM market check analysis, implementation and benefit setup transfer, member communication development, data files, plan consultation, appeals coordination, coordinated review of medical necessity in certain instances, issue resolution support and coordination, eligibility audits, real time/ same day updates to online health portal, and other related support services. For EBMS Preferred PBM vendors, the Contract Administrator receives funding directly from the PBM vendor for such service support.

D.      Plan Sponsor authorizes Contract Administrator to deduct the administrative fees for each month from the Plan Sponsor Account. The Contract Administrator shall also be authorized to deduct any applicable taxes, fees, assessments and or penalties from the Plan Sponsor Account upon prior notice to the Plan Sponsor.

E.      A binder fee of N/A representing the first month's estimated fees shall be payable on or before the effective date of this Agreement.

F.      An initial one-time set-up fee of N/A for eligibility loading, plan building and other services, shall be payable prior to commencement of services under this agreement.

███████████████████████████████████████████

H.      Additional Administrative Fees may be reflected on the applicable Schedule.

I.      The fee and rates outlined in Schedule A shall be renewed and revised as necessary, but in no event less than annually to be mutually acceptable to both parties.

Effective Date:  July 1, 2014

PLAN SPONSOR:                                    CONTRACT ADMINISTRATOR:

Monterey Peninsula Horticulture, Inc./          Employee Benefit Management Services, Inc.
Steven Roberts Original Desserts, LLC.

By: _____                     By: _____

Its: _____                    Its:    President
        C F O

RECEIVED

JAN 12 2015

EBMS - BILLINGS

## SCHEDULE B

## COBRA

The Plan Sponsor requests that the Contract Administrator provide certain services in compliance with the requirements of the Consolidated Budget Reconciliation Act (COBRA) as amended, and all related regulations with respect to the Plan Sponsor's COBRA responsibilities in consideration of the following:

## DUTIES AND RESPONSIBILITIES OF PLAN SPONSOR

A.   Notify the Contract Administrator in writing, of all Plan Members eligible under the Plan.

B.   Notify the Contract Administrator of certain qualifying events, in writing, within thirty (30) days of the occurrence of a qualifying event, including but not limited to a covered employee's end of employment, a covered employee's reduction of hours of employment, death of a covered employee, commencement of a proceeding in bankruptcy with respect to the employer, or the covered employee becoming entitled to Medicare benefits (under Part A, Part B, or both).  Said Notice shall contain sufficient information to satisfy the requirements as set forth in the Act.

C.   Forward any necessary information and/or documentation on to Contract Administrator applicable to a Plan Participant and/or a Plan Beneficiary and a Qualifying Event.

D.   Assist Contract Administrator in obtaining any necessary information and/or documentation applicable to a Plan Participant and/or Plan Beneficiary.

E.   Notify Contract Administrator of any Plan Participant and/or Plan Beneficiary address change.

F.   If applicable, forward the necessary COBRA premium on to the Contract Administrator.

G.   Report any deficiencies or unmet requirements to the IRS on Form 4980(b).

H.   From time to time, additional notices may be required by federal or state law.  Plan Sponsor is responsible for providing these additional notices.  Contract Administrator will provide the notices for an additional fee to be determined.

## DUTIES AND RESPONSIBILITIES OF CONTRACT ADMINISTRATOR

A.   Upon receipt of complete eligibility documentation, Contract Administrator shall provide each Plan Participant and all applicable Plan Beneficiaries with written initial notice of his or her continuation coverage rights under the Plan.

B.   Following notice of a Qualifying Event, Contract Administrator will notify all Qualified Beneficiaries of continuation coverage rights and premium amounts.

C.   Contract Administrator shall receive elections and premiums from Qualified Beneficiaries, track all premium payments received, and provide telephonic assistance for inquiries on COBRA benefits.

D.   Contract Administrator shall notify Qualified Beneficiaries of rate changes, the unavailability of COBRA, and COBRA termination.

## COMPENSATION

Effective Date: __July 1, 2014__

PLAN SPONSOR:                        CONTRACT ADMINISTRATOR:

Monterey Peninsula Horticulture,  Inc.    Employee Benefit Management Services, Inc.
Steven Roberts Original Desserts, LLC.

By: _____          By: _____

Its: _____CFO_____            Its:    President

JAN 14 2015

EBMS - BILLINGS

## SCHEDULE C

## FIDUCIARY DISCLOSURE STATEMENT

A.     Prohibited Transaction Class Exemption 84-24 (PTE 84-24), as issued by the Department of Labor, permits the receipt of reasonable compensation by certain enumerated interested parties for services rendered if proper disclosure is given and the transaction is approved by appropriate independent Plan fiduciaries. PTE 84-24 requires that the transaction be at arm's length and in the best interest of Plan participants. This notice serves to satisfy the disclosure requirements of PTE 84-24, if applicable to Plan Sponsor.

      1.     Description of Transaction:
              <u>Excess-loss Reinsurance Contract</u>
              <u>Life Insurance</u>

      2.     Name of Insurer:
              <u>Stop Loss Insurance Services, Inc.</u>
              <u>Lincoln Financial Group</u>

      3.       <u> X </u>     The Contract Administrator is not affiliated with the Insurer whose contract is being recommended and is not limited by any agreement with the Insurer.

           <u>  </u>     The Contract Administrator is affiliated with the Insurer whose contract is being recommended or is limited by an agreement with the Insurer. Explain:

      4.     Sales Commission (expressed as a percentage of gross annual premiums). If override commissions apply, explain below:

           0%

      5.     Description of any additional charges, fees, discounts, penalties or adjustment incurred by the Plan or which may be incurred by the Plan under the insurance company policy or contract.

      6.     Contract Administrator may receive additional compensation from the Insurer in the form of a production bonus, service fees, override commissions or a profit sharing arrangement. Such compensation may be based upon Contract Administrator's potential volume of business with the Insurer, the overall profitability of the Insurer's business, or other similar factors. The amount of such additional compensation, if any, will not be known until the end of the agreement period with the Insurer. Information regarding such additional compensation, insofar as it relates to the Plan, will be available for the Plan fiduciaries' review after such amounts have been determined.

B.     Contract Administrator may receive interest from banks on account balances, and compensation from pharmaceutical manufacturers, health care providers, managed care service providers, PPOs, HMOs, large case negotiators, etc. Such compensation may be based upon utilization of related products and services. Contract Administrator will retain such compensation to the extent necessary to reasonably compensate Contract Administrator for its costs resulting from such utilization. The amount of such additional compensation, if any, will be known only periodically. Upon the Plan Sponsor's reasonable request, information regarding such additional compensation, insofar as it relates to the Plan, will be available for the Plan Sponsor's review after such amounts have been determined.

C.     The Contract Administrator will forward to the Plan Sponsor 100% of all rebates received from the Plan Sponsor's contracted PBM. Plan Sponsor acknowledges and agrees that in the event Plan Sponsor fails to timely fund any claim obligations, as set forth in the Agreement or the applicable PBM Agreement, Contract Administrator may, after written notice to the Plan Sponsor, withhold any and all rebates from Plan Sponsor and apply said rebates to the unfunded claims.

I hereby acknowledge that, in my capacity as an independent fiduciary with authority to act on behalf of the Plan, I have received the above information concerning the above transactions and I approve the transactions on behalf of the Plan. I am not an insurance agent or broker, pension consultant or insurance company involved in the transaction. Further, I will not receive any compensation or other consideration, directly or indirectly, for my own personal account from any party dealing with the Plan in connection with the transaction.

Effective Date: __July 1, 2014__

PLAN SPONSOR:                                        CONTRACT ADMINISTRATOR:

Monterey Peninsula Horticulture, Inc.                Employee Benefit Management Services, Inc.
Steven Roberts Original Desserts, LLC.

By: _____                          By: _____

Its: _____CFO_____                            Its: ____President_____

JAN 1

EBMS - BILLINGS

**SCHEDULE E**

**HIPAA SERVICES**

The Contract Administrator will provide services with respect to the Plan Sponsor's responsibilities in compliance with the requirements of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), as amended, and all related regulations in consideration of the following:

## DUTIES AND RESPONSIBILITIES OF PLAN SPONSOR

To ensure correct HIPAA Certificates of Creditable Coverage, Plan Sponsor shall submit, in a timely manner and in writing, complete and accurate employment, health and coverage data to Contract Administrator.

## DUTIES AND RESPONSIBILITIES OF CONTRACT ADMINISTRATOR

A.      Issue certificates of coverage to those who, based upon data provided by Plan Sponsor, lose coverage under the Plan.

B.      Issue certificates of coverage to those who elect COBRA, then cease to be covered by the COBRA continuation coverage provided by the Plan.

C.      Issue certificates of coverage to those who request such certificate, but no later than twenty-four (24) months after cessation of coverage as set forth in the preceding two paragraphs.

D.      Meet all HIPAA/HITECH Privacy, Security, and Administrative Simplification requirements that pertain to a Business Associate.

## COMPENSATION

A.      The Contract Administrator shall be authorized to deduct the administration fees for each month from the Plan Sponsor Account.

B.      The fee structure shall be renewed annually and revised to be mutually acceptable to both parties.

Effective Date:   July 1, 2014

PLAN SPONSOR:                                      CONTRACT ADMINISTRATOR:

Monterey Peninsula Horticulture, Inc.            Employee Benefit Management Services, Inc.
Steven Roberts Original Desserts, LLC.

By: _____               By: _____

Its: _____CFO_____                            Its:      President

EBMS - BILLINGS

## SCHEDULE D
## CARELINK ADDENDUM

The Contract Administrator shall provide and Plan Sponsor shall pay for certain cost management services described in this Schedule D for the benefit of Plan's Sponsor's health benefit plan:

### A.   UTILIZATION MANAGEMENT

**Inpatient:**  Review actual or scheduled Admissions and, using clinical criteria, determine the medical necessity, conduct concurrent reviews and provide discharge planning, based upon the information provided to CARELINK, and provide certification, as appropriate.

**Outpatient:** Review actual or scheduled: (i) elective outpatient same-day surgeries; (ii) elective outpatient diagnostic procedures, including invasive; (iii) outpatient continuing services such as physical therapy, occupational therapy, speech therapy, home health care, hysterectomies, spinal surgeries, cancer treatments, dialysis, genetic testing, hospice, injectables and durable medical equipment (items in excess of $2,000.00).

   **a.   PRE-ADMISSION COUNSELING**

   Case Managers will provide telephonic counseling services to Covered Persons who have an inpatient, elective surgery and are not already enrolled in Case Management or Maternity Management. This service includes education on proper preparation for the hospital admission and recovery process and referral to other services, including Case Management when appropriate. CARELINK must receive three business days advance notice of the scheduled admission.

   **b.   POST-DISCHARGE COUNSELING**

   Case Managers will provide telephonic counseling services to members after being discharged from the hospital to the home setting, excluding maternity cases, 23-hour observation Case Management cases and members already enrolled in Case Management. This service includes assessment of member's health status, review of post-discharge instructions and medication, education on signs and symptoms of adverse effects of the procedure, and referral to other services, including Case Management when appropriate.

### B.   CASE MANAGEMENT

Case Management is a collaborative process to assess, plan, implement, coordinate, monitor and evaluate the options and services required to meet a Covered Person's health needs. If Plan Sponsor or the reinsurance carrier request case management services outside of the parameters set out by the program, an additional hourly fee will be charged.

### C.   MATERNITY MANAGEMENT

A review of maternity cases to assess the risk level in such cases, to perform specialized management services coordinating the delivery of prenatal health care services, to provide educational materials and counseling, to serve as a liaison between the Covered Person and Providers, to monitor and encourage the mother-to-be's compliance with appropriate prenatal health care.

### D.   TELEDOC

Covered Persons are provided with unlimited 24/7 access to licensed physicians by phone, secure e-mail, video and mobile app.

### E.   MISCELLANEOUS

Upon request of the Plan Sponsor, and as mutually agreed to by the parties, Contract Administrator will create customized reports and make changes to standard reports, correspondence, documents or other materials for an hourly charge.

Plan Sponsor acknowledges and agrees that neither Contract Administrator nor any external vendor that might perform the services outlined in Schedule D shall have no right, obligation, or liability to participate in the determination of what care or treatment is rendered to a Covered Person or how such care or treatment shall be rendered.  The decisions to obtain or deliver any health care service are solely between a Covered Person and his or her treating healthcare provider.

Effective Date:  July 1, 2014

PLAN SPONSOR:                                          CONTRACT ADMINISTRATOR:

Monterey Peninsula Horticulture, Inc.                 Employee Benefit Management Services, Inc.
Steven Roberts Original Desserts, LLC.

By: _____                         By: _____

Its: _____CFO_____                        Its: _____President_____

EBMS - BILLINGS

## SCHEDULE H

## miBenefits

Plan Sponsor desires to access employee/plan participant claim and eligibility information through miBenefits, the EBMS on-line portal.

Plan Sponsor agrees to hold all information that comes within its control strictly confidential, and provide all reasonable physical, electronic and procedural safeguards to prevent unauthorized disclosure of such information. Furthermore, Plan Sponsor agrees to comply with all applicable Federal and State laws and/or regulations regarding the security and confidentiality of such information including, but not limited to, any regulations, standards or rules propagated under the authority of the Gramm-Leach-Bliley Act and the Health Insurance Portability and Accountability Act of 1996 (HIPAA), HIPAA privacy and security and the Health Information and Technology Act (HITECH).

The Plan Sponsor agrees to hold harmless and indemnify the Contract Administrator against any expense, loss, lawsuit, settlement costs, penalty, damage, liability, claim or judgment, including reasonable attorneys' fees, arising out of, or resulting from Plan Sponsor's access to, disclosure and use of such information and/or failure to comply with the provisions of this schedule. These indemnifications shall survive the termination of this Agreement.

Contract Administrator is authorized to release a password enabling access, to:

LANA   PIERI _____ (name)

Director Human Resources (title)

360  Espinosa  Rd _____ (mailing address)

Salinas  CA  93907 _____

_____

LPIERI @ ROCKET FARMS .com (e-mail address)

FRAN  ABRAGNA - HAVES
V.P.  Human  Resources
2780  Tower  Road
Aurora  CO  80011

FADRAGNA HAVES @ original desserts
. com

The following password configuration is being given:

One password for all divisions/locations

Effective Date: _July 1, 2014_

PLAN SPONSOR:

Monterey Peninsula Horticulture, Inc.
Steven Roberts Original Desserts, LLC.

By: _____

Its: ____CFO____

CONTRACT ADMINISTRATOR:

Employee Benefit Management Services, Inc.

By: _____

Its:   President

EBMS - BILLINGS

## SCHEDULE L

## THIRD PARTY RECOVERY

The Plan Sponsor requests that the Contract Administrator provide certain services in order to protect the assets of the Plan in the event any recovery is available from a third party source.

### DUTIES AND RESPONSIBILITIES OF PLAN SPONSOR

A.  The Plan Sponsor agrees that Contract Administrator shall provide third party recovery services to the Plan. Plan Sponsor agrees that it will furnish all information it may possess regarding claims subject to third party recovery.

B.  Certain cases will require referral to an outside attorney and additional legal work beyond the scope of the services contemplated by this Schedule. The Plan Sponsor agrees that engagement of an outside attorney shall be the Plan's responsibility and that upon engagement of such, the Contract Administrator shall cooperate with the outside attorney but will have no further obligation to pursue recovery.

C.  The Plan Administrator shall timely respond to settlement offers presented by Contract Administrator.

D.  The Plan Administrator shall have the right to terminate the pursuit and/or recovery efforts against a third party, the participant, or any other liable party at any time.

### DUTIES AND RESPONSIBILITIES OF CONTRACT ADMINISTRATOR

A.  The Contract Administrator shall provide third party recovery services necessary to pursue the Plan's equitable interests including the initial determination as to whether a third party action exists, supervision, follow-up and closure. If the Plan Sponsor does not agree to the course of recovery action proposed by the Contract Administrator, the Contract Administrator shall have no further obligation or liability whatsoever for the recovery and reimbursement of the Plan's equitable interests. Services such as filing an action in State or Federal Court are beyond the scope of the services contemplated by this Agreement.

B.  The Contract Administrator may engage such outside consultants and services as the Contract Administrator deems necessary to pursue the Plan's interests. Fees of such outside consultants and services shall not be the responsibility of the Plan, without its prior written consent.

C.  The Contract Administrator agrees to provide summary status reports of subrogation and third party recovery upon request of the Plan Sponsor.

D.  The Contract Administrator agrees that it shall have no authority to compromise the Plan's equitable interests in excess of Ten Thousand ($10,000) without consent of the Plan Sponsor.

E.  Plan Sponsor hereby grants Contract Administrator authority to accept settlement of the Plan's equitable interests for offers received between Two Thousand One ($2,001) and Ten Thousand ($10,000) Dollars without the Plan Sponsor's specific consent, if the settlement offer is more than or equal to sixty-six percent of the Plan's equitable interests. Offers less than sixty-six percent will be presented to the Plan Sponsor for its review.

F.  The Contract Administrator shall have no obligation to pursue the Plan's equitable interests between One ($1) and Two Thousand ($2,000) Dollars. If the Contract Administrator does pursue such an interest on the Plan's behalf, the Plan Sponsor agrees that the Contract Administrator shall have the authority to compromise the lien and accept settlement on the Plan's behalf.


EBMS - BILLINGS

**COMPENSATION**

Effective Date: _July 1, 2014._

PLAN SPONSOR:

Monterey Peninsula Horticulture, Inc.
Steven Roberts Original Desserts, LLC.

By: _____

Its: _____C F O_____

CONTRACT ADMINISTRATOR:

Employee Benefit Management Services, Inc.

By: _____

Its:     President

## SCHEDULE P

### HOLD HARMLESS AND INDEMNIFICATION AGREEMENT
### STOP LOSS/ADVANCE FUNDING

With the understanding that the Contract Administrator is relying upon the representations made by the Plan Sponsor in the Administrative Services Agreement and as set forth below in this Schedule, the Plan Sponsor hereby represents and warrants the following:

1.  Plan Sponsor is responsible for establishing and maintaining the Plan, complying with all applicable laws and regulations, and retains sole and final discretionary authority to manage and administrate the affairs of its Plan.

2.  Plan Sponsor shall procure stop-loss coverage at levels sufficient to ensure the financial viability of the Plan and shall monitor and maintain the funding at a level necessary to ensure prompt payment of all expenses eligible under the Plan.

3.  If the Plan Sponsor elects to utilize the advance funding feature of its stop-loss policy, the Plan Sponsor agrees to assume any and all liability resulting from the use of that advanced funding feature. Such liability may include, but is not limited to, the loss of a negotiated PPO discount amount, the loss of a negotiated case rate, and/or a violation of state or federal regulations regarding the time period for payment of claims.

4.  Plan Sponsor hereby indemnifies and holds harmless Contract Administrator, including its respective officers, employees and agents, from and against any and all expenses, losses, lawsuits, claims, settlement costs, penalties, damages, judgments, attorney's fees, actions or causes of action whatsoever to the extent that such results from the delay or denial in claims payment resulting from the stop-loss carrier's advance funding feature and/or in any way is connected with any act, failure to act, the performance of and/or failure to perform any and all obligations by or related to the stop-loss carrier and/or the advance funding feature utilized by the Plan Sponsor or its agent.

This Hold Harmless and Indemnification Agreement shall survive the termination of any applicable stop-loss policy and/or contract as well as the Administrative Services Agreement between the parties hereto.

Effective Date:  July 1, 2014

PLAN SPONSOR:                              CONTRACT ADMINISTRATOR:

Monterey Peninsula Horticulture, Inc.        Employee Benefit Management Services, Inc.
Steven Roberts Original Desserts, LLC.

By: _____              By: _____

Its:    CFO                                Its:    President

EBMS - BILLINGS

## SCHEDULE A

## FEES

A.    In accordance with Section III of the Administrative Services Agreement, the Plan Sponsor agrees to pay to the Contract Administrator the following Administrative Fees:



B.    Plan Sponsor agrees to remit the following amounts to Contract Administrator or its designee for services performed by certain vendors on behalf of the Plan Sponsor or Plan. Unless noted otherwise in Section C below, Contract Administrator shall forward all amounts received to the appropriate vendor or vendor account.



C.    The Plan Sponsor acknowledges and agrees that the Contract Administrator may receive additional compensation in connection with services provided to Plan Sponsor from sources other than the Plan Sponsor or Plan. Contract Administrator may receive any of the following:

1. Wrap Networks:

The Contract Administrator contracts with wrap network arrangements for discounted pricing of non-network claims. If a wrap network is utilized on claims for Plan Sponsor, the Contract Administrator will retain a portion of the fee to offset administrative expenses including claims data analysis, EDI Routing and processing services.

2. Claims Negotiation Services:

The Contract Administrator contracts with certain entities to perform large claim negotiation services. If a large claim negotiation service is utilized on claims for Plan Sponsor's Plan, the Contract Administrator will retain a percentage of the total savings realized and paid by Plan Sponsor under Section B up to a maximum of 25%, for claims processing and coordination, and related communications with the provider, Plan participant and applicable carriers.

3. PBM Services and Audit Support:

The Contract Administrator contracts with PBM vendors to provide prescription drug benefits for **Plan Sponsor's Plan.** In conjunction with the services provided to Plan Sponsor by the PBM, Contract Administrator provides client support services, benefit design assistance, auditing services, data integration services, On line Health portal and decision support, PBM Contract Negotiation, PBM market check analysis, implementation and benefit setup transfer, member communication development, data files, plan consultation, appeals coordination, coordinated review of medical necessity in certain instances, issue resolution support and coordination, eligibility audits, real time/ same day updates to online health portal, and other related support services. For EBMS Preferred PBM vendors, the Contract Administrator receives funding directly from the PBM vendor for such service support.

D.   Plan Sponsor authorizes Contract Administrator to deduct the administrative fees for each month from the Plan Sponsor Account.   The Contract Administrator shall also be authorized to deduct any applicable taxes, fees, assessments and or penalties from the Plan Sponsor Account upon prior notice to the Plan Sponsor.

E.   A binder fee of N/A representing the first month's estimated fees shall be payable on or before the effective date of this Agreement.

F.   An initial one-time set-up fee of N/A for eligibility loading, plan building and other services, shall be payable prior to commencement of services under this agreement.

H.   Additional Administrative Fees may be reflected on the applicable Schedule.

I.   The fee and rates outlined in Schedule A shall be renewed and revised as necessary, but in no event less than annually to be mutually acceptable to both parties.

Effective Date:  July 1, 2015

PLAN SPONSOR:                              CONTRACT ADMINISTRATOR:

Monterey Peninsula Horticulture, Inc./      Employee Benefit Management Services, Inc.
Steven Roberts Original Desserts, LLC.

By:   _____            By:   _____

Its:   _____            Its:      President

**SCHEDULE B**

**COBRA**

The Plan Sponsor requests that the Contract Administrator provide certain services in compliance with the requirements of the Consolidated Budget Reconciliation Act (COBRA) as amended, and all related regulations with respect to the Plan Sponsor's COBRA responsibilities in consideration of the following:

## DUTIES AND RESPONSIBILITIES OF PLAN SPONSOR

A. Notify the Contract Administrator in writing, of all Plan Members eligible under the Plan.

B. Notify the Contract Administrator of certain qualifying events, in writing, within thirty (30) days of the occurrence of a qualifying event, including but not limited to a covered employee's end of employment, a covered employee's reduction of hours of employment, death of a covered employee, commencement of a proceeding in bankruptcy with respect to the employer, or the covered employee becoming entitled to Medicare benefits (under Part A, Part B, or both). Said Notice shall contain sufficient information to satisfy the requirements as set forth in the Act.

C. Forward any necessary information and/or documentation on to Contract Administrator applicable to a Plan Participant and/or a Plan Beneficiary and a Qualifying Event.

D. Assist Contract Administrator in obtaining any necessary information and/or documentation applicable to a Plan Participant and/or Plan Beneficiary.

E. Notify Contract Administrator of any Plan Participant and/or Plan Beneficiary address change.

F. If applicable, forward the necessary COBRA premium on to the Contract Administrator.

G. Report any deficiencies or unmet requirements to the IRS on Form 4980(b).

H. From time to time, additional notices may be required by federal or state law. Plan Sponsor is responsible for providing these additional notices. Contract Administrator will provide the notices for an additional fee to be determined.

I. Plan Sponsor shall indemnify Contract Administrator for errors made in manual eligibility updates to other vendors when Plan Sponsor has chosen manual over the electronic option.

## DUTIES AND RESPONSIBILITIES OF CONTRACT ADMINISTRATOR

A. Upon receipt of complete eligibility documentation, Contract Administrator shall provide each Plan Participant and all applicable Plan Beneficiaries with written initial notice of his or her continuation coverage rights under the Plan.

B. Following notice of a Qualifying Event, Contract Administrator will notify all Qualified Beneficiaries of continuation coverage rights and premium amounts.

C. Contract Administrator shall receive elections and premiums from Qualified Beneficiaries, track all premium payments received, and provide telephonic assistance for inquiries on COBRA benefits.

D. Contract Administrator shall notify Qualified Beneficiaries of rate changes, the unavailability of COBRA, and COBRA termination.

E. If applicable, Contract Administrator shall transmit eligibility updates to designated vendors.

## COMPENSATION

Effective Date:  July 1, 2015

PLAN SPONSOR:                          CONTRACT ADMINISTRATOR:

Monterey Peninsula Horticulture,  Inc.       Employee Benefit Management Services, Inc.
Steven Roberts Original Desserts, LLC.

By:    _____            By:    _____

Its:    _____            Its:     President

# SCHEDULE C

## FIDUCIARY DISCLOSURE STATEMENT

A.    Prohibited Transaction Class Exemption 84-24 (PTE 84-24), as issued by the Department of Labor, permits the receipt of reasonable compensation by certain enumerated interested parties for services rendered if proper disclosure is given and the transaction is approved by appropriate independent Plan fiduciaries. PTE 84-24 requires that the transaction be at arm's length and in the best interest of Plan participants. This notice serves to satisfy the disclosure requirements of PTE 84-24, if applicable to Plan Sponsor.

      1.    Description of Transaction:
          Excess-loss Reinsurance Contract
          Life Insurance

      2.    Name of Insurer:
          Optum Health - UHI
          Lincoln Financial Group

      3.    __X__    The Contract Administrator is not affiliated with the Insurer whose contract is being recommended and is not limited by any agreement with the Insurer.

          ___    The Contract Administrator is affiliated with the Insurer whose contract is being recommended or is limited by an agreement with the Insurer. Explain:

      4.    Sales Commission (expressed as a percentage of gross annual premiums). If override commissions apply, explain below:

          0%

      5.    Description of any additional charges, fees, discounts, penalties or adjustment incurred by the Plan or which may be incurred by the Plan under the insurance company policy or contract.

      6.    Contract Administrator may receive additional compensation from the Insurer in the form of a production bonus, service fees, override commissions or a profit sharing arrangement. Such compensation may be based upon Contract Administrator's potential volume of business with the Insurer, the overall profitability of the Insurer's business, or other similar factors. The amount of such additional compensation, if any, will not be known until the end of the agreement period with the Insurer. Information regarding such additional compensation, insofar as it relates to the Plan, will be available for the Plan fiduciaries' review after such amounts have been determined.

B.    Contract Administrator may receive interest from banks on account balances, and compensation from pharmaceutical manufacturers, health care providers, managed care service providers, PPOs, HMOs, large case negotiators, etc. Such compensation may be based upon utilization of related products and services. Contract Administrator will retain such compensation to the extent necessary to reasonably compensate Contract Administrator for its costs resulting from such utilization. The amount of such additional compensation, if any, will be known only periodically. Upon the Plan Sponsor's reasonable request, information regarding such additional compensation, insofar as it relates to the Plan, will be available for the Plan Sponsor's review after such amounts have been determined.

C.    The Contract Administrator will forward to the Plan Sponsor 100% of all rebates received from the Plan Sponsor's contracted PBM. Plan Sponsor acknowledges and agrees that in the event Plan Sponsor fails to timely fund any claim obligations, as set forth in the Agreement or the applicable PBM Agreement, Contract Administrator may, after written notice to the Plan Sponsor, withhold any and all rebates from Plan Sponsor and apply said rebates to the unfunded claims.

I hereby acknowledge that, in my capacity as an independent fiduciary with authority to act on behalf of the Plan, I have received the above information concerning the above transactions and I approve the transactions on behalf of the Plan. I am not an insurance agent or broker, pension consultant or insurance company involved in the transaction. Further, I will not receive any compensation or other consideration, directly or indirectly, for my own personal account from any party dealing with the Plan in connection with the transaction.

Effective Date:  July 1, 2015

PLAN SPONSOR:                                CONTRACT ADMINISTRATOR:

Monterey Peninsula Horticulture, Inc.        Employee Benefit Management Services, Inc.
Steven Roberts Original Desserts, LLC.

By:   _____            By:   _____

Its:   _____            Its:      President

## SCHEDULE D
## CARELINK ADDENDUM

The Contract Administrator shall provide and Plan Sponsor shall pay for certain cost management services described in this Schedule D for the benefit of Plan's Sponsor's health benefit plan:

### A. UTILIZATION MANAGEMENT

**Inpatient:** Review actual or scheduled Admissions and, using clinical criteria, determine the medical necessity, conduct concurrent reviews and provide discharge planning, based upon the information provided to CARELINK, and provide certification, as appropriate.

**Outpatient:** Review actual or scheduled: (i) elective outpatient same-day surgeries; (ii) elective outpatient diagnostic procedures, including invasive; (iii) outpatient continuing services such as physical therapy, occupational therapy, speech therapy, home health care, hysterectomies, spinal surgeries, cancer treatments, dialysis, genetic testing, hospice, injectables and durable medical equipment (items in excess of $2,000.00).

#### a. PRE-ADMISSION COUNSELING

Case Managers will provide telephonic counseling services to Covered Persons who have an inpatient, elective surgery and are not already enrolled in Case Management or Maternity Management. This service includes education on proper preparation for the hospital admission and recovery process and referral to other services, including Case Management when appropriate. CARELINK must receive three business days advance notice of the scheduled admission.

#### b. POST-DISCHARGE COUNSELING

Case Managers will provide telephonic counseling services to members after being discharged from the hospital to the home setting, excluding maternity cases, 23-hour observation Case Management cases and members already enrolled in Case Management. This service includes assessment of member's health status, review of post-discharge instructions and medication, education on signs and symptoms of adverse effects of the procedure, and referral to other services, including Case Management when appropriate.

### B. CASE MANAGEMENT

Case Management is a collaborative process to assess, plan, implement, coordinate, monitor and evaluate the options and services required to meet a Covered Person's health needs. If Plan Sponsor or the reinsurance carrier request case management services outside of the parameters set out by the program, an additional hourly fee will be charged.

### C. MATERNITY MANAGEMENT

A review of maternity cases to assess the risk level in such cases, to perform specialized management services coordinating the delivery of prenatal health care services, to provide educational materials and counseling, to serve as a liaison between the Covered Person and Providers, to monitor and encourage the mother-to-be's compliance with appropriate prenatal health care.

### D. TELEDOC

Covered Persons are provided with unlimited 24/7 access to licensed physicians by phone, secure e-mail, video and mobile app.

### E. MISCELLANEOUS

Upon request of the Plan Sponsor, and as mutually agreed to by the parties, Contract Administrator will create customized reports and make changes to standard reports, correspondence, documents or other materials for an hourly charge.

Plan Sponsor acknowledges and agrees that neither Contract Administrator nor any external vendor that might perform the services outlined in Schedule D shall have no right, obligation, or liability to participate in the determination of what care or treatment is rendered to a Covered Person or how such care or treatment shall be rendered.  The decisions to obtain or deliver any health care service are solely between a Covered Person and his or her treating healthcare provider.

Effective Date:  July 1, 2015

PLAN SPONSOR:                                    CONTRACT ADMINISTRATOR:

Monterey Peninsula Horticulture, Inc.           Employee Benefit Management Services, Inc.
Steven Roberts Original Desserts, LLC.

By: _____                      By: _____

Its: _____                     Its:    President

# SCHEDULE L

## THIRD PARTY RECOVERY

The Plan Sponsor requests that the Contract Administrator provide certain services in order to protect the assets of the Plan in the event any recovery is available from a third party source.

## DUTIES AND RESPONSIBILITIES OF PLAN SPONSOR

A. The Plan Sponsor agrees that Contract Administrator shall provide third party recovery services to the Plan. Plan Sponsor agrees that it will furnish all information it may possess regarding claims subject to third party recovery.

B. Certain cases will require referral to an outside attorney and additional legal work beyond the scope of the services contemplated by this Schedule. The Plan Sponsor agrees that engagement of an outside attorney shall be the Plan's responsibility and that upon engagement of such, the Contract Administrator shall cooperate with the outside attorney but will have no further obligation to pursue recovery.

C. The Plan Administrator shall timely respond to settlement offers presented by Contract Administrator.

D. The Plan Administrator shall have the right to terminate the pursuit and/or recovery efforts against a third party, the participant, or any other liable party at any time.

## DUTIES AND RESPONSIBILITIES OF CONTRACT ADMINISTRATOR

A. The Contract Administrator shall provide third party recovery services necessary to pursue the Plan's equitable interests including the initial determination as to whether a third party action exists, supervision, follow-up and closure. If the Plan Sponsor does not agree to the course of recovery action proposed by the Contract Administrator, the Contract Administrator shall have no further obligation or liability whatsoever for the recovery and reimbursement of the Plan's equitable interests. Services such as filing an action in State or Federal Court are beyond the scope of the services contemplated by this Agreement.

B. The Contract Administrator may engage such outside consultants and services as the Contract Administrator deems necessary to pursue the Plan's interests. Fees of such outside consultants and services shall not be the responsibility of the Plan, without its prior written consent.

C. The Contract Administrator agrees to provide summary status reports of subrogation and third party recovery upon request of the Plan Sponsor.

D. The Contract Administrator agrees that it shall have no authority to compromise the Plan's equitable interests in excess of Ten Thousand ($10,000) without consent of the Plan Sponsor.

E. Plan Sponsor hereby grants Contract Administrator authority to accept settlement of the Plan's equitable interests for offers received between Two Thousand One ($2,001) and Ten Thousand ($10,000) Dollars without the Plan Sponsor's specific consent, if the settlement offer is more than or equal to sixty-six percent of the Plan's equitable interests. Offers less than sixty-six percent will be presented to the Plan Sponsor for its review.

F. The Contract Administrator shall have no obligation to pursue the Plan's equitable interests between One ($1) and Two Thousand ($2,000) Dollars. If the Contract Administrator does pursue such an interest on the Plan's behalf, the Plan Sponsor agrees that the Contract Administrator shall have the authority to compromise the lien and accept settlement on the Plan's behalf.

**COMPENSATION**

███████████████████████████████████████████

Effective Date:  July 1, 2015

PLAN SPONSOR:                                    CONTRACT ADMINISTRATOR:

Monterey Peninsula Horticulture, Inc.            Employee Benefit Management Services, Inc.
Steven Roberts Original Desserts, LLC.

By:   _____                        By:   _____

Its:   _____                       Its:     President

## SCHEDULE P

## HOLD HARMLESS AND INDEMNIFICATION AGREEMENT
### STOP LOSS/ADVANCE FUNDING

With the understanding that the Contract Administrator is relying upon the representations made by the Plan Sponsor in the Administrative Services Agreement and as set forth below in this Schedule, the Plan Sponsor hereby represents and warrants the following:

1. Plan Sponsor is responsible for establishing and maintaining the Plan, complying with all applicable laws and regulations, and retains sole and final discretionary authority to manage and administrate the affairs of its Plan.

2. Plan Sponsor shall procure stop-loss coverage at levels sufficient to ensure the financial viability of the Plan and shall monitor and maintain the funding at a level necessary to ensure prompt payment of all expenses eligible under the Plan.

3. If the Plan Sponsor elects to utilize the advance funding feature of its stop-loss policy, the Plan Sponsor agrees to assume any and all liability resulting from the use of that advanced funding feature. Such liability may include, but is not limited to, the loss of a negotiated PPO discount amount, the loss of a negotiated case rate, and/or a violation of state or federal regulations regarding the time period for payment of claims.

4. Plan Sponsor hereby indemnifies and holds harmless Contract Administrator, including its respective officers, employees and agents, from and against any and all expenses, losses, lawsuits, claims, settlement costs, penalties, damages, judgments, attorney's fees, actions or causes of action whatsoever to the extent that such results from the delay or denial in claims payment resulting from the stop-loss carrier's advance funding feature and/or in any way is connected with any act, failure to act, the performance of and/or failure to perform any and all obligations by or related to the stop-loss carrier and/or the advance funding feature utilized by the Plan Sponsor or its agent.

This Hold Harmless and Indemnification Agreement shall survive the termination of any applicable stop-loss policy and/or contract as well as the Administrative Services Agreement between the parties hereto.

Effective Date:  July 1, 2015

PLAN SPONSOR:                                           CONTRACT ADMINISTRATOR:

Monterey Peninsula Horticulture, Inc.                   Employee Benefit Management Services, Inc.
Steven Roberts Original Desserts, LLC.

By:  _____                           By:  _____

Its:  _____                          Its:   President

## SCHEDULE A

## FEES

A.  In accordance with Section III of the Administrative Services Agreement, the Plan Sponsor agrees to pay to the Contract Administrator the following Administrative Fees:



B.  Plan Sponsor agrees to remit the following amounts to Contract Administrator or its designee for services performed by certain vendors on behalf of the Plan Sponsor or Plan. Unless noted otherwise in Section C below, Contract Administrator shall forward all amounts received to the appropriate vendor or vendor account.



C.  The Plan Sponsor acknowledges and agrees that the Contract Administrator may receive additional compensation in connection with services provided to Plan Sponsor from sources other than the Plan Sponsor or Plan. Contract Administrator may receive any of the following:

1. Wrap Networks:

The Contract Administrator contracts with wrap network arrangements for discounted pricing of non-network claims. If a wrap network is utilized on claims for Plan Sponsor, the Contract Administrator will retain a portion of the fee to offset administrative expenses including claims data analysis, EDI Routing and processing services.

2. Claims Negotiation Services:

The Contract Administrator contracts with certain entities to perform large claim negotiation services, or will provide those same services through Contract Administrator's staff. If a large claim negotiation service is utilized on claims for Plan Sponsor's Plan, the Contract Administrator will retain a portion of the Claims Negotiation Services fee paid by Plan Sponsor and described in Section B for claims processing and coordination, and related communications with the provider, Plan participant and applicable carriers. If Contract Administrator does not utilize an outside vendor to perform the negotiation, Contract Administrator shall retain the full Claims Negotiation Services fee as described in Section B.

3. PBM Services and Audit Support:

The Contract Administrator contracts with PBM vendors to provide prescription drug benefits for Plan Sponsor's Plan. In conjunction with the services provided to Plan Sponsor by the PBM, Contract Administrator provides client support services, benefit design assistance, auditing services, data integration services, On line Health portal and decision support, PBM Contract Negotiation, PBM market check analysis, implementation and benefit setup transfer, member communication development, data files, plan consultation, appeals coordination, coordinated review of medical necessity in certain instances, issue resolution support and coordination, eligibility audits, real time/ same day updates to online health portal, and other related support services. For EBMS Preferred PBM vendors, the Contract Administrator receives funding directly from the PBM vendor for such service support.

D.     Plan Sponsor authorizes Contract Administrator to deduct the administrative fees for each month from the Plan Sponsor Account.   The Contract Administrator shall also be authorized to deduct any applicable taxes, fees, assessments and or penalties from the Plan Sponsor Account upon prior notice to the Plan Sponsor.

E.     A binder fee of $__N/A__ representing the first month's estimated fees shall be payable on or before the effective date of this Agreement.

F.     An initial one-time set-up fee of $__N/A__ for eligibility loading, plan building and other services, shall be payable prior to commencement of services under this agreement.

███████████████████████████████████████

H.     Additional Administrative Fees may be reflected on the applicable Schedule.

I.     The fee and rates outlined in Schedule A shall be renewed and revised as necessary, but in no event less than annually to be mutually acceptable to both parties.

Effective Date:  July 1, 2016

PLAN SPONSOR:                                      CONTRACT ADMINISTRATOR:

Monterey Peninsula Horticulture, Inc. / Steven Roberts        Employee Benefit Management Services, Inc.
Original Desserts, LLC

By: _____                     By: _____

Its: _____                    Its:        President

## SCHEDULE B

## COBRA

The Plan Sponsor requests that the Contract Administrator provide certain services in compliance with the requirements of the Consolidated Budget Reconciliation Act (COBRA) as amended, and all related regulations with respect to the Plan Sponsor's COBRA responsibilities in consideration of the following:

## DUTIES AND RESPONSIBILITIES OF PLAN SPONSOR

A. Notify the Contract Administrator in writing, of all Plan Members eligible under the Plan.

B. Notify the Contract Administrator of certain qualifying events, in writing, within thirty (30) days of the occurrence of a qualifying event, including but not limited to a covered employee's end of employment, a covered employee's reduction of hours of employment, death of a covered employee, commencement of a proceeding in bankruptcy with respect to the employer, or the covered employee becoming entitled to Medicare benefits (under Part A, Part B, or both). Said Notice shall contain sufficient information to satisfy the requirements as set forth in the Act.

C. Forward any necessary information and/or documentation on to Contract Administrator applicable to a Plan Participant and/or a Plan Beneficiary and a Qualifying Event.

D. Assist Contract Administrator in obtaining any necessary information and/or documentation applicable to a Plan Participant and/or Plan Beneficiary.

E. Notify Contract Administrator of any Plan Participant and/or Plan Beneficiary address change.

F. If applicable, forward the necessary COBRA premium on to the Contract Administrator.

G. Report any deficiencies or unmet requirements to the IRS on Form 4980(b).

H. From time to time, additional notices may be required by federal or state law. Plan Sponsor is responsible for providing these additional notices. Contract Administrator will provide the notices for an additional fee to be determined.

I. Plan Sponsor shall indemnify Contract Administrator for errors made in manual eligibility updates to other vendors when Plan Sponsor has chosen manual over the electronic option.

## DUTIES AND RESPONSIBILITIES OF CONTRACT ADMINISTRATOR

A. Upon receipt of complete eligibility documentation, Contract Administrator shall provide each Plan Participant and all applicable Plan Beneficiaries with written initial notice of his or her continuation coverage rights under the Plan.

B. Following notice of a Qualifying Event, Contract Administrator will notify all Qualified Beneficiaries of continuation coverage rights and premium amounts.

C. Contract Administrator shall receive elections and premiums from Qualified Beneficiaries, track all premium payments received, and provide telephonic assistance for inquiries on COBRA benefits.

D. Contract Administrator shall notify Qualified Beneficiaries of rate changes, the unavailability of COBRA, and COBRA termination.

E. If applicable, Contract Administrator shall transmit eligibility updates to designated vendors.

## COMPENSATION

A. Contract Administrator shall retain 2% of the applicable premium of those who elect and pay COBRA.

B. Contract Administrator shall be authorized to deduct the administration fees for each month from the Plan Sponsor Account.

C. A binder fee of $ _N/A_ representing the first month's estimated fees shall be payable on or before the effective date of this Agreement.

D. The fee structure shall be renewed annually and revised to be mutually acceptable to both parties.

Effective Date: _July 1, 2016_

PLAN SPONSOR:                                    CONTRACT ADMINISTRATOR:

Monterey Peninsula Horticulture, Inc. / Steven Roberts      Employee Benefit Management Services, Inc.
Original Desserts, LLC

By: _____                       By: _____

Its: _____                      Its:     President

## SCHEDULE C

## FIDUCIARY DISCLOSURE STATEMENT

A.   Prohibited Transaction Class Exemption 84-24 (PTE 84-24), as issued by the Department of Labor, permits the receipt of reasonable compensation by certain enumerated interested parties for services rendered if proper disclosure is given and the transaction is approved by appropriate independent Plan fiduciaries. PTE 84-24 requires that the transaction be at arm's length and in the best interest of Plan participants. This notice serves to satisfy the disclosure requirements of PTE 84-24, if applicable to Plan Sponsor.

      1.   <u>Excess-loss Reinsurance Contract</u>
          <u>Life Insurance</u>

      2.   Name of Insurer:
          <u>Optum Health - UHI</u>
          <u>Lincoln Financial Group</u>

      3.   __X__   The Contract Administrator is not affiliated with the Insurer whose contract is being recommended and is not limited by any agreement with the Insurer.

          ____   The Contract Administrator is affiliated with the Insurer whose contract is being recommended or is limited by an agreement with the Insurer.  Explain:

      4.   Sales Commission (expressed as a percentage of gross annual premiums).  If override commissions apply, explain below:

          0%

      5.   Description of any additional charges, fees, discounts, penalties or adjustment incurred by the Plan or which may be incurred by the Plan under the insurance company policy or contract.

      6.   Contract Administrator may receive additional compensation from the Insurer in the form of a production bonus, service fees, override commissions or a profit sharing arrangement.  Such compensation may be based upon Contract Administrator's potential volume of business with the Insurer, the overall profitability of the Insurer's business, or other similar factors.  The amount of such additional compensation, if any, will not be known until the end of the agreement period with the Insurer.  Information regarding such additional compensation, insofar as it relates to the Plan, will be available for the Plan fiduciaries' review after such amounts have been determined.

B.   Contract Administrator may receive compensation from pharmaceutical manufacturers, health care providers, managed care service providers, PPOs, HMOs, large case negotiators, etc.  Such compensation may be based upon utilization of related products and services.  Contract Administrator will retain such compensation to the extent necessary to reasonably compensate Contract Administrator for its costs resulting from such utilization.  The amount of such additional compensation, if any, will be known only periodically.  Upon the Plan Sponsor's reasonable request, information regarding such additional compensation, insofar as it relates to the Plan, will be available for the Plan Sponsor's review after such amounts have been determined.

C.   The Contract Administrator will forward to the Plan Sponsor 100% of all rebates received from the Plan Sponsor's contracted PBM.  Plan Sponsor acknowledges and agrees that in the event Plan Sponsor fails to timely fund any claim obligations, as set forth in the Agreement or the applicable PBM Agreement, Contract Administrator may, after written notice to the Plan Sponsor, withhold any and all rebates from Plan Sponsor and apply said rebates to the unfunded claims.

D.   Contract Administrator utilizes non-interest bearing bank accounts as claims paying accounts and does not earn any compensation on balances that may exist in such accounts.

E.   Contract Administrator may use a bank purchase card or credit card as a means to advance payment on the Plan Sponsor's behalf to a healthcare provider for services provided to an enrolled Plan Participant.  Contract Administrator may utilize this payment mechanism to secure a more favorable discount on a claim or to satisfy a prompt pay requirement.  Plan Sponsor acknowledges that these bank purchase cards or credit cards may offer certain benefits to the cardholder for use of the card (i.e. cash back or airline mileage) and that Contract Administrator will retain these benefits to offset fees and costs associated with the use of these cards.

F.   Contract Administrator utilizes outside vendors to provide electronic payment services for claims payment. If a vendor retains a portion of the merchant processing fees or electronic payment fees paid by the provider to offset the vendor's costs associated with the transaction, Contract Administrator may receive a portion of such retained fees up to a maximum of 45% for administrative support services.

I hereby acknowledge that, in my capacity as an independent fiduciary with authority to act on behalf of the Plan, I have received the above information concerning the above transactions and I approve the transactions on behalf of the Plan. I am not an insurance agent or broker, pension consultant or insurance company involved in the transaction. Further, I will not receive any compensation or other consideration, directly or indirectly, for my own personal account from any party dealing with the Plan in connection with the transaction.

Effective Date: July 1, 2016

PLAN SPONSOR:

Monterey Peninsula Horticulture, Inc. / Steven Roberts Original Desserts, LLC

By: _____

Its: _____

CONTRACT ADMINISTRATOR:

Employee Benefit Management Services, Inc.

By: _____

Its:   President

## SCHEDULE D
## CARELINK ADDENDUM

The Contract Administrator shall provide and Plan Sponsor shall pay for certain cost management services described in this Schedule D for the benefit of Plan's Sponsor's health benefit plan:

### A. UTILIZATION MANAGEMENT

**Inpatient:** Review actual or scheduled Admissions and, using clinical criteria, determine the medical necessity, conduct concurrent reviews and provide discharge planning, based upon the information provided to CARELINK, and provide certification, as appropriate.

**Outpatient:** Review actual or scheduled: (i) elective outpatient same-day surgeries; (ii) elective outpatient diagnostic procedures, including invasive; (iii) outpatient continuing services such as physical therapy, occupational therapy, speech therapy, home health care, hysterectomies, spinal surgeries, cancer treatments, dialysis, genetic testing, hospice, injectables and durable medical equipment (items in excess of $2,000.00).

   a. **PRE-ADMISSION COUNSELING**

   Case Managers will provide telephonic counseling services to Covered Persons who have an inpatient, elective surgery and are not already enrolled in Case Management or Maternity Management. This service includes education on proper preparation for the hospital admission and recovery process and referral to other services, including Case Management when appropriate. CARELINK must receive three business days advance notice of the scheduled admission.

   b. **POST-DISCHARGE COUNSELING**

   Case Managers will provide telephonic counseling services to members after being discharged from the hospital to the home setting, excluding maternity cases, 23-hour observation Case Management cases and members already enrolled in Case Management. This service includes assessment of member's health status, review of post-discharge instructions and medication, education on signs and symptoms of adverse effects of the procedure, and referral to other services, including Case Management when appropriate.

### B. CASE MANAGEMENT

Case Management is a collaborative process to assess, plan, implement, coordinate, monitor and evaluate the options and services required to meet a Covered Person's health needs. If Plan Sponsor or the reinsurance carrier request case management services outside of the parameters set out by the program, an additional hourly fee will be charged.

### C. MATERNITY MANAGEMENT

A review of maternity cases to assess the risk level in such cases, to perform specialized management services coordinating the delivery of prenatal health care services, to provide educational materials and counseling, to serve as a liaison between the Covered Person and Providers, to monitor and encourage the mother-to-be's compliance with appropriate prenatal health care.

### D. TELEDOC

Covered Persons are provided with unlimited 24/7 access to licensed physicians by phone, secure e-mail, video and mobile app.

### E. MISCELLANEOUS

Upon request of the Plan Sponsor, and as mutually agreed to by the parties, Contract Administrator will create customized reports and make changes to standard reports, correspondence, documents or other materials for an hourly charge.

Plan Sponsor acknowledges and agrees that neither Contract Administrator nor any external vendor that might perform the services outlined in Schedule D shall have no right, obligation, or liability to participate in the determination of what care or treatment is rendered to a Covered Person or how such care or treatment shall be rendered.   The decisions to obtain or deliver any health care service are solely between a Covered Person and his or her treating healthcare provider.

Effective Date:  July 1, 2016

**PLAN SPONSOR:**                                          **CONTRACT ADMINISTRATOR:**

Monterey Peninsula Horticulture, Inc. / Steven Roberts     Employee Benefit Management Services, Inc.
Original Desserts, LLC

By: _____                              By: _____

Its: _____                             Its:    President

## SCHEDULE K

## CAFETERIA PLANS

The Plan Sponsor requests that the Contract Administrator provide certain services in order to allow employees to select among cash compensation and certain non-taxable benefits, namely coverage under one or more benefits programs maintained by Plan Sponsor. Plan Sponsor intends that the Plan qualify as a cafeteria plan under Section 125 and 129 of the Code and that the benefits provided under the Plan be eligible for exclusion from Federal income tax.

### DUTIES AND RESPONSIBILITIES OF PLAN SPONSOR

A.  Plan Sponsor shall establish separate Benefits Accounts based on the elections made by each employee. Contributions shall be credited to the proper Benefits Accounts of each employee.

B.  Plan Sponsor shall provide to the Contract Administrator any employment records of any employee and dependent eligible to participate under the Plan. Such records shall include any information the Contract Administrator may need for the proper administration of the Plan.

C.  Plan Sponsor shall have a Plan Document and Summary Plan Description to describe the benefits available to the employees.

D.  Plan Sponsor shall be responsible for all required reporting or disclosure requirements to the IRS, employees, or any other entity as required by applicable law, including but not limited to the Form 5500.

E.  Plan Sponsor shall be solely responsible for the use of employee salary reduction contributions in a manner consistent with applicable IRS and Treasury regulatory guidance, including forfeitures.

F.  Plan Sponsor shall be responsible for any non-discrimination testing required for the Plan.

### DUTIES AND RESPONSIBILITIES OF CONTRACT ADMINISTRATOR

A.  Contract Administrator shall process claims received from Participants of the Plan pursuant to the appropriate Plan Document.

B.  Contract Administrator shall respond to inquiries from Participants or employers.

C.  Contract Administrator shall adopt and apply rules or procedures to insure the orderly and efficient administration of the Plan. Contract Administrator shall use its best efforts to ensure such rules or procedures comply with applicable Internal Revenue Code, or IRS and/or Treasury published guidance and technical bulletins, and industry standard interpretations of such guidance.

D.  Contract Administrator shall provide Plan Sponsor with information it may require in connection with the Plan.

E.  Contract Administrator shall report to the Plan Sponsor, or any party designated by the Plan Sponsor, after the end of each Plan year regarding the administration of the Plan, and to report any significant problems as to the administration of the Plan and to make recommendations for modifications as to procedures and benefits, or any other change which might insure the efficient administration of the Plan.

F.  Contract Administrator shall perform its duties in a reasonable manner, consistent with applicable law and industry standard interpretations of published guidance, on a non-discriminatory basis and shall apply uniform rules to all Participants similarly situated under the Plan.

G.  Contract Administrator shall provide COBRA Continuation Coverage, if applicable, for eligible employees and dependents and shall advise said Participants of the terms and conditions of such continuation coverage.

H.  Contract Administrator shall provide a debit card to Plan Participants through an authorized vendor.

**COMPENSATION**



Effective Date: July 1, 2016

PLAN SPONSOR:

Monterey Peninsula Horticulture, Inc. / Steven Roberts
Original Desserts, LLC

By: _Lana Pieri_

Its: _HR Director_

CONTRACT ADMINISTRATOR:

Employee Benefit Management Services, Inc.

By: _____

Its:   President

## SCHEDULE L

## THIRD PARTY RECOVERY

The Plan Sponsor requests that the Contract Administrator provide certain services in order to protect the assets of the Plan in the event any recovery is available from a third party source.

### DUTIES AND RESPONSIBILITIES OF PLAN SPONSOR

A.   The Plan Sponsor agrees that Contract Administrator shall provide third party recovery services to the Plan. Plan Sponsor agrees that it will furnish all information it may possess regarding claims subject to third party recovery.

B.   Certain cases will require referral to an outside attorney and additional legal work beyond the scope of the services contemplated by this Schedule. The Plan Sponsor agrees that engagement of an outside attorney shall be the Plan's responsibility and that upon engagement of such, the Contract Administrator shall cooperate with the outside attorney but will have no further obligation to pursue recovery.

C.   The Plan Administrator shall timely respond to settlement offers presented by Contract Administrator.

D.   The Plan Administrator shall have the right to terminate the pursuit and/or recovery efforts against a third party, the participant, or any other liable party at any time.

### DUTIES AND RESPONSIBILITIES OF CONTRACT ADMINISTRATOR

A.   The Contract Administrator shall provide third party recovery services necessary to pursue the Plan's equitable interests including the initial determination as to whether a third party action exists, supervision, follow-up and closure. If the Plan Sponsor does not agree to the course of recovery action proposed by the Contract Administrator, the Contract Administrator shall have no further obligation or liability whatsoever for the recovery and reimbursement of the Plan's equitable interests. Services such as filing an action in State or Federal Court are beyond the scope of the services contemplated by this Agreement.

B.   The Contract Administrator may engage such outside consultants and services as the Contract Administrator deems necessary to pursue the Plan's interests. Fees of such outside consultants and services shall not be the responsibility of the Plan, without its prior written consent.

C.   The Contract Administrator agrees to provide summary status reports of subrogation and third party recovery upon request of the Plan Sponsor.

D.   The Contract Administrator agrees that it shall have no authority to compromise the Plan's equitable interests in excess of Ten Thousand ($10,000) without consent of the Plan Sponsor.

E.   Plan Sponsor hereby grants Contract Administrator authority to accept settlement of the Plan's equitable interests for offers received between Two Thousand One ($2,001) and Ten Thousand ($10,000) Dollars without the Plan Sponsor's specific consent, if the settlement offer is more than or equal to sixty-six percent of the Plan's equitable interests. Offers less than sixty-six percent will be presented to the Plan Sponsor for its review.

F.   The Contract Administrator shall have no obligation to pursue the Plan's equitable interests between One ($1) and Two Thousand ($2,000) Dollars. If the Contract Administrator does pursue such an interest on the Plan's behalf, the Plan Sponsor agrees that the Contract Administrator shall have the authority to compromise the lien and accept settlement on the Plan's behalf.

**COMPENSATION**

███████████████████████████████████████████

Effective Date:  July 1, 2016

PLAN SPONSOR:                          CONTRACT ADMINISTRATOR:

Monterey Peninsula Horticulture, Inc. / Steven Roberts    Employee Benefit Management Services, Inc.
Original Desserts, LLC

By:  _____        By:  _____

Its:  _____HR Director_____    Its:  _____President_____

## SCHEDULE P

## HOLD HARMLESS AND INDEMNIFICATION AGREEMENT
## STOP LOSS/ADVANCE FUNDING

With the understanding that the Contract Administrator is relying upon the representations made by the Plan Sponsor in the Administrative Services Agreement and as set forth below in this Schedule, the Plan Sponsor hereby represents and warrants the following:

1.  Plan Sponsor is responsible for establishing and maintaining the Plan, complying with all applicable laws and regulations, and retains sole and final discretionary authority to manage and administrate the affairs of its Plan.

2.  Plan Sponsor shall procure stop-loss coverage at levels sufficient to ensure the financial viability of the Plan and shall monitor and maintain the funding at a level necessary to ensure prompt payment of all expenses eligible under the Plan.

3.  If the Plan Sponsor elects to utilize the advance funding feature of its stop-loss policy, the Plan Sponsor agrees to assume any and all liability resulting from the use of that advanced funding feature. Such liability may include, but is not limited to, the loss of a negotiated PPO discount amount, the loss of a negotiated case rate, and/or a violation of state or federal regulations regarding the time period for payment of claims.

4.  Plan Sponsor hereby indemnifies and holds harmless Contract Administrator, including its respective officers, employees and agents, from and against any and all expenses, losses, lawsuits, claims, settlement costs, penalties, damages, judgments, attorney's fees, actions or causes of action whatsoever to the extent that such results from the delay or denial in claims payment resulting from the stop-loss carrier's advance funding feature and/or in any way is connected with any act, failure to act, the performance of and/or failure to perform any and all obligations by or related to the stop-loss carrier and/or the advance funding feature utilized by the Plan Sponsor or its agent.

This Hold Harmless and Indemnification Agreement shall survive the termination of any applicable stop-loss policy and/or contract as well as the Administrative Services Agreement between the parties hereto.

Effective Date:  July 1, 2016

PLAN SPONSOR:                                CONTRACT ADMINISTRATOR:

Monterey Peninsula Horticulture, Inc. / Steven Roberts       Employee Benefit Management Services, Inc.
Original Desserts, LLC

By:  _____               By:  _____

Its:  _____               Its:      President

# <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing was served on all counsel of record by electronic service through the Clerk of the Court's CM/ECF filing system on February 22, 2019.

Dated: February 22, 2019                    /s/ Bernard Given
                                             Bernard Given

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

17408088.1
231426-10003

DECLARATION OF J. MATTHEW JOHNSON IN SUPPORT OF
MOTION TO DISMISS

1   DANIEL A. PLATT (SBN 132665)
    dplatt@loeb.com
2   ARTHUR FELS (SBN 294802)
    afels@loeb.com
3   LOEB & LOEB LLP
    10100 Santa Monica Blvd., Suite 2200
4   Los Angeles, CA  90067
    Telephone: 310.282.2000
5   Facsimile: 310.282.2200

6   Attorneys for Third Party Defendant
    EMPLOYEE BENEFIT
7   MANAGEMENT SERVICES, INC.

8

9                    UNITED STATES DISTRICT COURT

10        NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

11

12  SALINAS VALLEY MEMORIAL          )   Case No.: 5:17-cv-07076-VKD
    HEALTHCARE SYSTEM,               )
13                                   )   Hon. Mag. Judge Virginia K.
              Plaintiff,             )   DeMarchi
14                                   )
         vs.                         )   Date: April 2, 2019
15                                   )   Time: 10:00 a.m.
    MONTEREY PENINSULA               )   Place: Courtroom 2
16  HORTICULTURE, INC. d/b/a         )
    ROCKET FARMS; MONTEREY           )   [PROPOSED] ORDER
17  PENINSULA HORTICULTURE,          )   GRANTING THIRD-PARTY
    INC./STEVEN ROBERTS, ORIGINAL    )   DEFENDANT EMPLOYEE
18  DESSERTS, LLC EMPLOYEE           )   BENEFIT MANAGEMENT
    BENEFIT PLAN; EMPLOYEE           )   SERVICES, INC.'S MOTION TO
19  BENEFIT MANAGEMENT               )   DISMISS MONTEREY
    SERVICES, INC.; ANASAZI          )   PENINSULA HORTICULTURE,
20  MEDICAL PAYMENT SOLUTIONS,       )   INC.'S THIRD-PARTY
    INC. d/b/a ADVANCED MEDICAL      )   COMPLAINT PURSUANT TO
21  PRICING SOLUTIONS;               )   FED. R. CIV. P. 12(B)(6)
                                     )
22            Defendants.            )   Complaint Filed: December 13, 2017
                                     )   Trial Date: None Set
23                                   )
                                     )
24  _____ )

25

26

27

28

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

17409858.1
231426-10003              [PROPOSED] ORDER GRANTING MOTION TO DISMISS

# [PROPOSED] ORDER

The motion to dismiss third-party plaintiff Monterey Peninsula Horticulture, Inc.'s third-party Complaint (the "Motion") filed by third-party defendant Employee Benefit Management Services, Inc. ("EBMS") came on for hearing on April 2, 2019, at 10:00 am, in Courtroom 2 of the above-entitled Court, the Honorable Magistrate Judge Virginia K. DeMarchi presiding.

After full consideration of the Motion, as well as the evidence and points and authorities submitted herewith, the Court GRANTS EBMS's motion.  EBMS is hereby DISMISSED from the third-party complaint.

**IT IS SO ORDERED**

Dated: _____, 2019

_____
Hon. Virginia K. DeMarchi
United States District Court Magistrate
Judge

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

17409858.1
231426-10003

1

[PROPOSED] ORDER GRANTING MOTION TO DISMISS

1

## CERTIFICATE OF SERVICE

2

3      I certify that a true and correct copy of the foregoing was served on all

4  counsel of record by electronic service through the Clerk of the Court's CM/ECF

5  filing system on February 22, 2019.

6

7  Dated: February 22, 2019                    /s/Bernard Given
                                               Bernard Given
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

17409858.1
231426-10003

[PROPOSED] ORDER GRANTING MOTION TO DISMISS



EXHIBIT 4

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

SALINAS VALLEY MEMORIAL
HEALTHCARE SYSTEM,

Plaintiff,

v.

MONTEREY PENINSULA
HORTICULTURE, INC., et al.,

Defendants.

Case No. 17-CV-07076-LHK

**ORDER GRANTING EBMS'S MOTION
TO DISMISS MONTEREY'S THIRD
PARTY COMPLAINT WITHOUT
LEAVE TO AMEND**

Re: Dkt. No. 71

Plaintiff Salinas Valley Memorial Healthcare System ("Salinas Valley") sues Defendants
Monterey Peninsula Horticulture, Inc. ("Monterey") and the Monterey Horticulture / Steven
Roberts Original Desserts, LLC Employee Benefit Plan ("the Plan") to recover money allegedly
owed for healthcare services. ECF No. 1. Monterey filed a Third Party Complaint against Third
Party Defendants Employee Benefit Management Services, Inc. ("EBMS"), Advanced Medical
Pricing Solutions, Inc. ("AMPS"), Claims Delegate Services, LLC ("CDS"), and Alliant
Insurances Services, Inc. ("Alliant") (collectively, "Third Party Defendants"). ECF No. 44
("TPC"). Before the Court is EBMS's motion to dismiss the TPC. Having considered the parties'
submissions, the relevant law, and the record in this case, the Court GRANTS EBMS's motion to

1

dismiss the TPC without leave to amend.

## I.    BACKGROUND

### A.  Factual Background

Monterey, which does business as Rocket Farms, "provides nursery products, including greenhouse growers, indoor potted foliage plants, and edible herbs, fruits and vegetables to its customers."  TPC ¶ 4.  Monterey is the sponsor and administrator of the Plan, as well as a fiduciary of the Plan.  *Id.*

The Plan was Monterey's health benefit plan that existed from July 1, 2014 to June 30, 2017, and was self-funded by employer and participant contributions.  *Id.* ¶ 9.  The Plan insured "Monterey's employees and employees' dependents against losses arising from their medical care."  *Id.*

EBMS is a Montana corporation and a "third-party administrator providing administrative services, including plan design, medical bill review, and claims administrative services, to self-funded plans."  *Id.* ¶ 5.  EBMS "adjusted, reviewed and paid claims under the Plan."  *Id.*  EBMS also "determined what healthcare providers would be paid by the Plan, and in what amount."  *Id.*

Monterey alleges that in 2014, Alliant convinced Monterey to switch from a fully insured plan to a self-insured plan.  *Id.* ¶ 15.  The Third Party Defendants "presented the self-insured plan as a cost-savings mechanism" for Monterey.  *Id.* ¶ 16.  The Third Party Defendants also "represented they were knowledgeable in self-funded plans, claim review and validation."  *Id.* ¶ 17.  Alliant advised Monterey to use the services of EBMS, AMPS, and CDS.  *Id.* ¶ 18.

EBMS was the Claims Administrator for the Plan.  *Id.* ¶ 21.  Monterey alleges that "[t]he services agreement between Monterey and EBMS listed EBMS' duties and responsibilities as Claims Administrator."  *Id.*  The services agreement stated that EBMS's "duties and responsibilities included, but were not limited to, preparing the SPD [Summary Plan Document], processing and adjudicating all claims, reviewing and responding to appeals regarding benefit determinations, facilitating reviews by independent review organizations, and answering medical

2

1    benefit and claim questions." *Id.* Monterey also entered a services agreement with AMPS and

2    CDS. *Id.* ¶ 22.

3        Monterey alleges that EBMS "discounted virtually all substantive medical claims

4    submitted to the Plan by healthcare providers in a similar fashion," and that EBMS "did not

5    administer the Plan according to the SPD." *Id.* ¶ 23b. EBMS also "made false communications to

6    healthcare providers regarding the level of plan benefits" and the coverage that the Plan would

7    provide. *Id.* ¶ 23c. According to Monterey, "EBMS, CDS and AMPS exercised complete

8    authority and control over Plan assets by determining what payment would be made out of Plan

9    assets, to whom such payments would be made, and in what amount." *Id.* ¶ 24.

10       Monterey alleges that the SPD "deceived Monterey, the Plan and Monterey's employees

11   and employee beneficiaries into believing EBMS, AMPS, and CDS were achieving savings in

12   claims paid by the Plan when no savings were actually realized or could ever possibly be

13   realized." *Id.* ¶ 27.

14       Healthcare providers, including Salinas Valley, appealed benefit determinations to EBMS,

15   and then to AMPS and CDS. *Id.* ¶ 28. After exhausting these avenues, Salinas Valley and other

16   healthcare providers sued Monterey in various actions. *Id.* ¶ 29. Monterey alleges that the Third

17   Party Defendants' actions "forced Monterey to expend significant time and resources in

18   identifying, disputing, appealing and negotiating allegedly underpaid claims." *Id.* ¶ 30.

19   **B. Procedural History**

20       On December 12, 2017, Salinas Valley filed its complaint against Monterey and the Plan.

21   ECF No. 1. The case was originally assigned to United States Magistrate Judge Howard R. Lloyd.

22   ECF No. 4.

23       On January 12, 2018, Monterey and the Plan filed a motion to dismiss Salinas Valley's

24   complaint. ECF No. 10. On May 31, 2018, Judge Lloyd issued an order granting in part and

25   denying in part Monterey and the Plan's motion to dismiss. ECF No. 29.

26       On June 4, 2018, the case was reassigned to United States Magistrate Judge Virginia K.

27                                                    3

28   Case No. 17-CV-07076-LHK
     ORDER GRANTING EBMS'S MOTION TO DISMISS MONTEREY'S THIRD PARTY COMPLAINT WITHOUT
     LEAVE TO AMEND

*United States District Court*
*Northern District of California*

1   DeMarchi.  ECF No. 30.

2          On June 14, 2018, Salinas Valley filed its first amended complaint.  ECF No. 32 ("FAC").

3   Salinas Valley brings the following claims against Monterey and the Plan: (1) recovery of

4   payments due under the Employee Retirement Income Security Act ("ERISA"); (2) violation of

5   the Affordable Care Act's maximum-out-of-pocket limitations; (3) intentional misrepresentation;

6   and (4) negligent misrepresentation.  FAC ¶¶ 226–263.

7          On June 28, 2018, Monterey and the Plan moved to dismiss the FAC.  ECF No. 34.  On

8   November 29, 2018, Judge DeMarchi denied Monterey and the Plan's motion to dismiss the FAC.

9   ECF No. 42.

10         On December 13, 2018, Monterey and the Plan filed an answer to Salinas Valley's

11  amended complaint.  ECF No. 45.

12         That same day, Monterey filed its third party complaint ("TPC") against EBMS, Advanced

13  Medical Pricing Solutions, Inc. ("AMPS"), Claims Delegate Services, LLC ("CDS"), and Alliant

14  Insurances Services, Inc. ("Alliant").  ECF No. 44.

15         The TPC brings claims against EBMS for (1) breach of fiduciary duty under Section

16  502(a)(2) of ERISA, TPC ¶¶ 31–39; (2) breach of contract, $id.$ ¶¶ 59 − 62; and (3) professional

17  negligence, $id.$ ¶¶ 79–83.

18         On February 22, 2019, EBMS filed the instant motion to dismiss the TPC.  ECF No. 71

19  ("Mot.").

20         On March 1, 2019, EBMS declined magistrate judge jurisdiction, and the case was

21  reassigned to the undersigned.  ECF Nos. 73, 75.

22         On March 8, 2019, Monterey and the Plan filed their opposition to EBMS's motion to

23  dismiss.  ECF No. 78.  On March 15, 2019, EBMS filed its reply.  ECF No. 79 ("Reply").

24  **II.     LEGAL STANDARD**

25     **A.  Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)**

26         Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint to include "a

27

28  Case No. 17-CV-07076-LHK
    ORDER GRANTING EBMS'S MOTION TO DISMISS MONTEREY'S THIRD PARTY COMPLAINT WITHOUT
    LEAVE TO AMEND

United States District Court
Northern District of California

short and plain statement of the claim showing that the pleader is entitled to relief."  A complaint

that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure

12(b)(6).  The U.S. Supreme Court has held that Rule 8(a) requires a plaintiff to plead "enough

facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a

probability requirement, but it asks for more than a sheer possibility that a defendant has acted

unlawfully."  *Id.* (internal quotation marks omitted).  For purposes of ruling on a Rule 12(b)(6)

motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the

pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire &*

*Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

     The Court, however, need not accept as true allegations contradicted by judicially

noticeable facts, *see Schwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000), and it "may look

beyond the plaintiff's complaint to matters of public record" without converting the Rule 12(b)(6)

motion into a motion for summary judgment, *Shaw v. Hahn*, 56 F.3d 1128, 1129 n.1 (9th Cir.

1995).  Nor must the Court "assume the truth of legal conclusions merely because they are cast in

the form of factual allegations."  *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per

curiam) (internal quotation marks omitted).  Mere "conclusory allegations of law and unwarranted

inferences are insufficient to defeat a motion to dismiss."  *Adams v. Johnson*, 355 F.3d 1179, 1183

(9th Cir. 2004).

### B.  Leave to Amend

     If the Court determines that a complaint should be dismissed, it must then decide whether

to grant leave to amend.  Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to

amend "shall be freely given when justice so requires," bearing in mind "the underlying purpose

of Rule 15 to facilitate decisions on the merits, rather than on the pleadings or technicalities."

5

*Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (alterations and internal quotation marks omitted). When dismissing a complaint for failure to state a claim, "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Id.* at 1130 (internal quotation marks omitted). Accordingly, leave to amend generally shall be denied only if allowing amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the moving party has acted in bad faith. *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008).

## III.    DISCUSSION

EBMS's motion to dismiss Monterey's TPC against EBMS[1] centers on a single issue: whether Monterey has exhausted a contractual obligation to mediate before filing suit. For the reasons explained below, the Court concludes that because Monterey has not exhausted that obligation, the Court must dismiss Monterey's TPC against EBMS.

The claims in Monterey's TPC arise from the Administrative Services Agreement ("Services Agreement") between EBMS and Monterey. Mot. at 2. The TPC refers to the Services Agreement as "[t]he services agreement between Monterey and EBMS," which made EBMS the Claims Administrator and listed EBMS's responsibilities and duties in that role. TPC ¶ 21. First, the Court must decide whether to consider the contents of the Services Agreement. Although Monterey did not attach the Services Agreement to the TPC, each of Monterey's causes of action references the Services Agreement and the TPC even includes an image of one section of the Services Agreement.

Specifically, in Monterey's breach of fiduciary duty claim, Monterey alleges that EBMS breached a fiduciary duty through misrepresentations about savings under the Plan and alleges that without "the trust that Monterey had in Alliant and EBMS, Monterey would not have signed the

---

[1] None of the other Third Party Defendants—Alliant, AMPS, and CDS—has joined EBMS's motion to dismiss.

6

Case No. 17-CV-07076-LHK
ORDER GRANTING EBMS'S MOTION TO DISMISS MONTEREY'S THIRD PARTY COMPLAINT WITHOUT LEAVE TO AMEND

services agreement with EBMS." TPC ¶ 36. Monterey's breach of contract claim alleges that EBMS "breached the services agreement." *Id.* ¶ 61. The TPC includes an image of the section in the Services Agreement setting forth EBMS's duties and responsibilities as claims administrator. *Id.* ¶ 60. Finally, Monterey's negligence claim is also based on the Services Agreement: Monterey alleges that under the "service agreement with EBMS," EBMS "was required to use the skill and care that a reasonably careful administrative service organization/third-party administrator would have used in similar circumstances." *Id.* ¶ 81.

The Ninth Circuit has held that a court may consider materials referenced in a pleading under the incorporation by reference doctrine, even if a plaintiff failed to attach those materials to the complaint. *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005). The purpose underlying this doctrine is to "[p]revent plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based." *Steinle v. City & Cty. of S.F.*, 919 F.3d 1154, 1167 n.17 (9th Cir. 2019) (alteration in original) (internal quotation marks and citation omitted).

For example, in *Knievel*, after the plaintiffs attached only a photograph and caption to their defamation complaint, the defendant asked the court to review the web pages on which the photograph and caption appeared because "viewers accessing the website could not help but to see at least some of the surrounding web pages in order to view the photograph and caption." *Id.* at 1076–77. The Ninth Circuit held that a court could consider those webpages under the incorporation by reference doctrine on a motion to dismiss. *Id.* at 1077. Similarly, Monterey's TPC explicitly references the Services Agreement throughout, and even includes an image of the Services Agreement. *See* TPC ¶¶ 36, 60, 81. Accordingly, the Court may consider the Services Agreement under the incorporation by reference doctrine. *See also Smith v. AMC Networks, Inc.*, 2019 WL 402360, at *4 (N.D. Cal. Jan. 31, 2019) (taking judicial notice of written works "referenced in the complaint"). To do otherwise would be to permit Monterey to base its claims on the Services Agreement, but avoid a motion to dismiss by omitting other large portions of the

United States District Court
Northern District of California

7

United States District Court
Northern District of California

Services Agreement. Considering the Service Agreement does not convert EBMS's motion to dismiss into a motion for summary judgment, contrary to Monterey's argument. *Shaw v. Hahn*, 56 F.3d 1128, 1129 n.1 (9th Cir. 1995).

Monterey also argues that the Declaration of J. Matthew Johnson is insufficient to authenticate the Services Agreement because Johnson—who is Corporate Counsel and Vice President of Legal at EBMS, Johnson Decl. ¶¶ 1–2—has only worked at EBMS for nine months. In his declaration, Johnson states "I am familiar with and maintain, among other things, the various agreements between EBMS and its clients. The documents attached collectively as Exhibit A are a true and correct copy of the 2014 Administrative Services Agreement and corresponding renewals for 2015 and 2016 between EBMS and Rocket Farms (except for pricing information, which has been redacted)." Johnson Decl. ¶ 2. Although Johnson's declaration does not quite establish that the Services Agreement is a business record, the Court overrules Monterey's objection for the following reasons. Monterey included an image of the Services Agreement in its own TPC. Monterey does not dispute that Monterey signed the Services Agreement attached to Johnson's declaration. Monterey does not contend that the version attached to Johnson's declaration is not a true and correct copy of the Services Agreement. Monterey does not contest that Monterey agreed to the Services Agreement.

Here, as EBMS contends, the Services Agreement requires mediation as a condition precedent to legal action. Specifically, Section 11.01 of the Services Agreement reads as follows:

> **<u>Dispute Resolution</u>**
> Plan Sponsor and Contract Administrator will meet and confer in an attempt to resolve any dispute arising out of or relating to this Agreement. A dispute not resolved within 60 days of this meeting will be submitted to mediation . . . . If the dispute is not resolved through mediation, the parties will be free to pursue all legal and equitable remedies otherwise available.

ECF No. 71-1, Ex. A at 10 (emphasis in original). Thus, the Services Agreement requires EBMS and Monterey to mediate any dispute "arising out of or relating" to the Services Agreement before a party may pursue "legal and equitable remedies."

Case No. 17-CV-07076-LHK
ORDER GRANTING EBMS'S MOTION TO DISMISS MONTEREY'S THIRD PARTY COMPLAINT WITHOUT LEAVE TO AMEND

In *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716 (9th Cir. 1999), the Ninth Circuit held that the similar "language 'arising in connection with' reaches every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract." *Id.* at 721; *see also Good(E) Bus. Sys., Inc. v. Raytheon Co.*, 614 F. Supp. 428, 429 (W.D. Wis. 1985) (noting that the phrase "arising out of or relating to this Agreement" has been "broadly construed") (citing *Prima Paint Corp. v. Floor & Conklin Mfg. Co.*, 388 U.S. 395 (1967)).

Section 11.01 is plainly applicable to the instant dispute because Monterey's TPC alleges that EBMS breached the Service Agreement, and thus the dispute has a "significant relationship" to the Services Agreement. *See* TPC ¶¶ 60–61 (alleging breach, and including a screenshot of the Service Agreement). As the TPC alleges, Monterey and EBMS's relationship was governed by the Service Agreement: "The services agreement between Monterey and EBMS listed EBMS' duties and responsibilities as Claim [sic] Administrator" for the Plan. *Id.* ¶ 21. The TPC also alleges that EBMS was negligent under the "service agreement with EBMS," EBMS "was required to use the skill and care that a reasonably careful administrative service organization/third-party administrator would have used in similar circumstances." *Id.* ¶ 81.

Even if the Court adopts Monterey's interpretation that Section 11.01 covers "disputes only between MPHI and EBMS about the execution or handling of the subject matter within the ASA agreement, vis-à-vis each other," Opp. at 6 (emphasis removed), Section 11.01 applies. In the TPC, Monterey alleges that EBMS is liable for breach of contract because EBMS did not execute its duties under the Services Agreement, and that EBMS was negligent in handling its duties under the Services Agreement. This qualifies as a dispute between Monterey and EBMS "about the execution or handling of the subject matter within the ASA agreement, vis-à-vis each other." Thus, Section 11.01 applies.

Furthermore, the TPC includes no allegation that EBMS and Monterey have mediated the dispute underlying the TPC, as required by the Services Agreement, and Monterey does not

9

United States District Court
Northern District of California

contest in its brief that Monterey and EBMS have not engaged in mediation. Thus, Monterey has not fulfilled a condition precedent to its legal action against EBMS, and the Court must dismiss the TPC's claims against EBMS.

District courts have dismissed claims in similar circumstances. For example, in *Brosnan v. Dry Cleaning Station Inc.*, 2008 WL 2388392 (N.D. Cal. Jun. 6, 2008), the plaintiffs brought fraud and breach of contract claims against the defendants. *Id.* at *1. The franchise agreement between the parties stated that "the Company [defendants] and the Franchisee [plaintiffs] each agree to enter into mediation of all disputes involving this Agreement or any other aspect of the relationship . . . prior to initiating any legal action against the other." *Id.* The district court granted the defendants' motion to dismiss the plaintiffs' lawsuit because "[f]ailure to mediate a dispute pursuant to a contract that makes mediation a condition precedent to filing a lawsuit warrants dismissal." *Id.* (citing, *inter alia*, *Charles J. Rounds Co. v. Joint Council of Teamsters No. 42*, 4 Cal. 3d 888 (1971)); *see also B & O Mfg., Inc. v. Home Depot U.S.A., Inc.*, 2007 WL 3232276, at *8 (N.D. Cal. Nov. 1, 2007) (dismissing claim because plaintiff failed to first mediate as required by an agreement between the parties).

Similarly, in *Free Range Content, Inc. v. Google Inc.*, 2016 WL 2902332 (N.D. Cal. May 13, 2016), the district court dismissed claims where the plaintiffs had failed to satisfy "a condition precedent to filing suit," which in that case was the requirement to provide the defendants notice before filing suit. *Id.* at *13–14; *see also Target Corp. v. Wolters Kluwer Health, Inc.*, 2015 WL 12646483, at *5 (C.D. Cal. Dec. 16, 2015) (explaining that an "alternative dispute provision . . . is considered a condition precedent to filing lawsuit").

Monterey makes two arguments against dismissal, none of which are availing. First, Monterey appears to argue that Section 11.01 is inapplicable because the instant dispute concerns Monterey's TPC and "the TPC is not a lawsuit filed against EBMS." Opp. at 2, 6. However, the TPC is in fact a set of legal allegations filed against EBMS, and Monterey identifies no language in Section 11.01 exempting third party complaints from its ambit. By its plain language, Section

10

United States District Court
Northern District of California

11.01 requires mediation before either EBMS or Monterey pursues "*all* legal and equitable remedies." Ex. A at 10 (emphasis added). Section 11.01 thus necessarily applies to the TPC, which requests both damages (a legal remedy) and an injunction (an equitable remedy) against EBMS based on claims arising from the Services Agreement. TPC at 24–25. Salinas Valley's allegations against Monterey in the FAC are simply not relevant to the instant motion, which concerns whether the dispute at issue in *Monterey*'s legal action against EBMS arises from or relates to the Services Agreement.

Second, Monterey argues that because many *other* provisions of the Services Agreement other than Section 11.01 are subject to reasonable dispute, the instant motion is functionally one for summary judgment. *See, e.g.*, Opp. at 8 (arguing that there are "disputed factual issues" concerning Section 2.01, which states that "EBMS will assist in the preparation of the Plan documents, benefits summaries, and materials necessary to operate the Plan"). However, the instant motion implicates none of those disputes. Moreover, Monterey's invocation of the substantive Services Agreement provisions in dispute further reinforces how Monterey's TPC arises from and relates to the Services Agreement.

Therefore, because Section 11.01 of the Services Agreement requires mediation as a condition precedent to legal action, and because Monterey does not allege that it mediated the instant dispute with EBMS, the Court must dismiss Monterey's TPC claims against EBMS. The dismissal is without prejudice to Monterey refiling once Monterey and EBMS have fulfilled the mediation condition. See *Brosnan*, 2008 WL 2388392, at *2 (dismissing complaint without prejudice where plaintiff failed to fulfill mediation condition precedent).

Finally, the Court considers whether to grant leave to amend. The Ninth Circuit has held that leave to amend should be denied where amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the moving party has acted in bad faith. *Leadsinger*, 512 F.3d at 532. Granting Monterey leave to amend its TPC claims against EBMS would be futile, cause undue delay, and unduly prejudice EBMS. Amendment would be futile because the

Case No. 17-CV-07076-LHK
ORDER GRANTING EBMS'S MOTION TO DISMISS MONTEREY'S THIRD PARTY COMPLAINT WITHOUT LEAVE TO AMEND

United States District Court
Northern District of California

Services Agreement requires mediation before Monterey may file suit against EBMS, and Monterey does not contest that Monterey and EBMS have not mediated. Similarly, granting Monterey leave to amend would only delay mediation and the ultimate resolution of this dispute between Monterey and EBMS, and would force EBMS to file a second motion to dismiss on Monterey's futile claims. Therefore, the Court DENIES Monterey leave to amend the TPC against EBMS.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS EBMS's motion to dismiss Monterey's TPC against EBMS without leave to amend. The Court's dismissal is without prejudice to Monterey refiling its claims against EBMS once Monterey has fulfilled the mediation condition precedent in the TPC.

**IT IS SO ORDERED.**

Dated: June 21, 2019

_Lucy H. Koh_
LUCY H. KOH
United States District Judge

Case No. 17-CV-07076-LHK
ORDER GRANTING EBMS'S MOTION TO DISMISS MONTEREY'S THIRD PARTY COMPLAINT WITHOUT LEAVE TO AMEND