DANIEL A. PLATT (SBN 132665)
dplatt@loeb.com
ARTHUR FELS (SBN 294802)
afels@loeb.com
LOEB & LOEB LLP
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA  90067
Telephone: 310.282.2000
Facsimile: 310.282.2200

Attorneys for Defendant EMPLOYEE
BENEFIT MANAGEMENT
SERVICES, LLC (misdenominated as
Employee Benefit Management
Services, Inc.)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

| | |
|---|---|
| MONTEREY PENINSULA HORTICULTURE, INC. dba ROCKET FARMS and MONTEREY PENINSULA HORTICULTURE, INC./STEVEN ROBERTS ORIGINAL DESSERTS, LLC, EMPLOYEE BENEFIT PLAN,<br><br>Plaintiffs,<br><br>v.<br><br>EMPLOYEE BENEFIT MANAGEMENT SERVICES, INC.;<br><br>Defendant. | Case No.: 5:20-cv-01660-NC<br><br>Hon. Mag. Nathanael M. Cousins<br><br>**DEFENDANT EBMS'S ANSWER TO COMPLAINT, COUNTERCLAIMS, AND THIRD-PARTY COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Complaint Filed: March 6, 2020<br>Trial Date: September 13, 2021 |

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

19141920.8
231426-10003

DEFENDANT'S ANSWER AND COUNTERCLAIM; THIRD-PARTY
COMPLAINT; DEMAND FOR JURY TRIAL

Defendant Employee Benefit Management Services, LLC (misdenominated as Employee Benefit Management Services, Inc.) ("EBMS") answers the claims contained in the complaint of plaintiffs Monterey Peninsula Horticulture, Inc., dba Rocket Farms, ("MPH") and Monterey Peninsula Horticulture, Inc./Steven Roberts Original Desserts, LLC, Employee Benefit Plan (the "Plan," and, together with MPH, "Plaintiffs") as follows:

1.     Answering paragraph 1, the allegations therein are legal conclusions that do not warrant a response.  To the extent paragraph 1 contains factual allegations, EBMS lacks sufficient information or belief to enable it to answer and, on that ground, denies generally and specifically each and every allegation contained therein.

2.     Answering paragraph 2, the allegations therein are legal conclusions that do not warrant a response.  To the extent paragraph 2 contains factual allegations, EBMS denies generally and specifically each and every allegation contained therein.

3.     Answering paragraph 3, the allegations therein are legal conclusions that do not warrant a response.  To the extent paragraph 3 contains factual allegations, EBMS denies generally and specifically each and every allegation contained therein.

4.     Answering paragraph 4, EBMS lacks sufficient information or belief to enable it to answer and, on that ground, denies generally and specifically each and every allegation in paragraph 4.

5.     Answering paragraph 5, the ASA,[1] the CDS Agreement, and the SPD speak for themselves and are the best evidence of their terms.  Except as expressly admitted herein, EBMS generally and specifically denies each and every allegation in paragraph 5.

6.     Answering paragraph 6, the RFP speaks for itself and is the best evidence of its terms.  With respect to the allegations relating to the conduct of Alliant Employee Benefits, EBMS lacks sufficient information or belief to enable it to

[1] Unless otherwise indicated, capitalized terms have the same meaning as in the complaint.

DEFENDANT'S ANSWER AND COUNTERCLAIM; THIRD-PARTY
COMPLAINT; DEMAND FOR JURY TRIAL

answer and, on that ground, denies generally and specifically those allegations. Except as expressly admitted herein, EBMS generally and specifically denies each and every allegation in paragraph 6.

7.      Answering paragraph 7, the RFP speaks for itself and is the best evidence of its terms.  Except as expressly admitted herein, EBMS generally and specifically denies each and every allegation in paragraph 7.

8.      Answering paragraph 8, the RFP speaks for itself and is the best evidence of its terms.  Regarding MPH's motivations, EBMS lacks sufficient information or belief to enable it to answer and, on that ground, denies generally and specifically those allegations.  Except as expressly admitted herein, EBMS generally and specifically denies each and every allegation in paragraph 8.

9.      Answering paragraph 9, the RFP speaks for itself and is the best evidence of its terms.  Regarding MPH's motivations or reliance, EBMS lacks sufficient information or belief to enable it to answer and, on that ground, denies generally and specifically those allegations.  Except as expressly admitted herein, EBMS generally and specifically denies each and every allegation in paragraph 9.

10.     Answering paragraph 10, the ASA and the CDS Agreement speak for themselves and are the best evidence of their terms.  Except as expressly admitted herein, EBMS generally and specifically denies each and every allegation in paragraph 10.

11.     Answering paragraph 11, the ASA speaks for itself and is the best evidence of its terms.  Except as expressly admitted herein, EBMS generally and specifically denies each and every allegation in paragraph 11.

12.     Answering paragraph 12, the allegations therein are legal conclusions that do not warrant a response.   To the extent paragraph 12 contains factual allegations, EBMS generally and specifically denies each and every allegation therein.

/ / / /

19141920.8
231426-10003
DEFENDANT'S ANSWER AND COUNTERCLAIM; THIRD-PARTY COMPLAINT; DEMAND FOR JURY TRIAL

13.     Answering paragraph 13, the ASA and the Plan Document speak for themselves and are the best evidence of their terms.  Except as expressly admitted herein, EBMS generally and specifically denies each and every allegation in paragraph 13.

14.     Answering paragraph 14, the ASA speaks for itself and is the best evidence of its terms.  Regarding MPH's motivations, EBMS lacks sufficient information or belief to enable it to answer and, on that ground, denies generally and specifically those allegations.  Except as expressly admitted herein, EBMS generally and specifically denies each and every allegation in paragraph 14

15.     Answering paragraph 15, the ASA speaks for itself and is the best evidence of its terms.  The official transcript of Kevin Larson's deposition testimony speaks for itself and is the best evidence of its contents. Except as expressly admitted herein, EBMS generally and specifically denies each and every allegation in paragraph 15.

16.     Answering paragraph 16, the ASA speaks for itself and is the best evidence of its terms.  Except as expressly admitted herein, EBMS generally and specifically denies each and every allegation in paragraph 16.

17.     Answering paragraph 17, EBMS neither admits nor denies the allegations therein.

18.     Answering paragraph 18, the CDS Agreement speaks for itself and is the best evidence of its terms.  The official transcript of Kevin Larson's deposition testimony speaks for itself and is the best evidence of its contents.  Regarding MPH's motivations, EBMS lacks sufficient information to enable it to answer and, on that ground, denies those allegations.  Except as expressly admitted herein, EBMS generally and specifically denies each and every allegation in paragraph 18.

19.     Answering paragraph 19, the CDS Agreement and the New Plan Document speak for themselves and are the best evidence of their terms.  Except as

/ / / /

expressly admitted herein, EBMS generally and specifically denies each and every allegation in paragraph 19.

20.     Answering paragraph 20, the official transcripts of the depositions of Kevin Larson and Tara Keehn speak for themselves and are the best evidence of their contents.   Except as expressly admitted herein, EBMS denies generally and specifically each and every allegation in paragraph 20.

21.     Answering paragraph 21, the CDS Agreement speaks for itself and is the best evidence of its terms.   Except as expressly admitted herein, EBMS generally and specifically denies each and every allegation in paragraph 21.

22.     Answering paragraph 22, the CDS Agreement and the SPD speak for themselves and are the best evidence of their terms.   Except as expressly admitted herein, EBMS generally and specifically denies each and every allegation in paragraph 22.

23.     Answering paragraph 23, the SPD speaks for itself and is the best evidence of its terms.   Except as expressly admitted herein, EBMS generally and specifically denies each and every allegation in paragraph 23.

24.     Answering paragraph 24, the SPD speaks for itself and is the best evidence of its terms.   Except as expressly admitted herein, EBMS generally and specifically denies each and every allegation in paragraph 24.

25.     Answering paragraph 25, the SPD speaks for itself and is the best evidence of its terms.   Except as expressly admitted herein, EBMS generally and specifically denies each and every allegation in paragraph 25.

26.     Answering paragraph 26, the allegations therein are legal conclusions that do not warrant a response.   To the extent paragraph 26 contains factual allegations, EBMS denies generally and specifically each and every allegation therein.

/ / / /

/ / / /

19141920.8
231426-10003
DEFENDANT'S ANSWER AND COUNTERCLAIM; THIRD-PARTY COMPLAINT; DEMAND FOR JURY TRIAL

27.     Answering paragraph 27, the SPD speaks for itself and is the best evidence of its terms. Except as expressly admitted herein, EBMS generally and specifically denies each and every allegation in paragraph 27.

28.     Answering paragraph 28, regarding MPH's motivations, EBMS lacks sufficient information or belief to enable it to answer and, on that ground, denies generally and specifically those allegations. Otherwise, EBMS denies generally and specifically each and every allegation in paragraph 28.

29.     Answering paragraph 29, the ASA and the CDS Agreement speak for themselves and are the best evidence of their terms. The official transcript of the deposition of Stacey Crossley speaks for itself and is the best evidence of its contents. Except as expressly admitted herein, EBMS generally and specifically denies each and every allegation in paragraph 29.

30.     Answering paragraph 30, the ASA and the CDS Agreement speak for themselves and are the best evidence of their terms. The official transcript of the deposition testimony of Stacey Crossley speaks for itself and is the best evidence of its contents. Except as expressly admitted herein, EBMS generally and specifically denies each and every allegation in paragraph 30.

31.     Answering paragraph 31, EBMS denies generally and specifically each and every allegation therein.

32.     Answering paragraph 32, the ASA speaks for itself and is the best evidence of its terms. Except as expressly admitted herein, EBMS generally and specifically denies each and every allegation in paragraph 32.

33.     Answering paragraph 33, EBMS denies generally and specifically each and every allegation therein.

34.     Answering paragraph 34, EBMS denies generally and specifically each and every allegation therein.

35.     Answering paragraph 35, EBMS denies generally and specifically each and every allegation therein.

36.     Answering paragraph 36, the pleadings filed in Case No. 5:17-cv-7076-VKD and Case No. BC711222 speak for themselves and are the best evidence their contents.   Except as expressly admitted, herein EBMS denies generally and specifically each and every allegation in paragraph 36.

37.     Answering paragraph 37, EBMS denies generally and specifically each and every allegation therein.

38.     Answering paragraph 38, the Court's docket for this matter speaks for itself and is the best evidence of its contents.   Except as expressly admitted herein, EBMS generally and specifically denies each and every allegation in paragraph 38.

## FIRST ALLEGED CAUSE OF ACTION

### (Breach of Fiduciary Duty)

39.     Answering paragraph 39, EBMS re-alleges its responses to paragraphs 1 through 38.

40.     Answering paragraph 40, the allegations therein are legal conclusions that do not warrant a response.   To the extent paragraph 40 contains factual allegations, EBMS denies generally and specifically each and every allegation therein.

41.     Answering paragraph 41, the allegations therein are legal conclusions that do not warrant a response.   To the extent paragraph 41 contains factual allegations, EBMS denies generally and specifically each and every allegation therein.

42.     Answering paragraph 42, the allegations therein are legal conclusions that do not warrant a response.   To the extent paragraph 42 contains factual allegations, EBMS denies generally and specifically each and every allegation therein.

43.     Answering paragraph 43, the allegations therein are legal conclusions that do not warrant a response.  To the extent paragraph 43 contains factual

/ / / /

19141920.8
231426-10003
DEFENDANT'S ANSWER AND COUNTERCLAIM; THIRD-PARTY
COMPLAINT; DEMAND FOR JURY TRIAL

allegations, EBMS denies generally and specifically each and every allegation therein.

44.   Answering paragraph 44, the allegations therein are legal conclusions that do not warrant a response.   To the extent paragraph 44 contains factual allegations, EBMS denies generally and specifically each and every allegation therein.

45.   Answering paragraph 45, the allegations therein are legal conclusions that do not warrant a response.   To the extent paragraph 45 contains factual allegations, EBMS denies generally and specifically each and every allegation therein.

46.   Answering paragraph 46, the allegations therein are legal conclusions that do not warrant a response.   To the extent paragraph 46 contains factual allegations, EBMS denies generally and specifically each and every allegation therein.

## SECOND ALLEGED CAUSE OF ACTION

### (Breach of Written Contract)

47.   Answering paragraph 47, EBMS re-alleges its responses to paragraphs 1 through 46.

48.   Answering paragraph 48, the ASA speaks for itself and is the best evidence of its terms.   Except as expressly admitted herein, EBMS generally and specifically denies each and every allegation in paragraph 48.

49.   Answering paragraph 49, the CDS Agreement speaks for itself and is the best evidence of its terms.   Except as expressly admitted herein, EBMS generally and specifically denies each and every allegation in paragraph 49.

50.   Answering paragraph 50, the allegations therein are legal conclusions that do not warrant a response.   To the extent paragraph 50 contains factual allegations, EBMS denies generally and specifically each and every allegation therein.

DEFENDANT'S ANSWER AND COUNTERCLAIM; THIRD-PARTY
COMPLAINT; DEMAND FOR JURY TRIAL

51.     Answering paragraph 51, the ASA speaks for itself and is the best evidence of its terms.  Except as expressly admitted herein, EBMS generally and specifically denies each and every allegation in paragraph 51.

52.     Answering paragraph 52, EBMS denies generally and specifically each and every allegation in paragraph 52.

## THIRD ALLEGED CAUSE OF ACTION

### (Indemnification)

53.     Answering paragraph 53, EBMS re-alleges its responses to paragraphs 1 through 52.

54.      Answering paragraph 54, the ASA and the CDS Agreement speak for themselves and are the best evidence of their terms.  Except as expressly admitted herein, EBMS generally and specifically denies each and every allegation in paragraph 54.

55.     Answering paragraph 55, EBMS denies generally and specifically each and every allegation therein.

## FOURTH ALLEGED CAUSE OF ACTION

### (Negligence)

56.     Answering paragraph 56, EBMS re-alleges its responses to paragraphs 1 through 55.

57.     Answering paragraph 57, the RFP speaks for itself and is the best evidence of its terms.  Except as expressly admitted herein, EBMS generally and specifically denies each and every allegation in paragraph 57.

58.     Answering paragraph 58, the ASA and the CDS agreement speak for themselves and are the best evidence of their terms.  Except as expressly admitted herein, EBMS generally and specifically denies each and every allegation in paragraph 58.

59.     Answering paragraph 59, the allegations therein are legal conclusions that do not warrant a response.  To the extent paragraph 58 contains factual

9

allegations, EBMS denies generally and specifically each and every allegation therein.

60.    Answering paragraph 60, EBMS denies generally and specifically each and every allegation therein.

## RESPONSE TO PRAYER FOR RELIEF

A.    EBMS denies Plaintiffs are entitled to damages.

B.    EBMS denies Plaintiffs have a right to disgorgement of profits received by EBMS.

C.    EBMS denies Plaintiffs are entitled to attorney's fees or costs pursuant to ERISA section 502(g) and the contractual indemnification provisions.

D.    EBMS denies that Plaintiffs are entitled to any further relief.

## SEPARATE AFFIRMATIVE DEFENSES

By alleging the affirmative defenses set forth below, EBMS intends no alteration of the burden of proof and/or burden of persuasion and/or burden of going forward with evidence.

### FIRST AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

EBMS is informed and believes, and on that basis alleges that Plaintiffs' complaint, including each and every claim and cause of action therein, fails to state facts sufficient to constitute a cause of action against EBMS.

### SECOND AFFIRMATIVE DEFENSE

### (Waiver)

EBMS is informed and believes, and on that basis alleges, that by their conduct and omissions, Plaintiffs are barred from asserting any claims for damages or from seeking other relief against EBMS under the doctrine of waiver.

/ / / /

/ / / /

/ / / /

## THIRD AFFIRMATIVE DEFENSE

### (Estoppel)

EBMS is informed and believes, and on that basis alleges, that by their conduct and omissions, Plaintiffs are barred from asserting any claim for damages or from seeking other relief against EBMS under the doctrine of Estoppel

## FOURTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

EBMS is informed and believes, and on that basis alleges, that Plaintiffs have engaged in careless, negligent or other wrongful conduct, and should therefore be barred from obtaining any relief against EBMS pursuant to the doctrine of unclean hands.

## FIFTH AFFIRMATIVE DEFENSE

### (Failure to Mitigate)

EBMS is informed and believes, and on that basis alleges, that Plaintiffs are barred from asserting any claims for damages or from seeking other relief from EBMS because Plaintiffs failed to take reasonable and/or necessary action to mitigate, lessen, reduce, and minimize said damages and losses.

## SIXTH AFFIRMATIVE DEFENSE

### (Laches)

EBMS is informed and believes, and on that basis alleges, that Plaintiffs are barred from asserting any claims for damages or from seeking other relief against EBMS under the doctrine of laches.

## SEVENTH AFFIRMATIVE DEFENSE

### (Statute of Limitations)

EBMS is informed and believes, and thereon alleges, that Plaintiffs' complaint, including each claim and cause of action therein, is barred by the applicable statute of limitations because Plaintiffs failed to file this action in a timely manner.

1

## EIGHTH AFFIRMATIVE DEFENSE

2

### (Contractual Limitations)

3    EBMS is informed and believes, and thereon alleges, that Plaintiffs'

4   complaint, including each claim and cause of action therein, is barred by a

5   contractual limitations period previously agreed to by the parties.

6

## NINTH AFFIRMATIVE DEFENSE

7

### (Lack of Causation)

8    EBMS is informed and believes, and on that basis alleges, that Plaintiffs fail

9   to establish how they were damaged by the acts of EBMS.

10

## TENTH AFFIRMATIVE DEFENSE

11

### (Offset)

12    EBMS is informed and believes, an on that basis alleges, that Plaintiffs'

13   damages, if any, have been offset such that Plaintiffs have not been damaged by the

14   conduct of EBMS.

15

## ELEVENTH AFFIRMATIVE DEFENSE

16

### (Comparative Fault of Others)

17    EBMS is informed and believes, and on that basis alleges, that the matters

18   complained of in Plaintiffs' complaint were caused, in whole or in part, by the acts

19   or omissions of third parties other than EBMS, and that any liability found against

20   EBMS must be reduced by the percentage of fault found to apply to said third

21   parties.

22

## ADDITIONAL DEFENSES

23    EBMS expressly and specifically reserves the right to add, delete, and/or

24   modify affirmative defenses based upon legal theories, facts, and circumstances that

25   may or will be divulged through discovery and/or further investigation or legal

26   analysis of Plaintiffs' position in this litigation.

27   / / / /

28   / / / /

19141920.8
231426-10003

## INCORPORATION OF AFFIRMATIVE DEFENSES

EBMS incorporates herein by reference as though fully set forth herein each and every one of the affirmative defenses asserted in answers on file to the Plaintiffs' complaint.

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

////

19141920.8
231426-10003

DEFENDANT'S ANSWER AND COUNTERCLAIM; THIRD-PARTY
COMPLAINT; DEMAND FOR JURY TRIAL

## DEFENDANT EBMS'S COUNTERCLAIM AND THIRD PARTY COMPLAINT AGAINST PLAINTIFF MPH AND THIRD-PARTY DEFENDANTS AMPS/CDS, AND ALLIANT

### PARTIES

1.     Defendant, counterclaimant, and third-party plaintiff EBMS[2] is a limited liability company headquartered in Billings, Montana.  EBMS is a third-party administrator for employer sponsored employee healthcare plans.

2.     EBMS is informed and believes, and based thereon alleges, that plaintiff and counter-defendant MPH is a California corporation with its principal place of business in Salinas, California.

3.     EBMS is informed and believes, and based thereon alleges, that third-party defendant CDS is a Florida limited liability company with its principal place of business in Norcross, Georgia.  EBMS is further informed and believes, and based thereon alleges, that on or around August 1, 2014, CDS became a wholly-owned subsidiary of third-party defendant AMPS, which, on information and belief, is an Arizona corporation with its principal place of business in Peachtree Corners, Georgia.  EBMS is also informed and believes, and based thereon alleges, that CDS conducts business in California, both on its own and through AMPS.  Both CDS and AMPS, on information and belief, provide administrative services related to employer sponsored healthcare plans, including medical bill review pursuant to Reference Based Pricing mechanisms.

4.     EBMS is informed and believes, and based thereon alleges, that third-party defendant Alliant is a Delaware corporation with its principal place of business in Newport Beach, California.  EBMS is further informed and believes, and based thereon alleges, Alliant is an insurance broker specializing in employee healthcare plans, including employer sponsored employee healthcare plans.

---

[2] Unless otherwise indicated, capitalized terms have the same meaning as in the answer and MPH's complaint.

**JURISDICTION AND VENUE**

5.    The Court has ancillary jurisdiction over EBMS's counterclaim because it arises out of the same transaction or occurrence that is the subject matter of MPH's claims against EBMS and does not require adding another party over whom the Court cannot acquire jurisdiction.  Supplemental jurisdiction exists for EBMS's third-party action because EBMS's claims are based on, arise from, and are factually interrelated with the claims of MPH against EBMS.

6.    The Court also has jurisdiction under 28 U.S.C. section 1332 because this case is between citizens of different states and the amount in controversy exceeds $75,000 to each of them.

7.    Venue is proper in the San Jose Division of the United States District Court for the Northern District of California under 28 U.S.C. section 1391(b) and (c), and 29 U.S.C. section 1132(e)(2).  This judicial district is the appropriate venue under 28 U.S.C. sections 1391(b) and (c) because it is where the acts, omissions and events giving rise to EBMS's counterclaims occurred and where MPH conducts business.  This judicial district is the appropriate venue under 29 U.S.C. section 1132(e)(2) because this district is where the Plan members resided during the relevant period.

**FACTUAL ALLEGATIONS COMMON TO COUNTERCLAIM AND THIRD-PARTY COMPLAINT**

8.    EBMS is informed and believes, and based thereon alleges, that prior to the Self-Funded Period (defined herein as July 1, 2014 through June 30, 2017), MPH provided health insurance for its full-time employees in the Salinas, California area through a third-party insurer.  In or about April 2014, MPH engaged in discussions with Alliant to address the risks and rewards of using Reference Based Pricing for self-insured plans.

9.    On July 1, 2014, Alliant issued a Request for Proposal on behalf of MPH that set out strict requirements for plan and benefit design, including a

requirement that the "Facility serviced will be managed through a Reference Based Pricing program."   A true and correct copy of the Request for Proposal is attached hereto as Exhibit A and is incorporated by reference.

10.     The joint response to the Request for Proposal submitted by EBMS and AMPS/CDS included, among other things, the requisite Referenced Based Pricing mechanism, which was to be implemented and managed by CDS/AMPS. MPH ultimately selected this proposal.

11.     The relationship between MPH and EBMS was governed by the ASA, which EBMS and MPH executed on or around July 1, 2014.  A copy of the ASA is attached as Exhibit B and is incorporated by reference.  The relationship between MPH, CDS/AMPS, and EBMS is governed by the CDS Agreement, which MPH, CDS/AMPS, and EBMS executed on or around July 1, 2014.    A copy of the CDS Agreement is attached as Exhibit C and is incorporated by reference.

12.     The ASA and CDS Agreement expired on or about June 30, 2017, at which time, on information and belief, MPH returned to a fully insured healthcare plan.

13.     On December 12, 2017, Salinas Valley Memorial Healthcare System sued MPH and the Plan in Northern District Case No. 5:17-cv-7076-VKD (*Salinas Valley Memorial Healthcare System v. MPH Peninsula Horticulture, Inc. d/b/a Rocket Farms, et al.*) for alleged underpayment of medical services provided to Plan members (the "SVMH Lawsuit").

14.     EBMS incurred significant expenses, in among other ways, appearing as a third-party defendant and responding to discovery.  MPH's third-party complaint against EBMS in the SVMH Lawsuit was dismissed because MPH filed it in violation of the ASA.

## FIRST CAUSE OF ACTION

(For Contractual Indemnity against MPH – ASA)

15.     EBMS realleges and incorporates herein by reference each and every

19141920.8
231426-10003

allegation set forth above in paragraphs 1 through 14.

16.   Section 9.02 of the ASA provides as follows:

> The Contract Administrator [Defendant] shall indemnify and hold harmless the Plan Sponsor [MPH] against any expense, loss, lawsuit, settlement costs, penalty, damage, liability, claim or judgment, including reasonable attorneys' fees, resulting from the negligent acts or omissions or willful misconduct of the Contract Administrator. The Plan Sponsor agrees to indemnify and hold harmless the Contract Administrator against any expense, loss, lawsuit, settlement costs, penalty, damage, liability, claim or judgment, including reasonable attorneys' fees, arising out of or resulting from the Contract Administrator's performance of its services hereunder where the Contract Administrator has adhered to the framework of polices, interpretations, rules, practices and procedures made or established by the Plan Sponsor, or has otherwise performed its services without negligence or willful misconduct and, in accordance with industry practice, or is being considered an entity responsible for payment under the plan as referenced in Federal Medicare Secondary Payer laws and regulations. The provisions of this section shall apply to arbitration and all forms of alternative dispute resolution as well as litigation. These indemnifications shall survive the termination of this Agreement.

17.   EBMS has incurred, and continues to incur, considerable expenses, primarily in the form of attorneys' fees, from litigation arising out of or related to EBMS's duties under the ASA. These expenses are reimbursable under Section 9.02 of the ASA.

18.   EBMS has performed its services according to the ASA without negligence or willful misconduct, and in accordance with industry practice.

19.   EBMS is entitled to indemnification in full by MPH for any and all claims, losses, damages, costs, or expenses EBMS has incurred, or will incur, relating to litigation arising out of or related to EBMS's duties under the ASA.

## SECOND CAUSE OF ACTION

(For Contractual Indemnity against MPH and CDS/AMPS – CDS Agreement)

20.   EBMS realleges and incorporates herein by reference each and every allegation set forth above in paragraphs 1 through 19.

21.   Under the section titled "INDEMNIFICATION & LIMITATION OF

17

LIABILITY," the CDS Agreement provides for reciprocal indemnification between EBMS, MPH and CDS/AMPS:

> <u>Indemnification</u>.   Each Party[3] (the "Responsible Party") agrees to reimburse, indemnify, defend and hold harmless each of the other Parties and their respective directors, officers and employees (each an "Affected Party") from and against any liability, damages, losses, costs and expenses (including reasonable attorneys' fees) incurred by any of them, or any claim, demand, charge, action, cause of action or other proceeding asserted by a third party against any of them, as a result of, arising out of, or based upon an uncured material breach of any covenant, agreement, representation or warranty made in this Agreement by the Responsible Party.

22.    EBMS has incurred, and continues to incur, considerable expenses, primarily in the form of attorneys' fees, from litigation arising out of one or more uncured material breaches of a covenant, agreement, representation or warranty in the CDS Agreement by MPH and AMPS/CDS.  These expenses are reimbursable under the CDS Agreement.

23.    Pursuant to the CDS Agreement, EBMS is entitled to indemnification in full by MPH and AMPS/CDS for any and all claims, losses, damages, costs, or expenses EBMS has incurred, or will incur, relating to MPH's and/or AMPS/CDS's breach or breaches of any covenant, agreement, representation or warranty in the CDS Agreement.

## **THIRD CAUSE OF ACTION**

(For Equitable Indemnity against MPH, AMPS/CDS, and Alliant)

24.    EBMS realleges and incorporates herein by reference each and every allegation set forth above in paragraphs 1 through 23.

25.    As a direct, proximate and foreseeable result of the filing of the Complaint by SVMH and the within action, EBMS has been compelled to incur attorneys' fees, court costs, and the expenses of this action and other claims and actions, and may in the future be compelled to incur additional liability, expenses,

---

[3] Including Defendant, MPH, and CDS per the terms of the CDS Agreement.

DEFENDANT'S ANSWER AND COUNTERCLAIM; THIRD-PARTY COMPLAINT; DEMAND FOR JURY TRIAL

and fees by reason of settlement, judgment, and/or defense. EBMS is entitled in equity and pursuant to California Code of Civil Procedure Section 1021.6 to be held harmless and to be indemnified by MPH, CDS/AMPS and Alliant, and each of them, for its costs, fees, and expenses, according to proof.

## PRAYER FOR RELIEF

WHEREFORE, EBMS prays for judgment as follows:

1.     That MPH take nothing from its complaint;

2.     For a determination that EBMS is entitled to contractual indemnification in full by MPH and CDS/AMPS for any and all claims, losses, damages, attorneys' fees, or expenses EBMS has incurred, or will incur, as a result of its performance under the ASA or the CDS Agreement;

3.     For a determination that EBMS is entitled to equitable indemnity in full by MPH, AMPS/CDS, and Alliant for any and all claims, losses, damages, attorneys' fees, or expenses EBMS has incurred, or will incur, as a result of the conduct of MPH, AMPS/CDS, and Alliant with respect to the Plan; and

4.     For such other relief as this Court may deem just and proper.


                                           Respectfully submitted,

Dated:  June 26, 2020                      LOEB & LOEB LLP
                                           DANIEL A. PLATT
                                           ARTHUR FELS

                                           By:     */s/ Arthur Fels*
                                                   Arthur Fels
                                                   Attorneys for Defendant
                                                   EMPLOYEE BENEFIT
                                                   MANAGEMENT SERVICES,
                                                   LLC. (misdenominated as
                                                   Employee Benefit Management
                                                   Services, Inc.)

DEFENDANT'S ANSWER AND COUNTERCLAIM; THIRD-PARTY
COMPLAINT; DEMAND FOR JURY TRIAL

1

## DEMAND FOR JURY TRIAL

2      Defendant and counterclaimant Employee Benefit Management Services,

3   LLC hereby demands a trial by jury.

4

5   Dated:  June 26, 2020                    LOEB & LOEB LLP
                                             DANIEL A. PLATT
6                                            ARTHUR FELS

7                                            By:    /s/ Arthur Fels
                                                    Arthur Fels
8                                                   Attorneys for Defendant
                                                    EMPLOYEE BENEFIT
9                                                   MANAGEMENT SERVICES,
                                                    LLC. (misdenominated as
10                                                  Employee Benefit Management
                                                    Services, Inc.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

19141920.8                 DEFENDANT'S ANSWER AND COUNTERCLAIM; THIRD-PARTY
231426-10003                    COMPLAINT; DEMAND FOR JURY TRIAL

EXHIBIT  A

# REQUEST FOR PROPOSAL



**Quotes Due:  Tuesday, April 29th**         **Effective Date:    July 1, 2014**

## Client Information

**Company Name:   Monterey Peninsula Horticulture, Inc.**

| Divisions/Subsidiaries: | Main Location: | Primary Industry: |
| --- | --- | --- |
| Rocket Farms, Inc. | Salinas, CA | Grower |
| Rocket Farms Herbs, Inc. | Pico Rivera, CA | Grower / Packer |
| Rocket Farms Greenhouse, Inc. | Salinas, CA | Labor |
| Growers Transplanting, Inc. | Salinas, CA | Grower |
| Steven Roberts Original Desserts (SRO) | Aurora, CO | Food Processing, Production, Distribution |

## Important Information / Client Objectives

Alliant Insurance Services was recently retained by Monterey Peninsula Horticulture as the broker of record of their employee benefits program to aid in creating a solution for the July 1st renewal needs.  Their medical benefits are current fully insured through Western Growers with a large portion of their workforce insured on a limited benefit program that must be eliminated at renewal.

In addition to this challenge, several new divisions were added to the program over the course of the past 12 months, through the course of which it has become very evident that the out of state network coverage is not adequate for their new population.

The client's objective is to establish an ACA compliant benefits program by 7/1/14, while still being affordable to both the company and they employees.

We have done our best to provide as much information as possible to enable you to provide a proposal.  We thank you in advance for your understanding that this is an 11th hour request and appreciate your efforts to be as competitive as possible in light of the tight time constraints.  Do not hesitate to reach out to us with any questions you may have in order to help expedite this quote request.

## RFP Contact Information

Attn: Tiffany Behrnes
tbehrnes@alliant.com
Telephone: 559.374.3563
Fax: 559.434.0224

Attn: Tomi Winn
twinn@alliant.com
Telephone: 559.326-6379
Fax: 559.434.0224

### Alliant Employee Benefits
9 River Park Place East, 3rd Floor
Fresno, CA 93720

**Broker:** Tomi Winn
**Account Manager:** Tiffany Behrnes

© 2013 Alliant Insurance Services, Inc. All rights reserved. Alliant Employee Benefits, a division of Alliant Insurance Services, Inc.
CA License No. 0C36861

# REQUEST FOR PROPOSAL



## Self-Funded Quote Request Details

The client is interested in establishing an onsite clinic, initially in the Colorado plant of the SRO division, second in their North Carolina division and will also explore the possibility of onsite or near-site clinics at additional locations if feasible.

This option will encompass a **Silver plan**, intended to replace the current "Hourly", limited benefit plan. For services that cannot be performed in the onsite/near-site clinic or for members/company locations who do not have access to an onsite/near-site clinic the PHCS network will be utilized for professional services. Facility serviced will be managed through a Referenced Based Pricing program.

In addition to the Silver plan, employees will have the option of a **Gold plan**, intended to replace the current "Salary" plan. This plan will operate as a traditional PPO, utilizing the CIGNA network with a slightly richer level of benefits.

| TPA Information | |
|---|---|
| TPA under Consideration: | EBMS |
| PPO Network(s): | Gold Plan: CIGNA<br>Silver Plan: Referenced Based Pricing (Medicare +170%) / PHCS<br>(It is assumed those in the salary plan will elect the Gold plan and those in the Hourly plan will elect the Silver plan) |
| Rx Vendor(s): | TPA's preferred |
| **Stop Loss Information** | |
| Specific Deductible(s): | $50,000 & $75,000 |
| Coverage under ISL | Medical & Rx |
| Coverage under ASL | Medical & Rx |
| Contract Type(s) | 12/12 |

## Eligibility Rules

| Rule Description |
|---|
| All eligible Hourly and Salary Employees |

| Waiting Period |
|---|
| First of the month following 30 days<br>(Currently Hourly employees are subject to a 60 day waiting period however this will need to be modified 7/1 to conform w/ ACA) |

All employees are offered and have been offered coverage. However, please keep in mind several of these divisions were just brought into the program over the past 12 months. One of the frustrations the client had with the prior broker was their unwillingness to visit each of the locations for enrollment meetings; therefore they are uncertain how well the program was rolled out and/or understood by employees in certain areas. Although we have committed to doing this for the upcoming open enrollment period, we believe a large number of employees may have waived coverage because of having Medical/Medicaid.

## Benefits

See attached requested plan designs for each quote option

© 2013 Alliant Insurance Services, Inc. All rights reserved. Alliant Employee Benefits, a division of Alliant Insurance Services, Inc.
CA License No. 0C36861

# REQUEST FOR PROPOSAL



## Rates

Current medical plans are fully insured with Western Growers.  Please find attached a renewal summary illustrating the current and proposed renewal rates for each of the divisions.

## Experience Reports

As this is considered a fully insured plan by Western Growers, our access to claims experience is limited.  Additionally, as mentioned earlier, several of the divisions entered their current policy within the last 12 months.  We were able to obtain the following information:

**Claims Paid from 01/01/2013 – 12/31/2014**:This information has been summarized by plan number with an identification if the plan was an hourly plan (limited to a $50k calendar year maximum) or salary plan (traditional PPO plan design).  We do not have access to enrollment by month however have provided the current enrollment for each plan.  We have also included an entry date column so that you are aware of the date in which each division joined the program so that you can adjust the experience accordingly.

**Large Claims Report:**  The large claim report that was provided with the renewal is included in this RFP package.  Please read the notation from Western Growers carefully.  The order of the claims amounts does not reflect the diagnosis listed on the same line.

**Group Summary Report:** This report gives a monthly illustration back to August 2011 of the number of enrolled employees (Single and Family), premium and paid claims.

© 2013 Alliant Insurance Services, Inc. All rights reserved. Alliant Employee Benefits, a division of Alliant Insurance Services, Inc.
CA License No. 0C36861

EXHIBIT  B

# EMPLOYEE BENEFIT MANAGEMENT SERVICES, INC.

# ADMINISTRATIVE SERVICES AGREEMENT

for

# MONTEREY PENINSULA HORTICULTURE, INC.
### &
# STEVEN ROBERTS ORIGINAL DESSERTS, LLC.

RECEIVED

JAN 1 2015

EBMS - BILLINGS

# EMPLOYEE BENEFIT MANAGEMENT SERVICES, INC.

## ADMINISTRATIVE SERVICES AGREEMENT

THIS Agreement is dated this 1st day of July, 2014, by and between Monterey Peninsula Horticulture, Inc. and Steven Roberts Original Desserts, LLC., 360 Espinosa Rd., Salinas, CA 93907, hereinafter referred to as the "Plan Sponsor," and Employee Benefit Management Services, Inc., of 2075 Overland Avenue, Billings, Montana 59102, hereinafter referred to as the "Contract Administrator."

WHEREAS, The Plan Sponsor has established an employee benefit plan, hereinafter called the "Plan", which provides for payment of certain welfare benefits to and for certain eligible individuals as defined by the Plan's master plan document, hereinafter called the "Plan Document", such individuals being hereinafter referred to as "Plan Members"; and,

WHEREAS, The Plan Sponsor desires to engage the services of the Contract Administrator to provide certain services with respect to the Plan as enumerated below;

NOW, THEREFORE, in consideration of the mutual covenants and conditions contained herein, the parties hereto agree as follows:

## SEC. I    DUTIES AND RESPONSIBILITIES OF PLAN SPONSOR

1.01    The Plan Sponsor is the Plan Administrator and retains ultimate discretionary authority and all final authority and responsibility for the Plan and its operation. The Contract Administrator is empowered to act only as expressly stated in this Agreement or as mutually agreed to in writing.

1.02    The Plan Sponsor retains all final authority and responsibility in developing, and determining in accordance with applicable law, benefit provisions, and Plan language describing such benefit provisions, as outlined in the Plan Document, and, where necessary, trust document. Plan Sponsor will secure legal review of such documents from Plan Sponsor's legal counsel.

1.03    The Plan Sponsor shall have final authority in determining issues of eligibility and coverage under the Plan and claims to be paid by the Plan with the express exception of the amount of any claim eligible for reimbursement.

1.04    The Plan Sponsor shall have final authority as to the investment (if any) and use of any assets to fund the Plan.

1.05    The Plan Sponsor shall procure stop-loss coverage at levels sufficient to ensure the viability of the Plan, and shall determine and maintain the funding level required for prompt payment of all expenses incurred by the Plan. Such expenses shall include but shall not be limited to:

(a)    specific and/or aggregate stop-loss insurance premiums;

(b)    other insurance premiums;

(c)    appropriate reserves for both reported and unreported claims; and

(d)    payment of benefits pursuant to the Plan.

1.06    The Plan Sponsor shall be responsible for collecting all appropriate contributions to the Plan from all Plan Members. Failure to collect any such contributions shall not relieve the Plan Sponsor from its funding obligation to the Plan.

1.07    The Plan Sponsor shall be responsible for taking the following actions to facilitate the proper performance of the Contract Administrator's responsibilities:

    (a)    provide the Contract Administrator with a complete and accurate list of all individuals eligible for benefits under the Plan, and who are enrolled in the Plan, by online entry of such information or by such other method as the parties may agree from time to time prior to the effective date;

    (b)    notify the Contract Administrator, no less than monthly, of any changes in eligibility and participation. Notice of Plan Member termination must be given within thirty (30) days of the termination. Under no circumstances shall credits for administrative fees be retroactive beyond two (2) months, or to the beginning of the current Administrative Services Agreement, whichever time period is shorter;

    (c)    review, approve and distribute to all eligible Plan Members (and return to Contract Administrator when necessary) all appropriate and necessary materials and documents, including but not limited to, Plan Documents, summaries of benefits, identification cards, enrollment forms, applications and notice forms as may be necessary for the operation of the Plan or to satisfy the requirements of State or Federal laws or regulations;

    (d)    provide the Contract Administrator with copies of any and all revisions or changes to the Plan Document as soon as is reasonably known, but no later than sixty (60) days before the effective date of the changes, or as otherwise required under applicable law;

    (e)    satisfy any and all required reporting, required responses, and disclosure requirements imposed by law and/or solicited from any and all governmental agencies;

    (f)    maintain bank account(s) in the name of the Plan, in a financial institution mutually agreed upon by the Plan Sponsor and Contract Administrator, from which checks or drafts are issued to cover expenses of the Plan, hereinafter referred to as the "Plan Sponsor Account;"

    (g)    provide the Contract Administrator with any additional information incidental to the Plan, as may be requested by the Contract Administrator from time to time;

    (h)    review and respond to all final internal adverse benefit determinations as may be required in the Plan Document; and

    (i)    perform any non-discrimination testing on the Plan as required by law.

    (j)    provide adequate and timely funding and/or payment to satisfy all state and/or federal regulations, including but not limited to PPACA assessments, taxes, fees, and/or penalties, state or other federal agency fees, assessments, and taxes, upon the applicable effective date, whether known or unknown at the time of executing this Agreement . This provision shall survive the termination of this Agreement, as Plan Sponsor is solely responsible for any applicable assessments, taxes, fees and/or penalties associated with the Plan or related to the Plan Sponsor's requirements to offer coverage.

## SEC. II     DUTIES AND RESPONSIBILITIES OF THE CONTRACT ADMINISTRATOR

2.01    The Contract Administrator agrees to perform the following administrative services for the Plan Sponsor:

    (a)    assist in the preparation and printing of a Plan Document, summaries of benefits, identification cards, and other material necessary to the operation of the Plan;

    (b)    process and adjudicate all claims presented for payment in accordance with the Plan Document, including but not limited to reasonable investigatory work in determining claim eligibility, and preparing and distributing benefit checks, and Explanation of Benefits to Plan Members and/or service providers, as applicable;

(c)    Contract Administrator shall review and respond to appeals made by Plan Members of adverse benefit determinations as may be required in the Plan Document.

(d)    To the extent set forth in the Plan Document, Contract Administrator, on behalf of Plan Sponsor, will facilitate reviews required by an Independent Review Organization (IRO). The Contract Administrator will submit all documentation regarding the appeal to the IRO and work with the IRO as needed to complete its review. The Contract Administrator will pass all costs of the IRO review on to the Plan Sponsor as described on Schedule A. Plan Sponsor will be responsible for collecting any allowable reimbursements from the Plan Member;

(e)    corresponding with Plan Members and their representatives regarding possible third-party liability for expenses paid by the Plan on Plan Member's behalf, as set forth in Schedule L, Contract Administrator shall have no responsibility or liability for the refusal of Plan Members or their representatives to reimburse the Plan for such expenses. Contract Administrator shall have no obligation to take any legal action to enforce the Plan's subrogation rights:

(f)    respond to inquiries from the Plan Sponsor, Plan Members and service providers concerning requirements, procedures or benefits of the Plan, though such information shall not constitute a determination of benefits that will be paid under the Plan or a guarantee or certification to anyone that any amount will be paid. Benefit determinations can only be made after a complete claim is submitted and fully processed by the Contract Administrator, and are subject to all eligibility requirements, limitations, exclusions and other provisions in effect when a claim is processed;

(g)    maintain all claim files for the Plan in accordance with Section VI hereof;

(h)    in addition to utilization reports, prepare and provide monthly reports of contributions received from the Plan Sponsor and all disbursements made from the Plan. Standard reports that can be produced by the automated claims system in use by the Contract Administrator, will be available to the Plan Sponsor. These reports will be made available only to authorized individuals who will protect the privacy of such information in accordance with HIPAA and other applicable laws, as amended. Unless required by law, under no conditions will the Plan Sponsor use the information provided in any manner that could jeopardize an individual's privacy;

(i)    once a year, provide the Plan Sponsor with an annual summary report of the operation of its Plan;

(j)    provide information necessary for, and assist the Plan Sponsor in, preparing reports required by any local, state or federal government pertaining to the operation of the Plan. Additional compensation shall be negotiated between the parties for any unusual reporting or disclosure obligations;

(k)    assist the Plan Sponsor with the establishment of rates and provide the Plan Sponsor with information on rate structures for comparable benefit programs; and

(l)    obtain quotations, as requested by Plan Sponsor, for policies of insurance, if available, including stop-loss or excess risk coverage and/or ancillary coverages such as life and AD&D. The decision to purchase any such insurance shall be made solely by Plan Sponsor. Contract Administrator makes no representations or warranties regarding the adequacy of any particular coverage or carrier. Contract Administrator may receive commissions or other compensation in connection with Plan Sponsor's purchase of such insurance as described in the accompanying disclosure Schedule.

2.02    The Plan Sponsor may contract with Contract Administrator to provide claim payment services (run-in) for those claims which were incurred prior to the effective date of this Agreement. A fee may be charged on a per transaction basis. A transaction is considered any and all activities that generate an Explanation of Benefit or other benefit determination.

2.03    Contract Administrator shall cooperate with the Plan Sponsor in the defense of any action arising out of matters related to this Agreement. The defense of any legal action involving the Plan shall not be the obligation of the Contract Administrator..

2.04    Contract Administrator will perform the function of filing the information reporting returns (Form 1099) with the IRS under the Tax Identification Number of Contract Administrator. Both the Contract Administrator and the Plan Sponsor agree that the responsibility for said reporting is that of the Plan Sponsor.

2.05    Contract Administrator and Plan Sponsor agree that any and all functions performed by Contract Administrator on behalf of the Plan Sponsor do not give rise to Contract Administrator acting as a "fiduciary" of the Plan. Both parties agree that the Contract Administrator is not a fiduciary of or for the Plan; that Contract Administrator does not have discretionary authority or discretionary control with respect to the management of the Plan; that Contract Administrator does not exercise any authority or control with respect to the management or disposition of the assets of the Plan; that Contract Administrator does not render investment advice; and with respect to the foregoing, the Contract Administrator has no authority or responsibility to do so.

## SEC. III   FEES OF THE CONTRACT ADMINISTRATOR

3.01    The Contract Administrator shall receive consideration in accordance with Schedule A herein incorporated by reference or as otherwise specifically denoted on another Schedule.

3.02    The Administrative Fees must be received by the Contract Administrator on or before the 10th day of the month for which they are due. The Administrative Fees described in Schedule A are payable in advance and may be deducted monthly by the Contract Administrator from the Plan Sponsor Account.

3.03    If the Plan Sponsor, for any reason whatsoever, fails to make a required fee payment by the 30th day of the month in which it is due, the Contract Administrator may:

(a)    after written notice to Plan Sponsor, suspend the performance of its services to the Plan Sponsor until such time as the Plan Sponsor makes the proper remittance;

(b)    charge interest to the Plan Sponsor on all past due fees at the rate of one and one-half percent (1½%) per month or the maximum rate allowed by law, whichever is less;

(c)    cease retroactively to the end of the month for which full payment was last received, all administrative services; and/or

(d)    commence termination of this Agreement in accordance with Section VIII.

3.04    In the event Contract Administrator advances any sums to a vendor or a state and/or federal agency on behalf of the Plan Sponsor, Plan Sponsor agrees to immediately reimburse Contract Administrator in full and the remedies in Section 3.03 will apply. This provision shall survive the termination of this Agreement.

3.05    If the number of participants enrolled in the Plan decreases by twenty-five percent (25%) or more when compared to the number of participants enrolled on the effective date of this Administrative Services Agreement, Contract Administrator shall have the right to prospectively adjust its administrative fee immediately upon written notice to the Plan Sponsor. The adjustment may be made regardless of any rate guarantee that may be in place for that period of time. If Plan Sponsor does not give its written consent within five (5) business days to the adjustment in fees, Contract Administrator may immediately terminate this Agreement.

3.06    The Contract Administrator shall not provide or be responsible for the expenses and cost of legal counsel, actuaries, certified public accountants, consulting physicians, consulting dentists, medical and other review charges for special claims investigations, independent medical review services or similar services performed for the Plan Sponsor. With the exception of independent medical reviews, the Contract Administrator shall not be authorized to engage such services or incur expense or cost therefore without the consent of the Plan Sponsor. Plan Sponsor hereby consents to reimburse Contract Administrator for any expense or cost incurred on behalf of the Plan Sponsor for said independent medical review services as set forth on Schedule A.

3.07    If Plan Sponsor fails to pay any undisputed fee, expense, tax, assessment, penalty, and/or any other sum due under this Agreement, Plan Sponsor shall pay all reasonable expenses incurred by Contract Administrator in collecting those sums, including reasonable attorney fees and costs.

## SEC. IV    CLAIMS PAYMENT

4.01    On a weekly basis, or as otherwise directed by the Plan Sponsor, the Contract Administrator shall provide a list of claims approved for payment under the Plan. The Plan Sponsor shall deposit sufficient funds in the Plan Sponsor Account to cover the approved claims within five (5) business days. The Contract Administrator shall issue checks from the Plan Sponsor Account to pay approved claims.

4.02    If the Plan Sponsor, for any reason whatsoever, fails to deposit sufficient funds in the Plan Sponsor Account within twenty (20) business days from the daterequested by the Contract Administrator, or if the Contract Administrator has reasonable concerns regarding the Plan Sponsor's ability to sufficiently fund claims, the Contract Administrator may immediately, with prior notice to the Plan Sponsor, suspend or terminate the prescription drug card (if applicable), suspend all claims paying activities, notify PPO networks, the DOL, healthcare providers, participants, beneficiaries, and vendors, as applicable and/or take other necessary legal action until sufficient and timely claims funding is established.

4.03    Plan Sponsor acknowledges that Preferred Provider Organization (PPO) discounts may not be available for any claim "paid" outside of the terms of the PPO contract. Paid typically means processed, funded and mailed.

4.04    Plan Sponsor acknowledges that claims must be paid according to the terms of the underlying stop loss contract, if applicable, or the Plan Sponsor may not be reimbursed for claims that may otherwise qualify for reimbursement. Paid typically means processed, funded and mailed.

4.05    The Contract Administrator shall not be responsible for any late filings, penalties,  fines, taxes, assessments, lost PPO discounts, unrealized stop-loss reimbursements, etc., that may result from late or inadequate funding (from any source), suspension or cessation of performance described herein.

4.06    Contract Administrator has no financial responsibility to the Plan Sponsor, or any other party, to pay for any professional, hospital or other bills related to a Member. Plan Sponsor will resolve billing and administrative issues directly with Providers. Upon request, the Contract Administrator will facilitate communications between Provider and Plan Sponsor to resolve billing and administrative issues.

## SEC. V    LIMITS OF THE CONTRACT ADMINISTRATOR'S RESPONSIBILITY

5.01    If a claim adjudication error should be discovered, the Contract Administrator shall use diligent efforts toward the recovery of any loss therefrom. Contract Administrator shall not be required to initiate legal proceedings for any such recovery and shall have no liability for such errors, provided they are reasonable, made in good faith, and within acceptable industry standards.

5.02    It is understood and agreed that the Contract Administrator is, and shall remain, an independent contractor with respect to the services being performed and shall, for no purpose, be deemed an employee or fiduciary of the Plan Sponsor.

5.03 It is understood and agreed that the Contract Administrator is not a "Plan Sponsor", "Plan Administrator" or "Fiduciary" of or for the Plan within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA") or applicable state law.  Notwithstanding anything in the Agreement to the contrary, any delegation of authority or duties pursuant to this Agreement construed by a court of law or governmental agency to make the Contract Administrator such a Plan Administrator or fiduciary shall be null and void, and such duties are hereby retained by the Plan Sponsor.  Accordingly, the services to be performed by Contract Administrator shall be limited to the ministerial services set forth in this Agreement and the performance by Contract Administrator of such services shall be subject to review by the Plan Sponsor.

5.04 The Contract Administrator shall have no responsibility, risk, liability or obligation for the funding of the Plan.  The responsibility and obligation for funding the Plan shall be solely and totally the responsibility of the Plan Sponsor.  Contract Administrator shall have no final discretionary authority or control over the management or disposition of Plan assets, and no authority over, or responsibility for, Plan administration.  Contract Administrator is neither the Plan Sponsor or Plan Administrator, nor a provider of health care services.  Contract Administrator shall have no responsibility for any insurance coverage relating to the Plan, Plan Members, or Plan Sponsor; or the nature or quality of professional health services rendered to Plan Members.

5.05 Contract Administrator and Plan Sponsor shall each be solely responsible for compliance with all laws, rules and regulations that are now or hereafter applicable to each of them and their own performance under this Agreement.  Contract Administrator shall not be responsible for establishing or maintaining the Plan or ensuring the Plan Sponsor is in compliance with applicable State or Federal legal requirements, nor shall Contract Administrator be an entity that is responsible for payment under the Plan or for payment of any fees, assessments, penalties or taxes, regardless of whether such fees, assessments, penalties or taxes are assessed against the Plan, the Plan Sponsor, or the Contract Administrator on behalf of the Plan Sponsor.  The Plan Sponsor shall, in its sole discretion, determine the source of funding for such fees, assessments, penalties, or taxes, and shall assume all liability for the appropriateness of use of Plan assets or Plan Sponsor general funds to pay such fees, assessments, penalties and taxes.

5.06 It is understood by the Plan Sponsor that the Contract Administrator is not an insurance company, investment advisor, plan administrator, fiduciary, custodian, law firm or actuarial firm.

5.07 Contract Administrator shall, when requested by Plan Sponsor, assist Plan Sponsor with the application for stop-loss insurance including completion of required disclosure documents.  If Contract Administrator has provided administrative services under this or a prior Agreement in the twelve (12) consecutive months prior to the application for stop-loss insurance then Contract Administrator will complete the disclosure documents based on claims it has adjudicated and information it has received through utilization review.  If the Contract Administrator has not provided administrative services during the prior twelve (12) consecutive month period, then it has no responsibility for the completeness of information submitted on the disclosure document.

5.08 In the event Contract Administrator does not procure stop-loss insurance for Plan Sponsor or assist Plan Sponsor in such procurement, Plan Sponsor shall indemnify and hold harmless Contract Administrator and its respective officers, partners, employees and agents from and against any and all expenses, claims, settlement costs, penalty, damages, judgments,, attorney's fees, actions or causes of action whatsoever to the extent that such results from the stop-loss carrier, stop-loss coverage, or lack thereof, and/or in any way connected with any act, failure to act, the performance of and/or failure to perform any and all obligations by or related to the stop-loss coverage selected and procured by the Plan Administrator/Sponsor or its Broker/agent.  This provision shall survive the termination of any applicable stop-loss policy and/or contract as well as this Agreement.

5.09 Contract Administrator, on behalf of the Plan Sponsor, has agreed to perform the required duties and act as the Responsible Reporting Entity (RRE) with regard to and as defined by the Medicare Secondary Payer Mandatory Reporting Provisions in Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007.  In the event the Contract Administrator is unable to report timely, accurate information, as required by law, due to the Plan Sponsor's failure to provide timely and accurate information, the Plan Sponsor agrees to hold the Contract Administrator harmless and indemnify the Contract Administrator for any and all resulting penalties and/or damages.

## SEC. VI        RECORDS

6.01        The Contract Administrator shall maintain for seven (7) years following receipt or until they are provided to Plan Sponsor as provided in Section 8.04 below, in either electronic or paper form, all records and files in conjunction with the administrative services to be performed hereunder. The term "records and files" shall include, but shall not be limited to, the claim files, unissued and canceled checks, bank statements, copies of stop-loss applications and contracts, and copies of the account ledger sheets of the applicable bank accounts.

6.02        During normal business hours, individual claim files shall be available for inspection and copying by the Plan Sponsor and at the Plan Sponsor's expense, if appropriate releases and authorizations from all applicable claimants are executed and presented to the Contract Administrator or an appropriate Business Associate Agreement is in place.

6.03        The Contract Administrator shall, within thirty (30) days following written notice from the Plan Sponsor, allow the Plan Sponsor, or an authorized agent, to inspect or audit relevant records and files maintained by the Contract Administrator, at the administrative office of the Contract Administrator, during normal business hours. The Plan Sponsor shall be liable for any and all fees charged by the auditor. Any such agent or auditor that has access to the records and files maintained by the Contract Administrator shall, prior to beginning such inspection or audit, sign a written Business Associate Agreement and an agreement regarding the use of proprietary and confidential information and the right of the Contract Administrator to review and respond to the agent's or auditor's final report. Plan Sponsor agrees it will not contract with any entity to perform what can be categorized as a "contingency audit" (in which an auditing firm will retain a dollar percentage fee from claims they believe have been paid in error) or "database audit" (in which claims are screened against a database) of records and files maintained by Contract Administrator.

## SEC. VII        TERM OF AGREEMENT

7.01        This agreement shall become effective at 12:01 a.m. on the 1st day of July, 2014, and shall remain in effect until terminated pursuant to Section VIII of this Agreement.

## SEC. VIII        TERMINATION

8.01        This Agreement may be terminated:

(a)        by either party by giving written notice of non-renewal to the other party at least forty five (45) days prior to the end of the then current term;

(b)        immediately by the non-breaching party in the event the breaching party fails to correct a material breach to the reasonable satisfaction of the non-breaching party within fifteen (15) days after the breaching party receives written notification of breach from the non-breaching party;

(c)        simultaneously upon the Chapter 7 bankruptcy filing of the Plan Sponsor and/or the Plan Administrator;

(d)        upon written agreement of the parties; or

(e)        upon the termination of the Plan.

8.02        A penalty for early termination will apply, equal to the Administrative Fees listed on Schedule A and payable for the remainder of the required forty five (45) day notice of termination.

8.03        Application of this Agreement to any state or jurisdiction may be prospectively discontinued by either party as of the date such party determines that it will be penalized, by such state or jurisdiction, for performance of its responsibilities under this Agreement.

8.04     Upon termination by either party, the Contract Administrator shall, within sixty (60) days, deliver to the Plan Sponsor a paid claims analysis, abbreviated case management summaries (if applicable), complete eligibility listings as well as a complete and final accounting of the financial status of the Plan if applicable. The cost of producing additional reports shall be the responsibility of the Plan Sponsor. The Contract Administrator shall retain, for seven (7) years after termination of this Agreement, all records and files, in either paper or electronic form, in accordance with standards of insurance record keeping. If the Plan Sponsor desires copies of all records and files, Plan Sponsor shall allow Contract Administrator reasonable time in which to duplicate this material and will reimburse Contract Administrator for reasonable costs incurred in its retrieval and duplication. If the Plan Sponsor desires possession of the records and files, the Contract Administrator shall, upon the request and at the expense of the Plan Sponsor, arrange for the delivery of this material to the Plan Sponsor or its authorized agent. Upon receipt of all records and files, the Plan Sponsor agrees to defend, indemnify and hold harmless the Contract Administrator, its directors, officers, representatives and employees against any and all claims, lawsuits, settlements, judgments, costs, penalties, damages and liabilities, including attorneys' fees, resulting from, or arising out of or in connection with, any function of the Contract Administrator under this agreement or with a claim for benefits under the Plan. The Plan Sponsor further understands and agrees that, upon receipt of the records and files, the Contract Administrator is forever released from all liability, loss or damage arising from any subsequent audit.

8.05     Upon termination of this Agreement, and for an additional fee, the Plan Sponsor and Contract Administrator may enter into a subsequent agreement whereby Contract Administrator will provide run-out claim payment services for claims received after the termination of this Agreement, but incurred prior to termination of this Agreement. The Contract Administrator may require payment in advance, and services will be provided only to the extent that Plan Sponsor provides sufficient and timely funding of claims payments.

8.06     Within four (4) months following termination, when requested by the Plan Sponsor, Contract Administrator shall deliver to the Plan Sponsor, data related to assist the Plan Sponsor's completion of Form 5500.

8.07     After termination of this Agreement and upon receipt of any funds received by the Contract Administrator on behalf of the Plan Sponsor, the Contract Administrator may keep all or a portion of said funds to the extent that any amounts are due to the Contract Administrator for the services discussed herein.

8.08     Upon termination of this Agreement all duties and responsibilities of the Contract Administrator shall cease unless specifically addressed within this agreement or as set forth in a separate run-out Agreement.

## SEC. IX     MISCELLANEOUS

9.01     This Agreement shall be governed by the laws of the State of Montana or, where applicable, Federal law.

9.02     The Contract Administrator shall indemnify and hold harmless the Plan Sponsor against any expense, loss, lawsuit, settlement costs, penalty, damage, liability, claim or judgment, including reasonable attorneys' fees, resulting from the negligent acts or omissions or willful misconduct of the Contract Administrator. The Plan Sponsor agrees to indemnify and hold harmless the Contract Administrator against any expense, loss, lawsuit, settlement costs, penalty, damage, liability, claim or judgment, including reasonable attorneys' fees, arising out of, or resulting from the Contract Administrator's performance of its services hereunder where the Contract Administrator has adhered to the framework of policies, interpretations, rules, practices and procedures made or established by the Plan Sponsor, or has otherwise performed its services without negligence or willful misconduct and, in accordance with industry practices, or is being considered an entity responsible for payment under the Plan, as referenced in Federal Medicare Secondary Payer laws and regulations.  The provisions of this section shall apply to arbitration and all forms of alternative dispute resolution as well as litigation.  These indemnifications shall survive the termination of this Agreement.

9.03     Contract Administrator shall not be responsible or obligated for the investment of any assets or funds of the Plan.

9.04      Payments to the Plan, and other Plan obligations, may pass through Contract Administrator's non-interest bearing disbursement account as a matter of convenience and for efficiency. Contract Administrator will incorporate sound business practices and be responsible for reasonable internal audits. Banking charges incurred in the ordinary course of business will be the responsibility of the Contract Administrator.

9.05      This Agreement, together with the Schedule(s) and any Amendments, constitutes the entire Agreement between Contract Administrator and Plan Sponsor with respect to the subject matter hereof, and supersedes all prior proposals, discussions, negotiations, and writings between the parties relating to such subject matter. This Agreement may only be modified in writing and executed by authorized representatives of both Contract Administrator and Plan Sponsor.

9.06      If any provision of this Agreement is held to be illegal or unenforceable by a court of competent jurisdiction, the remaining provisions shall remain in effect and the illegal or unenforceable provision shall be modified so as to conform to the original intent of this Agreement to the greatest extent legally permissible.

9.07      The obligations of either Contract Administrator or Plan Sponsor under this Agreement, shall be suspended during the continuance of any force majeure applicable to the party. The term "force majeure" shall mean any cause not reasonably within the control of the party claiming suspension, including, without limitation, an act of God, industrial disturbance, war, riot, weather-related disasters, earthquake, governmental action, and unavailability or break down of equipment. The party claiming suspension under this provision shall take reasonable steps to resume performance as soon as possible without incurring unreasonably excessive costs. If a force majeure suspension affecting one of the parties continues for more than thirty (30) days, the other party may elect to immediately terminate this Agreement by written notice on any business day thereafter.

9.08      Neither party may assign its rights or duties under this Agreement without the prior written consent of the other, except that either party may assign this Agreement to a subsidiary or affiliate of that party and may subcontract certain duties to non-affiliated third parties, provided that such assignments and subcontracts shall not relieve such party of any obligations or liability under this Agreement. This Agreement shall be binding upon and inure to the benefit of the parties' respective successors and permitted assigns.

9.09      Any failure by a party to enforce or require performance by the other party of any of the terms or conditions of this Agreement shall not constitute a waiver or a breach of any such term or condition thereafter occurring.

## SEC. X     PROVISIONS REQUIRED BY STATE STATUTES

10.01      Montana Code Annotated 33-17-602 requires that the following provisions be included in this Agreement. These provisions shall be disregarded and inapplicable unless they relate to state-regulated functions performed by the Contract Administrator for this particular Plan.

      (a)      All insurance charges or premiums collected by the Contract Administrator, on behalf of the Plan Sponsor, and return premiums received from the Plan Sponsor, shall be held by the Contract Administrator in a fiduciary capacity. Such funds shall be immediately remitted to the person entitled to them or deposited promptly in a fiduciary bank account established and maintained by the Contract Administrator. The Contract Administrator shall cause the bank, in which the fiduciary account is maintained, to keep records clearly recording the deposits in and withdrawals from such account on behalf of the Plan Sponsor. The Contract Administrator shall promptly obtain and keep copies of all such records and, upon request of the Plan Sponsor, shall furnish copies of such records pertaining to deposits and withdrawals on behalf of the Plan Sponsor.

        The Contract Administrator shall not pay any claim by withdrawals from such fiduciary account. Withdrawals from such account shall be made, as provided in this agreement, for:

          (1)     remittance to the Plan Sponsor;
          (2)     deposit in an account maintained in the name of the Plan Sponsor;
          (3)     transfer to and deposit in a claims paying account;

(4)  payment of commissions, fees, or charges; or

(5)  remittance of return premiums to the person entitled to the premium.

(b)  Any policies, certificates, booklets, termination notices, or other written communications delivered by the Plan Sponsor to the Contract Administrator for delivery to Plan Members shall be delivered promptly after receipt of instructions to do so.

(c)  Compensation to the Contract Administrator where the Contract Administrator adjusts or settles claims, shall in no way be contingent on claim experience.  This shall not prevent the compensation of the Contract Administrator from being based on premiums or charges collected or number of claims paid or processed.

## SEC. XI    DISPUTE RESOLUTION

11.01    Plan Sponsor and Contract Administrator will meet and confer in an attempt to resolve any dispute arising out of or relating to this Agreement. A dispute not resolved within 60 days of this meeting will be submitted to mediation, which will be held in Billings, Montana in accordance with the American Arbitration Association ("AAA") Rules of Procedure for Mediation. A single mediator, either mutually selected by the parties or AAA and having at least 10 years' legal experience in healthcare, including but not limited to self-funding and ERISA, will mediate the dispute. If the dispute is not resolved through mediation, the parties will be free to pursue all legal and equitable remedies otherwise available, provided, however that any action taken or remedy sought must be initiated within one year of the parties' first meeting to resolve the dispute.

## SEC. XII    SCHEDULES TO THE AGREEMENT

12.01    The Schedules attached hereto, become part of the body of this Agreement, and are herein incorporated by reference when selected by the Plan Sponsor.  Schedules or Amendments subsequently executed by both parties and attached hereto, shall become part of the body of this Agreement and incorporated herein.

IN WITNESS THEREOF the Parties hereto sign their names as duly authorized officers and have executed this Agreement.

PLAN SPONSOR:                                    CONTRACT ADMINISTRATOR:

Monterey Peninsula Horticulture, Inc./          Employee Benefit Management Services, Inc.
Steven Roberts Original Desserts, L.L.C.

By: _____                      By: _____

Its:  _____C F O_____                          Its:    President

## SCHEDULE A

## FEES

A.    In accordance with Section III of the Administrative Services Agreement, the Plan Sponsor agrees to pay to the Contract Administrator the following Administrative Fees:



B.    Plan Sponsor agrees to remit the following amounts to Contract Administrator or its designee for services performed by certain vendors on behalf of the Plan Sponsor or Plan. Unless noted otherwise in Section C below, Contract Administrator shall forward all amounts received to the appropriate vendor or vendor account.

C.    The Plan Sponsor acknowledges and agrees that the Contract Administrator may receive additional compensation in connection with services provided to Plan Sponsor from sources other than the Plan Sponsor or Plan. Contract Administrator may receive any of the following:

1. Wrap Networks:

The Contract Administrator contracts with wrap network arrangements for discounted pricing of non-network claims. If a wrap network is utilized on claims for Plan Sponsor, the Contract Administrator will retain a portion of the fee to offset administrative expenses including claims data analysis, EDI Routing and processing services.

2. Claims Negotiation Services:

The Contract Administrator contracts with certain entities to perform large claim negotiation services. If a large claim negotiation service is utilized on claims for Plan Sponsor's Plan, the Contract Administrator will retain a percentage of the total savings realized and paid by Plan Sponsor under Section B up to a maximum of 25%, for claims processing and coordination, and related communications with the provider, Plan participant and applicable carriers.

J. PBM Services and Audit Support:

The Contract Administrator contracts with PBM vendors to provide prescription drug benefits for Plan Sponsor's Plan. In conjunction with the services provided to Plan Sponsor by the PBM, Contract Administrator provides client support services, benefit design assistance, auditing services, data integration services, On line Health portal and decision support, PBM Contract Negotiation, PBM market check analysis, implementation and benefit setup transfer, member communication development, data files, plan consultation, appeals coordination, coordinated review of medical necessity in certain instances, issue resolution support and coordination, eligibility audits, real time/ same day updates to online health portal, and other related support services. For EBMS Preferred PBM vendors, the Contract Administrator receives funding directly from the PBM vendor for such service support.

D.   Plan Sponsor authorizes Contract Administrator to deduct the administrative fees for each month from the Plan Sponsor Account. The Contract Administrator shall also be authorized to deduct any applicable taxes, fees, assessments and or penalties from the Plan Sponsor Account upon prior notice to the Plan Sponsor.

E.   A binder fee of N/A representing the first month's estimated fees shall be payable on or before the effective date of this Agreement.

F.   An initial one-time set-up fee of N/A for eligibility loading, plan building and other services, shall be payable prior to commencement of services under this agreement.

H.   Additional Administrative Fees may be reflected on the applicable Schedule.

I.   The fee and rates outlined in Schedule A shall be renewed and revised as necessary, but in no event less than annually to be mutually acceptable to both parties.

Effective Date:  July 1, 2014

PLAN SPONSOR:                                CONTRACT ADMINISTRATOR:

Monterey Peninsula Horticulture, Inc./       Employee Benefit Management Services, Inc.
Steven Roberts Original Desserts, LLC.

By: _____              By: _____

Its:  C F O                                  Its:   President

RECEIVED
JAN 12 2015
EBMS - BILLINGS

**SCHEDULE B**

**COBRA**

The Plan Sponsor requests that the Contract Administrator provide certain services in compliance with the requirements of the Consolidated Budget Reconciliation Act (COBRA) as amended, and all related regulations with respect to the Plan Sponsor's COBRA responsibilities in consideration of the following:

## DUTIES AND RESPONSIBILITIES OF PLAN SPONSOR

A.  Notify the Contract Administrator in writing, of all Plan Members eligible under the Plan.

B.  Notify the Contract Administrator of certain qualifying events, in writing, within thirty (30) days of the occurrence of a qualifying event, including but not limited to a covered employee's end of employment, a covered employee's reduction of hours of employment, death of a covered employee, commencement of a proceeding in bankruptcy with respect to the employer, or the covered employee becoming entitled to Medicare benefits (under Part A, Part B, or both). Said Notice shall contain sufficient information to satisfy the requirements as set forth in the Act.

C.  Forward any necessary information and/or documentation on to Contract Administrator applicable to a Plan Participant and/or a Plan Beneficiary and a Qualifying Event.

D.  Assist Contract Administrator in obtaining any necessary information and/or documentation applicable to a Plan Participant and/or Plan Beneficiary.

E.  Notify Contract Administrator of any Plan Participant and/or Plan Beneficiary address change.

F.  If applicable, forward the necessary COBRA premium on to the Contract Administrator.

G.  Report any deficiencies or unmet requirements to the IRS on Form 4980(b).

H.  From time to time, additional notices may be required by federal or state law. Plan Sponsor is responsible for providing these additional notices. Contract Administrator will provide the notices for an additional fee to be determined.

## DUTIES AND RESPONSIBILITIES OF CONTRACT ADMINISTRATOR

A.  Upon receipt of complete eligibility documentation, Contract Administrator shall provide each Plan Participant and all applicable Plan Beneficiaries with written initial notice of his or her continuation coverage rights under the Plan.

B.  Following notice of a Qualifying Event, Contract Administrator will notify all Qualified Beneficiaries of continuation coverage rights and premium amounts.

C.  Contract Administrator shall receive elections and premiums from Qualified Beneficiaries, track all premium payments received, and provide telephonic assistance for inquiries on COBRA benefits.

D.  Contract Administrator shall notify Qualified Beneficiaries of rate changes, the unavailability of COBRA, and COBRA termination.

## COMPENSATION

███████████████████████████████████

Effective Date:  July 1, 2014

**PLAN SPONSOR:**

Monterey Peninsula Horticulture,  Inc.
Steven Roberts Original Desserts, LLC.

By: _____

Its: _____ CFO _____

**CONTRACT ADMINISTRATOR:**

Employee Benefit Management Services, Inc.

By: _____

Its:      President

JA Page 14 2015

EBMS - BILLINGS

## SCHEDULE C

### FIDUCIARY DISCLOSURE STATEMENT

A.  Prohibited Transaction Class Exemption 84-24 (PTE 84-24), as issued by the Department of Labor, permits the receipt of reasonable compensation by certain enumerated interested parties for services rendered if proper disclosure is given and the transaction is approved by appropriate independent Plan fiduciaries. PTE 84-24 requires that the transaction be at arm's length and in the best interest of Plan participants. This notice serves to satisfy the disclosure requirements of PTE 84-24, if applicable to Plan Sponsor.

   1.  Description of Transaction:
       <u>Excess-loss Reinsurance Contract</u>
       <u>Life Insurance</u>

   2.  Name of Insurer:
       <u>Stop Loss Insurance Services, Inc.</u>
       <u>Lincoln Financial Group</u>

   3.  __X__   The Contract Administrator is not affiliated with the Insurer whose contract is being recommended and is not limited by any agreement with the Insurer.

       _____   The Contract Administrator is affiliated with the Insurer whose contract is being recommended or is limited by an agreement with the Insurer. Explain:

   4.  Sales Commission (expressed as a percentage of gross annual premiums). If override commissions apply, explain below:

       0%

   5.  Description of any additional charges, fees, discounts, penalties or adjustment incurred by the Plan or which may be incurred by the Plan under the insurance company policy or contract.

   6.  Contract Administrator may receive additional compensation from the Insurer in the form of a production bonus, service fees, override commissions or a profit sharing arrangement. Such compensation may be based upon Contract Administrator's potential volume of business with the Insurer, the overall profitability of the Insurer's business, or other similar factors. The amount of such additional compensation, if any, will not be known until the end of the agreement period with the Insurer. Information regarding such additional compensation, insofar as it relates to the Plan, will be available for the Plan fiduciaries' review after such amounts have been determined.

B.  Contract Administrator may receive interest from banks on account balances, and compensation from pharmaceutical manufacturers, health care providers, managed care service providers, PPOs, HMOs, large case negotiators, etc. Such compensation may be based upon utilization of related products and services. Contract Administrator will retain such compensation to the extent necessary to reasonably compensate Contract Administrator for its costs resulting from such utilization. The amount of such additional compensation, if any, will be known only periodically. Upon the Plan Sponsor's reasonable request, information regarding such additional compensation, insofar as it relates to the Plan, will be available for the Plan Sponsor's review after such amounts have been determined.

C.  The Contract Administrator will forward to the Plan Sponsor 100% of all rebates received from the Plan Sponsor's contracted PBM. Plan Sponsor acknowledges and agrees that in the event Plan Sponsor fails to timely fund any claim obligations, as set forth in the Agreement or the applicable PBM Agreement, Contract Administrator may, after written notice to the Plan Sponsor, withhold any and all rebates from Plan Sponsor and apply said rebates to the unfunded claims.

I hereby acknowledge that, in my capacity as an independent fiduciary with authority to act on behalf of the Plan, I have received the above information concerning the above transactions and I approve the transactions on behalf of the Plan. I am not an insurance agent or broker, pension consultant or insurance company involved in the transaction. Further, I will not receive any compensation or other consideration, directly or indirectly, for my own personal account from any party dealing with the Plan in connection with the transaction.

Effective Date: __July 1, 2014__

PLAN SPONSOR:                                   CONTRACT ADMINISTRATOR:

Monterey Peninsula Horticulture, Inc.           Employee Benefit Management Services, Inc.
Steven Roberts Original Desserts, LLC.

By:                                             By:

Its:        C F O                               Its:      President

JAN 1

EBMS - BILLINGS

## SCHEDULE E

### HIPAA SERVICES

The Contract Administrator will provide services with respect to the Plan Sponsor's responsibilities in compliance with the requirements of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), as amended, and all related regulations in consideration of the following:

## DUTIES AND RESPONSIBILITIES OF PLAN SPONSOR

To ensure correct HIPAA Certificates of Creditable Coverage, Plan Sponsor shall submit, in a timely manner and in writing, complete and accurate employment, health and coverage data to Contract Administrator.

## DUTIES AND RESPONSIBILITIES OF CONTRACT ADMINISTRATOR

A. Issue certificates of coverage to those who, based upon data provided by Plan Sponsor, lose coverage under the Plan.

B. Issue certificates of coverage to those who elect COBRA, then cease to be covered by the COBRA continuation coverage provided by the Plan.

C. Issue certificates of coverage to those who request such certificate, but no later than twenty-four (24) months after cessation of coverage as set forth in the preceding two paragraphs.

D. Meet all HIPAA/HITECH Privacy, Security, and Administrative Simplification requirements that pertain to a Business Associate.

## COMPENSATION

A. The Contract Administrator shall be authorized to deduct the administration fees for each month from the Plan Sponsor Account.

B. The fee structure shall be renewed annually and revised to be mutually acceptable to both parties.

Effective Date:  July 1, 2014

PLAN SPONSOR:

Monterey Peninsula Horticulture, Inc.
Steven Roberts Original Desserts, LLC.

By: _____

Its: _____ CFO _____

CONTRACT ADMINISTRATOR:

Employee Benefit Management Services, Inc.

By: _____

Its:  President

EBMS - BILLINGS

**SCHEDULE D**

**CARELINK ADDENDUM**

The Contract Administrator shall provide and Plan Sponsor shall pay for certain cost management services described in this Schedule D for the benefit of Plan's Sponsor's health benefit plan:

### A. UTILIZATION MANAGEMENT

**Inpatient:** Review actual or scheduled Admissions and, using clinical criteria, determine the medical necessity, conduct concurrent reviews and provide discharge planning, based upon the information provided to CARELINK, and provide certification, as appropriate.

**Outpatient:** Review actual or scheduled: (i) elective outpatient same-day surgeries; (ii) elective outpatient diagnostic procedures, including invasive; (iii) outpatient continuing services such as physical therapy, occupational therapy, speech therapy, home health care, hysterectomies, spinal surgeries, cancer treatments, dialysis, genetic testing, hospice, injectables and durable medical equipment (Items in excess of $2,000.00).

    a.   PRE-ADMISSION COUNSELING

        Case Managers will provide telephonic counseling services to Covered Persons who have an inpatient, elective surgery and are not already enrolled in Case Management or Maternity Management. This service includes education on proper preparation for the hospital admission and recovery process and referral to other services, including Case Management when appropriate. CARELINK must receive three business days advance notice of the scheduled admission.

    b.   POST-DISCHARGE COUNSELING

        Case Managers will provide telephonic counseling services to members after being discharged from the hospital to the home setting, excluding maternity cases, 23-hour observation Case Management cases and members already enrolled in Case Management. This service includes assessment of member's health status, review of post-discharge instructions and medication, education on signs and symptoms of adverse effects of the procedure, and referral to other services, including Case Management when appropriate.

### B. CASE MANAGEMENT

Case Management is a collaborative process to assess, plan, implement, coordinate, monitor and evaluate the options and services required to meet a Covered Person's health needs. If Plan Sponsor or the reinsurance carrier request case management services outside of the parameters set out by the program, an additional hourly fee will be charged.

### C. MATERNITY MANAGEMENT

A review of maternity cases to assess the risk level in such cases, to perform specialized management services coordinating the delivery of prenatal health care services, to provide educational materials and counseling, to serve as a liaison between the Covered Person and Providers, to monitor and encourage the mother-to-be's compliance with appropriate prenatal health care.

### D. TELEDOC

Covered Persons are provided with unlimited 24/7 access to licensed physicians by phone, secure e-mail, video and mobile app.

### E. MISCELLANEOUS

Upon request of the Plan Sponsor, and as mutually agreed to by the parties, Contract Administrator will create customized reports and make changes to standard reports, correspondence, documents or other materials for an hourly charge.

Plan Sponsor acknowledges and agrees that neither Contract Administrator nor any external vendor that might perform the services outlined in Schedule D shall have no right, obligation, or liability to participate in the determination of what care or treatment is rendered to a Covered Person or how such care or treatment shall be rendered. The decisions to obtain or deliver any health care service are solely between a Covered Person and his or her treating healthcare provider.

Effective Date: July 1, 2014

**PLAN SPONSOR:**                                     **CONTRACT ADMINISTRATOR:**

Monterey Peninsula Horticulture, Inc.                Employee Benefit Management Services, Inc.
Steven Roberts Original Desserts, LLC.

By: _____              By: _____

Its: _____CFO_____                     Its: _____President_____

EBMS - BILLINGS

**SCHEDULE H**

**miBenefits**

Plan Sponsor desires to access employee/plan participant claim and eligibility information through miBenefits, the EBMS on-line portal.

Plan Sponsor agrees to hold all information that comes within its control strictly confidential, and provide all reasonable physical, electronic and procedural safeguards to prevent unauthorized disclosure of such information. Furthermore, Plan Sponsor agrees to comply with all applicable Federal and State laws and/or regulations regarding the security and confidentiality of such information including, but not limited to, any regulations, standards or rules propagated under the authority of the Gramm-Leach-Bliley Act and the Health Insurance Portability and Accountability Act of 1996 (HIPAA), HIPAA privacy and security and the Health Information and Technology Act (HITECH).

The Plan Sponsor agrees to hold harmless and indemnify the Contract Administrator against any expense, loss, lawsuit, settlement costs, penalty, damage, liability, claim or judgment, including reasonable attorneys' fees, arising out of, or resulting from Plan Sponsor's access to, disclosure and use of such information and/or failure to comply with the provisions of this schedule. These indemnifications shall survive the termination of this Agreement.

Contract Administrator is authorized to release a password enabling access, to:

LANA   PIERI                          (name)

Director  Human  Resorres (title)

360   Espinosa  Rd      (mailing address)

Salinas   CA 93907

LPIERI @ ROCKET FARMS .com (e-mail address)

FRAN  ABRAGNA-HAVES
V.P.  Human  Resources
2780  Tower  Road
Aurora   CO  80011

FABRAGNA HAVES @ original desserts . com

The following password configuration is being given:

One password for all divisions/locations

Effective Date:  July 1, 2014

PLAN SPONSOR:

Monterey Peninsula Horticulture, Inc.
Steven Roberts Original Desserts, LLC.

By: _____

Its:      CFO      _____

CONTRACT ADMINISTRATOR:

Employee Benefit Management Services, Inc.

By: _____

Its:      President

## SCHEDULE L

## THIRD PARTY RECOVERY

The Plan Sponsor requests that the Contract Administrator provide certain services in order to protect the assets of the Plan in the event any recovery is available from a third party source.

### DUTIES AND RESPONSIBILITIES OF PLAN SPONSOR

A.  The Plan Sponsor agrees that Contract Administrator shall provide third party recovery services to the Plan., Plan Sponsor agrees that it will furnish all information it may possess regarding claims subject to third party recovery.

B.  Certain cases will require referral to an outside attorney and additional legal work beyond the scope of the services contemplated by this Schedule. The Plan Sponsor agrees that engagement of an outside attorney shall be the Plan's responsibility and that upon engagement of such, the Contract Administrator shall cooperate with the outside attorney but will have no further obligation to pursue recovery.

C.  The Plan Administrator shall timely respond to settlement offers presented by Contract Administrator.

D.  The Plan Administrator shall have the right to terminate the pursuit and/or recovery efforts against a third party, the participant, or any other liable party at any time.

### DUTIES AND RESPONSIBILITIES OF CONTRACT ADMINISTRATOR

A.  The Contract Administrator shall provide third party recovery services necessary to pursue the Plan's equitable interests including the initial determination as to whether a third party action exists, supervision, follow-up and closure. If the Plan Sponsor does not agree to the course of recovery action proposed by the Contract Administrator, the Contract Administrator shall have no further obligation or liability whatsoever for the recovery and reimbursement of the Plan's equitable interests. Services such as filing an action in State or Federal Court are beyond the scope of the services contemplated by this Agreement.

B.  The Contract Administrator may engage such outside consultants and services as the Contract Administrator deems necessary to pursue the Plan's interests. Fees of such outside consultants and services shall not be the responsibility of the Plan, without its prior written consent.

C   The Contract Administrator agrees to provide summary status reports of subrogation and third party recovery upon request of the Plan Sponsor.

D.  The Contract Administrator agrees that it shall have no authority to compromise the Plan's equitable interests in excess of Ten Thousand ($10,000) without consent of the Plan Sponsor.

E.  Plan Sponsor hereby grants Contract Administrator authority to accept settlement of the Plan's equitable interests for offers received between Two Thousand One ($2,001) and Ten Thousand ($10,000) Dollars without the Plan Sponsor's specific consent, if the settlement offer is more than or equal to sixty-six percent of the Plan's equitable interests. Offers less than sixty-six percent will be presented to the Plan Sponsor for its review.

F.  The Contract Administrator shall have no obligation to pursue the Plan's equitable interests between One ($1) and Two Thousand ($2,000) Dollars.  If the Contract Administrator does pursue such an interest on the Plan's behalf, the Plan Sponsor agrees that the Contract Administrator shall have the authority to compromise the lien and accept settlement on the Plan's behalf.


EBMS - BILLINGS

**COMPENSATION**

███████████████████████████████████████████

Effective Date: July 1, 2014.

PLAN SPONSOR:                              CONTRACT ADMINISTRATOR:

Monterey Peninsula Horticulture, Inc.      Employee Benefit Management Services, Inc.
Steven Roberts Original Desserts, LLC.

By: _____                By: _____

Its: _____ C F O _____                 Its: _____ President _____

## SCHEDULE P·

### HOLD HARMLESS AND INDEMNIFICATION AGREEMENT
### STOP LOSS/ADVANCE FUNDING

With the understanding that the Contract Administrator is relying upon the representations made by the Plan Sponsor in the Administrative Services Agreement and as set forth below in this Schedule, the Plan Sponsor hereby represents and warrants the following:

1.  Plan Sponsor is responsible for establishing and maintaining the Plan, complying with all applicable laws and regulations, and retains sole and final discretionary authority to manage and administrate the affairs of its Plan.

2.  Plan Sponsor shall procure stop-loss coverage at levels sufficient to ensure the financial viability of the Plan and shall monitor and maintain the funding at a level necessary to ensure prompt payment of all expenses eligible under the Plan.

3.  If the Plan Sponsor elects to utilize the advance funding feature of its stop-loss policy, the Plan Sponsor agrees to assume any and all liability resulting from the use of that advanced funding feature. Such liability may include, but is not limited to, the loss of a negotiated PPO discount amount, the loss of a negotiated case rate, and/or a violation of state or federal regulations regarding the time period for payment of claims.

4.  Plan Sponsor hereby indemnifies and holds harmless Contract Administrator, including its respective officers, employees and agents, from and against any and all expenses, losses, lawsuits, claims, settlement costs, penalties, damages, judgments, attorney's fees, actions or causes of action whatsoever to the extent that such results from the delay or denial in claims payment resulting from the stop-loss carrier's advance funding feature and/or in any way is connected with any act, failure to act, the performance of and/or failure to perform any and all obligations by or related to the stop-loss carrier and/or the advance funding feature utilized by the Plan Sponsor or its agent.

This Hold Harmless and Indemnification Agreement shall survive the termination of any applicable stop-loss policy and/or contract as well as the Administrative Services Agreement between the parties hereto.

Effective Date:  July 1, 2014

PLAN SPONSOR:                                      CONTRACT ADMINISTRATOR:

Monterey Peninsula Horticulture, Inc.            Employee Benefit Management Services, Inc.
Steven Roberts Original Desserts, LLC.

By: _____                        By: _____

Its:   CFO _____                          Its:      President


EBMS · BILLINGS

EXHIBIT C

# CLAIMS DELEGATE SERVICE AGREEMENT

This CLAIMS DELEGATE SERVICE AGREEMENT (the "Agreement") is made and entered into effective as of the 1st day of July, 2014 (the "Contract Date"), by and among: (A) CLAIMS DELEGATE SERVICES, LLC, a Florida limited liability company with its principal place of business at 5300 Broken Sound Blvd. NW, Suite 200, Boca Raton, FL 33487 ("CDS" or the "Delegate"); (B) the MONTEREY PENINSULA HORTICULTURE EMPLOYEE BENEFIT PLAN(the "Plan"); (C) the Plan Sponsor and Plan Administrator, MONTEREY PENINSULA HORTICULTURE, INC., a California corporation with its principal place of business at 360 Espinosa Rd., Salinas, CA 93907 ("Company"), acting on its own behalf and on behalf of each of the Affiliated Companies (as such term defined below);and (D) the Plan's third party administrator, EMPLOYEE BENEFIT MANAGEMENT SERVICES, INC., a Montana corporation with its principal place of business at 2075 Overland Ave , Billings, MT 59102 (The "Claims Administrator").   When the Company is acting as the Plan Sponsor, it is acting in its capacity as the settlor of the Plan and will be referred to as the "Plan Sponsor." When the Company is acting as the named administrator of the Plan, it is acting in its fiduciary capacity and will be referred to as the "Plan Administrator."  The Company and Affiliated Businesses, Plan, Plan Sponsor and Plan Administrator are hereinafter sometimes referred to collectively as the "Plan Parties" and each individually as a "Plan Party." CDS, the Plan Parties and the Claims Administrator are hereinafter sometimes referred to collectively as the "Parties" and each individually as a "Party."

WHEREAS, the Plan Sponsor, which established the Plan to provide medical benefits to eligible participants, wants to engage CDS to help implement and administer a Reference Based Reimbursement plan design and wants to modify the Claims Administrator's services to support that effort, and both CDS and the Claims Administrator are willing to undertake such engagement and provide such services on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions herein contained, the Parties agree as follows:

•**CAPITALIZED TERMS & DEFINITIONS**

•Capitalized Terms Not Otherwise Defined.  Any capitalized term used and not otherwise defined in the body of this Agreement will have the meaning set forth in the Plan Modification Exhibit, if such term is defined therein, and if not, it will have such meaning as may be set forth in another Exhibit or Schedule attached hereto. Any capitalized term used and not otherwise defined in this Agreement or an Exhibit or Schedule hereto will have the meaning established for such term under ERISA.

•Certain Definitions.  For purposes of this Agreement, the terms below will have the following meanings:

"*Advocacy Authorization*" means the valid consent of a Billed Participant, submitted in a written form acceptable to CDS, authorizing CDS to provide Protective Efforts for their benefit.

"*Advocacy*" or "*Advocacy Program*" or "*Balance-Billing Advocacy*" means the balance-billing support and advocacy program for offered by CDS for Participants, as described in Section 2.03 of this Agreement.

"*Affiliated Businesses*" means the following companies, each of which is owned by or under common or shared ownership and control with the Company and has employee Participants in the Plan: (i) Rocket Farms, Inc., a California corporation owned by the Company with its principal place of business at 360 Espinosa Rd., Salinas, CA 93907; (ii) Rocket Farms Herbs, Inc., a California corporation owned by the Company with its principal place of business at 7909 Crossway Drive, Pico Rivera, CA 90660; (iii) Rocket Farms Greenhouse, Inc., a California

corporation owned by the Company with its principal place of business at 7909 Crossway Drive, Pico Rivera, CA 90660; (iv) Growers Transplanting, Inc., a California corporation owned by the Company with its principal place of business at 2651 North Cabrillo HWY , Half Moon Bay, CA 94021; and (v) Steven Roberts Originals, LLC d/b/a Steven Roberts Original Desserts, a Colorado limited liability company with its principal place of business at 2780 Tower Road, Aurora, CO 80239.

"*Applicable Law(s)*" means, as to any particular party or subject matter, all applicable statutes and laws, regulations and rules promulgated thereunder, judicial orders, and the rules and requirements of governmental authorities having jurisdiction over such party or subject matter.

"*Balance-Bill*" or "*Balance-Billing*" means a billing for or attempting to collect on Hospital and Facility Claims that the Plan does not pay or cover and which, according to the terms of the Plan, are not considered appropriately billable to or the responsibility of the Participant, such as charges billed in error, duplicate charges, impermissible charges, unreasonably excessive charges, etc.

"*Billed Participant*" means a Covered Person or Participant who is subject to actions or attempts to collect an Improper Balance.

"*Billed Rates*" means, as to any Hospital or Facility Claim, the rates or pricing levels reflected in the Hospital or Facility bill.

"*Corporate Parties*" means, jointly and severally, the Company and each of the Affiliated Businesses.

"*Defense*" or "*Balance-Billing Defense*" means commercially reasonable efforts to defend or provide for the defense of Billed Participants against law suits and other legal actions to collect an Improper Balance contrary to applicable terms in the Plan Document.

"*EOBs*" means explanations of benefits and explanations of payments.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*Excessive Charges*" means such portions of an Improper Balance that are directly attributable to Billed Rates charged by a Hospital or Facility in excess of the Specified Fee Levels.

"*Gold Plan*" means, of the two different benefit plan options available under the Plan, that benefit plan option that has lower annual out-of-pocket maximums and lower deductibles, copays and coinsurance levels for certain benefits than the maximums, deductibles, copays and coinsurance levels offered under the Silver Plan.

"*Improper Balance*" means charges on Hospital and Facility Claims that the Plan does not pay or cover and which, according to the terms of the Plan, are not considered appropriately billable to or the responsibility of the Participant, such as charges billed in error, duplicate charges, impermissible charges, unreasonably excessive charges, etc.

"*Legal Plan*" and "*Legal Plan Membership*" means the Legal Club of America program provided and maintained by Legal Club Financial Corporation, and a membership in such program that entitles the member and his or her spouse and children to certain benefits and services described on Schedule 1 attached hereto.

"*Medical Care*" means, as to any Improper Balance, the medical treatment, services and goods to which the Improper Balance relates.

"*New Direct Contract*" means any Direct Contract executed after the effective date of this Agreement or the New Plan Document, and any Direct Contract that CDS assisted with, advised on or was otherwise involved in proposing, soliciting, structuring, negotiating, preparing, documenting, procuring or obtaining.

*"New Plan Document"* means a new Plan Document or an amended and restated version the prior Plan Document that incorporates the Required Modifications.

*"Notice of Disputed Charges"* means a letter to a Provider or a collection agency that is attempting to collect an Improper Balance notifying such party that a Billed Participant is formally disputing charges and exercising rights under the Fair Credit Billing Act, Fair Debt Collection Practices Act, Fair Credit Reporting Act or similar federal or state laws, and demanding an investigation and correction of billing errors and the suspension of collection efforts and negative credit reporting in accordance with Applicable Law.

*"Plan Document"* means the Company's most recent Plan Document and/or Summary Plan Description, together with all modifications and amendments made thereto since the original adoption of the Plan Document.

*"Pre-existing Direct Contract"* means a Direct Contract, executed prior to the effective date of this Agreement and the New Plan Document, that CDS was not involved in proposing, soliciting, structuring, negotiating, preparing, documenting, procuring or obtaining.

*"Properly Balance-Billed Amounts"* means any portion of the charges on Hospital and Facility Claims that are not paid or covered by the Plan and under its terms are considered appropriately billable to and the responsibility of the Participant, such as deductibles, coinsurance amounts, charges for procedures not covered as a benefit of the Plan, etc.

*"Protective Efforts"* means commercially reasonable efforts to defend or provide for the defense of Billed Participants from attempts to collect an Improper Balance in violation of applicable terms and rules in the Plan Document.

*"Reference Based Reimbursement"* or *"RBR"* means a health plan design that defines and establishes the amount of benefits payable for hospital and medical facility Services and Supplies, based on the consistent application of various formulas to reasonably objective and reliable data reference points that are indicative of fair and reasonable values and rational pricing for such Services and Supplies.

*"Required Modifications"* means the health plan benefits structure, design, concepts, definitions, terms and provisions set forth in Exhibit A, attached hereto and incorporated herein by this reference (the "Plan Modification Exhibit").

*"Silver Plan"*, means, of the two different benefit plan options available under the Plan, that benefit plan option that has higher annual out-of-pocket maximums and higher deductibles, copays and coinsurance levels for certain benefits than the maximums, deductibles, copays and coinsurance levels offered under the Gold Plan.

*"Specified Fee Level(s)"* means the levels of payment for medical treatment and supplies set forth on Schedule 2, attached hereto and incorporated herein by this reference.

*"Unreasonable Fees"* means any amount or portion of the charges included in a Hospital or Facility bill that constitutes an Improper Balance.

•**DELEGATE OBLIGATIONS & SERVICES**

•Document Review and Recommendations. The Plan Parties will provide or cause the Claims Administrator to provide CDS with a current copy and all prior amendments to the Plan Document, as well as the following: (a) the Plan's administrative services agreement(s); (b) any stop-loss policy issued to or for the benefit of the Plan; (c) any PPO network access agreement(s) and direct provider contract(s) entered into or used by or for the benefit of the Plan; and (d) forms, templates or representative examples of the EOBs, notices of adverse benefit determinations and notices of adverse determinations on appeal used by the Plan. As requested and deemed reasonably necessary, CDS will review, comment on, revise or suggest revisions or amendments to such documents to help with the

incorporation and integration of the Required Modifications into a New Plan Document draft for review and approval by legal counsel for the Plan, and to otherwise facilitate the adoption, implementation and administration of an RBR plan design ("RBR Consulting and Documentation Assistance").

•Description of Services.  CDS assumes the obligations will provide the services described below (the "Services"), subject to and in accordance with the Required Modifications and the New Plan Document.  CDS agrees to:
•Manage and oversee the Claim Review and Validation Program and subject Hospital and Facility Claims to the level of review that, in the discretion of CDS, is appropriate or desirable under the facts and circumstances relating to such Claims;

•Make the Delegated Claims Decisions and engage, at its own expense, such Billing Review Specialists, Medical Review Specialists and other expert or professional advisors as CDS, in its discretion, deems appropriate based on the relevant facts and circumstances (it being understood that, barring a material reason to do otherwise, CDS intends to use Anasazi Medical Payment Systems, Inc. d/b/a "AMPS" as the primary Billing Review Specialist);

•Handle HFC Benefit Determinations and Final HFC Appeals in accordance with the New Plan Document, and advise the Plan Administrator and Claims Administrator regarding the same;

•Maintain the Advocacy Program and offer Balance-Billing Advocacy for Participants who need and desire it;

•Provide an explanatory video (in both English and English with Spanish subtitles) to educate Company employees about the Claim Review and Validation Program, the Permitted Payment Levels for Hospital and Facility benefits, and the Advocacy Program; and

•Maintain all necessary records pertaining to the Services.

•Advocacy Program.  Subject to all exceptions and limitations set forth below, CDS will maintain the Advocacy Program and offer Balance-Billing Advocacy support, as follows:
•Program Components.  The Advocacy Program will provide assistance and support for Participants with regard to Balance-Billing by Hospitals and Facilities:
•       CDS will maintain a toll free support line for Participants to call if they are balance-billed or subject to collections efforts for a Hospital and Facility Claim, which line will be staffed by personnel trained to assist callers with balanced billing issues ("Billing Advocates") under the supervision of the CDS in-house legal staff;
•       CDS will maintain a database of Participants created from eligibility files and claims data provided by the Plan Administrator and/or the Claims Administrator that will allow Billing Advocates to confirm the identity of Participants and access claims records and related documentation with regard to which Participants may have questions or need assistance;
•       Billing Advocates will attempt to contact any Participant for whom a Hospital and Facility Claim over $2,500 with an Improper Balance of more than $500 is submitted, and will take incoming calls from any Participants to explain and answer questions about Permitted Payment Levels, Unreasonable Fees, Improper Balances, Properly Balance-Billed Amounts, and the ways that the Advocacy Program can assist Billed Participants;
•       Billed Participants will have the option to authorize CDS to contact medical providers on their behalf with regard to disputing an Improper Balance or arranging terms for the payment of Properly Balance-Billed Amounts; and
•       For Billed Participants requesting assistance, the Billing Advocates will provide Advocacy Authorization forms, appropriate Notice of Disputed Charges letters, and suggestions and instructions on how to handle subsequent contact concerning a Balance-Bill.

•Protective Efforts.  For Billed Participants in the Gold Plan seeking assistance, CDS will provide for Protective Efforts as to any Balance-Bill or Improper Balance, and act in good faith to protect the Billed Participant from being forced to pay such portion of an Improper Balance that, if taken together with the paid Benefits amount and Properly Balance-Billed Amounts for the Hospital and Facility Claim at issue, would exceed the Specified Fee Levels for the Covered Services and Covered Medical Expenses in question.  For Billed Participants in the the Silver Plan who decide to retain counsel, at their own expense, to defend against legal action to collect an Improper Balance on a

Balance-Bill, CDS will upon request assist and advise such counsel in preparing to defend against such legal action ("Defense Assistance"). To facilitate the provision of Protective Efforts for Gold Plan Participants, and as a convenience to Silver Plan Participants who may choose to engage counsel at their own expense, CDS will enroll all Covered Employees in the Legal Plan. With the consent of and at no cost to any Billed Participant in the Gold Plan, CDS will have the right to use the Legal Plan Membership to engage local legal counsel to represent and defend such Billed Participant or otherwise assist with the provision of Protective Efforts for their benefit. Silver Plan Participants may use the Legal Plan Membership to engage counsel at their own expense and, upon request, CDS will assist in locating, selecting and communicating with such counsel to facilitate their engagement.

•Exclusions and Limitations Regarding Protective Efforts. Notwithstanding anything in this Agreement to the contrary, CDS will not have any obligation to provide for or continue Protective Efforts for a Billed Participant with regard to any particular Balance-Bill or Improper Balance if:

• the Billed Participant does not provide Advocacy Authorization for CDS, or provides but subsequently revokes such Advocacy Authorization;

• the Billed Participant, Plan Administrator or Claims Administrator does not notify CDS within seven (7) days of actually or constructively receiving or becoming aware of a Balance-Bill or any assertion, statement, notice, claim, demand for payment, collection effort or other action regarding an Improper Balance, provided, however, that this item 2.03(c)(ii) exclusion will not apply to a delay in giving notice to CDS if it is clear that the delay in question did not result in there being insufficient time to reasonably prepare for and properly satisfy any applicable legal, regulatory or judicial filings or deadlines, did not interfere with effectively exercising rights on behalf or for the benefit of the Billed Participant, and did not decrease the likelihood of successfully protecting or defending the Billed Participant or otherwise materially compromise the ability of CDS to make effective Protective Efforts;

• the Billed Participant does not fully cooperate with the Protective Efforts, including cooperating with CDS, its insurance carrier and any attorney(s) they may designate, in the investigation and defense of any claim, suit or proceeding against the Billed Participant over an Improper Balance, which investigation and defense CDS, in consultation with any designated lawyer(s) involved, will have the right to control and direct;

• the Billed Participant agrees to pay or contribute to any settlement, compromise or payment of an Improper Balance, without the prior written approval of CDS;

• the Billed Participant does not either pay any Properly Balance-Billed Amounts in full when due, or else timely agree to payment terms with the Hospital or Facility, provide evidence of the same to CDS, and then make all payments in accordance with the agreed upon terms;

• before receiving the Medical Care, the Billed Participant agrees to pay all charges to be billed for the Medical Care after having been given a meaningful and reasonably specific estimate of the rates or amounts to be charged;

• after receiving the Medical Care, the Billed Participant agrees to pay for the Medical Care at the Billed Rates, or agrees to pay all Balance-Billed Amounts or any Improper Balance, or confirms or ratifies an alleged prior agreement to pay at the Billed Rates or to pay all charges billed for the Medical Care;

• a party brings a lawsuit or takes other legal action over a Balance-Bill or an Improper Balance and the Plan and Billed Participant, taken together, have not paid or formally offered payment to the Hospital or Facility in question equal to or greater than the Specified Fee Levels for the Medical Care to which the Balance-Bill relates;

• a Plan Party, the Claims Administrator or the Billed Participant is party to a contract that requires payment for the Medical Care at the Billed Rates or other rates in excess of the Specified Fee Levels, or that specifically prohibits bill review or adjustments based on Unreasonable Fees;

• the Plan Parties and the Claims Administrator have not used EOB messaging, restrictive endorsement language and a notice of adverse benefit determination, the specific forms of which have either been recommended or approved in writing by CDS; or

• any monies owed to CDS under this Agreement have not been paid in full when due, or a Plan Party or the Claims Administrator have otherwise failed to satisfy their obligations under or strictly adhere to the terms and conditions of this Agreement or the Plan Document.

•Settlement Authority. CDS will have the authority to negotiate settlements of Hospital and Facility Claims and Final HFC Appeals on terms that it deems reasonable under the circumstances and permissible under the Plan ("Settlement Terms"). CDS will give the Plan Administrator written notice of any proposed Settlement Terms. If the Plan Parties do not agree with such Settlement Terms and elect not to comply, then with respect to the Hospital and Facility Claim in question, the Plan Parties will be responsible for the outcome of any litigation regarding the

Hospital and Facility Claim and any related costs and damages that are in excess of the settlement amount proposed by CDS, including the costs of litigation and any judgment.

•General Limitations. The Parties understand and agree that CDS will have no authority, responsibility or liability under this Agreement or the Plan Document other than as specifically referenced above with respect to Delegated Claims Decisions, Claim Review, Balance-Billing Advocacy and Protective Efforts. In the event that the Plan Administrator and/or the Claims Administrator for any reason disregards or acts contrary to any determination or decision of CDS regarding any Delegated Claims Decision, then CDS will automatically be relieved of obligations, responsibilities and liability under this Agreement with respect to such determination or decision and will have no obligation to indemnify or hold the Plan Parties or any other party harmless with respect to such determination or decision. If CDS determines that any exclusion of a benefit or coverage in the New Plan Document is not enforceable, it will have the authority to direct the payment of any related Hospital and Facility Claim benefit and will have no further indemnification obligation or other liability in connection therewith.

•Standard of Care. CDS will exercise its authority and carry out its duties and responsibilities as the Claims Delegate in accordance with the specific terms of the New Plan Document, as a fiduciary of the Plan, and will adhere to the "prudent man standard of care" set forth in 29 U.S.C. §1104(a)(1)(A), (B) and (D). Otherwise, CDS agrees to provide the Services in a professional, workmanlike, commercially reasonable manner.

•**PLAN RESPONSIBILITIES**

•The Plan Parties and/or the Claims Administrator assume the following obligations, duties and responsibilities under this Agreement, as indicated, and agree to perform as follows:
•Appointment of Claims Delegate. The Plan Sponsor will appoint CDS as the Claims Delegate for the Plan and delegate and grant to CDS the responsibility and discretionary authority described in the Required Modifications.

•New Plan Document. The Plan Parties will cause the New Plan Document to be prepared and to include the Recommended Modifications in a manner and form satisfactory to CDS (the "New Plan Document"), and will ensure that the New Plan Document is formally adopted with proper notice to all Participants and Employees and otherwise in accordance with all Applicable Laws. The Parties acknowledge and agree that regardless of the effective date stated on the face of the New Plan Document (the "Effective Date"), CDS will not be responsible for any inability or failure to perform any Services occurring prior to such actual date as the New Plan Document has been formally adopted and signed and has become fully effective. The Parties will use their best efforts to cause the New Plan Document to be finalized, formally adopted and fully executed within twenty (20) days of the Contract Date. Upon its adoption, an executed copy of the New Plan Document will be attached hereto as Exhibit B. Any subsequent modification or amendment of the New Plan Document during the Term of this Agreement must: (i) appoint and authorize CDS as the Claims Delegate; (ii) allocate, delegate and grant to CDS primary responsibility and maximum discretionary authority with respect to all Delegated Claims Decisions; (iii) be furnished to CDS for review and comment reasonably in advance of the intended effective date of such modification or amendment; and (iv) be acceptable in form and substance to CDS as to all such modifications or amendments that relate to, have or would have any material effect on the responsibilities and authority of the Claims Delegate.

•Processing and Payment. The Claims Administrator will process all Hospital and Facility Claims in accordance with the New Plan Document and Applicable Law, and the Plan Administrator will fund and cause the Claims Administrator to promptly pay benefits for such Hospital and Facility Claims according to the Delegated Claims Decisions made by CDS, using checks bearing restrictive endorsement language approved in writing by CDS. The Claims Administrator will also process all Hospital and Facility Claim Appeals, and will be responsible for making benefit determinations on first Appeals and sending out required notices regarding such determinations The Plan Administrator will fund and cause the Claims Administrator to promptly pay any additional benefits approved by CDS, in full or in part, on Final HFC Appeals. In processing claims and appeals, the Plan Administrator and the Claims Administrator will comply with all requirements of the New Plan Document and Applicable Law. At the reasonable request of CDS, the Plan Administrator and the Claims Administrator will provide CDS with a written description of the administrative processes and safeguards which are in place to ensure adherence to and consistent application of all provisions and terms of the New Plan Document.

•Delivery of Hospital and Facility Claims. The Plan Administrator will, within five (5) days of receipt, forward or cause the Claims Administrator to forward to CDS or its designee all Hospital and Facility Claims and related materials and information, even if there is reason to believe that a Hospital and Facility Claim has been forwarded directly to CDS by or on behalf of a Claimant.

•Delivery of EOBs and EOPs; Proof of Payment. The Plan Administrator will cause the Claims Administrator to deliver or provide CDS with access to EOBs for each Hospital and Facility Claim within five (5) days of the payment of such Claim. As soon as practicably possible after a request by CDS, the Plan Administrator will provide or cause to be provided to CDS a copy or digital image of the front and back of the cancelled check with which payment was made for any Hospital and Facility Claim.

•Delivery of Final HFC Appeals. The Plan Administrator will, within five (5) days of receipt, forward or cause the Third Party Administrator to forward to CDS or its designee all Final HFC Appeals and related materials and information, even if there is reason to believe that a Final HFC Appeal has been forwarded directly to CDS by or on behalf of a Claimant or any other party.

•General Compliance, Cooperation, Support and Facilitation. In addition to satisfying the responsibilities and obligations specifically set forth in this Agreement, the Plan Parties and the Claims Administrator agree to act strictly in accordance with the terms of the New Plan Document and to use their best efforts to cooperate with and support and facilitate the efforts of CDS to maintain the Claim Review and Validation Program, make Delegated Claims Decisions and provide Billing Advocacy, Protective Efforts and other Services as contemplated in the New Plan Document and this Agreement.

### •FEES &PAYMENT TERMS

•Delegate Service Fees. The Plan Parties agree to pay and shall be jointly and severally responsible for paying to CDS the deposit ("Deposit") and all fees set forth on Schedule 3, attached hereto and incorporated herein by this reference (respectively, "Fees" and the "Fee Schedule"). CDS will invoice the Plan Parties for Fees owed on a regular basis, and all accrued Fees outstanding shall be due and payable in full within twenty (20) days of invoicing; provided, however, that Base Fees (as defined on the Fee Schedule) shall be paid one (1) month in advance, by the first day of each month, regardless of invoicing. Any Fees not paid within such twenty (20) days will be considered delinquent ("Delinquent Fees"), and the Plan Parties shall pay interest at the rate of one and one-half percent (1.5%) per month on the outstanding balance of all Delinquent Fees from the date they were originally due until all such amounts are paid in full; provided that payment of interest on any delinquent payment shall not affect or limit any other rights or remedies of CDS or obligations of the Plan Parties or the Claims Administrator with respect to such delinquent payment. Notwithstanding anything in this Agreement or the Plan Document to the contrary, in the event that any Delinquent Fees and accrued interest are not paid within ten (10) days of written demand, CDS will have the right to suspend performance of the Services immediately with written notice to the Plan Administrator and Claims Administrator.

•Permitted Uses of Reserved Fees. The Fee Schedule may require that some portion of the Fees be reserved and allocated for use by CDS only as specifically permitted herein (the "Reserve"). Fees allocated to the Reserve may be used, at the reasonable discretion of CDS, for the following purposes only: (i) to pay not more than half of any external legal fees, costs and expenses incurred in connection with defending or attempting to resolve any claim, demand or action made or taken against a Billed Participant for any Improper Balance; or (ii) to settle any claim, demand or action made or taken against a Billed Participant regarding any Improper Balance, subject to prior consultation with the Plan Administrator ("Authorized Purposes"). In the event of the termination of this Agreement, at such time as the Plan Parties have paid CDS all amounts due under this Agreement in full, and each has provided CDS with a written waiver and release of all obligations and liability regarding Billing Advocacy and Protective Efforts under the Agreement, CDS will pay to the Plan within ninety (90) days an amount equal to any Fees allocated to the Reserve that have not been used or committed to be used for Authorized Purposes.

•Claims Administrator Fees. In consideration of the Claims Administrator's duties and obligations under this Agreement, including its cooperation, support and facilitation of the Claim Review and Validation Program, the Second Appeals Process, the Balance-Billing Advocacy Program, and the other efforts of CDS to provide the Services and perform in accordance with the Plan, the Plan Parties will pay the Claims Administrator in accordance with the Fee Schedule. Invoicing and payment of such fees will be handled in accordance with the Administrative Services Agreement between the Plan and the Claims Administrator or as they otherwise agree.

## •INDEMNIFICATION & LIMITATION OF LIABILITY

•Indemnification. Each Party (the "Responsible Party") agrees to reimburse, indemnify, defend and hold harmless each of the other Parties and their respective directors, officers and employees (each an "Affected Party") from and against any liability, damages, losses, costs and expenses (including reasonable attorneys' fees) incurred by any of them, or any claim, demand, charge, action, cause of action or other proceeding asserted by a third party against any of them, as a result of, arising out of, or based upon an uncured material breach of any covenant, agreement, representation or warranty made in this Agreement by the Responsible Party.

•Limitations of Liability. In no event will any Responsible Party be required to pay damages, reimburse, indemnify, defend or hold harmless any Affected Party for, from or against: (a) any liability, damages, losses, costs and expenses of any kind that result from the negligence or intentional misconduct of any Affected Party or from a failure to act in accordance with this Agreement or the Plan Document on the part of any Affected Party; (b) any lost profits or other consequential or incidental damages incurred or likely to be incurred by any Affected Party (irrespective of whether the Responsible Party has been advised of the possibility or likelihood of any such damages), and any sanctions, fines, penalties, taxes, multiple damages or damages that are exemplary or punitive in nature; (c) any demands, actions, suits, claims or counterclaims based any contract, other than this Agreement, to which any Affected Party or their agent or representative is a party or is subject or bound. In addition, notwithstanding anything in the Agreement to the contrary, in no event will CDS be liable for or required to pay damages, reimburse, indemnify, defend or hold harmless any Affected Party for, from or against any liability, damages, losses, costs and expenses incurred by of them, or any claim, demand, charge, action, cause of action or other proceeding asserted by a third party against any of them, as a result of, arising out of, based upon or for: (i) any Services provided or failure to perform Services in connection with any Hospital and Facility Claim that arose prior to the Adoption Date; (ii) any Benefits or charges included in any Hospital and Facility Claim determined to be payable by the Plan in accordance with the terms of the Plan Document; (iii) any liability, damages, costs or losses resulting or arising from any provision or portion of the Plan Document determined not to be enforceable or to conflict with Applicable Law; or (iv) any amount which the Plan would have been responsible to pay on such Hospital or Facility Claim regardless of any CDS breach or failure to adhere to the terms of the Plan Document or this Agreement; or (v) any demand or award for payment or reimbursement of charges for Covered Services, Covered Medical Expenses or other Services and/or Supplies; (vi) as to any individual Hospital or Facility Claim or any group of Hospital and Facility Claims relating to the same incident of care, any amount exceeding Two Hundred and Fifty Thousand and No/100 Dollars ($250,000.00); or (vii) as to all Hospital or Facility Claims taken together, any amounts in the aggregate exceeding the greater of either One Million and No/100 Dollars ($1,000,000.00) or 50% of the total Fees paid to CDS under this Agreement during the prior 36 months.

## •CONFIDENTIALITY & PROPRIETARY INTERESTS

•Confidentiality of Claim Records and Information. CDS will exercise all commercially reasonable efforts to maintain the confidentiality of the claims records and information created or received by CDS in the performance of the Services. CDS will only disclose the information in such records to the Plan Administrator or its authorized agents, if permitted by Applicable Law to do so, or to any other party, including governmental and other regulatory agencies to the extent such disclosure is required by legal process or pursuant to any applicable statute, rule or regulation. The obligations of CDS contained in this Section 6.01 will not be construed to restrict or prevent CDS from disclosing information in such records to the extent such disclosure is authorized or necessary in order for CDS to perform the Services under this Agreement and as contemplated under the Plan Document.

•Protected Health Information. In addition, to the extent information obtained or received by CDS in connection with the performance of the Services constitutes "protected health information," as defined under 45 CFR 164.501 ("Protected Information"), CDS agrees that such Protected Information will be used or disclosed by CDS only for the purposes of performing the Services and for such other purposes as expressly provided in 45 CFR 164.504(e)(4), and the Parties will execute a Business Associate Agreement meeting the requirements of 45 CFR 164.504(e)(2), a sample form of which is attached hereto as Exhibit C.

•Rights in Service Delivery Model and Materials. The Parties acknowledge and agree that the systems, processes, procedures, designs, plans, methods, work flows, know-how, pricing data, scripts, flow charts, forms, documentation, instructions, letters, notices, memoranda, position statements, and other materials (the "Delegate Program Materials") used in connection with the design, administration and provision of the Services under the Claims Delegate service delivery model described in or implemented in connection with to this Agreement (the "Delegate Service Model"), including, without limitation, the design and administration of the Review Program, the explanation and defense of Delegated Claims Decisions and provision of the Advocacy Program, are and will at all times remain the property of CDS and/or its affiliates, partners, joint-venturers or licensors ("Affiliates"). CDS reserves all right, title and interest in and to any intellectual property, proprietary or other rights in the Delegate Service Model and the Delegate Program Materials (but not the Plan, Employee, Claimant or Claim data reflected therein), as well as any improvements, adaptations, modifications or derivative works based thereon or conceived, created or made thereto by any Party.

•Limited License. CDS grants to the other Parties the limited, non-exclusive, non-transferable right and license to use the Delegate Program Materials during the Term of this Agreement, only as necessary in connection with the Services and for the sole purpose of satisfying obligations or requirements under this Agreement. No ownership or other rights in the Delegate Service Model or the Delegate Program Materials are granted to the Plan Parties or the Claims Administrator unless and except as may be expressly set forth herein, and all rights not expressly granted to the Plan Parties in this Agreement are reserved by CDS and its Affiliates. Except for the foregoing permitted use, the Plan Parties will not, and will ensure that the Claims Administrator and their respective employees, contractors agents and representatives do not, modify, publish, transmit, participate in the transfer of, make available to third parties, reproduce, create derivative works of, distribute, publicly display, or in any way exploit the Delegate Service Model or the Delegate Program Materials in whole or in part, including (without limitation) for the purpose of obtaining, creating, building or providing a materially similar or competitive service. This CDS limited license does not apply to any material or work product that is generally used or available in the industry, or in the public domain.

### •TERM & TERMINATION

•Term. The term of this Agreement (the "Term") will begin as of the Contract Date and will continue until it is terminated as specifically permitted herein; provided, however, that for a period ending no less than twelve (12) months from the Effective Date.

•Termination. This Agreement may be terminated only as follows:

Termination With Cause. CDS or the Plan Parties may terminate this Agreement at any time, with notice and an opportunity to cure as set forth below, if the other has defaulted in the performance of any of its material obligations under this Agreement. In such event, the Party declaring the default must provide the other Party (the "Recipient") with written notice setting forth in detail the nature of the default. Upon delivery of such notice, the Recipient will then have five (5) business days to cure a monetary default, or thirty (30) days to cure a non-monetary default; provided, however, that if the nature of the non-monetary default is such that it is not reasonably subject to being cured within a thirty (30) day period, then the Recipient may cure such default by commencing to cure in good faith and thereafter continuing with diligence and continuity to completion within a reasonable time thereafter. If any Fees are not paid within ten (10) days of the due date, CDS will have the right to resign at any time with five (5) days advance notice, and this Agreement will immediately terminate upon the effective date of CDS's resignation. If there is a default on any payment due CDS under this Agreement, in addition to the right to resign and effect a termination, CDS will be entitled to bring an action

against one or more of the Plan Parties for any balance due, plus interest on such amount at the rate of 1.5% per month from the date the payment became delinquent until paid in full.

Termination Without Cause. Any time after the first anniversary of the Effective Date, either CDS or the Plan Parties may terminate this Agreement for any reason, or for no reason at all, with at least ninety (90) days prior written notice to the other Parties.

•Rights and Duties Upon Termination. As of the effective date of termination, all rights and obligations of the Parties under this Agreement will terminate, except as specifically provided herein. The Plan Parties will pay all outstanding amounts invoiced or known to be owed as of the date of termination within ten (10) days of such date, and will pay any amounts determined to be owed thereafter within ten (10) days of the earlier of such determination or invoicing. With regard to claims made against Billed Participants for Improper Balances under Hospital and Facility Claims adjudicated by CDS during the Term of this Agreement, CDS will continue to make or provide for such Protective Efforts as may be required in connection therewith, subject to all conditions, requirements, limitations and exclusions set forth in this Agreement, but only if and for so long as: (a) all Fees and other amounts due to CDS have been paid in full and CDS continues to maintain any remaining Reserve; (b) the Plan Document is amended such that it continues to authorize CDS to act as the Claims Delegate, with all of the authority and discretion provided in the Recommended Modifications, but only with regard to Claims adjudicated by CDS during the Term of this Agreement that are or may still become subject to Balance Billing ("Open Claims"); and (c) the Plan Parties, the Claims Administrator (or any new third party administrator) and any Billed Participants continue to fulfill and satisfy all requirements and obligations set forth in this Agreement.

•**MISCELLANEOUS PROVISIONS**

•General Representations & Warranties. Each Party, as a material inducement to the other Parties to enter into this Agreement, makes the following representations and warranties: (a) the Party is an entity duly formed, validly existing and in good standing under the laws of its state of organization and maintains its principal place of business at the address indicated in this Agreement; (b) the execution, delivery and performance by the Party of this Agreement (i) is within its power and legal capacity; (ii) has been duly authorized by all necessary corporate or organizational action; (iii) does not contravene any provision of its organizational documents; (iv) does not violate any law or regulation, or any order or decree of any court or governmental authority applicable to it; and (v) does not (and will not with notice and/or the passage of time) violate, breach, conflict with or constitute a default under any other agreement to which it is a party or by which it is bound; (c) the Party has read this Agreement in its entirety, is aware of and understands all of its terms and conditions, and has had the opportunity to seek the advice of an attorney of its choosing regarding this Agreement and all of its terms and conditions; and (d) this Agreement shall be duly executed and delivered by the Party and shall constitute a legal, valid and binding obligation of the Party enforceable against it in accordance with its terms. In addition to the general representations and warranties set forth above, the Plan Parties represent and warrant that the Plan has operated and been administered in accordance with its terms and provisions and in compliance with all applicable statutes, laws, regulations, judicial orders and requirements of governmental authorities having jurisdiction over any of the Plan Parties, and that the New Plan Document and any subsequent modifications or amendments thereto will fully comply and be adopted in accordance with the requirements of Applicable Law.

•Subsequent Change of Third Party Administrator. Notwithstanding anything in this Agreement to the contrary, if the Plan Parties exercise the right at any time during the Term to replace the third party administrator originally named as Claims Administrator under this Agreement (the "Original TPA") with another third party administrator, then: (i) the Original TPA will be paid all monies due to it for services rendered through the effective date of the change in third party administrators, if any, within thirty (10) days after such amounts become due; (ii) CDS will have the right to terminate this Agreement if it does not approve of the party selected to replace the Original TPA, which approval may be withheld in the sole discretion of CDS for any reason; and (iii) the new third party administrator selected by the Plan Parties to become the Claims Administrator, if approved by CDS, will be required to become a party to an amended and restated version of this Agreement in form and substance satisfactory to CDS.

•<u>Conflict Between Applicable Law and Intent of Agreement</u>.  In the event it becomes clear that under Applicable Law, whether currently existing or later adopted, as interpreted or applied by any court or government authority, payment at the Specified Fee Levels will not constitute fair and reasonable consideration for covered services in the absence of specifically agreed upon price terms, then upon written notice of such legal determination to the Plan, CDS shall thereafter have no liability for any representation or warranty to the contrary and will not be responsible for making Protective Efforts with regard to subsequently Balance-Billed amounts below such fee levels as have been legally determined to constitute fair and reasonable consideration for the covered services in question.

•<u>Notices</u>.  All notices pursuant to this Agreement must be in writing and will be deemed given:  (a) upon delivery (which may be by facsimile transmission with confirmation of receipt by the transmitting machine); (b) on the designated date for delivery if sent by recognized overnight courier (such as Federal Express); or (c) on the fifth (5th) day following the date of deposit in the United States mail, certified mail postage prepaid with return receipt requested, if addressed to the addresses set forth below the respective signatures of the Parties to this Agreement:  Any Party may change its address designated for receiving notice by informing the other Parties of such change in accordance with this <u>Section 8.04</u>.

•<u>Confidentiality of Agreement</u>.  Each Party will maintain this Agreement and the terms hereof in strict confidence and will not disclose or provide a copy of this Agreement or the terms hereof in any form whatsoever to any entity or person except, on a strictly need-to-know basis, to a director, officer, executive employee, attorney or accounting professional of such Party who has agreed in writing to maintain this Agreement and the terms hereof in strict confidence.

•<u>Cooperation, Amendment and Waiver</u>.  The Parties will use their best efforts to cooperate with each other and to provide any further assurances, including the execution of any additional agreements, reasonably necessary or desirable to implement the intentions of the Parties evidenced herein.  However, no amendment or waiver of any provision of this Agreement will in any event be effective, unless the same will be in writing as signed by the Parties hereto, and then such waiver or consent will be effective only in the specific instance and for the specific purpose given.  No waiver will waive, or otherwise affect, any other provision of, or the rights and obligations of the Parties under, this Agreement.

•<u>No Assignment</u>.  This Agreement will be binding upon and inure to the benefit of the Parties named herein and their respective successors only.  No Party hereto may assign this Agreement or any of its rights, interests, or obligations hereunder without the express written consent of the other Parties, which consent will not be unreasonably withheld.

•<u>Subcontracting</u>.  CDS may use subcontractors to assist in providing the Services to be performed under this Agreement provided that CDS will continue to be responsible for all acts and omissions of its subcontractors.  All CDS subcontractors will be subject to the confidentiality provisions of this Agreement.

•<u>Exclusivity</u>.  The rights granted to the Parties pursuant to this Agreement will be deemed to be their exclusive rights with respect to the subject matter of this Agreement, and the exclusive standing to enforce this Agreement shall belong to the Parties.  No person or entity not a signatory to this Agreement shall be or have standing to enforce any rights as a third party beneficiary under this Agreement.

•<u>Compliance with Applicable Law</u>.  In carrying out its respective obligations and responsibilities under this Agreement, each of the Parties agrees to observe and comply with all applicable statutes, laws, regulations, judicial orders, and the rules and requirements of governmental authorities having jurisdiction over the Parties or the subject matter of this Agreement.

  •*Force Majeure*.  In the event that either Party is unable to perform any of its obligations under this Agreement because of natural disaster, civil disobedience, acts of war (declared or undeclared), or actions or decrees of governmental bodies (any of these events which is referred to as a *"Force Majeure* Event"), the Party who has been so affected will immediately notify the other Parties and will do everything possible to resume performance.  Upon receipt of such notice, all obligations under this Agreement will be immediately

suspended. If the period of non-performance exceeds ten (10) working days from the receipt of notice of the *Force Majeure* Event, the Party whose ability to perform has not been so affected may, by giving written notice, terminate this Agreement without liability.

•Enforceability; Severability. This Agreement will be binding upon, inure to the benefit of and be enforceable by the Parties and their respective successors and permitted assigns. If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such determination will not impair or affect the validity, legality or enforceability of the remaining provisions thereof, and each provision is hereby declared to be separate, severable and distinct.

•Entire Agreement. This Agreement constitutes the entire agreement and understanding between the Parties with respect to the matters referred to herein and supersedes any prior agreements, understandings, negotiations and discussions, whether written or oral. All schedules attached to this Agreement and initialed by each of the Parties are expressly made a part of, and incorporated by reference into, this Agreement.

•Counterparts. This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument and Agreement. Facsimile signatures and/or electronically submitted signatures will be deemed originals.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement by their duly authorized representatives, effective as of the Contract Date first set forth above.

**DELEGATE:**

CLAIMS DELEGATE SERVICES, LLC

By: _____     Date Signed: _____
    Richard T. Hirsch, CEO

| | |
|---|---|
| Address: | 5300 Broken Sound Blvd. NW, Suite 200, Boca Raton, Florida 33487, |
| Attention: | Richard T. Hirsch |
| Phone: | (404)724-0404 |
| Fax: | (404)745-0587 |

**COMPANY & PLAN:**

MONTEREY PENINSULA HORTICULTURE, INC., d/b/a Rocket Farms,
signing on its own behalf, on behalf of each Business Affiliate, as Plan Sponsor, and as the
Plan Administrator on behalf of the Monterey Peninsula Horticulture Employee Benefit Plan

By: _____     Date Signed: **7/1 / 14**

Name: **DONALD BARNETT**, Title: **CFO**

Address: **360 Espinosa Rd. Salinas CA 93907**
Attention: _____
Phone: **831 - 269 - 7505**
Fax: _____

**CLAIMS ADMINISTRATOR:**

EMPLOYEE BENEFIT MANAGEMENT SERVICES, INC.

By: _____     Date Signed: **12/17/14**

Name **Kevin Larson**, Title: **President**

Address: **2075 Overland Avenue, Billings, MT 59102**
Attention: **Kevin Larson**
Phone: **406 - 245 - 3575**
Fax: **406 - 672 - 5380**

## SCHEDULE 1
### *LEGAL CLUB OF AMERICA MEMBERSHIP PLAN*
Members and their family will have access to a nationwide network of plan attorneys that have contracted with Legal Club to provide free and discounted legal services. Through the Advocacy Program, members will be referred to a plan attorney based on language, area of law, and location.
### BENEFIT FEATURES:
Free Legal Services: The following services are available at no charge from a Legal Club of America plan attorney.
- Initial phone consultation for each new legal matter (no time limit);
- Initial face-to-face consultation for each new legal matter (no time limit);
- Review of independent legal documents (6 page maximum per document, no limit to the number of new independent documents);
- Plan attorneys will help Members represent themselves in small claims court;
- When deemed appropriate by the plan attorney, he or she will write letters on the Member's behalf (one letter per legal matter, with no limit on the number of new legal matters); and
- When deemed appropriate by the Plan attorney, he or she will make phone calls on the Member's behalf (one phone call per legal matter, with no limit on the number of new legal matters)

NOTE: Upon request, a Plan attorney will prepare a free Simple Will for the Covered Employee, as well as update the Will annually at no charge (a Simple Will with Minors Trust is available for $250). In addition, a state specific, web based, Living Will form is available to Members at no charge. Using this form, a Living Will can be completed by the Member and notarized by a Notary Public, and should then be stored in a safe location where it will be readily accessible if needed.

Deeply Discounted Legal Services\*: There are various commonly used legal services for which plan attorneys have agreed to charge a one-time, deeply discounted fee, such as (such as traffic ticket defense, name changes, simple divorce, spouse/child non-support, regular incorporations, Chapter 7 Bankruptcy and personal real estate closings). Rates and information about these and other flat fee services are available upon request).
\**Court costs and filing fees additional.*
Guaranteed Low Hourly Rate: Plan attorneys have contracted to never charge more than $125.00 per hour, or when appropriate, give Members a 40% discount off their usual and customary hourly rate, whichever is greater, for legal care that goes beyond the free and discounted services described above.
Retainers: In the case of extended legal care, plan attorneys may ask the member for a retainer. Any retainer sought will be computed by multiplying the number of hours a plan attorney believes a case will take, by the appropriate discounted hourly plan rate. For instance; 10 hours x $125.00 = a retainer of $1,250.00. Any unused portion of the retainer will be returned to the member.
Contingency Fee Discounts: The contingency fee discount will be a 10% reduction of the state maximum rate or the attorney's usual rate, whichever is lower.
\**In many states, Attorney liability may require Plan Attorneys to obtain a retainer from the member prior to providing some of the free member benefits. Such a retainer, if required in connection with Protective Efforts, will be taken care of by the Claims Delegate.*

CDS agreement with Rocket Farms and EBMS 7-1-2014

## SCHEDULE 2
### *SPECIFIED FEE LEVELS*

"*Specified Fee Level(s)*" means payment for medical treatment and supplies at levels equal to or greater than the following: (i) for Hospitals and Hospital-Affiliated Facilities, 175% of the greater of the Medicare allowable reimbursement amount for the Services or the Hospital's costs reflected in the Hospital's most recent departmental cost ratio report to the Centers for Medicare and Medicaid Services ("CMS") and published as the "Medicare Cost Report" in the American Hospital Directory (the "CMS Cost Ratio"); (ii) for ambulatory health care centers and other Independent Facilities, including Ambulatory Surgery Centers that are not Hospital-Affiliated Facilities and/or for which no Medicare based reimbursement is available, 175% of the greater of Medicare Outpatient Prospective Payment System (OPPS) allowed fees or the Medicare allowed reimbursement amount for comparable services from other facilities in the same geographic region; (iii) for any general medical and/or surgical services not covered under (i) or (ii) above, the cost to the Provider for providing the Services plus an additional 75%, calculated based upon industry-standard resources, published and publicly available fee and cost lists and comparisons, or a combination thereof, and taking into consideration Usual and Customary rates, CMS Cost Ratios, Medicare allowed fees (by geographic region), Medicare OPPS allowed fees; (iv) for pharmacy charges, 150% of the average acquisition cost ("AAC") for the pharmaceuticals, calculated using one or more industry-standard resources such as National Average Drug Acquisition Cost (NADAC) pricing, applicable State AAC pricing standards, Predictive Acquisition Cost determined by Glass Box Analytics, or another comparable and widely recognized data source; (v) for medical and surgical supplies, implants and devices, 130% of the cost to the Provider, which cost may be established by a provider supplied invoice or, in the absence of a provider supplied invoice, calculated based on other documentation such as comparable invoices or receipts, or industry-standard resources, such as published and publicly available price and cost lists and comparisons, or a combination thereof; (vi) for clinical care and procedures or other services for which fees, for technical reasons, cannot be determined as set forth above, 300% of the Resource-based relative value scale (RBRVS) rates in the same geographic area; (vii) for physician medical and surgical care, freestanding laboratory, x-ray and other diagnostic or therapeutic radiology services may be determined based upon the greater of the fees for comparable services in the geographic region at the ninety-fifth (95th) percentile of the Physician Fee Reference ("PFR") or 175% of the Medicare allowed amount for comparable services in the same geographic region.

## SCHEDULE 3
### *FEES*

<u>INITIAL PAYMENT & DEPOSIT</u>.  As consideration for the RBR Consulting and Documentation Assistance provided or made available to or for the benefit of the Plan Parties, and to offset various CDS costs and expenses related to the implementation of the New Plan Document, the Claim Review and Validation Program, Reference Based Reimbursement and the Advocacy Program, the Plan Parties shall pay CDS $3,500 immediately upon execution of the Agreement. In addition, on or before the Contract Date, the Plan Parties shall pay CDS a deposit, to be applied against Variable Fees (defined below) as they come due, in an amount equal to $15 multiplied by the highest number of Covered Employees participating in the Plan at any point during the twelve (12) months ending on the Contract Date.

<u>DELEGATE SERVICE FEES</u>.  CDS shall be paid ongoing service fees as follows:
•*Gold Plan* -- CDS shall be paid base fees ("Base Fees") of $1 per month for each Employee Participant in the Gold Plan, plus variable fees ("Variable Fees") equal to 10% of the gross billed charges on all Hospital and Facility Claims ("Gross Charges") for all Covered Persons under the Gold Plan, of which an amount equal to 1% of such Gross Charges will be reserved by CDS and used only as specifically permitted in the Agreement (the "Reserve").
•*Silver Plan* -- Variable Fees equal to 8% of the aggregate Gross Charges on all Hospital and Facility Claims for all Covered Persons under the Silver Plan, with 7.5% to be used by CDS without restriction, and 0.5% to be allocated to the Reserve.

<u>FEE REDUCTIONS, LIMITATIONS & ANNUAL CAP</u>.  Notwithstanding anything herein to the contrary, Variable Fees on certain Claims will be reduced or limited, and subject to an annual cap, as set forth below:
•*Large Claims* -- As to Gross Charges in excess of $250,000 on any individual Hospital and Facility Claim under the Gold Plan, the Variable Fees shall be reduced to 8% with 0.5% allocated to the Reserve.
•*Dialysis & Home Infusion Claims* -- Variable Fees payable for dialysis and home infusion Claims shall be Two Hundred and Fifty and No/100 Dollars ($250.00) per Claim.
•*Direct Contract Claims* -- Variable Fees shall be reduced with regard to Claims for Covered Services and Supplies provided to or for the benefit of any Covered Person by or on behalf of any Directly Contracted Provider, as follows:  (i) for Claims submitted under any Pre-existing Direct Contract during the term of this Agreement, Variable Fees shall be paid equal to 2.5% of the Gross Charges on such Claims, without any portion of such fees being allocated to the Reserve; and (ii) for Claims submitted under any New Direct Contract at any time prior to either the fifth anniversary of the effective date of such New Direct Contract or a later expiration or termination of this Agreement, Variable Fees shall be paid equal to 4% of the Gross Charges on such Claims, without any portion of such fees being allocated to the Reserve.  The Plan Parties understand and agree that the obligation to pay Variable Fees on Claims submitted or paid under each New Direct Contract shall survive any expiration or termination of this Agreement occurring prior to the fifth anniversary of the effective date of such New Direct Contract.
•*Annualized Cap* -- Variable Fees payable during each year of the term of this Agreement, excluding Fees payable for Claims under New Direct Contracts, shall be limited in the aggregate to an amount equal to Four Hundred and Twenty and No/100 Dollars ($420.00) per Employee Participant covered under the Plan during that year, prorated for partial-year participation.

<u>CLAIMS ADMINISTRATOR FEES</u>.  The Plan will pay the Claims Administrator under the Administrative Services Agreement with the Plan Parties and shall disclose the amount of such consideration in writing to CDS prior to or simultaneous with the execution of this Agreement and, as to any subsequent adjustment to such consideration, within five(5) business days of the date such adjustment is agreed upon. The Plan will pay the Claims Administrator fees under this Agreement equal to 2% of the Gross Charges on Hospital and Facility Claims for Covered Persons under the Gold Plan, and 1.5% of the Gross Charges on Hospital and Facility Claims for Covered Persons under the Silver Plan; provided, however, that the amount of such fees shall be adjusted as follows:  (a) as to Gross Charges in excess of $250,000 on any individual Hospital and Facility Claim under the Gold Plan, such fees shall be reduced to 1%; (b) no fees shall be payable on dialysis and home infusion Claims, Claims submitted under any Pre-existing Direct Contract, or Claims submitted under any New Direct Contract

## EXHIBIT A
### *RECOMMENDED MODIFICATIONS*

*The New Plan Document must include and integrate into the structure of the Plan the following information, definitions, terms, provisions and concepts in a manner that CDS determines to be reasonably satisfactory:*

•GENERAL INFORMATION. In the general information section of the Plan (where the Plan Sponsor, Plan Administrator and Third Party Administrator are listed), the "Claims Delegate" must be identified as:

> Claims Delegate Services, LLC
> 5300 Broken Sound Blvd., NW
> Suite 200, Boca Raton, FL 33487
> Phone: _____

•DEFINITIONS. The following defined terms must be incorporated into the Plan:

• **"Adverse Benefit Determination"** means a denial, reduction, or termination of, or a failure to provide or make a payment (in whole or in part) for a benefit, including any such denial, reduction, termination, or failure to provide or make a payment for a Claim that is based on:

• A determination of an individual's eligibility to participate in a plan or health insurance coverage;

• A determination that a claimed benefit is not a covered benefit;

• The imposition of a Pre-existing Condition exclusion, source-of-injury exclusion, or other limitation on otherwise covered benefits;

• A determination that a claimed benefit is Experimental, Investigational, or not Reasonable, Medically Necessary or appropriate; or

• Invalid Charges.

•**"Allowable Expense"** means any Medically Necessary, Usual, Customary and Reasonable item of expense, at least a portion of which is covered under this Plan. When some Other Plan provides benefits in the form of services rather than cash payments, the reasonable cash value of each service rendered shall be deemed to be the benefit. Benefits payable under any Other Plan include the benefits that would have been payable had claim been duly made therefore.

• **"Assignment of Benefits"** means an arrangement whereby the Claimant assigns their right to seek and receive payment of eligible Plan benefits, in strict accordance with the terms of this Plan Document, to a Provider. If a Provider accepts said arrangement, the Provider's rights to receive Plan benefits are equal to those of a Claimant and are limited by the terms of this Plan Document. A Provider that accepts this arrangement thereby indicates acceptance of an "Assignment of Benefits" as consideration in full for Services and Supplies rendered.

•**"Authorized Representative"** means a person specifically authorized in writing signed by a Claimant to act on behalf of the Claimant for a benefit Claim submission or an appeal of an Adverse Benefit Determination.

•**"Benefit Determination"** means a determination made by the Claims Delegate, Plan Administrator or Third Party Administrator on a Claim for benefits, including an Adverse Benefit Determination.

•**"Billing Review"** means a review of billing documentation and related medical records undertaken to uncover any identifiable Invalid Charges, as necessary and sufficient to allow the Claims Delegate to reasonably assess the accuracy and validity of billed charges submitted in connection with a Claim and to make determinations as to whether any such charge exceeds the Maximum Allowable Charge or whether such Claim exceeds Permitted Payment Levels.

•**"Billing Review Specialist"**
    "Billing Review Specialist" means any organization(s) or individual(s) engaged to provide Billing Review services, advice and recommendations regarding Hospital and Facility Claims. The Claims Delegate or the Plan Administrator will, upon request, furnish the name, address, and phone number of the Billing Review Specialist(s) conducting the Billing Review on a Claim.

•**"Claim Review"** means Billing Review and/or Medical Record Review of Hospital and Facility Claims.

•**"Clean Claim"** means a Claim that can be processed in accordance with the terms of this document, without the need to obtain any additional information from the service Provider or a third party, and that has no defect or impropriety. A defect or impropriety shall include a lack of required sustaining documentation as set forth and in accordance with this document, or a particular situation or circumstance requiring special treatment which prevents timely payment from being made, as set forth in and permitted by this document. Clean Claims do not include Claims under investigation for fraud and abuse or under review for Medical Necessity and Reasonableness, or fees under review for Usual and Customariness, or any other matter that may prevent the charge(s) from being covered expenses in accordance with the terms of this document. *Filing a Clean Claim* -- A Provider submits a Clean Claim by providing the required data elements on the standard Claim forms, along with any attachments and additional elements or revisions to data elements of which the Provider has knowledge. The Claims Delegate or the Plan Administrator may require attachments or other information in addition to these standard forms (as noted elsewhere in this document and at other times prior to Claim submittal) to ensure charges constitute covered expenses as defined by and in accordance with the terms of this document. The paper Claim form or electronic file record must include all required data elements and must be complete, legible, and accurate. A Claim will not be considered to be a Clean Claim if the Participant has failed to submit required forms or additional information to the Plan as well. Notwithstanding anything herein to the contrary, no Hospital and Facility Claim shall be a Clean Claim unless either (i) complete itemized statements of charges and descriptions of the provided Services and Supplies have been submitted along with the standard Claim forms, or (ii) the Claims Delegate determines, is its sole discretion, that such itemized statements and descriptions are not needed, or that the portion of such itemized statements and descriptions that has been submitted is sufficient.

•**"Contracted Providers"** means Directly Contracted Providers and Network Physicians.

•**"Contracted Services"** means medical treatment and other Services and Supplies provided to a Participant by any Contracted Provider .

•**"Covered Expense"** or **"Covered Medical Expense"** means Reasonable charges within Permitted Payment Levels and eligible for coverage in this Plan, which charges are incurred by or on behalf of a Participant for Covered Services and Supplies and do not exceed Maximum Allowable Charge amounts. A Covered Medical Expense is a Usual and Customary fee for a Reasonable, Medically Necessary service, treatment or supply, meant to improve a condition or participant's health, which is eligible for coverage in this Plan. When there are multiple treatment options available, and one is no more effective than another, the Covered Medical Expense is based on the least costly Covered Service option that is no less effective than any other option. Covered Expenses will be determined based upon all Plan provisions, and all treatment is subject to benefit payment maximums shown in the Summary of Benefits and as determined elsewhere in this document.

•**"Covered Person"** shall have the same meaning as **"Participant."**

•**"Covered Services"** or **"Covered Services and Supplies"** means Hospital or other Services and Supplies ordered by a Physician or licensed Practitioner that are Reasonable and Medically Necessary for the treatment of an Illness or Injury, are not of a luxury or personal nature, are provided in accordance with the terms of this document, are not excluded under the exclusions and limitations provisions and other terms of this Plan, and is eligible for coverage under this Plan to the extent the applicable charge amount does not exceed the Maximum Payable Amount. When there are multiple treatment options available, and one is no more effective than another, the Covered Service is the least costly option that is no less effective than any other option. Covered Services and Supplies will be determined

based upon all Plan provisions, and all Covered Services and Supplies are subject to benefit payment maximums reflected in the Summary of Benefits and/or as determined elsewhere in this document.

•"**Delegated Authority**" means the ultimate decision-making power and discretionary authority granted to and held by the Claims Delegate under this Plan to review, evaluate, make HFC Benefit Determinations and handle Final HFC Appeals and other decisions relating to Hospital and Facility Claims.

•"**Direct Contract**" means a contract entered into directly by or for the direct benefit of the Plan with a Hospital, Facility, Physician or Practitioner to offer Services and Supplies to Participants at negotiated rates and fees.

•"**Directly Contracted**" or a "**Directly Contracted Provider**" means a Hospital, Facility, Physician or Practitioner that has contracted directly with or for the benefit of the Plan to offer Services and Supplies to Participants at negotiated rates and fees.

•"**Errors**" shall have the meaning ascribed to such term in the Claim Review and Validation Program section of the Plan.

•"**Facility**" means any facility that provides medical services on an Outpatient basis, whether a Hospital-Affiliated Facility or Independent Facility.

•"**Gold Plan**" means, of the two different benefit plan options available under the Plan, that benefit plan option that has lower annual out-of-pocket maximums and lower deductibles, copays and coinsurance levels for certain benefits than the maximums, deductibles, copays and coinsurance levels offered under the Silver Plan.

•"**Hospital-Affiliated Facility**" means an Ambulatory Surgical Center or other facility that provides medical services on an Outpatient basis and is owned, controlled, managed or otherwise formally affiliated with a Hospital.

•"**Hospital and Facility Claims**" means Post-service Claims for charges by any Hospital, Hospital-Affiliated Facility or Independent Facility (individually referred to each as a "**Hospital or Facility Claim**").

•"**Hospital Expenses**" means charges by a Hospital for Room and Board (including private room accommodations) and/or for care in an Intensive Care Unit, provided that such care is furnished at the direction of a Physician.

•"**Hospital Miscellaneous Expenses**" means the actual charges made by a Hospital in its own behalf for Services and Supplies rendered to a Participant which are Medically Necessary for the treatment of such Participant. Hospital Miscellaneous Expenses do not include charges for room and board or for professional services (including intensive nursing care by whatever name called), regardless of whether the services are rendered under the direction of the Hospital or otherwise.

•"**Independent Facility**" means an independent, free-standing facility that provides medical services on an Outpatient basis (e.g., an Ambulatory Surgical Center or a Nephrology center, clinic or facility) and is not owned, controlled, managed or otherwise affiliated with a Hospital.

•"**Invalid Charges**" means:  (a) charges that are found to be based on "Errors," "Unbundling," "Misidentification" or "Unclear Description" (as such terms are defined in the "Claim Review and Validation Program" section of the Plan); (b) charges for fees or services determined not to have been Medically Necessary, Usual, Customary and Reasonable; or (c) charges that are otherwise determined by the Claims Delegate or the Plan Administrator to be invalid or impermissible based on any applicable law, regulation, rule or professional standard.

•"**Maximum Allowable Charge**" means the greatest benefit payable for a specific coverage item or benefit under the Plan, the amount of which will be the lesser of:  (a) the Usual and Customary amount; (b) the allowable charge specified under the terms of the Plan; (c) the negotiated rate for Directly Contracted Provider Services established in a contractual arrangement with a Directly Contracted Provider; or (d) the actual billed charges for the Covered

Services. The Maximum Allowable Charge will not include any identifiable Invalid Charges and may be determined by the Claims Delegate or the Plan Administrator, as appropriate, according to the results of any Billing Review and Medical Record Review. The Plan will reimburse according to the actual charge billed if it is less than the Usual and Customary amount. The Plan has the discretionary authority to decide if a charge exceeds Usual, Customary and Reasonable Fees and is for a Medically Necessary and Reasonable service.

•"**Medically Necessary/Medical Necessity**" refers to health care services ordered by a Physician or Dentist exercising prudent clinical judgment provided to a Participant for the purposes of evaluation, diagnosis or treatment of that Participant's sickness or Injury. Such services, to be considered Medically Necessary, must be clinically appropriate in terms of type, frequency, extent, site and duration for the diagnosis or treatment of the Participant's sickness or Injury. The Medically Necessary setting and level of service is that setting and level of service which, considering the Participant's medical symptoms and conditions, cannot be provided in a less intensive medical setting. Such services, to be considered Medically Necessary must be no more costly than alternative interventions and are at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of the Participant's sickness or Injury without adversely affecting the Participant's medical condition. In order for a service to be considered Medically Necessary: (a) it must not be maintenance therapy or maintenance treatment; (b) its purpose must be to restore health; (c) it must not be primarily custodial in nature; and (d) it must not be a listed item or treatment not allowed for reimbursement by CMS (Medicare).

> For Hospital stays, Medically Necessary means that acute care as an Inpatient is necessary due to the kind of services the Participant is receiving or the severity of the Participant's condition and that safe and adequate care cannot be received as an outpatient or in a less intensified medical setting. The mere fact that a service or care is recommended, ordered, prescribed, approved or furnished by a Physician or Dentist does not mean that it is "Medically Necessary." In addition, the fact that certain services are excluded from coverage under this Plan because they are not "Medically Necessary" does not mean that any other services are deemed to be "Medically Necessary."

> To be Medically Necessary, all of these criteria must be met. The determination of whether a service, supply, or treatment is or is not Medically Necessary may include findings of the American Medical Association and the Plan Administrator's own medical advisors or medical advisors to the Claims Delegate. Each of the Plan Administrator and the Claims Delegate has the discretionary authority to decide whether care or treatment is or was Medically Necessary. The Plan reserves the right to incorporate CMS (Medicare) guidelines in effect on the date of treatment as additional criteria for determination of Medical Necessity and/or an Allowable Expense.

•"**Medical Record Review**" means the process by which the Plan, based upon a review and audit of medical records, determines that a different treatment or different quantity of a drug or supply was provided which is not supported in the billing or that treatment, drugs or other services or supplies, or fees therefore, were provided that were not clinically appropriate or were only necessary for the care and treatment of Illness or Injury that was caused by the treating Provider.

•"**Medical Review Specialist**" means any organization(s) or individual(s) engaged by the Claims Delegate or the Plan Administrator to undertake or assist with Medical Record Review. The Claims Delegate or the Plan Administrator, upon request, will furnish the name, address, and phone number of the Medical Review Specialist(s) that handled the Medical Record Review in connection with a Claim.

•"**Misidentification**" shall have the meaning ascribed to such term in the Claim Review and Validation Program section of the Plan.

•"**Network Contract**" means a contract allowing Participants to access or use a Physician-Only Network to obtain Contracted Services from Network Physicians.

•"**Network Physician**" means a Physician or Practitioner participating in a Physician-Only Network.

•**"Outpatient"** means a patient who receives Services and Supplies at a Hospital but is not admitted as a registered overnight bed patient; this must be for a period of less than twenty-four (24) hours. This term can also be applicable to Services rendered in a Free-Standing Facility or Hospital-Affiliated Facility.

•**"Participant"** means an Employee, a Dependent, a COBRA Qualified Beneficiary or a COBRA Qualified Beneficiary's Dependent meeting the eligibility requirements for coverage as specified in this Plan, and who is properly enrolled in the Plan. A Participant may sometimes be referred to in this Plan or in related documentation or materials as a **"Covered Person"**).

•**"Permitted Payment Level(s)"** means charges for Services and Supplies, listed and included as Covered Expenses under the Plan, which are Medically Necessary for the care and treatment of Illness or Injury, but only to the extent that such fees are within applicable limits established in this Plan including, but without limitation, in the "Claim Review and Validation Program" section of the Plan.

•**"Physician"** means a person permitted to perform services provided by this Plan who is legally entitled to perform certain medical services according to applicable and current licensure, certification or registration ("License" or "Licensed" or "Licensure") in the state or jurisdiction where the services are rendered. The person must be acting within the scope of his or her Licensure and must hold one of the following Licenses, degrees and/or titles: Medical Doctor or Surgeon (M.D.); Doctor of Osteopathy (D.O.); Doctor of Optometry (O.D.); Doctor of Podiatric Medicine (D.P.M.); Doctor of Dental Surgery (D.D.S.); Doctor of Dental Medicine (D.M.D.); or Doctor of Chiropractic (D.C.)..

•**"Physician-Only Network"** means a group of Physicians and Practitioners participating in a network with which the Plan has contracted for access (directly or through a third party), who have agreed to accept payment at negotiated rates as consideration for Services and Supplies provided to Participants.

•**"Practitioner"** means a person permitted to perform services provided by this Plan who is legally entitled to perform certain medical services according to applicable and current licensure, certification or registration ("License" or "Licensed" or "Licensure") in the state or jurisdiction where the services are rendered. The person must be acting within the scope of his or her licensure, certification or registration ("License" or "Licensed") and must hold one of the following Licenses, degrees and/or titles:

•Advanced Practice Nurse (A.P.N.) or Advanced Practice Registered Nurse (A.P.R.N.)
•Audiologist
•Certified Diabetic Educator and Dietician
•Certified Nurse Midwife (C.N.M.)
•Certified Nurse Practitioner (C.N.P.)
•Certified Operating Room Technician (C.O.R.T.)
•Certified Psychiatric/Mental Health Clinical Nurse
•Certified Registered Nurse Anesthetist (C.R.N.A.)
•Certified Surgical Technician (C.S.T.)
•Licensed Acupuncturist (L.AC.)
•Licensed Clinical Social Worker (L.C.S.W.)
•Licensed Mental Health Counselor (LMHC)
•Licensed Occupational Therapist
•Licensed or Registered Physical Therapist or Physiotherapist
•Licensed Practical Nurse (L.P.N.)
•Licensed Professional Counselor (L.P.C.)
•Licensed Speech Language Pathologist
•Licensed Surgical Assistant (L.S.A.)
•Licensed Vocational Nurse (L.V.N.)
•Master of Social Work or Social Welfare (M.S.W.)
•Physician Assistant (P.A.)

- Psychologist (Ph.D., Ed.D., Psy.D.)
- Registered Nurse (R.N.)
- Registered Nurse First Assistant (R.N.F.A.)
- Registered Nurse Practitioner (R.N.-N.P.)
- Registered Respiratory Therapist (R.R.T.)
- Registered Speech Therapist (R.S.T.) or other Licensed Speech Therapist
- Speech Language Pathologist

- **"Provider"** means a Hospital, Facility, Physician, licensed speech or occupational therapist, licensed professional physical therapist, physiotherapist, audiologist, speech language pathologist, licensed professional counselor, certified nurse practitioner, certified psychiatric/mental health clinical nurse, or other practitioner defined or listed herein, or approved by the Plan Administrator.

- **"Reasonable"** means, in the Plan Administrator's or Claims Delegate's discretion, Services or Supplies, or fees for Services or Supplies which are necessary for the care and treatment of Illness or Injury not caused by the treating Provider. Determination that fee(s) or services are Reasonable will be made by the Claims Delegate or the Plan Administrator, taking into consideration unusual circumstances or complications requiring additional time, skill and experience in connection with a particular service or supply; industry standards and practices as they relate to similar scenarios; and the cause of Injury or Illness necessitating the service(s) and/or charge(s).

  This determination will consider, but will not be limited to, the findings and assessments of the following entities: (a) The National Medical Associations, Societies, and organizations; and (b) The Food and Drug Administration. To be Reasonable, service(s) and/or fee(s) must be in compliance with generally accepted billing practices for unbundling or multiple procedures. Services, supplies, care and/or treatment that results from errors in medical care that are clearly identifiable, preventable, and serious in their consequences for patients, are not Reasonable. The Claims Delegate or the Plan Administrator retains discretionary authority to determine whether service(s) and/or fee(s) are Reasonable based upon information presented to the Claims Delegate or the Plan Administrator. A finding of Provider negligence and/or malpractice is not required for service(s) and/or fee(s) to be considered not Reasonable.

  Charge(s) and/or services are not considered to be Reasonable, and as such are not eligible for payment (exceed the Maximum Allowable Charge), when they result directly or indirectly from Provider error(s) and/or Facility-acquired conditions deemed "reasonably preventable" in accordance with evidence-based guidelines such as, but not limited to, CMS guidelines. By way of clarification, and without limitation, charges are not considered Reasonable if they are care, supplies, treatment, and/or services required or intended to treat Injuries sustained or Illnesses contracted while the Participant was under and due to the care of a Provider, including infections and complications, when such injury, illness, infection or complication would not reasonably be expected to occur under the circumstances of a course of treatment and can be attributed to an error by the Provider, in the opinion of the Claims Delegate, in light of the medical records of the treatment.

  The Plan reserves for itself and parties acting on its behalf the right to review charges on claims submitted to, processed and/or paid by the Plan, to identify charge(s) and/or service(s) that are not Reasonable and, therefore, not eligible for payment by the Plan. With regard to Contracted Services, charges at negotiated rates or fees specifically established under a contract for Directly Contracted Provider Services or under a Physician Network Contract shall be presumed to be Reasonable, but only to the extent that such charges do not include otherwise Invalid Charges.

- **"Service(s)"** or **"Services and/or Supplies"** or **"Service and/or Supply"** means services, supplies, procedures, treatment or care meant to improve the condition or health of a Participant.

- **"Silver Plan"** means, of the two different benefit plan options available under the Plan, that benefit plan option that has higher annual out-of-pocket maximums and higher deductibles, copays and coinsurance levels for certain benefits than the maximums, deductibles, copays and coinsurance levels offered under the Gold Plan.

•**"Unbundling"** shall have the meaning ascribed to such term in the Claim Review and Validation Program section of the Plan.

•**"Unclear Description"** shall have the meaning ascribed to such term in the Claim Review and Validation Program section of the Plan.

•**"Usual and Customary"** means eligible, covered expenses identified by the Claims Delegate or the Plan Administrator to be usual and customary for the service or supply in question, taking into consideration the fee(s) which the Provider most frequently charges and/or accepts as payment for the service or supply from the majority of its patients, the cost to the Provider for providing the services, the prevailing range of fees charged and/or accepted for the service or supply by Providers of similar training and experience in the same geographic locale or area, and the Medicare reimbursement rates for the service or supply. The term(s) "same geographic locale" and/or "area" mean a metropolitan area, county, or such greater area as is necessary to obtain a representative cross-section of Providers, persons or organizations rendering such treatment, services, or supplies for which a specific charge is made or for which a reimbursement is accepted. To be Usual and Customary, fee(s) must be in compliance with generally accepted billing practices for unbundling or multiple procedures.

The term "Usual" refers to the amount of a charge made or accepted for medical services, care, or supplies, to the extent that the charge or reimbursement does not exceed the common level of charges made or reimbursements accepted by other medical professionals with similar credentials, or health care Facilities, pharmacies, or equipment suppliers of similar standing, which are located in the same geographic locale in which the charge was incurred.

The term "Customary" refers to the form and substance of a service, supply, or treatment provided in accordance with generally accepted standards of medical practice to one individual, which is appropriate for the care or treatment of an individual of the same sex, comparable age and who has received such services or supplies within the same geographic locale.

Usual and Customary charges and/or reimbursements may, at the Plan Administrator's or Claims Delegate's discretion, alternatively be determined and established by the Plan using normative data such as, but not limited to, Medicare cost to charge ratios, average wholesale price (AWP) for prescriptions and/or manufacturer's retail pricing (MRP) for supplies and devices.

For claim determinations made in accordance with the Claim Review and Validation Program, the Usual and Customary fee will be the Permitted Payment Levels. Please refer to the section, "Claim Review and Validation Program," for the definition of Permitted Payment Levels.

•**"Usual, Customary and Reasonable Fees"** means actual fees for Reasonable services or supplies, but only the amount of those fees that constitute a Reasonable charge for such services or supplies and that does not exceed the Usual and Customary amount charged for such services or supplies.

•PLAN ADMINISTRATION.

•**Plan Administrator and Claims Delegate**.

The named Fiduciary for limited purposes relating specifically to Delegated Claims Decisions is the Claims Delegate.   The named fiduciary for all other purposes is the Plan Administrator, who shall have the authority to control and manage the operation and administration of the Plan. The Plan Administrator may delegate responsibilities for the operation and administration of the Plan. The Plan Administrator shall have the authority to amend or terminate the Plan, to determine its policies, to appoint and remove service providers, adjust their compensation (if any), and exercise general administrative authority over them. The Plan Administrator has the sole authority and responsibility to review and make final decisions on all Claims to benefits hereunder, except with regard to Claims to benefits for Hospital and Facility Claims and

HFC Benefit Determinations, for which the Claims Delegate has the sole authority and responsibility to review and make final decisions.

Notwithstanding anything in this Plan Document and Summary Plan Description to the contrary, the Plan Sponsor has the power and authority to, and hereby does allocate, delegate and grant to Claims Delegate Services, LLC (the "Claims Delegate" or "Delegate") primary responsibility and authority for all Hospital and Facility Claims review, evaluation, benefits determinations and appeals. The responsibilities, powers and authority granted to the Claims Delegate are more specifically set forth below, in the subsection labeled "Powers and Duties of the Claims Delegate" and in the Plan sections entitled "Claim Review and Validation Program" and "Procedures for Claims and Appeals" and the various other related provisions of the Plan (collectively, the "Review and Appeals Provisions"). The Claims Delegate shall have no authority, responsibility or liability other than as referenced above.

The Plan Administrator shall establish the policies, practices and procedures of this Plan. The Plan Administrator and the Claims Delegate shall administer this Plan in accordance with its terms. It is the express intent of this Plan that the Plan Administrator and the Claims Delegate shall have maximum legal discretionary authority to construe and interpret the terms and provisions of the Plan, to make determinations regarding issues which relate to eligibility for benefits (including the determination of which services, supplies, care and treatment are Experimental), to decide disputes which may arise relative to a Participant's rights, and to decide questions of Plan interpretation and those of fact relating to the Plan. The decisions within their respective scopes of authority of the Plan Administrator and the Claims Delegate as to the facts related to any Claim for benefits and the meaning and intent of any provision of the Plan, or its application to any Claim, shall receive the maximum deference provided by law and will be final and binding on all interested parties. Benefits under this Plan will be paid only if the Plan Administrator or the Claims Delegate, as appropriate, decides in its discretion that the Participant is entitled to them. The Plan Administrator shall have discretionary authority over Claims Delegate such that ultimate discretionary authority resides with the Plan Administrator except with regard to Delegated Claims Decisions (as such term is defined below in the "Duties and Powers of Claims Delegate" subsection of the Plan), in which case Claims Delegate shall have ultimate discretionary authority.

●**Powers and Duties of the Plan Administrator**.

The duties of the Plan Administrator include the following:

●To administer the Plan in accordance with its terms;
●To determine all questions of eligibility, status and coverage under the Plan;
●To interpret the Plan, including the authority to construe possible ambiguities, inconsistencies, omissions and disputed terms;
●To make factual findings;
●To decide disputes which may arise relative to a Participant's rights;
●To prescribe procedures for filing a Claim for benefits, to review Claim denials and appeals relating to them and to uphold or reverse such denials;
●To keep and maintain the Plan documents and all other records pertaining to the Plan;
●To appoint and supervise a third party administrator to pay Claims;
●To perform all necessary reporting as required by applicable law;
●To ensure that the Plan is administered in accordance with applicable law;
●To establish and communicate procedures to determine whether a Medical Child Support Order or national medical support notice is a QMCSO;
●To delegate to any person or entity such powers, duties and responsibilities as it deems appropriate; and
●To perform each and every function necessary for or related to the Plan's administration.

●**Powers and Duties of the Claims Delegate.**

The Claims Delegate shall have the following powers and duties, specifically with respect to and in connection with Hospital and Facility Claims review, evaluation, benefits determinations and appeals:

•When applicable, regarding Delegated Claims Decisions (as defined below), to administer the Plan in accordance with its terms;

•To determine all questions of coverage and make all Benefit Determinations on Hospital and Facility Claims ("HFC Benefit Determinations"), in accordance with the terms of the Plan, and exercise full and final discretionary authority and ultimate decision-making power as to all HFC Benefit Determinations, including identifying and making decisions regarding benefits availability and coverage, Invalid Charges, whether Services and Supplies provided to Claimants are Medically Necessary or Experimental/Investigational, and whether or not or to what degree charges for Services and Supplies provided to Claimants constitute Covered Expenses under the Plan;

•To handle all final administrative appeals of HFC Benefit Determinations ("Final HFC Appeals") and provide a full and fair review, in accordance with the terms of the Plan, to any covered individual whose claim for benefits has been denied in whole or in part in connection with any HFC Benefit Determinations, and to exercise full and final discretionary authority and ultimate decision-making power to uphold or reverse such denials in full or in part, and make any other decisions regarding Final HFC Appeals;

•To exercise full and final discretionary authority to interpret the Plan with respect to and in connection with Hospital and Facility Claims, HFC Benefit Determinations and Final HFC Appeals, including the authority to (i) remedy possible ambiguities, inconsistencies, disputed terms and/or omissions in the Plan and related documents, (ii) decide disputes that may arise relative to a Participants' rights, and (iii) determine all questions of fact and law arising under the Plan (collectively, the "Delegated Claims Decisions");

•To make factual findings related to or in connection with Delegated Claims Decisions and to exercise the authority to request and require any person to furnish such reasonable information as Delegate deems necessary or desirable for the proper administration of the Plan in connection with Delegated Claims, and as a condition to receiving any Hospital and Facility Claims benefits under the Plan;

•To undertake, provide for, manage and oversee (i) the assessment and validation of Hospital and Facility Claims and the Services and Supplies provided and fees charged in connection therewith, (ii) such level of Claim Review as Delegate deems appropriate and desirable for Hospital and Facility Claims under the circumstances, and (iii) the selection and engagement of such Billing Review Specialists, Medical Review Specialists, health care professionals and subject matter experts as Delegate deems appropriate and desirable under the circumstances, for Claim Review purposes or otherwise in connection with the Review and Appeals Provisions, and make final decisions regarding all such matters;

•To designate other persons to carry out any duty or power that would otherwise be a responsibility of the Claims Delegate under the terms of the Review and Appeals Provisions and retain such consultants, service providers, legal counsel, or other specialists, as the Claims Delegate may deem appropriate and necessary in connection with the Review and Appeals Provisions and Delegated Claims Decisions;

•To keep and maintain, or cause to be kept and maintained, such records pertaining to Delegated Claims Decisions as may be required by the Plan or applicable law; and

•To perform such other duties and functions as are necessary or required in connection with the Review and Appeals Provisions, Delegated Claims Decisions and Claim Review.

The duties and powers of the Claims Delegate shall be limited to those referenced above.

Except as may be otherwise specified or plainly required by the context, any reference made in this Plan to the Plan Administrator "and/or" the Claims Delegate, or to the Claims Delegate "and/or" the Plan Administrator, shall be interpreted and deemed to mean: (i) the Claims Delegate, with regard to Hospital and Facility Claims and Delegated Claims Decisions; and (ii) the Plan Administrator, with regard to other Claims and any matters not directly related to Delegated Claims Decisions.

•CLAIM PROCEDURES; PAYMENT OF CLAIMS.

•**Postservice Claims.** A "Postservice Claim" is a claim for a benefit under the Plan after the services have been rendered. A Post-service Claim is considered to be filed when the following information is received by the Third Party Administrator with a Form CMS-1500 or Form UB92 or any successor forms:

•The date of service;
•The name, address, telephone number, and tax identification number of the provider of the services or supplies;
•The place where the services were rendered;
•The diagnosis and procedure codes;
•The amount of charges, which reflect any applicable Directly Contracted Provider repricing;
•The name of the Plan;
•The name of the Covered Employee;
•The name of the patient; and
•For Hospital and Facility Claims, itemized statements of charges and descriptions of the Services and Supplies, unless the Claims Delegate determines, in its sole discretion, that such itemized statements and descriptions are not needed, or that any portion of such itemized statements and descriptions that has been submitted is sufficient.

Upon receipt of this information, the claim will be deemed to be filed with the Plan; provided, however, that each Claimant claiming benefits under the Plan shall be responsible for supplying, at such times and in such manner as the Claims Delegate and/or the Plan Administrator in its sole discretion may require, any additional written proof that the expenses were incurred, or that the benefit is covered under the Plan, which may be requested by the Claims Delegate and/or the Plan Administrator. This includes any substantiating documentation, Coordination of Benefits information or other information that may be required by the Plan as proof. The Third Party Administrator and, in the case of Hospital and Facility Claims, the Claims Delegate will determine if enough information has been submitted to enable proper consideration of the claim. If not, more information may be requested as provided herein.

If the Claims Delegate and/or Plan Administrator, in its sole discretion, determines that the Claimant has not incurred a Covered Expense, or that the benefit is not covered under the Plan, or if the Claimant fails to furnish such proof as is requested, no benefits shall be payable under the Plan. Notwithstanding anything herein to the contrary, the Claims Delegate and/or the Plan Administrator may, on a case-by-case basis, determine that it is reasonable under the circumstances to make a decision as to whether a Claimant has incurred a Covered Expense, in spite of the absence of any particular form of written proof or item(s) of substantiating documentation.

Once a written Claim for benefits is received, in the case of Hospital and Facility Claims, the Claims Delegate shall cause such Claim to go through a Claim Review. In the case of any other Claims, the Plan Administrator or either a Plan fiduciary or the Third Party Administrator, acting on the discretionary authority of the Plan Administrator, may elect to have such Claim go through the Review Program. Please refer to the section entitled "Claim Review and Validation Program" for information regarding Plan provisions related to the audit and adjudication of certain Claims under the Review Program.

•**Claim Review and Validation Program**. Pursuant to and in accordance with the specific authority granted by the Plan Sponsor to the Claims Delegate, the Plan has arranged for the Delegate to establish, implement and oversee an ongoing program of Claim Review and validation for all Hospital and Facility Claims, in order to identify charges and fees that are not Reasonable, were billed in error, exceed Usual and Customary amounts or were billed for services which were not Medically Necessary and/or appropriate. This program may include both Billing Review and Medical Record Review (the "Review Program"). Benefits for Claims will be reduced for any charges that are determined under this Review Program to be in excess of "Permitted Payment Levels" (as defined below). The determination of Permitted Payment Levels under this Review Program will supersede any other Plan provisions related to application of a Reasonableness and/or Usual and Customary fee determination.

Medical care Providers will be given a fully detailed explanation of any charges that are found to be in excess of Permitted Payment Levels. Assignment of Benefits will remain in force, will constitute consideration in full for services rendered, and in exchange for the Provider's agreement not to bill the Participant for charges which were not covered as a result of the Review Program, will be allowed the rights and privileges to file an appeal of the determination in accordance with the same rights and privileges accorded to Participants.

**Any Participant who continues to receive billings from the medical care provider for charges which were not covered as a result of the Review Program should contact the Claims Delegate right away for assistance. The Claims Delegate may be contacted at:**

Claims Delegate Services, LLC
5300 Broken Sound Blvd., NW
Suite 200
Boca Raton, FL 33487
Phone:855-202-6484
Fax: 561-491-6564

A Participant who is unable to contact the Claims Delegate after making reasonable attempts to do so should contact the Plan Administrator. The Plan Administrator is identified in the General Information section of this Summary Plan Description.

The Participant must pay for any normal cost-sharing features of the Plan, such as Deductibles, Coinsurance and Copayments, and any amounts otherwise excluded or limited according to the terms of the Plan, except for Invalid Charges.

The Review Program's effectiveness will require comprehensive review of detailed records including, for example, itemized statements of charges and descriptions of the Services and Supplies provided. Without this detailed information, the Plan will be unable to determine the amount of Covered Expenses eligible for reimbursement. Any additional information required for Billing Review or Medical Record Review will be requested directly from the Provider of the Services and Supplies and/or the Claimant. In the event that the Claims Delegate does not receive information adequate for purposes of the Review Program within the time limits required, it will be necessary to deny the Claim. Should such a denial be necessary, the Claimant and/or the Provider of the Services and Supplies may appeal the denial in accordance with the provisions found in the "Procedures for Claims and Appeals" section of this Summary Plan Description.

"Permitted Payment Level(s)" means the charges for Services and Supplies listed and included as Covered Expenses under the Plan, which are Medically Necessary for the care and treatment of Illness or Injury, but only to the extent that the fees charged therefore are within all applicable limitations and restrictions established in this Plan including, but are not limited to, the following:

## GOLD PLAN PERMITTED PAYMENT LEVELS

•Hospitals & Affiliated Facilities. The Permitted Payment Level for charges by Hospitals and Affiliated Facilities (collectively, "Hospital Facilities") shall be based upon the greater of 150% of the Medicare allowable reimbursement amount for the Services or 150% of the Hospital's costs for the Services as reflected in the Hospital's most recent departmental cost ratio report to the Centers for Medicare and Medicaid Services ("CMS") and published as the "Medicare Cost Report" in the American Hospital Directory (the "CMS Cost Ratio").

•Ambulatory Surgery Centers & Other Independent Facilities. The Permitted Payment Level for Services and Supplies provided by ambulatory health care centers and other Independent Facilities, including those Ambulatory Surgery Centers that are Independent Facilities (and/or for which no Medicare based reimbursement is available), may be based upon the Medicare allowable reimbursement amount for comparable services and supplies in other facilities in the same geographic region, plus an additional 50%, and/or the Medicare Outpatient Prospective Payment System (OPPS) reimbursement amount for the Services and Supplies, plus an additional 50%.

•Other Medical & Surgical Services. The Permitted Payment Level for any general medical and/or surgical Covered Services not addressed under the two immediately preceding subsections may be established or calculated taking into consideration or based on: (i) allowable reimbursement amounts for such Services according to the OPPS or other Medicare fee payment methodology (by geographic region) plus an additional 50%; (ii) the costs for such Services, as reflected in relevant CMS Cost Ratios, plus an additional 50%; or (ii) the Usual and Customary rates as reflected in, or determined by reference to or through the use of any other industry-standard resources or widely

recognized data sources, including any resources listed above or any other fee and/or cost information, sources, lists or comparative data published or publicly available (free, for purchase or by subscription), or any combination of such resources that are sufficient, in the opinion of the Claims Delegate, to determine a Reasonable amount of Covered Medical Expense under the Plan for such Covered Services.

•Facilities Lacking Requisite Benchmarks & Specified Services. In the event that for technical reasons Permitted Payment Levels for Covered Services cannot be determined in accordance with the guidelines set forth above in the three immediately preceding subsections, and for other Services or Supplies specified below, the Permitted Payment Levels may be determined as follows:

•Pharmaceuticals. The Permitted Payment Level for pharmacy charges may be calculated at 150% of the Average Acquisition Cost ("AAC") as defined by the National Average Drug Acquisition Cost (NADAC) (as determined by CMS), the Predictive Acquisition Cost (PAC) (Glass Box Analytics), or other comparable and recognized data source.

•Supplies, Implants & Devices. The Permitted Payment Level for charges for medical and surgical supplies, implants and devices may be based upon the cost to the provider of such items, plus an additional 20%, which cost may be established by a provider supplied invoice or, in the absence of a provider supplied invoice, through other documentation or sources of cost data such as, but not limited to, comparable invoices, receipts, cost lists or other documentation or sources of cost information deemed appropriate by the Claims Delegate.

•Clinical Care. The Permitted Payment Level for charges for clinical care and Services may be based upon Resource-based relative value scale (RBRVS) rates for the same geographic area, plus an additional 100%.

•Physician Medical and Surgical Care, Laboratory, X-ray and Therapy. The Permitted Payment Level for physician medical and surgical care, freestanding laboratory, x-ray and other diagnostic or therapeutic radiology services may be determined based upon fees for comparable Services and Supplies in the same geographic region that are paid either at the ninetieth (90th) percentile of the Physician Fee Reference ("PFR") or at 150% of the Medicare allowed reimbursement amount.

•Outpatient Renal Dialysis. The Permitted Payment Level for outpatient renal dialysis and infusion therapy shall be determined based on 150% of the Medicare allowable reimbursement amount for similarly situated Providers in the same geographic area.

•Unbundling. The Permitted Payment Level for Services and Supplies will not include charges for any items billed separately that are customarily included in a global billing procedure code in accordance with the American Medical Association's CPT® (Current Procedural Terminology) and/or the Healthcare Common Procedure Coding System (HCPCS) codes used by CMS ("Unbundling").

•Errors. The Permitted Payment Levels will not include charges for any billing mistakes or improprieties including, but not limited to, up-coding, duplicate charges, charges for care, supplies, treatment, and/or services not actually rendered or performed, or charges otherwise determined to be invalid, impermissible or improper based on any applicable law, regulation, rule or professional standard ("Errors"); provided, however, that in the Claims Delegate's and/or the Plan Administrator's discretion, industry accepted foreseeable risks of Covered Services may not be deemed to be Errors, and the Plan Administrator retains the discretionary authority to determine what constitutes an industry accepted foreseeable risk for any particular Covered Service.

•Unclear Description & Misidentification. The Permitted Payment Levels will not include any charges for which the Claims Delegate cannot clearly identify or understand the Service or Supply being billed ("Unclear Description"), and in the event that it is determined under the Plan based upon a Claim Review that any Service or type or quantity of a drug or other Supply shown on a bill is not supported in the billing and medical records, and that some different Service or type or quantity of a drug or other Supply was actually provided ("Misidentification"), then the Claims Delegate may establish the Permitted Payment Level for the Services and Supplies actually provided according to the Claim Review findings, subject to the terms of the Plan Document.

•Services Provided Under Direct Contract. The Permitted Payment Levels for Contracted Services provided by Directly Contracted Providers and Physicians will be the rates or fees established under the applicable contract for

Directly Contracted Health Care Services or the applicable Physician Network Contract; provided, however, that the amounts of such rates and fees shall be presumed to be Reasonable only to the extent that they do not include otherwise Invalid Charges, which shall be outside of the Permitted Payment Levels.

If the Claims Delegate reasonably concludes that the particular facts and circumstances related to a Hospital or Facility Claim under the Gold Plan justify reimbursement greater than that which would result from the strict application of the payment formulas set forth above, and that the payment of such increased reimbursement would serve the best interests of the Plan and its Participants (including interests in avoiding costs and expenses of disputes over the amount of the reimbursement paid on a Hospital or Facility Claim), the Claims Delegate may, in its sole discretion, increase reimbursement for Allowable Expenses included in such Hospital or Facility Claim by up to 17% of the Permitted Payment Levels set forth above.

In addition, the Plan Administrator and Claims Delegate shall jointly have the discretion to make a Benefit Determination to pay charges in excess of Permitted Payment Level limits on a Hospital and Facility Claim under the Gold Plan, but only in the rare instance when, in light of the facts and circumstances relating to the incident of care in question, such payment is Reasonable and it has been clearly and definitively established that the payment of a lesser amount could not in good faith be considered to represent fair and equitable consideration for the Services and Supplies included in the Claim.

### SILVER PLAN PERMITTED PAYMENT LEVELS

•Hospitals & Affiliated Facilities. The Permitted Payment Level for charges by Hospitals and Affiliated Facilities (collectively, "Hospital Facilities") shall be based upon the greater of 140% of the Medicare allowable reimbursement amount for the Services or 140% of the Hospital's costs for the Services as reflected in the Hospital's most recent departmental cost ratio report to the Centers for Medicare and Medicaid Services ("CMS") and published as the "Medicare Cost Report" in the American Hospital Directory (the "CMS Cost Ratio").

•Ambulatory Surgery Centers & Other Independent Facilities. The Permitted Payment Level for Services and Supplies provided by ambulatory health care centers and other Independent Facilities, including those Ambulatory Surgery Centers that are Independent Facilities (and/or for which no Medicare based reimbursement is available), may be based upon the Medicare allowable reimbursement amount for comparable services and supplies in other facilities in the same geographic region, plus an additional 40%, and/or the Medicare Outpatient Prospective Payment System (OPPS) reimbursement amount for the Services and Supplies, plus an additional 40%.

•Other Medical & Surgical Services. The Permitted Payment Level for any general medical and/or surgical Covered Services not addressed under the two immediately preceding subsections may be established or calculated taking into consideration or based on: (i) allowable reimbursement amounts for such Services according to the OPPS or other Medicare fee payment methodology (by geographic region) plus an additional 40%; (ii) the costs for such Services, as reflected in relevant CMS Cost Ratios, plus an additional 40%; or (ii) the Usual and Customary rates as reflected in, or determined by reference to or through the use of any other industry-standard resources or widely recognized data sources, including any resources listed above or any other fee and/or cost information, sources, lists or comparative data published or publicly available (free, for purchase or by subscription), or any combination of such resources that are sufficient, in the opinion of the Claims Delegate, to determine a Reasonable amount of Covered Medical Expense under the Plan for such Covered Services.

•Facilities Lacking Requisite Benchmarks & Specified Services. In the event that for technical reasons Permitted Payment Levels for Covered Services cannot be determined in accordance with the guidelines set forth above in the three immediately preceding subsections, and for other Services or Supplies specified below, the Permitted Payment Levels may be determined as follows:

•Pharmaceuticals. The Permitted Payment Level for pharmacy charges may be calculated at 140% of the Average Acquisition Cost ("AAC") as defined by the National Average Drug Acquisition Cost (NADAC) (as determined by CMS), the Predictive Acquisition Cost (PAC) (Glass Box Analytics), or other comparable and recognized data source.

•Supplies, Implants & Devices. The Permitted Payment Level for charges for medical and surgical supplies, implants and devices may be based upon the cost to the provider of such items, plus an additional 20%, which cost may be established by a provider supplied invoice or, in the absence of a provider supplied invoice, through other documentation or sources of cost data such as, but not be limited to, comparable invoices, receipts, cost lists or other documentation or sources of cost information deemed appropriate by the Claims Delegate.

•Clinical Care. The Permitted Payment Level for charges for clinical care and Services may be based upon Resource-based relative value scale (RBRVS) rates for the same geographic area, plus an additional 80%.

•Physician Medical and Surgical Care, Laboratory, X-ray and Therapy. The Permitted Payment Level for physician medical and surgical care, freestanding laboratory, x-ray and other diagnostic or therapeutic radiology services may be determined based upon fees for comparable Services and Supplies in the same geographic region that are paid either at the ninetieth (90th) percentile of the Physician Fee Reference ("PFR") or at 140% of the Medicare allowed reimbursement amount.

•Outpatient Renal Dialysis. The Permitted Payment Level for outpatient renal dialysis and infusion therapy shall be determined based on 140% of the Medicare allowable reimbursement amount for similarly situated Providers in the same geographic area.

•Unbundling. The Permitted Payment Level for Services and Supplies will not include charges for any items billed separately that are customarily included in a global billing procedure code in accordance with the American Medical Association's CPT® (Current Procedural Terminology) and/or the Healthcare Common Procedure Coding System (HCPCS) codes used by CMS ("Unbundling").

•Errors. The Permitted Payment Levels will not include charges for any billing mistakes or improprieties including, but not limited to, up-coding, duplicate charges, charges for care, supplies, treatment, and/or services not actually rendered or performed, or charges otherwise determined to be invalid, impermissible or improper based on any applicable law, regulation, rule or professional standard ("Errors"); provided, however, that in the Claims Delegate's and/or the Plan Administrator's discretion, industry accepted foreseeable risks of Covered Services may not be deemed to be Errors, and the Plan Administrator retains the discretionary authority to determine what constitutes an industry accepted foreseeable risk for any particular Covered Service.

•Unclear Description & Misidentification. The Permitted Payment Levels will not include any charges for which the Claims Delegate cannot clearly identify or understand the Service or Supply being billed ("Unclear Description"), and in the event that it is determined under the Plan based upon a Claim Review that any Service or type or quantity of a drug or other Supply shown on a bill is not supported in the billing and medical records, and that some different Service or type or quantity of a drug or other Supply was actually provided ("Misidentification"), then the Claims Delegate may establish the Permitted Payment Level for the Services and Supplies actually provided according to the Claim Review findings, subject to the terms of the Plan Document.

•Services Provided Under Direct Contract. The Permitted Payment Levels for Contracted Services provided by Directly Contracted Providers and Physicians will be the rates or fees established under the applicable contract for Directly Contracted Health Care Services or the applicable Physician Network Contract; provided, however, that the amounts of such rates and fees shall be presumed to be Reasonable only to the extent that they do not include otherwise Invalid Charges, which shall be outside of the Permitted Payment Levels.

In the event that the Permitted Payment Level exceeds the actual charge billed for the treatment, service or supply in question, the Plan will not be required to cover more than the actual billed charge.

If, in the opinion of the Claims Delegate, insufficient information is available to determine the Permitted Payment Level for a specific treatment, service or supply using only the above-listed guidelines, then in establishing the Permitted Payment Level, consideration will be given to typical pricing for the most comparable treatment, service or supply, as well as to comparative severity and/or geographic location. Furthermore, notwithstanding anything herein to the contrary, the Claims Delegate has the right, in its sole discretion, to establish Permitted Payment Levels for any particular conditions, treatments, Services and

Supplies using accepted industry-standard documentation, based on payment amounts commonly received and accepted from other payor(s) for such conditions, treatments, services and supplies, or other credible data or metrics relevant to determining reasonable fees for the same, applied without discrimination to any Participant.

•**Notification of an Adverse Benefit Determination.** The Plan Administrator and/or the Claims Delegate shall provide or cause to be provided adequate notice in writing to any covered Participant whose Claim for benefits under this Plan has been denied, setting forth the specific reasons for such denial and written in a manner calculated to be understood by the Participant. Further, the Plan Administrator and/or the Claims Delegate shall afford a reasonable opportunity to any Participant, whose Claim for benefits has been denied, for a fair review of the decision denying the Claim by the person designated by the Plan Administrator and/or the Claims Delegate for that purpose.

•APPEAL PROCESS.

•**Full and Fair Review of All Claims.** In cases where a claim for benefits is denied, in whole or in part, and the Participant believes the claim has been denied wrongly, the Participant may appeal the denial and review pertinent documents. The Plan provides for two (2) levels of appeal following an Adverse Benefit Determination. The Claimant has one hundred eighty (180) days following an initial Adverse Benefit Determination to file an appeal of that determination, and sixty (60) days following a second Adverse Benefit Determination to file an appeal of that determination. The appeal process will provide the Claimant with a reasonable opportunity for a full and fair review of the Claim and Adverse Benefit Determination and will include the following:

•Receipt of written request by the Third Party Administrator from the Claimant, or an Authorized Representative of the Claimant, in the proper form for review of Adverse Benefit Determination, which initiates the appeal process.
•The Claimant will have the opportunity to submit written comments, documents, records, and other information relating to the Claim.
•The Claimant will have the opportunity to review the Claim file and to present evidence and testimony as part of the internal claims and appeals process.
•The Claimant will be provided, free of charge and sufficiently in advance of the date that the notice of final internal Adverse Benefit Determination is required, with new or additional evidence considered, relied upon, or generated by the Plan in connection with the Claim, as well as any new or additional rationale for a denial at the internal appeals stage, and a reasonable opportunity for the Claimant to respond to such new evidence or rationale.
•The Claimant will be provided, on request and free of charge: (i) reasonable access to, and copies of all documents, records, and other information relevant to the Claimant's Claim in possession of the Plan Administrator, the Claims Delegate or the Third Party Administrator; (ii) information regarding any rule, guideline, protocol, or other similar criterion relied upon in making the Adverse Benefit Determination; (iii) information regarding any voluntary appeals procedures offered by the Plan; (iv) information regarding the Claimant's right to an external review process; and (v) an explanation of the scientific or clinical judgment for the determination, applying the terms of the Plan to the Claimant's medical circumstances.
•The review of the Adverse Benefit Determination will take into account all comments, documents, records and other information submitted by the Claimant relating to the Claim, without regard to whether such information was submitted or considered in the initial Benefit Determination.
•No deference will be afforded to the previous Adverse Benefit Determination.
•The party reviewing the appeal may be neither the party who made the prior Adverse Benefit Determination, nor a subordinate of the party who made the prior Adverse Benefit Determination.
•In deciding an appeal on which the Adverse Benefit Determination was based in whole or in part on a medical judgment, including whether a particular treatment, drug, or other item is Experimental, Investigational, or not Medically Necessary or appropriate, the Third Party Administrator, the Claims Delegate or the Plan Administrator, as appropriate depending on the level of appeal, will consult with a health care professional who has appropriate training and experience in the field of medicine involving the medical judgment. The health care professional consulted for the appeal will not be the health care professional or a subordinate of the health care professional consulted in connection with the Adverse Benefit Determination that is the subject of the appeal.

•Medical or vocational experts whose advice was obtained on behalf of the Plan in connection with the Adverse Benefit Determination will be identified, even if the Plan did not rely upon their advice.

> The first level of appeal for all Post-service Claims, and the second level of appeal for Post-service Claims other than Hospital and Facility Claims will be the responsibility of the Plan Administrator. The Plan Sponsor has allocated, delegated and granted to the Claims Delegate primary responsibility and authority for all second level appeals of Adverse Benefit Determinations for Hospital and Facility Claims.

> For questions about appeal rights or for assistance, claimants can contact the Employee Benefits Security Administration at 1-866-444-EBSA (3272). Consumer assistance may be available in your State. Contact your State Department of Insurance to find out if consumer assistance for claim appeals is available. The California Dept of Insurance can be contacted at 800-927-4357. See Appendix I for additional information.

•**Requirements for Appeal.** The Claimant must file an appeal of a Claim in writing. The Claimant has one hundred eighty (180) days following an initial Adverse Benefit Determination to file an appeal of that determination, and sixty (60) days following a second Adverse Benefit Determination to file an appeal of that determination.

> All Appeals of Adverse Benefit Determinations on Preservice Claims must be sent to the utilization review administrator. Claimants should refer to their identification card for the name and address of the utilization review administrator.

> All first level Appeals of Adverse Benefit Determinations on any Postservice Claims and second level Appeals of Adverse Benefit Determinations on any Post-service Claims other than Hospital and Facility Claims must be sent to the Plan Administrator, care of the Third Party Administrator, and must be addressed as follows:

> Employee Benefits Services Management Inc
> Attention: Claims Appeals
> 2075 Overland Ave
> Billings  MT 59104

> All second level Appeals of Adverse Benefit Determinations on Hospital and Facility Claims must be sent to the Claims Delegate, and must be addressed as follows:

> Claims Delegate Services, LLC
> Attention: Appeals Department
> 5300 Broken Sound Blvd., NW
> Suite 200
> Boca Raton, FL 33487

> It shall be the responsibility of the Claimant to submit proof that the claim for benefits is covered and payable under the provisions of the Plan. Any appeal must include:

•The name of the Employee/Participant;
•The Employee/Participant's unique identifier;
•The group name or identification number;
•All facts and theories supporting the claim for benefits. **Failure to include any theories or facts in the appeal will result in their being deemed waived. In other words, the Claimant will lose the right to raise factual arguments and theories which support this claim if the Claimant fails to include them in the appeal;**
•A statement in clear and concise terms of the reason or reasons for disagreement with the handling of the claim; and
•Any material or information that the Claimant has which indicates that the Claimant is entitled to benefits under the Plan.

> If the Claimant provides all of the required information, it may be that the expenses will be eligible for payment under the Plan.

•**Second Appeal Process**. Upon receipt of notice of the Plan's Adverse Benefit Determination regarding the first appeal, the Claimant has sixty (60) days to file a second appeal of the denial of benefits. The Claimant again is entitled to a "full and fair review" of any denial made at the first appeal, which means the Claimant has the same rights during the second appeal as he or she had during the first appeal.

•<u>Requirements for Second Appeal</u>. As with the first appeal, the Claimant's second appeal must be in writing and must include all of the items set forth in the section above entitled "Requirements for Appeal."

•<u>Timing of Notification of Benefit Determination on Second Appeal</u>. The Plan shall notify the Claimant of the Claims Delegate's Benefit Determination on review within a reasonable period of time, but not later than thirty (30) days after receipt of the second appeal. The period of time within which the Plan's determination is required to be made shall begin at the time the second appeal is filed in accordance with the procedures of this Plan, without regard to whether all information necessary to make the determination accompanies the filing.

•<u>Manner and Content of Notification of Adverse Benefit Determination on Second Appeal</u>. The same information must be included in the Plan's response to a second appeal as a first appeal, except for: (a) a description of any additional information necessary for the Claimant to perfect the Claim and an explanation of why such information is needed; and (b) a description of the Plan's review procedures and the time limits applicable to the procedures. See the section entitled " Manner and Content of Notification of Adverse Benefit Determination on First Appeal."

•<u>Furnishing Documents in the Event of an Adverse Determination on Second Appeal</u>. In the case of an Adverse Benefit Determination on the second appeal, the Claims Delegate and/or the Plan Administrator shall provide such access to, and copies of, documents, records, and other information described in the section relating to the Notice of Benefit Determination on First Appeal, as appropriate.

•**Decision on Second Appeal to be Final**. If, for any reason, the Claimant does not receive a written response to the second appeal within the appropriate time period set forth above, the Claimant may assume that the appeal has been denied. The decision by the Claims Delegate or Plan Administrator or other appropriate named fiduciary of the Plan on second level appeal review will be final, binding and conclusive and will be afforded the maximum deference permitted by law. **All claim review procedures provided for in the Plan must be exhausted before any legal action is brought. Any legal action for the recovery of any benefits must be commenced within one hundred and eighty (180) days after the Plan's claim review procedures have been exhausted.** Any action with respect to a fiduciary's breach of any responsibility, duty or obligation hereunder must be brought within three (3) years after the date of service.

•**Appointment of Authorized Representative**. A Claimant is permitted to appoint an authorized representative to act on his or her behalf with respect to a benefit Claim or appeal of an Adverse Benefit Determination; provided, however, that an Assignment of Benefits by a Claimant to a provider will not constitute appointment of that provider as an authorized representative. To appoint such a representative, the Claimant must complete a form which can be obtained from the Claims Delegate or the Plan Administrator or the Third Party Administrator. However, in connection with a claim involving Urgent Care, the Plan will permit a health care professional with knowledge of the Participant's medical condition to act as the Participant's authorized representative without completion of this form. In the event a Claimant designates an authorized representative, all future communications from the Plan concerning that Claim will be with the representative, rather than the Claimant, unless the Claimant directs the Claims Delegate or the Plan Administrator, in writing, to the contrary.

•**Provider of Service Appeal Rights**. As noted above, while a Claimant may appoint the provider of service as the Authorized Representative with full authority to act on his or her behalf in the appeal of a denied Claim, an Assignment of Benefits by a Claimant to a provider of service will not constitute appointment of that provider as an Authorized Representative. However, in an effort to facilitate a full and fair review of the denied Claim, the Plan will consider an appeal received from the provider as a Claimant's appeal, and will respond to the provider (and the Claimant) with the results of the review accordingly. Any such appeal must be made within the time limits and under the conditions for filing an appeal specified under the section, "Appeal Process," above. Any Provider that accepts Assignment of Benefits, in accordance with this Plan, has agreed to accept and is deemed for all purposes to have accepted such Assignment of Benefits as consideration in full for services rendered, and has agreed to and shall be bound by the rules and provisions set forth within the terms of this document. Similarly, <u>**Providers filing an appeal of an Adverse Benefit Determination under the Plan, other than as a formally appointed Authorized Representative, must agree, and by filing an appeal shall be deemed to agree: (i) to pursue reimbursement**</u>

for Covered Expenses directly from the Plan, further waiving any right to recover such expenses from the Claimant, and (ii) to comply with the conditions of the section "Requirements for First Appeal" above. The Claimant is specifically intended to be and shall be a third party beneficiary of the agreements referenced in (i) and (ii) above. Any Provider filing an appeal of an Adverse Benefit Determination under the Plan that then pursues recovery from the Claimant, on any legal or equitable theory, shall be acting in violation of this Plan and shall be required to immediately refund in full any and all amounts paid to or for the benefit of such Provider by or on behalf of the Plan in connection with the Claim in question.

For purposes of this section, the Provider's waiver to pursue Covered Expenses does not include the following amounts, which will remain the responsibility of the Claimant:

•Deductibles;

•Copayments;

•Coinsurance;

•Penalties for failure to comply with the terms of the Plan; and

•Charges for Services and Supplies which are not included for coverage under the Plan. **Note: This does not apply to amounts found to be in excess of Permitted Payment Levels, as defined in the section, "Claim Review and Validation Program."** The Claimant will not be held responsible for any amounts found to be in excess of Permitted Payment Levels.

Contact the Third Party Administrator, the Claims Delegate or the Plan Administrator for additional information regarding provider of service appeals.

•**Physical Examinations; Autopsy.** The Plan reserves the right, exercisable at the discretion of the Plan Administrator or the Claims Delegate or other designated Plan fiduciary, to have a Physician of its own choosing examine any Participant whose condition, Sickness or Injury is the basis of a Claim. All such examinations shall be at the expense of the Plan. This right may be exercised when and as often as the Plan may reasonably require during the pendency of a claim. The Participant must comply with this requirement as a necessary condition to coverage. The Plan also reserves the right to have an autopsy performed upon any deceased Participant whose condition, Sickness, or Injury is the basis of a claim. This right may be exercised only where not prohibited by law.

•**Payment of Benefits.** All benefits under this Plan are payable, in U.S. Dollars, to the Covered Employee whose Sickness or Injury, or whose covered Dependent's Sickness or Injury, is the basis of a claim, unless the Claimant gives written direction, at the time of filing proof of a Claim, to pay directly the health care provider rendering such services. The Claimant, in accordance with the terms of this Plan, compensates Providers of healthcare services with such an Assignment of Benefits. Payment of benefits from the Plan to a health care provider pursuant to written direction of the Claimant is subject to the approval of the Claims Delegate and/or the Plan Administrator, and shall be made as consideration in full for services rendered. In the event of the death or incapacity of a Covered Employee and in the absence of written evidence to this Plan of the qualification of a guardian for his or her estate, this Plan may, in its sole discretion, make any and all such payments to the individual or institution which, in the opinion of this Plan, is or was providing the care and support of such Employee.

•**Assignments.** Benefits for medical expenses covered under this Plan may be assigned by a Participant to the Provider; however, if those benefits are paid directly to the Employee, the Plan shall be deemed to have fulfilled its obligations with respect to such benefits. The Plan will not be responsible for determining whether any such assignment is valid. Payment of benefits which have been assigned will be made directly to the assignee unless a written request not to honor the assignment, signed by the covered Employee and the assignee, has been received before the proof of loss is submitted.

No Participant shall at any time, either during the time in which he or she is a Participant in the Plan, or following his or her termination as a Participant, in any manner, have any right to assign his or her right to sue to recover benefits under the Plan, to enforce rights due under the Plan or to any other causes of action which he or she may have against the Plan or its fiduciaries.

The Claimant, in accordance with the terms of this Plan, compensates Providers of healthcare services with an Assignment of Benefits. By accepting an Assignment of Benefits in lieu of billing the Claimant directly, the Provider waives its right to balance-bill and acknowledges that the Assignment of Benefits is adequate consideration to compensate for the services rendered. Any Provider who has accepted Assignment of Benefits and/or payment of benefits from the Plan and then pursues recovery from the Claimant, on any legal or equitable theory, shall be acting in violation of this Plan and shall be required to immediately refund in full any and all amounts paid to such Provider by or on behalf of the Plan in connection with the Claim in question.

Providers should accept an Assignment of Benefits as consideration in full for services rendered, and submit claims directly to the Plan. The Plan will pay the scheduled benefit amount, less any required deductibles and copayments, and subject to any limits or exclusions, directly to the Provider. When available, benefits will be limited by the terms of the Plan, including provisions which limit benefits to Reasonable claims for the Usual and Customary amount, and if applicable may not exceed the Maximum Allowable Charge and Permitted Payment Level.

If any such benefit remains unpaid at the death of the Covered Employee, if the Claimant is a minor, or if the Claimant is (in the opinion of the Plan Administrator) legally incapable of giving a valid receipt and discharge for any payment, the Plan Administrator may, at its option, pay such benefits to any one or more of the following relatives of the Claimant: wife, husband, mother, father, Child or children, brother or brothers, sister or sisters. Such payment will constitute a complete discharge of the Plan's obligation to the extent of such payment, and the Plan Administrator will not be required to follow-up and determine how such paid money was used.\

•**Copayment Advances.** The Claims Delegate and Plan Administrator shall together have the discretionary authority, but never the obligation, to cause the Plan or Plan Sponsor to pay on behalf of a covered Employee all or part of any Deductible, Copayment or Out-of-Pocket Amount owed on Hospital and Facility Claims for medical Services and Supplies provided to the Employee or a Dependent of the Employee (a "Copayment Advance"); provided, however, that such authority is specifically intended to be exercised in situations where (i) it can be reasonably expected that making the Copayment Advance may help reduce the aggregate amount of benefits paid by the Plan, as opposed to merely helping the Employee and/or Dependent, and (ii) the Employee does not object to the Copayment Advance. Each Employee's enrollment application for coverage under this Plan will include a payroll deduction authorization granting Employer the right to deduct from the Employee's payroll to recover any outstanding Copayment Advance. This authorization must be filled out, signed and returned with the enrollment application.

#### •MEDICAL BENEFITS.

•Covered Medical Expenses mean Reasonable Claims for charges, within Permitted Payment Levels and not in excess of Usual and Customary fee amounts, incurred by or on behalf of a Participant for the Hospital or other medical services listed below which are: (a) ordered by a Physician or licensed Practitioner; (b) Medically Necessary for the treatment of an Illness or Injury; (c) not of a luxury or personal nature; and (d) not excluded under the exclusions and limitations provisions of this Plan. Certain charges including, without limitation, Hospital and Facility charges will be evaluated under the Claim Review program, and Covered Charges will be determined based upon the Permitted Payment Levels. Please refer to the Claim Review and Validation Program section of the Plan for additional information about Claim Review and Permitted Payment Levels.

**EXHIBIT B**
NEW PLAN DOCUMENT

The undersigned hereby acknowledge that the attached New Plan Document, consisting of ___ pages, has been accepted as of _____ __, 2014:

*PLAN ADMINISTRATOR*

Company Name: _____

By: _____   Date Signed: _____

Name: _____   Title: _____

*PLAN SPONSOR*

Company Name: Monterey Pen. Horticulture

By: _____   Date Signed: 7-1-14

Name: DONALD BARNETT   Title: CFO

*DELEGATE*

Company Name: _____

By: _____   Date Signed: _____

Name: _____   Title: _____

*CLAIMS ADMINISTRATOR*

Company Name: Employee Benefit Management Services, Inc.

By: _____   Date Signed: 12/17/14

Name: Kevin J. Larson   Title: President

CDS agreement with Rocket Farms and EBMS 7-1-2014

# PROOF OF SERVICE

I, Patsy Taylor, the undersigned, declare that:

I am employed in the County of Los Angeles, State of California, over the age of 18, and not a party to this cause. My business address is 10100 Santa Monica Blvd., Suite 2200, Los Angeles, CA 90067.

On June 29, 2020, I caused to be served a true copy of the **Defendant EBMS's Answer To Complaint, Counterclaims And Third Party Complaint, Demand For Jury Trial,** on the parties in this cause as follows:

☑ **(VIA EMAIL)** I caused the transmission of the above-named documents to the email address set forth below.

Kennady Leavitt Owensby PC
Curtis S. Leavit
Lance M. Martin
621 Capitol Mall, Suite 2500
Sacramento, CA 95814
Telephone: 916-732-3060
Email:  cleavitt@kennadayleavitt.com
        lmartin@kennadayleavitt.com

I am readily familiar with Loeb & Loeb LLP's practice for collecting and processing correspondence for mailing with the United States Postal Service and Overnight Delivery Service. That practice includes the deposit of all correspondence with the United States Postal Service and/or Overnight Delivery Service the same day it is collected and processed.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on June 29, 2020, at Los Angeles, California.

/s/ Patsy Taylor
Patsy Taylor

17937350.1
231426-10003                          PROOF OF SERVICE

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations